**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| DERRICK JONES, JEROME JONES, and DARNELL RUSAN | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Cause No. 4:21-cv-600 ) ) JURY TRIAL DEMANDED |
| CITY OF ST. LOUIS, MISSOURI; SUPERINTENDENT ADRIAN BARNES, in his official capacity; COMMISSIONER JEFFREY CARSON, in his official capacity; LIEUTENANT JAVAN FOWLKES, in his individual capacity; CORRECTIONAL OFFICER AISHA TURNER, in her individual capacity; CORRECTIONAL OFFICER DIRELL ALEXANDER, in his individual capacity; CORRECTIONAL OFFICER MICHELLE LEWIS, in her individual capacity; CORRECTIONAL OFFICER JANE DOE, in her individual capacity; and CORRECTIONAL OFFICERS JOHN DOES 1-2, in their individual capacities, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

## FIRST AMENDED COMPLAINT

Plaintiffs Derrick Jones, Jerome Jones, and Darnell Rusan, for their First Amended Complaint against the City of St. Louis, Superintendent Adrian Barnes, Acting Commissioner Jeffrey Carson, Lieutenant Javan Fowlkes, Correctional Officer Aisha Turner, Correctional Officer Direll Alexander, Correctional Officer Michelle Lewis, Correctional Officer Jane Doe, and Correctional Officers John Does 1-2 ("Defendants") allege as follows:

### Introduction

1.     On December 14, 2020 Derrick Jones was maced in the face without provocation. He was then beaten and left in a cell to "marinate" according to correctional officers. In February 2021, Jerome Jones was placed in a small, secure visiting room. Without warning, jail staff sprayed

1

the room with excessive amounts of mace, leaving Jerome in the mace-filled room, asking for help and shouting that he could not breathe, for nearly half an hour. That same month Darnell Rusan received the same type of treatment, when he was locked for hours, fully nude, in a room filled with mace. He, too, was given no warning before the mace was deployed, and was not actively resisting or threatening staff. What happened to Derrick, Jerome, and Darnell is indicative of a widespread pattern inside CJC of using mace to inflict pain and suffering on detainees in the City's care, without cause or warning, and often on detainees who are passive, restrained, or confined.

2.      But CJC staff do not use only chemical agents to punish and harm detainees in their custody and care. They also have a practice of depriving detainees of water to their cells—sometimes for hours, sometimes for days—simply because detainees talk back, bang on their cell doors, or "get an attitude."

3.      In the face of these persistent and widespread torture practices by CJC staff, Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 to redress the violation of their constitutional rights as secured by the Fourteenth Amendment to the United States Constitution. More specifically, the claims in this lawsuit stem from the conditions of Plaintiffs' confinement at the St. Louis City Justice Center ("CJC").

4.      During Plaintiffs' confinement at the CJC, they were subjected to the infliction of pain and suffering by Defendants, who used chemical agents (mace) on the detainees without prior warning, and for the purpose of inflicting punishment and/or pain and suffering, not for security or safety reasons.

5.      The incidents described below reflect a larger, widespread custom of CJC staff using mace for the purpose of the infliction of pain and suffering of detainees, including macing detainees who are restrained, confined inside a secure cell, or only passively resistant (and not

aggressive or threatening safety or security). CJC staff mace detainees for talking on the phone. They mace detainees who are handcuffed. They mace detainees who are sitting, passively, in visiting booths. They use excessive amounts of mace, and leave detainees to "marinate" in the burning air without access to the medical unit immediately to properly wash the mace from their eyes. These customs and practices are unconstitutional and have resulted directly in the pain and suffering not just of the named plaintiffs, but every mace survivor who was or remains detained at the CJC.

6.      During Plaintiffs' confinement at the CJC, they were (and continue to be) subjected to regular deprivations of drinking water and water for toilets by Defendants, who regularly shut off the water solely for the purpose of punishment and seeking to control behavior. Defendants also have a widespread custom or practice of turning off otherwise functioning water systems that provide potable drinking water and water to flush toilets to entire pods of detainees' cells, for the purpose of inflicting punishment and seeking to control detainees' behavior when there is no valid security justification for doing so.

**<u>Parties</u>**

7.      Plaintiff Derrick Jones is a resident of the City of St. Louis. As of the filing of this Complaint, Derrick is detained at the CJC.

8.      Plaintiff Jerome Jones was a resident of the City of St. Louis until mid-April 2021. Jerome was incarcerated for two and a half years awaiting trial, and was released after he was acquitted of all charges. At all times relevant to his claims in this case, Jerome was detained at the CJC.

9.      Plaintiff Darnell Rusan is a resident of the City of St. Louis. As of the filing of this Complaint, Darnell is detained at the CJC.

3

10.     Defendant City of St. Louis, Missouri, is a political and geographic subdivision of the State of Missouri and is organized as a constitutional charter city under Article VI, section 19 of the Missouri Constitution. The City is the public entity responsible for oversight of the City Justice Center through the Division of Corrections within the Department of Public Safety.

11.     Defendant Adrian Barnes is the Superintendent of the City Justice Center and is being sued in his official capacity. Defendant Barnes enforces the detention of individuals housed at the City Justice Center. At all times relevant to the subject matter of this litigation, Defendant Barnes was responsible for training and supervising all Correctional Officers at the City Justice Center, for setting jail policy, and for ensuring the health and welfare of all persons detained at the City Justice Center. At all times relevant to the facts and claims herein, Defendant Barnes was operating under color of law and within the scope of his employment with the City.

12.     Defendant Jeffrey Carson is the Acting Commissioner of the St. Louis Division of Corrections and is being sued in his official capacity. Defendant Carons directs the Division of Corrections and enforces the detention of individuals housed at City Justice Center. At all times relevant to the subject matter of this litigation, Defendant Carson was responsible for training and supervising all other Defendants and other employees of the City of St. Louis staffing the City Justice Center, for setting jail policy, and for ensuring the health and welfare of all persons detained at City Justice Center.[1] At all times relevant to the facts and claims herein, Defendant Carson was operating under color of law and within the scope of his employment with the City.

13.     Defendants Lt. Javan Fowlkes, CO Aisha Turner, CO Direll Alexander, CO Michelle Lewis, CO Jane Doe and COs John Does 1-2 (collectively, the "Individual Defendants")

---

[1] Dale Glass retired from the position of Commissioner effective June 1, 2021. Jeffrey Carson currently serves as Acting Commissioner and is automatically substituted in as a defendant pursuant to Fed. R. Civ. P. 25(d).

4

were employees of the CJC during the relevant time period. At all times relevant to the events in this case, the Individual Defendants were acting under color of law and within the scope of their employment with CJC. The Individual Defendants are sued here in their individual capacities.

## Jurisdiction and Venue

14.    Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of their rights as secured by the Fourteenth Amendment to the United States Constitution. This Court therefore has jurisdiction pursuant to 28 U.S.C. § 1331.

15.    Venue is appropriate in this district pursuant to 28 U.S.C. §1391(e) because a substantial part of the events giving rise to the claims asserted occurred in this judicial district. Divisional venue is proper in the Eastern Division because a substantial part of the events giving rise to Plaintiffs' claims arose in the City of St. Louis. E.D.Mo. L.R. 2.07(A)(1), (B)(1).

## Facts

***Defendants' excessive and malicious use of mace against Derrick Jones.***

16.    Derrick Jones has been in CJC custody since November 3, 2020. Much of that time he has spent in solitary confinement.

17.    Derrick was locked in solitary confinement on or about December 14, 2020, and has been there since, 161 days. At the time of the filing of this Complaint, Derrick remains in solitary confinement. Derrick has no natural light in his solitary cell, and his cell light has intermittently been broken during his time locked alone in his cell. He is allowed out of his cell only one hour each day, at a maximum. There are days where he is not allowed out of his cell at all.

18.    Prior to Defendants moving him to solitary, Derrick was housed in 4C, the epicenter of the COVID-19 outbreak at CJC. While there, he was allowed out of his cell twice each day for

5

45 minutes at a time. Around December 14, 2020, Derrick's cellmate was demonstrating signs of COVID-19, including a fever and lack of taste. Because being housed with his cellmate would expose him to likely infection from the novel coronavirus, Derrick asked a female guard, CO Jane Doe, if he could be moved to a different cell. She nodded her head and told him she would see what they could do about it.

19.     After some further discussion, CO Jane Doe told Derrick he would have to stay in his cell with the infected cellmate. She then told Derrick to hold on, and left him sitting while she momentarily left the wing.

20.     When CO Jane Doe came back into the wing, she had a can of mace in her hand, and she was accompanied by other corrections officers.

21.     CO Jane Doe sprayed Derrick Jones in the eyes and face. She did not give any warning prior to spraying him with mace.

22.     CO Jane Doe and other guards then took Derrick to the ground, kicked him about his head, and placed him in handcuffs behind his back.

23.     While Derrick was restrained on the floor in handcuffs, Lt. Fowlkes sprayed him with mace again. Lt. Fowlkes did not give any directions, commands, or warnings to Derrick prior to do doing so.

24.     At the time Derrick was maced, he was not acting aggressively and was not threatening staff safety.

25.     The mace stung Derrick's eyes badly, and made it difficult for him to breathe.

26.     After being sprayed with mace twice, and still in handcuffs, Derrick Jones was taken to the medical unit and placed in a holding cell with the door closed. His eyes and face were

still burning, and he was having a hard time breathing. Because of the pain he was in, Derrick pounded on the door, pleading for help.

27.     Lt. Fowlkes came to the room, opened the door, sprayed Derrick with mace for a third time, and closed the door, saying, **"Let him marinate."**

28.     Around twenty minutes later, Derrick saw medical staff who washed his eyes out with water. He was then taken to his solitary cell, where he was not allowed out for eight days. He was denied a shower this entire time, despite having been maced three times in a row and the burning mace clinging to his skin and clothes.

***Defendants' excessive and malicious use of mace against Jerome Jones.***

29.     Jerome Jones spent over two years in custody at CJC awaiting trial before he was ultimately acquitted.

30.     On or about February 9, 2021, CJC staff asked Jerome to move from a single-person cell to a double-person cell. He informed CJC staff that he did not want to move and there was no reason to move him.

31.     CO Robinson and CO Allen told Jerome that Lt. Fowlkes was going to mace Jerome if he did not comply. Jerome indicated again he would not move cells, but he was not physically resisting. Jerome was in handcuffs throughout the course of this entire conversation.

32.     CO Robinson, CO Allen, and Lt. Fowlkes then placed Jerome in a no-contact visiting room—a room approximately 3 feet by 5 feet in size that is fully enclosed and secure when the door is shut.

33.     Once Jerome was in the room, Lt. Fowlkes asked Jerome if he was going to move cells. Jerome responded, "No," and Lt. Fowlkes sprayed an excessive amount of mace into the visiting booth until it filled the room.

7

34.    Lt. Fowlkes then closed the door. Jerome was left in the mace-filled room for approximately 25 minutes.

35.    During that time, Jerome banged on the door asking for help, shouting that he could not breathe. He had so much difficulty getting air that he got down on the ground to try to get fresh air from the crack between the door and the ground.

36.    His calls for help went ignored until finally they removed him and brought him to a two-person cell.

37.    At the time Jerome was maced, he was not acting aggressively, was not threatening staff safety, and was confined inside a secured cell.

38.    Jerome's eyes, face, and entire body were burning from the mace.

39.    He did not have access to water to flush his eyes with because the water was shut off in his cell that day.

40.    Although he requested medical attention, he was not brought down to the medical unit to receive assistance for his injuries.

41.    Jerome was not allowed to shower until the next day. But even after that, it took about three days for the mace to stop burning. For weeks after the incident, Jerome would wake up in the middle of the night not able to fully breathe.

42.    To this day, Jerome still experiences respiratory issues which, upon information and belief, are caused by his exposure to excessive mace at the CJC.

***Defendants' excessive and malicious use of mace against Plaintiff Rusan.***

43.    Plaintiff Darnell Rusan has been in custody at CJC since around Thanksgiving of 2020. He has been personally maced at least three times, and has witnessed countless other instances of excessive and unwarranted macing by CJC staff.

44.    In December 2020, Darnell was out of his cell to make a phone call during rec time. CO Turner yelled at him not to use the phone near her and an officer. Confused, he pulled his mask down and asked CO Turner, "Don't you remember me?" CO Turner replied, "I remember who the fuck you are," and told him to walk away from them. At this point, Darnell immediately moved away from CO Turner and the other officer, and got on the phone with his sister.

45.    CO Turner called over and told him to, "Put that damn mask on." He put the mask on but complained on the phone to his sister about CO Turner, asking his sister to come down and "file a report" against CO Turner because he had a feeling CO Turner was going to escalate the situation.

46.    CO Lewis then told Darnell that he had a bad attitude, that he had to lock down for the rest of day, and ordered him to hang up the phone.

47.    Darnell told his sister, "I love you, I have to go." But before he could even hang up the phone, CO Turner was next to him and sprayed mace directly in his face.

48.    While being sprayed by CO Turner, Darnell lifted a chair to shield his face from the spray and started to walk away from CO Turner and CO Lewis. At that time, and without warning, CO Lewis also sprayed Darnell with mace.

49.    Neither CO Turner nor CO Lewis gave Darnell any warning before they deployed mace.

50.    Darnell went to the shower to try to wash the mace off his body, as it was burning his eyes and skin. CO Alexander and CO John Doe 2 removed Darnell from the shower, placed him in handcuffs, and put him on the elevator down to the medical unit.

51.    While on the elevator, CO Alexander slammed Darnell's head into the wall. Once he was in the medical unit, CO Alexander started hitting and choking him while Darnell was still

in handcuffs, and told him, "we'll kill your little ass in here." Darnell attempted to protest his treatment verbally. He never got to see a nurse and was only down in the medical unit for approximately 15-20 minutes.

52.     CO Alexander and CO John Doe 2 brought him back up and into one of the visiting booths in 5B. CO Alexander pressed him up against the wall and began choking him. As he was being choked, Darnell's eyes began to get blurry, he became dizzy, and he struggled to catch a breath. At this point, he yelled out, "I can't breathe" to which CO Alexander told him, "That's the whole point." This entire time, Darnell was still handcuffed and bleeding from the head.

53.     Eventually, CO Alexander let him go. After CO Alexander and CO Doe 2 stepped away from Darnell, they walked to the door. One of the two sprayed excessive mace into the room as they closed the door, completely filling the air with noxious chemicals.

54.     CJC staff left Darnell in that mace-filled visiting room for approximately nine hours. Darnell was bleeding from the head the entire time, and still covered in chemical agents from being maced multiple times within hours of each other.

55.     Darnell asked to go to medical after he was released from the cell, but the correctional staff would not take him down.

56.     In February 2021, Darnell was maced again by CJC staff.

57.     Immediately preceding the macing incident, CJC staff were conducting nude body cavity searches of detainees inside secure visiting rooms. Darnell had never been stripped searched before and was uncomfortable. He began laughing during the search and asked the guard, "do you actually like this job?" In retaliation, the correctional officer told Darnell to "bend over and spread it again."

58.     The guard then called out to Lt. Fowlkes, "We got someone refusing over here!" In response, Lt. Fowlkes came over to Darnell armed with a can of mace.

59.     Darnell tried to explain the situation to Lt. Fowlkes and how he had already been searched, telling him he wasn't comfortable. Let. Fowlkes said, "get comfortable" and sprayed Darnell—who was fully nude—and the room with an excessive amount of mace, filling the room, and locked him in the visiting room.

60.     Darnell was left in the visiting room for four hours. Once again, Darnell asked to go to medical after he was released from the cell, but the correctional staff would not take him down.

***Defendants have a widespread custom of using excessive mace on CJC detainees, without adequate warning, and for the purpose of inflicting pain.***

61.     The individual cases in this complaint are not unique. The excessive use of mace without warning and for the purpose of inflicting pain—like those incidents involving Plaintiffs—is common at CJC. CJC staff have a widespread custom and practice of using excessive mace, without adequate warning, for the purpose of inflicting pain on detainees.

62.     CJC staff also have a widespread custom and practice of macing detainees who are restrained, confined inside a secure cell, or only passively resistant (and not aggressive or threatening staff safety).

63.     Below is a subset of examples of CJC staff's improper uses of mace, which, taken together indicate a consistent and widespread practice:

   a.   CJC staff have maced a detainee while he was having a seizure.

   b.   In November 2020, CO Robinson maced detainee Errol Peyton without warning. While taking him to medical, CO Robinson refused to hold onto Mr.

11

Peyton, who was handcuffed, for balance. As a result, Mr. Peyton lost his balance, fell down the stairs, and broke his knee.

c.  In December 2020, Anthony Roberts and his cellmate were sprayed excessively with mace without warning.

d.  In January 2021, detainee Troy Jackson was maced by Lt. Washington for no reason and without any warning. He was denied medical treatment afterward.

e.  In January 2021, detainee David Aaron was maced for refusing to put his cigarette out. The correctional officer sprayed an excessive amount of mace under his cell door, without prior warning.

f.  In February 2021, detainee Lorenzo White witnessed CO Harris mace another detainee who was standing outside someone's cell, trying to defuse tension between that third person and CO Harris. CO Harris sprayed the detainee without any warning, and simply for asking why the guard was cutting his rec short and ordering him to lock down. The guard emptied the entire can of mace on the detainee and because Mr. White was standing behind the detainee, he was sprayed as well. Three different supervisors witnessed this incident, but did not intervene or prevent CO Harris from using chemical agents.

g.  In February 2021, detainee Anthony Roberts witnessed guards excessively mace a detainee who was sitting in a professional visit room, and shut the door afterward.

h.  In February 2021, guards sprayed mace into the chuckhole of a jail cell door after they suspected the detainee threw a piece of food out of their cell.

   i. In February 2021, guards sprayed an entire can of mace into Housing Unit 3B, without any commands, directions, or warning. People were having a hard time breathing, trying to hold up shirts on their faces to mask the spray, and vomiting from the mace.

   j. In May 2021, Lt. Broc told detainee Bakari Franklin to remove paper from a light fixture in his cell—paper which was on the light at the time Mr. Franklin was moved into that cell. Mr. Franklin complied, and took the paper down. Lt. Broc returned with a riot can of mace, and again ordered Mr. Franklin to take the paper down, even though he already had. Fearful of getting maced for no reason, Mr. Franklin asked to speak with Captain Baker. Lt. Broc told him, "I'm not getting nobody, she doesn't run shit." Mr. Franklin again pointed out that he had already taken the paper down. Lt. Broc and a correctional officer approached Mr. Franklin in the back of the cell, and maced him in the face, including in his mouth and eyes. When Mr. Franklin went to the shower to try to rinse the mace off his face, Lt. Broc kicked him in the shower, saying, "Take that, bitch."

64. Derrick Jones has witnessed CJC guards' excessive, indiscriminate, and unnecessary use of mace against other detainees on multiple occasions where there was no security threat and the detainee was not acting aggressively or actively resisting staff. For example, Derrick has seen guards spray mace into chuckholes. He has seen them spray people if they are yelling or talking out of line. He has seen Defendant Fowlkes, in particular, mace people detained at CJC multiple times.

65. Jerome Jones described the use of mace by correctional officers and supervisors at

CJC as a daily occurrence. Jerome and other detainees all describe the correctional officers and supervisors as using large canisters of mace, which deploy 'fogs' or amounts of mace appropriate for large crowds or areas, on individual detainees.

66.     Mace is often deployed by or in the presence of jail supervisors.

67.     The use of mace throughout CJC is inescapable given how often CJC staff deploy mace, and in such large quantities. For example, staff are often seen carrying or deploying large capacity or riot-sized cans of mace.

68.     Visiting booths often have tangible smell and residue from mace that is openly detectable for hours or days after a macing incident.

69.     These customs and practices are not just unconstitutional, they also violate the City Division of Corrections' own written policy regarding the use of chemical agents. A true and correct copy of that policy is attached hereto as **Exhibit A**.

70.     Defendants' written policy sets forth the method for use of chemical agents on detainees, including spraying the detainee for only 2-3 seconds, and giving a verbal warning before the use of the spray. It prohibits the use of mace on an inmate who has been placed on restraint and prohibits the use of pepper spray on a detainee who "does not pose eminent [sic] danger to staff safety, other inmates; is passive resistant, or is confined inside a secured cell but is disruptive in the cell."

71.     Defendants' written policy also prohibits the use of mace as punishment and when there is no justifiable security reason to use it on a detainee.

72.     The policy also requires that all persons be given immediate medical treatment and attention as needed, and that the detainee be provided a clean set of clothing.

14

73.     And the policy requires a Use of Force Report be completed every time chemical agents are used. Yet, upon information and belief, CJC staff are not completing these reports as required.

74.     For example, the Division of Correction's monthly reports for October 2020 through March 2021 report zero allegations of use of force, and zero instances where staff used force that required minor first aid.[2] Yet in that time, Derrick and multiple other inmates submitted IRRs or other complaints alleging improper use of force, while CJC staff were openly spraying mace throughout the jail without justification and in violation of CJC policy and detainees' constitutional rights.

75.     Upon further information and belief, supervisory staff at CJC, including Defendants Barnes and Carson, are aware of these unconstitutional practices and violations of written policy, but have not taken adequate steps to reprimand, discipline, or train staff who are responsible for the violations described herein.

76.     Even if detainees attempt to complain about the unconstitutional and abusive use of mace by a given correctional officer or supervisor, the detainee does not receive a response and the officer or supervisor continues carrying and using mace at will.

***Defendants punish Derrick, Jerome, and other detainees held on the fifth floor of CJC through deprivation of potable drinking water and water to flush toilets***

77.     In CJC cells, detainees are expected to access drinking water from a sink on top of the toilet in the cell. The same water supply provides drinking water and water for the toilet to flush.

---

[2] These monthly reports are available on the City's website. *See*, *e.g.*, https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/monthly-reports-2021.cfm (last accessed May 20, 2021).

78.     Upon information and belief, correctional officers at CJC are able to shut off the water source, preventing access to water in each detainee's cell. Shutting off the water source both blocks drinking water from coming out of the sink spout and prevents the toilet from flushing.

79.     On February 6, 2021, following the uprising of CJC detainees that started the prior evening, some detainees formerly housed in the fourth-floor pods were moved up to the fifth floor that same day. Among the detainees moved was Plaintiff Jerome Jones.

80.     When those detainees were moved up to the fifth floor, they were put in cells where the water supply had been cut off by correctional staff, even though detainees had not intentionally flooded their cells or threatened to do so.

81.     For several days following, detainees on the fifth floor had no access to water to drink or ability to flush the toilet.

82.     For these days, Plaintiffs and the other detainees were also not receiving regular, if any, meals, and as such were not given any juice or other supplements at mealtime.

83.     This meant Plaintiffs and the other detainees went *days* without having any liquids to drink.

84.     During these days, Jerome was forced to use the bathroom in a toilet that would not flush, meaning that he was sleeping next to a toilet bowl of standing excrement and urine. Some inmates were put into cells that had toilets already filled with excrement.

85.     Several other detainees' toilets overflowed, with the floors of their cells then strewn with this excrement and urine.

86.     This complete deprivation of drinking water and water to flush toilets initially lasted at least three days, until February 9, 2021, and possibly longer for some other pods on the fifth floor.

87.     The lack of water between February 6 through February 9, 2021, was not due to plumbing or equipment failures, but was an intentional, punitive, and retaliatory deprivation of water.

88.     When Jerome was maced on February 9, 2021, he was put back in his cell with no ability to flush his eyes or skin. He was in the cell for approximately 12 hours or more with mace residue on his skin and no method to wash it off, and without access to drinking water.

89.     Since February 9, 2021, the correctional staff have continued to regularly shut off water to detainees' cells for periods of time varying from several hours to multiple shifts. On information and belief, these water shutoffs occur at least weekly, if not more often.

90.     These regular water shut-offs are not the basis of equipment failures or plumbing issues. The water shut-offs are not conducted for maintenance purposes.

91.      Instead, correctional staff cut off the water to punish whole pods of detainees for individual detainees' behavior or speech, and to discourage questions or challenges from detainees.

92.     On February 10, 2021, a group of concerned advocates wrote to the City of St. Louis, Public Safety Director Jimmie Edwards, and former Commissioner Dale Glass to apprise them of the conditions at CJC. Among the issues raised in that letter was the deprivation of drinking water and water to the toilets. A true and correct copy of that letter is attached hereto as **Exhibit B**.

93.     Then-City-Counselor Michael Garvin responded the following day, wholly disregarding the concerns raised in the February 10 letter. For example, Mr. Garvin wrote: "the **only** time water is 'turned off' is when detainees intentionally plug the toilets with clothing and flood the jail floors. Detainees are given scheduled times when their water will be turned back on."

(emphasis added). A true and correct copy of Mr. Garvin's February 11, 2021 letter is attached hereto as **Exhibit C**.

94.     Correctional officers do occasionally shut off the water for non-punitive reasons. For example, some shutoffs occur when individual detainees "flood their cells" (meaning to stop up their toilets and cause water to spill on the floor). But, contrary to the position previously taken by the City, that is the exception. More often, correctional officers shut off the water to punish individual detainees for many actions beyond that situation: when detainees ask too many questions, when detainees take too long coming in from their very limited recreation time, if detainees "get an attitude," or if one inmate resists getting maced or disciplined.

95.     Staff also commonly shut off water when detainees bang on their cell doors—something detainees do to get staff attention or assistance because staff routinely ignore the call buttons in detainees' cells, if the call buttons are functioning at all.

96.     These water shut-offs periodically occur in each pod on the fifth floor since February 9, 2021. Some examples include the following instances:

   a.   In February 2021, the water was shut off one day to the entire pod where Jerome was housed because the correctional officers stated some of the other detainees were "acting childish" and needed to be taught a lesson.

   b.   On March 5, Lt. Fowlkes turned off water to cells in the pod where Derrick was housed. After Derrick asked a Correctional Officer Chris to turn the water back on, CO Chris said that only Lt. Fowlkes could, and "you know how he is."

   c.   On April 25, a detainee got into an argument with CO Smith in pod 5D. In response, the CO shut off water for the entire pod. When asked why he shut the water off, the CO responded: "I did it cause I want to."

18

      d.   On May 13 and May 18, 2021, Lt. Fowlkes shut off the water to pod 5B all day during his entire shift, with no instance of inmates flooding their cells. Around this same time, water was shut off in pod 5D for about 3-4 hours in response to a detainee kicking his cell door.

97.    As further evidence the water shut-offs are not connected to mechanical or equipment issues, specific correctional officers—namely Lt. Fowlkes—have a predilection for turning the water off. Lt. Fowlkes will announce to the pod upon arriving that he's turning the water off to have "a quiet night." If Lt. Fowlkes comes to work angry, he will immediately turn off the water.

98.    Guards will routinely threaten detainees with water shut-offs in response to minor misconduct unrelated to plumbing. For example, they will shout, "If you keep it up, you won't have your damn water tomorrow!" Or: "Act right or we'll turn the water off." And, from Defendant Fowlkes: "If you keep talking shit, I won't turn the water back on."

99.    This regular punishment of water deprivation for a number of hours amounts to cruel, inhumane and unlawful treatment or punishment and causes severe health effects for the detainees.

100.    Derrick describes the water shut-offs as causing intense dehydration and making him feel as though he is going to die.

101.    Jerome describes the water shut-offs as causing stress, headaches, and dehydration. Because Jerome was put into a cell after being maced during a water shut-off, he dealt with intense burning for hours with no way to flush his eyes.

102.    Detainees attempt to avoid using the bathroom during these times which causes discomfort and stomach issues.

19

103.    Because they lack drinking water, detainees are unable to take medicine, which can create security and safety issues for CJC staff and inmates, in addition to medical and mental health issues for the detainee.

104.    Because many of their commissary-purchased foods require water, detainees are also unable to adequately eat during the punitive water shut-offs.

105.    Aside from the physical repercussions of being deprived of water, Defendants' arbitrary and punitive water shut-offs cause Plaintiffs and other detainees mental pain and suffering. Detainees experience anxiety, fear, and helplessness when water is turned off, not knowing when it will be turned back on. Even when water resumes, they experience anxiety not knowing the next time guards will turn the water off, and for how long.

106.    Punishment of inmates by suspension or restriction of water also violates the prohibition of torture and ill-treatment and universally recognized international human rights standards, as set forth most notably in the "Nelson Mandela Rules" (United Nations Standard Minimum Rules for the Treatment of Prisoners, U.N. Doc. A/RES/70/175 (Jan. 8, 2016). https://www.un.org/en/events/mandeladay/mandela_rules.shtml).

***Defendants deny Plaintiffs access to the grievance process.***

107.    The CJC inmate handbook describes a complicated written administrative grievance process. Although the jail now has an electronic grievance process, which detainees can access on their tablets, it is not discussed at all in the inmate handbook.

108.    Plaintiffs never received a copy of the inmate handbook, and have never been informed about the CJC grievance policy.

109.    In practice, the grievance process at the jail is opaque and confusing, and practically inaccessible by detainees due to staff stonewalling or refusal to cooperate in providing or delivering informal resolution requests ("IRRs") or grievance documents.

110.    Derrick Jones has filed handwritten IRRs regarding the conditions of his confinement, but has never received a response to those IRRs.

111.    He also has filed grievances on his tablet. He has never received a response to those, either.

112.    After the macing incident in December, Derrick Jones completed an IRR addressing the incident, and gave the IRR to a corrections officer, Trece. The wing in which Derrick is locked in solitary confinement does not have a box or any other formal location where detainees can deliver grievances. CO Trece received the IRR, but Mr. Jones has never received a response.

113.    Per CJC grievance policy, the CJC Grievance Coordinator must respond to grievances within 15 working days.

114.    On or about December 28, 2020, after receiving no response to the IRR, he completed a grievance on his tablet.

115.    Derrick did not receive a response to the electronic grievance, so in early March 2021, he filed an appeal on his tablet. As of March 26, 2021, the tablet still indicated that the grievance appeal was under review. However, CJC's grievance policy requires CJC staff respond to appeals within 10 business days.

116.    As of the filing of this Complaint, Derrick Jones still has not received any response to his IRR or grievances regarding CJC staff's excessive use of mace.

117.    Derrick also used the tablet to file a grievance complaining about the improper and inhumane practice of shutting the water off in his pod in early March 2021. He received no response and so, after several weeks, he filed an appeal on his tablet. Derrick did not receive a response to that appeal within the 10 working days set out in the policy for CJC staff to respond.

Jerome Jones, too, tried to grieve his macing incident. He completed an IRR, but jail staff refused to accept the form, thus preventing him from being able to access the grievance process at all.

118.    Darnell Rusan asked for an IRR form and was denied. When he persisted in requesting an IRR form to grieve Defendants' use of mace, he was threatened with mace yet again. Darnell has not had access to a tablet.

119.    The practice of denying access to the grievance process—either by refusing to give forms to detainees, or never responding to IRRs or grievances—is very common at CJC, and presents an impediment to the informal resolution of conflict or issues with conditions at the jail.

### Claims for Relief

### COUNT I
**Excessive Force in Violation of Fourteenth Amendment under 42 U.S.C. § 1983**
**(Derrick Jones against Defendants Jane Doe and Fowlkes)**

120.    Plaintiffs incorporate all preceding paragraphs as if fully set forth in this Count.

121.    Defendants Jane Doe and Fowlkes purposefully or knowingly used objectively unreasonable force on Derrick Jones when they sprayed him with an excessive amount of mace while he was restrained and again while he was confined within a secure room, and without providing a prior warning, as described more fully above.

122.    The circumstances under which Jane Doe and Fowlkes used mace against Derrick, as described above, were not rationally related to a legitimate governmental purpose or, alternatively, were excessive in relation to any legitimate governmental purpose.

123.    Defendants Jane Doe and Fowlkes's above-described actions were undertaken with malice and/or reckless disregard for Derrick's constitutional rights.

124.    Defendants Jane Doe and Fowlkes's actions were the direct and proximate cause of the violations of Derrick's constitutional rights and the damages suffered by Derrick, including pain, suffering, emotional distress, and injury.

WHEREFORE, Plaintiff Derrick Jones prays this Court enter judgment in his favor against Defendants Jane Doe and Fowlkes, award compensatory damages, costs and attorneys' fees, and punitive damages against Defendants Jane Doe and Fowlkes, and for such further additional relief as this Court may deem just and appropriate.

**COUNT II**
**Excessive Force in Violation of Fourteenth Amendment under 42 U.S.C. § 1983**
**(Jerome Jones against Defendant Fowlkes)**

125.    Plaintiffs incorporate all preceding paragraphs as if fully set forth in this Count.

126.    Defendant Fowlkes purposefully or knowingly used objectively unreasonable force on Jerome Jones when he sprayed him with an excessive amount of mace while he was restrained and within a secure room, as described more fully above.

127.    The circumstances under which Fowlkes used mace against Jerome, as described above, were not rationally related to a legitimate governmental purpose or, alternatively, were excessive in relation to any legitimate governmental purpose.

128.    Defendant Fowlkes's above-described actions were undertaken with malice and/or reckless disregard for Jerome's constitutional rights.

129.    Defendant Fowlkes's actions were the direct and proximate cause of the violations of Jerome's constitutional rights and the damages suffered by Jerome, including pain, suffering, emotional distress, and injury.

WHEREFORE, Plaintiff Jerome Jones prays this Court enter judgment in his favor against Defendant Fowlkes, award compensatory damages, costs and attorneys' fees, and punitive damages against Defendant Fowlkes, and for such further additional relief as this Court may deem just and appropriate.

## COUNT III
**Excessive Force in Violation of Fourteenth Amendment under 42 U.S.C. § 1983**
**(Darnell Rusan against Defendants Turner, Alexander, John Doe 2, Lewis, and Fowlkes)**

130.    Plaintiffs incorporate all preceding paragraphs as if fully set forth in this Count.

131.    Defendants Turner, Alexander, Doe 2, Lewis, and Fowlkes purposefully or knowingly used objectively unreasonable force on Darnell Rusan when they sprayed him three times with an excessive amount of mace, including once while he was restrained and months later when he was fully nude and confined within a secure room. In each instance, he was not actively resisting or threatening staff and was sprayed without prior warning, as described more fully above.

132.    Defendant Alexander also purposefully or knowingly used objectively unreasonable force on Darnell Rusan when he slammed Darnell's head into the elevator wall after macing him, and when he hit and choked Darnell, telling him, "we'll kill your little ass in here." Darnell's head still hurts from those beatings.

133.    The circumstances under which Turner, Alexander, Doe 2, Lewis, and Fowlkes used mace against Darnell, as described above, were not rationally related to a legitimate governmental purpose or, alternatively, were excessive in relation to any legitimate governmental purpose.

134.    Defendants Turner, Alexander, Doe 2, Lewis, and Fowlkes's above-described actions were undertaken with malice and/or reckless disregard for Darnell's constitutional rights.

135.    Defendants Turner, Alexander, Doe 2, Lewis, and Fowlkes's actions were the direct and proximate cause of the violations of Darnell's constitutional rights and the damages suffered by Darnell, including pain, suffering, emotional distress.

WHEREFORE, Plaintiff Darnell Rusan prays this Court enter judgment in his favor against Defendants Turner, Alexander, Doe 2, Lewis and Fowlkes, award compensatory damages, costs

and attorneys' fees, and punitive damages against Defendants Turner, Alexander, Doe 2, Lewis, and Fowlkes, and for such further additional relief as this Court may deem just and appropriate.

<u>COUNT IV</u><br>
<em>Monell</em> <strong>Claim for Excessive Force in Violation of</strong><br>
<strong>Fourteenth Amendment under 42 U.S.C. § 1983</strong><br>
<strong>(All Plaintiffs against the City of St. Louis and Defendants Barnes and Carson, in their</strong><br>
<strong>official capacities)</strong>

136.    Plaintiffs incorporate all preceding paragraphs as if fully set forth in this Count.

137.    Plaintiffs have been detained (or, in the case of Jerome Jones, were detained) at the CJC for several months. During that time, they have experienced and witnessed countless instances of CJC staff's indiscriminate, excessive, and unnecessary use of mace on detainees. These instances occur with shocking frequency, and have been occurring with frequency for their entire detention.

138.    During the relevant time period, Defendants Barnes and Carson had or should have had notice of widespread practices by employees at the CJC under which detainees were sprayed excessively with mace without proper warning and absent any security need warranting the use of chemical agents, and under which detainees were sprayed with mace for the malicious purpose of infliction of pain and punishment.

139.    These widespread practices are the result of the lack of formal training and supervision on the use of chemical agents, and lack of repercussions for the excessive and inappropriate use of chemical agents.

140.    These widespread practices were allowed to flourish and become so well-settled as to constitute de facto policy of the CJC because governmental policymakers with authority over the jail—namely, Defendants Barnes and Carson—exhibited deliberate indifference to the problem, thereby effectively ratifying it.

141.    Additionally, these practices are allowed to flourish because CJC staff routinely obstruct and completely disregard detainee IRRs and other complaints regarding instances of force by correctional officers, so as to cover-up and insulate staff from sanctions both civil and criminal repercussions when targeting and abusing detainees.

142.    Plaintiffs' injuries were caused in substantial party by these widespread policies, practices, and procedures promulgated by the CJC.

WHEREFORE, Plaintiffs pray this Court enter judgment in their favor against the City and Defendants Barnes and Carson, award compensatory damages, costs and attorneys' fees, and punitive damages against each of the Individual Defendants in their individual capacities, enter an order against the City and Defendants Barnes and Carson prohibiting the unconstitutional use of mace going forward, and for such further additional relief as this Court may deem just and appropriate.

### COUNT V
**Conditions of Confinement Amounting to Punishment in Violation of the Fourteenth Amendment under 42 U.S.C. § 1983**
**(Derrick Jones and Jerome Jones against Defendant Fowlkes and CO John Doe 1)**

143.    Plaintiffs incorporate all preceding paragraphs as if fully set forth in this Count.

144.    Defendants Fowlkes and CO Doe 1 purposefully or knowingly took actions to cut off the water source bringing water to detainees' cells.

145.    These correctional officers' regular action of shutting off water to detainees' cells is expressly and intentionally taken to punish entire groups of detainees for speech, minor infractions, or misbehavior from one detainee.

146.    Alternatively, the correctional officers' regular action of shutting off water to inmates' cells is not rationally connected to a legitimate non-punitive purpose and is excessive in relation to any such legitimate purpose.

147.    Defendants CO Doe 1 and Fowlkes's above-described actions were undertaken with malice and/or reckless disregard for Derrick and Jerome's constitutional rights.

148.    Defendants CO Doe 1 and Fowlkes's actions were the direct and proximate cause of the violations of Derrick and Jerome's constitutional rights and the damages suffered by Derrick and Jerome, including pain, suffering, emotional distress.

WHEREFORE, Plaintiffs pray this Court enter judgment in their favor against Defendants Fowlkes and CO Doe 1, award compensatory damages to Jerome Jones, nominal damages to both Derrick Jones and Jerome Jones, costs and attorneys' fees, and punitive damages against Defendants CO Doe 1 and Fowlkes in their individual capacities, declare these practices as unconstitutional and enter an order against all Defendants prohibiting the use of water deprivation as a tactic to unconstitutionally punish of detainees going forward, and for such further additional relief as this Court may deem just and appropriate.

<u>COUNT VI</u>
*Monell* Claim for Conditions of Confinement Amounting to Punishment
in Violation of the Fourteenth Amendment under 42 U.S.C. § 1983
**(Derrick Jones against the City of St. Louis and Defendants Barnes and Carson, in their
official capacities)**

149.    Plaintiffs incorporate all preceding paragraphs as if fully set forth in this Count.

150.    Derrick Jones has been detained at the CJC for several months. During that time, he and countless others have been subjected to punitive and retaliatory water shut-offs. These deprivations occur sporadically but regularly, and are imposed not in response to misconduct related to plumbing, but as punishment for minor and non-threatening misconduct, such as asking questions or "getting an attitude." These shut-offs have persisted for months, and continue to take place.

151.    During the relevant time period, Defendants Barnes and Carson had or should have had notice of widespread practices by employees at the CJC under which detainees were

intentionally deprived of drinking water and water for their toilets, for the malicious purpose of infliction of pain and punishment.

152.    These widespread practices were allowed to flourish and become so well-settled as to constitute de facto policy of the CJC because governmental policymakers with authority over the jail—namely, Defendants Barnes and Carson—exhibited deliberate indifference to the problem, thereby effectively ratifying it.

153.    These practices also are allowed to flourish because CJC staff fail to apprise detainees of the jail's grievance process, and routinely obstruct and completely disregard detainee IRRs and other complaints so as to cover-up and insulate staff from sanctions both civil and criminal repercussions when targeting and abusing detainees.

154.    Derrick's injuries were caused in substantial party by these widespread policies, practices, and procedures promulgated by the CJC.

WHEREFORE, Plaintiff Derrick Jones prays this Court enter judgment in his favor against the City and Defendants Barnes and Carson, award nominal damages, costs and attorneys' fees, and enter an order against the City and Defendants Barnes and Carson prohibiting the unconstitutional practice of water shut-offs as punishment going forward, and for such further additional relief as this Court may deem just and appropriate.

Dated: June 21, 2021                          Respectfully submitted,

                                              ARCHCITY DEFENDERS, INC.

                                              By: /s/ Maureen Hanlon
                                              Blake A. Strode (MBE #68422MO)
                                              Jacki Langum (MBE #58881MO)
                                              John M. Waldron (MBE #70401MO)
                                              Maureen Hanlon (MBE #70990MO)
                                              Emanuel Powell (E.D. Mo. Bar No. #706171MA)
                                              Nathaniel R. Carroll (MBE #67988MO)

440 N. 4th Street, Suite 390
Saint Louis, MO 63102
855-724-2489
314-925-1307 (fax)
bstrode@archcitydefenders.org
jlangum@archcitydefenders.org
jwaldron@archcitydefenders.org
mhanlon@archcitydefenders.org
epowell@archcitydefenders.org
ncarroll@archcitydefenders.org

RODERICK & SOLANGE MACARTHUR
JUSTICE CENTER

By: /s/ Amy E. Breihan
Amy E. Breihan (MBE #65499MO)
William Patrick Mobley (MBE #63636MO)
3115 S. Grand Blvd., Suite 300
Saint Louis, MO 63118
(314) 254-8540
(314) 254-8547 (fax)
amy.breihan@macarthurjustice.org
pat.mobley@macarthurjustice.org

SAINT LOUIS UNIVERSITY SCHOOL OF LAW
LEGAL CLINICS

By: /s/ Lauren Bartlett
Brendan Roediger (E.D. Mo. Bar No. #6287213IL)
Lauren Bartlett (MBE #71698MO)
100 N. Tucker Blvd.
Saint Louis, MO 63101-1930
314-977-2778
brendan.roediger@slu.edu
lauren.bartlett@slu.edu

RIGHTS BEHIND BARS

By: /s/ Oren Nimni
Oren Nimni *pro hac vice pending
416 Florida Avenue, NW #26152
Washington, D.C. 20001
(206) 200-9088
oren@rightsbehindbars.org

*Attorneys for the Plaintiffs*