**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| DERRICK JONES, JEROME JONES, DARNELL RUSAN, and MARRELL WITHERS,<br><br>on behalf of themselves and all similarly situated individuals,<br><br>       Plaintiffs,<br><br>    v.<br><br>CITY OF ST. LOUIS, MISSOURI; LIEUTENANT JAVAN FOWLKES, in his individual capacity; LIEUTENANT AISHA TURNER, in her individual capacity; CORRECTIONAL OFFICER DIRELL ALEXANDER, in his individual capacity; LIEUTENANT SHERRY RICHARD, in her individual capacity; CORRECTIONAL OFFICER BRUCE BORDERS, in his individual capacity; CORRECTIONAL OFFICER DEBRA WILLIS, in her individual capacity; CORRECTIONAL OFFICER JONES, in his individual capacity; and CORRECTIONAL OFFICER JOHN DOE, in his individual capacity,<br><br>    Defendants. | Cause No. 4:21-cv-600<br><br>JURY TRIAL DEMANDED |

**SECOND AMENDED COMPLAINT**

Plaintiffs Derrick Jones, Jerome Jones, Darnell Rusan and Marrell Withers individually and on behalf of all similarly situated individuals,[1] file this Second Amended Complaint against the City of St. Louis, Lieutenant Javan Fowlkes, Lieutenant Aisha Turner, Correctional Officer Direll Alexander, Lieutenant Sherry Richard, Correctional Officer Bruce Borders, Correctional Officer Debra Willis, Correctional Officer Jones, and Correctional Officer John Doe ("Defendants") and allege as follows:

---

[1] Named plaintiffs and members of the proposed class are referred to as "Plaintiffs" herein.

### Introduction

1.      This is a civil rights class action complaint, brought on behalf of all individuals detained at the St. Louis City Justice Center ("CJC"), who have been subjected to or are at risk of being subjected to the violent and systemic use of excessive chemical agents and water shut-offs employed by CJC Correctional Officers arbitrarily, punitively, and in response to reasonable and non-violent detainee concerns.

2.      On December 14, 2020, Derrick Jones was needlessly maced[2] in the face. He was then beaten, maced again, and left in a cell to "marinate," according to correctional officers. On February 9, 2021, Jerome Jones was placed in a small, secure visiting room. Without warning, jail staff sprayed the room with copious amounts of mace. They left Jerome in the mace-filled room, asking for help and shouting that he could not breathe, for nearly half an hour. That same month, Darnell Rusan was maced multiple times. In one instance, he was locked for hours, fully nude, in a tiny room filled with mace. He, too, was given no warning before the mace was deployed, and he was not physically resisting or threatening staff prior to being attacked. Marrell Withers was maced two times in a row in January 2022,while restrained in handcuffs, simply for expressing concern about COVID exposure. Before he was maced he told jail staff he had asthma and begged them not to mace him. What happened to Derrick, Jerome, Darnell, Marrell, and other class members is indicative of a widespread pattern inside the St. Louis City Justice Center of using chemical agents to inflict pain and suffering on detainees in the City's care, without cause or warning, and often on detainees who are passive, restrained, or confined. And when deploying chemical agents, jail staff fail to take precautions or provide any reasonable accommodations for detainees with disabilities.

---

[2] Throughout this Complaint, "mace" refers to chemical agents as that term is defined in City Division of Corrections policy no. 3.2.15.

3.      But City correctional staff do not only use chemical agents to punish and harm detainees in their custody and care. They also have a punitive practice of depriving detainees of water to their cells—sometimes for hours, sometimes for days—simply because detainees talk back, bang on their cell doors, or "get an attitude."

4.      In the face of these persistent and widespread torture practices by City correctional staff, Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 to redress the violation of their constitutional rights as secured by the Fourteenth Amendment to the United States Constitution, and the constitutional rights of others who are similarly situated. More specifically, the claims in this lawsuit stem from the conditions of Plaintiffs' confinement at the St. Louis City Justice Center.

5.      During Plaintiffs' confinement at CJC, they were subjected to the infliction of pain and suffering by Defendants, who used chemical agents on the detainees without prior warning, and for the purpose of inflicting punishment and/or pain and suffering, not for security or safety reasons.

6.      The incidents described below reflect a larger, widespread custom of City correctional staff using chemical agents for the purpose of the infliction of pain and suffering of detainees, including macing detainees who are restrained, confined inside a secure cell, or only passively resistant (and not aggressive or threatening safety or security). CJC correctional staff spray chemical agents on detainees for talking on the phone. They spray chemical agents on detainees who are handcuffed. They use chemical agents on detainees who are sitting, passively, in visiting booths. They use excessive amounts of chemical agents—enough to fill the room with a fog of the substance—and leave detainees to "marinate" in the burning air without access to the medical unit or even water to properly wash the chemical agents from their eyes. They spray chemical agents through chuckholes in locked cell doors, leaving detainees to suffocate while

3

correctional staff stand safely outside the cell. These customs and practices are unconstitutional and have resulted directly in the pain and suffering not just of the named plaintiffs, but every survivor of chemical agents who was or remains detained in the CJC.

7.      During Plaintiffs' confinement in the CJC, they were (and continue to be) subjected to regular deprivations of water for drinking, flushing toilets, and simple hygiene by Defendants, who regularly shut off the water solely for the purpose of punishment and seeking to control behavior. This widespread custom or practice of turning off otherwise functioning water systems to detainees' cells, is done for the purpose of inflicting punishment and seeking to control detainees' behavior when there is no valid security justification for doing so.

**Parties**

8.      Plaintiff Derrick Jones is a resident of the City of St. Louis. As of the filing of this Second Amended Complaint and during the pendency of this matter, Derrick has been detained in the City jails.

9.      Plaintiff Jerome Jones was a resident of the City of St. Louis until mid-April 2021. Jerome was incarcerated for two and a half years awaiting trial, and was released after he was acquitted of all charges. At all times relevant to his claims in this case, Jerome was detained at the City Justice Center.

10.     Plaintiff Darnell Rusan is a resident of the City of St. Louis. As of the filing of this Second Amended Complaint, Darnell is detained in the City Justice Center, and has been detained at the City Justice Center at all times relevant to his claims in this case.

11.     Plaintiff Marrell Withers is a resident of the City of St. Louis. As of the filing of this Second Amended Complaint, Marrell is detained in the City Justice Center and has been detained at the City Justice Center at all times relevant to his claims in this case.

4

12.     Defendant City of St. Louis, Missouri, is a political and geographic subdivision of the State of Missouri and is organized as a constitutional charter city under Article VI, section 19 of the Missouri Constitution. The City is the public entity responsible for oversight of the City Justice Center through the Division of Corrections within the Department of Public Safety.

13.     Defendants Lt. Javan Fowlkes, Lt. Aisha Turner, CO Direll Alexander, Lt. Sherry Richard, CO Bruce Borders, CO Debra Willis, CO Jones and CO John Doe (collectively, the "Individual Defendants") were employees of the City jails during the relevant time period. At all times relevant to the events in this case, the Individual Defendants were acting under color of law and within the scope of their employment with the City. The Individual Defendants are sued here in their individual capacities.

## Jurisdiction and Venue

14.     Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of their rights as secured by the Fourteenth Amendment to the United States Constitution. This Court therefore has jurisdiction pursuant to 28 U.S.C. § 1331.

15.     Venue is appropriate in this district pursuant to 28 U.S.C. §1391(e) because a substantial part of the events giving rise to the claims asserted occurred in this judicial district. Divisional venue is proper in the Eastern Division because a substantial part of the events giving rise to Plaintiffs' claims arose in the City of St. Louis. E.D.Mo. L.R. 2.07(A)(1), (B)(1).

## Facts

***Defendants' excessive and malicious use of chemical agents against Derrick Jones.***

16.     Derrick Jones has been in the custody of the St. Louis Division of Corrections since November 3, 2020. Derrick was held at the CJC until November 1, 2021, when he was moved to the Workhouse without explanation. He was recently moved back to the CJC.

17.     Until on or about January 7, 2022, Derrick was restricted to his cell for at least 23 hours a day, or as it is commonly known--solitary confinement. He was held in a cell alone for that entire time, and for the majority of it, there was no natural light in his cell. The artificial light fixture in his cell was broken. He was allowed out of his cell only one hour each day, at a maximum, and there are many days at a time when he is not allowed out of his cell at all. In January 2022, he was not allowed out of his cell for 8 days.

18.     Derrick has previously been diagnosed with schizophrenia and bipolar disorder, according to jail records, and suffered immensely in solitary confinement.

19.     Prior to Defendants moving him to solitary, Derrick was housed in unit 4C, the epicenter of the COVID-19 outbreak at CJC. While there, he was allowed out of his cell twice each day for 45 minutes at a time. On December 14, 2020, Derrick's cellmate was exhibiting signs of COVID-19 infection.

20.     In fact, besides Derrick, his entire unit had either tested positive for COVID-19 or were demonstrating signs of infection, including fever and lack of taste. Derrick was the only one who remained apparently uninfected.  Because being housed with his cellmate would expose him to infection from the novel coronavirus, Derrick asked a guard, Lt. Richard, if he could be moved to a different cell. She nodded her head and told him she would see what they could do about it.

21.     After some further discussion, Lt. Richard told Derrick he would have to stay in his cell with the infected cellmate. She then told Derrick to hold on, and left him sitting while she momentarily left the wing.

22.     When Lt. Richard came back into the wing, she had a riot-size can of mace in her hand, and she was accompanied by other corrections officers.

23.     Lt. Richard sprayed Derrick in the eyes and face. She did not give any warning prior to spraying him with mace.

24.     Lt. Richard and seven other COs knocked Derrick to the ground, and he was kicked and punched in the head while the COs held him to the ground and put him in handcuffs.

25.     While Derrick was restrained on the floor in handcuffs, Lt. Fowlkes sprayed Derrick's face with mace. Lt. Fowlkes did not give any directions, commands, or warnings to Derrick prior to do doing so.

26.     At the time Derrick was maced, he was not acting aggressively and was not threatening anyone's safety.

27.     The mace stung Derrick's eyes badly, and made it difficult for him to breathe for 36 hours after the assault.

28.     After being sprayed with mace twice, and still in handcuffs, Derrick Jones was taken to the medical unit and placed in a holding cell with the door closed. His eyes and face were still burning, and he was having a hard time breathing. Because of the pain he was in, Derrick pounded on the door, pleading for help.

29.     Lt. Fowlkes came to the room, opened the door, sprayed Derrick with mace for a third time, and closed the door, saying, **"Let him marinate."**

30.     Around twenty minutes later, Derrick saw medical staff who washed his eyes out with water. Medical staff did not wash off the rest of Derrick's skin or allow him to wash himself. They did not remediate the chemical agents on his clothing or offer him a change of clothes. He was then taken to his solitary cell, where he was entirely confined for eight days. He was denied a shower this entire time, despite having been maced three times in a row and the burning mace clinging to his skin and clothes.

7

*Defendants' excessive and malicious use of chemical agents against Jerome Jones.*

31.     Jerome Jones spent over two years in custody at CJC awaiting trial before he was ultimately acquitted.

32.     On or about February 9, 2021, CO Hopgood and CO Eastling asked Jerome to move from a single-person cell to a double-person cell. He told them that he did not want to move and there was no reason to move him.

33.     CO Robinson and CO Allen told Jerome that Lt. Fowlkes was going to mace Jerome if he did not comply. Jerome indicated again he would not move cells, but he was not physically resisting. Jerome was in handcuffs throughout the course of this entire conversation.

34.     CO Robinson, CO Allen, and Lt. Fowlkes then placed Jerome in a no-contact visiting room—a room approximately 3 feet by 5 feet in size that is fully enclosed and secure when the door is shut.

35.     Once Jerome was in the room, Lt. Fowlkes asked Jerome if he was going to move cells. Jerome responded, "No," and Lt. Fowlkes sprayed an excessive amount of mace into the visiting booth until it filled the room. CO Anthony Spencer was a witness to this incident.

36.     Lt. Fowlkes then closed the door. Jerome was left in the mace-filled room for approximately 25 minutes.

37.     During that time, Jerome banged on the door asking for help, shouting that he could not breathe. He had so much difficulty getting air that he had to lie on the floor to try to get fresh air from the crack between the door and the ground.

38.     His calls for help went ignored until finally staff removed him from the visiting room and took him to a two-person cell.

39.     At the time Jerome was maced, he was not acting aggressively, was not threatening staff safety, and was confined inside a secured cell.

40.     Jerome's eyes, face, and entire body were burning from the mace.

41.     He did not have access to water to flush his eyes with because the water was shut off in his cell that day.

42.     Although he requested medical attention, he was not brought down to the medical unit to receive assistance for his injuries.

43.     Jerome was not allowed to shower until the next day. But even after that, it took about three days for the mace to stop burning. For weeks after the incident, Jerome would wake up in the middle of the night not able to fully breathe.

44.     To this day, Jerome still experiences respiratory issues which, upon information and belief, are caused by his exposure to excessive chemical agents at the CJC.

***Defendants' excessive and malicious use of chemical agents against Plaintiff Rusan.***

45.     Plaintiff Darnell Rusan has been in custody at CJC since around Thanksgiving of 2020. He has been personally maced at least three times, and has witnessed countless other instances of excessive and unwarranted macing by CJC staff.

46.     Darnell is prone to epileptic seizures. He must take medication to keep his seizures under control, a fact that was documented upon Darnell's admission to CJC.

47.     On December 19, 2020, Darnell was out of his cell to make a phone call during rec time. Lt. Turner yelled at him not to use the phone near her and an officer. Confused, he pulled his mask down and asked Lt. Turner, "Don't you remember me?" Lt. Turner replied, "I remember who the fuck you are," and told him to walk away from them. At this point, Darnell immediately moved away from Lt. Turner and the other officer, and got on the phone with his sister.

48.     Lt. Turner called over and told him to, "Put that damn mask on." He put the mask on but complained on the phone to his sister about Lt. Turner, because he had a feeling Lt. Turner was going to escalate the situation.

49.     A correctional officer told Darnell that he had a bad attitude, that he had to lock down for the rest of day, and ordered him to hang up the phone.

50.     But before he could hang up the phone, Lt. Turner was next to him and sprayed mace directly in his face.

51.     Lt. Turner did not give Darnell any warning before she deployed mace.

52.     Darnell went to the shower to try to wash the mace off his body, as it was burning his eyes and skin. CO Alexander and CO Borders removed Darnell from the shower, placed him in handcuffs, and put him on the elevator down to the medical unit.

53.     While on the elevator, CO Alexander slammed Darnell's head into the wall. Once he was in the medical unit, CO Alexander started hitting and choking him while Darnell was still in handcuffs, and told him, "we'll kill your little ass in here." Darnell attempted to protest his treatment verbally. He never got to see a nurse and was only down in the medical unit for approximately 15-20 minutes.

54.     CO Alexander and CO Borders brought him back up and into one of the visiting booths in 5B. CO Alexander pressed him up against the wall and began choking him. As he was being choked, Darnell's eyes began to get blurry, he became dizzy, and he struggled to catch a breath. At this point, he yelled out, "I can't breathe" to which CO Alexander told him, "That's the whole point." This entire time, Darnell was still handcuffed, covered in painful chemical agents, and bleeding from the head.

55.     Eventually, CO Alexander let Darnell go. After CO Alexander and CO Borders stepped away from Darnell, they walked to the door. One of the two sprayed excessive chemical agents into the room as they closed the door, completely filling the air with noxious chemicals.

10

56.     CJC staff left Darnell in that mace-filled visiting room for approximately nine hours. Darnell was bleeding from the head the entire time, and still covered in chemical agents from being maced multiple times within hours of each other.

57.     Darnell asked to go to medical after he was released from the cell, but the correctional staff would not take him down.

58.     On February 3, 2021, Darnell was maced again by CJC staff.

59.     Immediately preceding the macing incident, CJC staff were conducting nude body cavity searches of detainees inside secure visiting rooms. Darnell was uncomfortable, so he began laughing during the search and asked the guard, "do you actually like this job?" In retaliation, the correctional officer told Darnell to "bend over and spread it again."

60.      The guard then called out to Lt. Fowlkes, "We got someone refusing over here!" In response, Lt. Fowlkes came over to Darnell armed with a can of mace.

61.     Darnell tried to explain the situation to Lt. Fowlkes and how he had already been searched, telling him he wasn't comfortable. Lt. Fowlkes said, "get comfortable" and sprayed Darnell—who was fully nude—and the room with an excessive amount of mace, filling the room, and locked him in the visiting room.

62.     Darnell was left in the visiting room for hours. Despite his requests, Darnell was not taken to medical nor given a chance to wash off the mace.

***Defendants' excessive and malicious use of chemical agents against Marrell Withers.***

63.     Marrell Withers is in custody at CJC.

64.     On or about January 7, 2022 he was housed in 4C at CJC. He had recently received a COVID test indicating that he was COVID negative.

65.     Despite this, CJC Correctional Officers told Marrell that they were going to transfer him to a special CJC wing for COVID-positive detainees.

66.     Marrell was aware that the Omicron variant of COVID-19 was surging. He was afraid of being exposed to COVID, and the possible repercussions related to getting COVID, including death.

67.     Marrell told the COs that he was afraid of COVID exposure and did not want to be transferred to a special wing for COVID-positive detainees. He asked the COs to call medical and confirm the result of his PCR test. The COs did not call medical and instead handcuffed Marrell behind his back.

68.     CO Willis then instructed CO Jones to mace Marrell, who was restrained in handcuffs and was not physically resisting. Marrell told COs Willis and Jones that he had asthma and begged them not to mace him.

69.     CO Jones then reached around and maced Marrell in the face while he was handcuffed and facing the wall.

70.     Marrell tried to stay calm and restrained his reactions to being maced. CO Willis yelled that the mace had not worked and instructed CO Jones to spray Marrell another time.

71.      CO Jones then maced Marrell, who was still restrained in handcuffs, a second time.

72.     Afterwards, Marrell was taken to the medical unit but he did not receive a change of clothes or the opportunity to shower.

***Defendants' widespread custom of using excessive chemical agents on detainees in the City Justice Center, without adequate warning, and for the purpose of inflicting pain.***

73.     The individual cases in this complaint are not unique or even unusual. The excessive use of chemical agents without warning and for the purpose of inflicting pain—like in those incidents involving the named plaintiffs—is common in the City Justice Center. CJC staff have a widespread custom and practice of using excessive chemical agents, without adequate warning, for the punitive purpose of inflicting pain detainee. The named Plaintiffs have plausibly

demonstrated that the injustices they suffered, like the injuries that have been and may be inflicted on other members of the CJC Class, stem directly from Defendants' policies, practices, and customs concerning use of chemical agents.

74.     CJC jail staff use an extraordinary amount of force against people detained in CJC. According to use-of-force reports prepared by CJC staff between October 1, 2020 and November 30, 2020, a period of 61 days, correctional officers deployed chemical agents on detainees on 90 separate occasions. Upon information and belief, these use of force reports do not even reflect every macing incident that occurred during this time frame.

75.     CJC jail staff also have a widespread custom and practice of macing detainees who are restrained, confined inside a secure cell, or only passively resistant (and not aggressive or threatening staff safety).

76.     For example, according to use of force reports prepared by CJC staff between December 2, 2020 and April 30, 2021, correctional officers, standing outside the cell door, deployed mace through the chuck hole of a locked door at least 45 times.[3]

77.     Below are additional, non-exclusive, representative examples of City jail staff's improper uses of chemical agents, which, taken together, indicate a consistent and widespread practice:

> a.   In October 2020, a transgender detainee being held at the facility was maced for refusing to undress in front of other detainees.
>
> b.   In November 2020, one detainee was maced on three separate occasions in one day, and then maced twice more that week.
>
> c.   CJC staff maced a detainee while he was having a seizure.

---

[3] Upon information and belief, these use of force reports do not reflect every macing incident that occurred during this time frame.

d.  CJC staff maced a detainee having a mental health crisis for allegedly refusing to go on suicide watch.

e.  On November 2020, CO Robinson maced detainee Errol Peyton without warning. While taking him to medical, CO Robinson refused to hold onto Mr. Peyton, who was handcuffed, for balance. As a result, Mr. Peyton lost his balance, fell down the stairs, and broke his knee.

f.  In December 2020, Anthony Roberts and his cellmate were sprayed excessively with mace without warning.

g.  In January 2021, detainee Troy Jackson was maced by Lt. Washington for no reason and without any warning. He was denied medical treatment afterward.

h.  In January 2021, Lt. Fowlkes deployed a riot-sized can of mace under the door of the room where Dejuan Allen was being detained without warning because Allen complained about being put in a cell with strange urine on the floor of the cell. Allen couldn't breathe from the mace and so he banged on the doors of the room. Instead of helping him, Lt. Fowlkes, still safely on the other side of a locked door, *again* deployed mace into the room where Allen was being held. Allen was left in that room filled with mace for two hours.

i.  In February 2021, detainee Lorenzo White witnessed CO Harris mace another detainee who was standing outside someone's cell, trying to defuse tension between that third person and CO Harris. CO Harris sprayed the detainee without any warning, and simply for asking why the guard was cutting his rec short and ordering him to lock down. The guard emptied the entire can of mace on the detainee and because Mr. White was standing behind the detainee, he

14

was sprayed as well. Three different supervisors witnessed this incident, but did not intervene or prevent CO Harris from using chemical agents.

j.  In February 2021, detainee Anthony Roberts witnessed guards excessively mace a detainee who was sitting in a professional visit room, and shut the door afterward.

k.  In February 2021, guards sprayed mace into the chuckhole of a jail cell door after they suspected that the detainee threw a piece of food out of their cell.

l.  In February 2021, guards sprayed an entire can of mace into Housing Unit 3B, without any commands, directions, or warning. People were having a hard time breathing, trying to hold up shirts over their faces to mask the spray, and vomiting from the mace.

m.  On March 25, 2021, Kevin Moore was on suicide watch and lying down in his cell when Lt. Richard deployed mace through the chuckhole of his cell door without warning or reason. Moore has asthma, which he was worried about after being sprayed with chemical agents.

n.  In the spring of 2021 Marrell Withers and other detainees in 4D of CJC were sprayed with chemical agents from a riot-sized can, without warning. Marrell and 15-20 other detainees were on the sidelines of a fight they were not involved in and urged the other detainees to stop fighting, which had gone on for some time without CO intervention. The mace was so strong that Marrell could not breathe.

o.  In April 2021, CO Hopgood deployed a riot-size can of mace through the chuckhole of detainee Terrion Phillips' cell in 5B without warning or reason.

15

Hopgood closed the chuckhole, leaving Phillips trapped in the cell full of mace and unable to breathe.

p.   In May 2021, Lt. Broc told detainee Bakari Franklin to remove paper from a light fixture in his cell—paper which was on the light at the time Mr. Franklin was moved into that cell. Mr. Franklin complied, and took the paper down. Lt. Broc returned with a riot can of mace, and again ordered Mr. Franklin to take the paper down, even though he already had. Fearful of getting maced for no reason, Mr. Franklin asked to speak with Captain Baker. Lt. Broc told him, "I'm not getting nobody, she doesn't run shit." Mr. Franklin again pointed out that he had already taken the paper down. Lt. Broc and a correctional officer approached Mr. Franklin in the back of the cell, and maced him in the face, including in his mouth and eyes. When Mr. Franklin went to the shower to try to rinse the mace off his face, Lt. Broc kicked him in the shower, saying, "Take that, bitch."

q.   On May 26, 2021, a detainee was maced in his cell after his cellmate voiced displeasure at being asked to move cells. Despite the detainee being uninvolved in the conversation, despite neither person in the cell threatening anyone, and despite being protected by the closed and locked door, Lt. Fowlkes stuck a nozzle through the door and sprayed mace into the room, saying "Y'all think about that."

r.   On July 30, 2021, an entire group of detainees in CJC Pod 3B were subjected to mace following an attempt by the detainees to peacefully discuss issues with the correctional officers.  The detainees were seeking a conversation with the

Lieutenants and Supervisors about issues in the unit. The correctional officers left the unit, and a Response Team threw projectile canisters of chemical agents, and shut the doors to the units.

s. In August 2021, detainee Leron Harris was lying down in his cell when COs sprayed mace into his cell without warning or reason. The COs closed the door of his cell leaving Harris stuck breathing in the chemical agents, causing him to cough and throw up.

t. In August 2021, detainee Ovell Smith and other detainees were maced by multiple COs  after complaining about the water being shut off in their cells for two days. Ovell Smith and others were then handcuffed and lead to visiting booths. Without warning, COs maced Smith and others a second time even as they were restrained in handcuffs. Smith has asthma, and since being maced repeatedly at CJC, he has had more difficulty breathing.

u. On September 16, 2021, an entire Pod of detainees was sprayed by Lt. Archibald, and COs Howard and Bryan in retaliation for the detainees' verbal, non-threatening protests about issues in the unit. The officers used large canisters of chemical agents, hitting several detainees directly in the face, causing sustained issues with vision. The entire unit was locked down. Detainees were not given medical treatment.

v. In November 2021, Reginald Smith was maced without warning or reason while trying to walk back to his cell. The mace caused his skin to burn and made it difficult for him to breathe.

w.  In January 2022, CO Wilburn deployed chemical agents through the chuckhole of Rodney Roberson's cell after Rodney refused to move cells. Wilburn then maced him two more times through the chuckhole before Rodney had to be taken to medical.

78.  Derrick Jones has witnessed CJC guards' excessive, indiscriminate, and unnecessary use of mace against other detainees on multiple occasions where there was no security threat and the detainee was not acting aggressively or actively resisting staff. For example, Derrick has seen guards spray mace into chuckholes, leaving detainees stuck in a cell full of chemical agents. He has seen them spray people if they are yelling or talking out of line. He has seen Lt. Fowlkes, in particular, mace people detained at CJC, without justification, multiple times.

79.  Jerome Jones described the use of mace by correctional officers and supervisors at CJC as a daily occurrence. Jerome and other detainees all describe the correctional officers and supervisors as using large canisters of mace, which are sometimes referred to as "Riot" cans, which deploy 'fogs' or amounts of mace appropriate for large crowds or areas, on individual detainees.

80.  Mace is often deployed by or in the presence of jail supervisors.

81.  The suffering caused by the use of mace throughout CJC is inescapable to anyone detained there, given how often CJC staff deploy mace, and in such large quantities. For example, staff are often seen carrying or deploying large capacity or riot-sized cans of mace.

82.  Visiting booths often have tangible smell and residue from mace that is openly detectable for hours or days after a macing incident.

83.  City purchasing records also reflect the excessive use of chemical agents at City jails: in 2020, CJC purchased just 30 cans of SABRE mace. **In 2021, it purchased 800 cans.**

84.     These customs and practices are not just unconstitutional, they also violate the City's Division of Corrections' own written policy regarding the use of chemical agents. A true and correct copy of that policy is attached hereto as **Exhibit A**.

85.     Defendants' written policy sets forth the method for use of chemical agents on detainees, including spraying the detainee for only 2-3 seconds, and giving a verbal warning before the use of the spray. It prohibits the use of mace on a detainee who has been placed on restraint and prohibits the use of mace on a detainee who "does not pose eminent [*sic*] danger to staff safety, other inmates [detainees[; is passive [*sic*] resistant, or is confined inside a secured cell but is disruptive in the cell."

86.     Defendants' written policy also prohibits the use of mace as punishment and when there is no justifiable security reason to use it on a detainee.

87.     The policy also requires that all persons be given immediate medical treatment and attention as needed, and that the detainee be provided a clean set of clothing.

88.     And the policy requires a Use of Force Report be completed every time chemical agents are used. Yet, upon information and belief, CJC staff are not completing these reports in every instance, as required.

89.     For example, the Division of Correction's monthly reports for October 2020 through March 2021 report zero allegations of use of force, and zero instances where staff used force that required minor first aid.[4] Yet in that time, Derrick and multiple other detainees submitted IRRs or other complaints alleging improper use of force, while CJC staff were openly spraying mace (which, according to Defendants' policy, *per se* require first-aid attention) throughout the

---

[4] These monthly reports are available on the City's website. *See*, *e.g.*, https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/monthly-reports-2021.cfm (last accessed May 20, 2021). Unfortunately, the City appears to have ceased posting monthly reports, with the last publicly available report available posted November 2021.

jail without justification and in violation of Division of Corrections policy and detainees'
constitutional rights.

90.     Upon further information and belief, supervisory staff, including Superintendent
Barnes and Commissioner of Corrections Clemons-Abdullah are aware of these unconstitutional
practices and violations of written policy, but are deliberately indifferent to these unconstitutional
practices and have not taken adequate steps to reprimand, discipline, or train staff who are
responsible for the violations described herein.

91.     As a result, all detainees at CJC are at significant risk of excessive and
unconstitutional violence at the hands of CJC Correctional Officers.

92.     According to use of force reports prepared by CJC staff, two staff members – CO
Che' Boatman and Lt. Javan Fowlkes – were responsible for a combined 36 instances of macing
detainees in just two months. Yet, neither was restricted from interacting with detainees or using
mace. Indeed, neither CO Boatman nor Lt. Fowlkes evidently experienced any consequences for
this egregious violation of Defendants' own written policy. Consequences were reserved for the
people left choking and burning in their cells.

93.     Supervisory review of use-of-force reports is cursory and almost universally results
in the affirmation of the force used no matter the amount of force or whether the justification of
the force comports with department policy. Use of force reports show that video of incidents is
rarely saved.

94.     In the exceedingly rare instance that a supervisor notes issues with the force used,
it does not result in any consequences for the officers.

95.     Even if detainees attempt to complain about the unconstitutional and abusive use
of mace by a given correctional officer or supervisor, the detainee does not receive a response

beyond being told off verbally, and the officer or supervisor continues carrying and using mace at will.

***Defendants' punishment of Derrick, Jerome, Darnell, Marrell and other CJC detainees through deprivation of potable drinking water and water to flush toilets.***

96.     In CJC cells, detainees are expected to access drinking water from a sink on top of the toilet in the cell. The same water supply provides drinking water and water for the toilet to flush.

97.     Upon information and belief, correctional officers at CJC are able to shut off the water source, preventing access to water in each detainee's cell. Shutting off the water source both blocks drinking water from coming out of the sink spout and prevents the toilet from flushing.

98.     On February 6, 2021, following the uprising of CJC detainees that started the prior evening, some detainees formerly housed in the fourth-floor pods were moved up to the fifth floor. Among the detainees moved was Plaintiff Jerome Jones.

99.     When those detainees were moved up to the fifth floor, they were put in cells where the water supply had been cut off by correctional staff, even though detainees had not intentionally flooded their cells or threatened to do so.

100.    For several days following, detainees on the fifth floor had no access to water to drink or ability to flush the toilet.

101.    For these days, Plaintiffs and the other detainees were also not receiving regular, if any, meals, and as such were not given any juice or other supplements at mealtime.

102.    This meant Plaintiffs and the other detainees went **days** without having any liquids to drink.

103.	During these days, Jerome was forced to use the bathroom in a toilet that would not flush, meaning that he was sleeping next to a toilet bowl of standing excrement and urine. Some detainees were put into cells that had toilets already filled with excrement.

104.	Several other detainees' toilets overflowed, the floors of their cells then strewn with this excrement and urine.

105.	This complete deprivation of drinking water and water to flush toilets initially lasted at least three days, until February 9, 2021, and, upon information and belief, possibly longer for some other pods on the fifth floor.

106.	The lack of water between February 6 through February 9, 2021, was not due to plumbing or equipment failures, but was an intentional, punitive, and retaliatory deprivation of water.

107.	After Jerome was unjustifiably maced on February 9, 2021, he was put back in his cell without running water. He therefore had no ability to flush the chemical agents from his eyes or skin. He was in the cell for approximately 12 hours or more with mace residue on his skin and no method to wash it off, and without access to drinking water.

108.	Around July 2021, the drinking water in Marrell's CJC cell did not work for 8 days. He was so desperate for water that he had to break the sprinkler in his cell in order to get the attention of COs who had ignored his calls for help.

109.	In the summer of 2021, COs also shut off the water to Marrell's cell as a form of punishment.

110.	Darnell has also experienced many water shut offs during his detention at CJC. Most recently, in November 2021, Lt. Fowlkes shut off the water to his cell and all others cells in

his unit as punishment for a fight that occurred between two other detainees. The water remained shut off throughout Lt. Fowlkes's shift.

111.     Since February 9, 2021, the correctional staff have continued to regularly shut off water to detainees' cells for periods of time varying from several hours to multiple shifts. On information and belief, these water shutoffs occur at least weekly, if not more often.

112.     These regular water shut-offs are not the result of equipment failures or plumbing issues. The water shut-offs are not conducted for maintenance purposes.

113.      Instead, correctional staff cut off the water to punish whole pods of detainees for individual detainees' behavior or speech, and to discourage questions or challenges from detainees.

114.     On February 10, 2021, a group of concerned advocates wrote to the City of St. Louis, Public Safety Director Jimmie Edwards, and then-Commissioner Dale Glass to apprise them of the conditions at CJC. Among the issues raised in that letter was the deprivation of drinking water and water to the toilets. A true and correct copy of that letter is attached hereto as **Exhibit B**.

115.     Then-City-Counselor Michael Garvin responded the following day, wholly disregarding the concerns raised in the February 10 letter. For example, Mr. Garvin wrote: "the **only** time water is 'turned off' is when detainees intentionally plug the toilets with clothing and flood the jail floors. Detainees are given scheduled times when their water will be turned back on." (emphasis added). A true and correct copy of Mr. Garvin's February 11, 2021 letter is attached hereto as **Exhibit C**.

116.     Correctional officers do occasionally shut off the water for non-punitive reasons. For example, some shutoffs occur when individual detainees "flood their cells" (meaning to stop up their toilets and cause water to spill on the floor). But, contrary to the position previously taken

by the City, that is the exception. More often, correctional officers shut off the water as punishment, inflicted on everyone in the affected area, in response to the actions of individual detainees. These punitive deprivations of water are inflicted in response to a wide range of occurrences, none of them flooded cells: when detainees ask too many questions, when detainees take too long coming in from their very limited recreation time, if detainees "get an attitude," or if one detainee resists getting maced or disciplined.

117.    Staff also commonly shut off water when detainees bang on their cell doors—something detainees do to get staff attention or assistance because staff routinely ignore the call buttons in detainees' cells, if the call buttons are functioning at all.

118.    These water shut-offs periodically occur throughout CJC since February 9, 2021. Some representative examples include the following instances:

     a.   In February 2021, the water was shut off one day to the entire pod where Jerome was housed because the correctional officers stated some of the other detainees were "acting childish" and needed to be taught a lesson.

     b.   In February 2021,Willie Frazier was put in a cell with no access to water after a CO had an altercation with another detainee.

     c.   On March 5, 2021, Lt. Fowlkes turned off water to cells in the pod where Derrick was housed. After Derrick asked a Correctional Officer Chris to turn the water back on, CO Chris said that only Lt. Fowlkes could do so, and "you know how he is."

     d.   On April 25, 2021, a detainee got into an argument with CO Smith in pod 5D. In response, the CO shut off water for the entire pod. When asked why he shut the water off, the CO responded: "I did it cause I want to."

e. On May 13 and May 18, 2021, Lt. Fowlkes shut off the water to pod 5B all day during his entire shift, with no instance of detainees flooding their cells. Around this same time, water was additionally shut off in pod 5D for about 3-4 hours in response to a detainee kicking his cell door.

f. In December 2021 Andrew Brummell was maced and then left without access to water in his cell.

119.    As further evidence the water shut-offs are not connected to mechanical or equipment issues, specific correctional officers—namely Lt. Fowlkes—have a predilection for turning the water off. Lt. Fowlkes will announce to the pod upon arriving that he's turning the water off to have "a quiet night." Sometimes, when Lt. Fowlkes arrives at work, he simply turns off the water immediately.

120.    Guards routinely threaten detainees with water shut-offs in response to minor misconduct unrelated to plumbing. For example, they will shout, "If you keep it up, you won't have your damn water tomorrow!" Or: "Act right or we'll turn the water off." And, from Lt. Fowlkes: "If you keep talking shit, I won't turn the water back on."

121.    This regular punishment by water deprivation for a number of hours or days amounts to cruel, inhumane treatment or punishment and causes severe health effects for the detainees.

122.    Derrick describes the water shut-offs as causing intense dehydration and making him feel as though he is going to die.

123.    Jerome describes the water shut-offs as causing stress, headaches, and dehydration. Because Jerome was put into a cell after being maced during a water shut-off, he dealt with intense burning for hours with no way to flush his eyes.

124.    Detainees attempt to avoid using the bathroom during these times which causes discomfort and stomach issues.

125.    When they lack drinking water, detainees are unable to take medicine, which can create security and safety issues for CJC staff and detainees, in addition to entirely preventable medical and mental health issues for the detainees.

126.    Because many of their commissary-purchased foods require water to consume, detainees are also unable to adequately eat during the punitive water shut-offs.

127.    Aside from the physical repercussions of being deprived of water, Defendants' arbitrary and punitive water shut-offs cause Plaintiffs and other detainees mental pain and suffering. Detainees experience anxiety, fear, and helplessness when water is turned off, not knowing when it will be turned back on. Detainees experience trauma when they are forced to wonder when or even whether they will regain access to water. They live with the fear of being entirely dependent on CJC staff to be able to avoid  dehydration. This fear is exacerbated by CJC staff's frequent, if not ever-present, threats to turn off the water. Even when water resumes, they experience anxiety not knowing the next time guards will turn the water off, or for how long.

128.    Punishment of detainees by suspension or restriction of water also violates the prohibition of torture and ill-treatment and universally recognized international human rights standards, as set forth most notably in the "Nelson Mandela Rules" (United Nations Standard Minimum Rules for the Treatment of Prisoners, U.N. Doc. A/RES/70/175 (Jan. 8, 2016). https://www.un.org/en/events/mandeladay/mandela_rules.shtml).

***Defendants denial of Plaintiffs' access to the grievance process.***

129.    The City jails' detainee handbook describes a complicated written administrative grievance process. Although the jail now has an electronic grievance process, which detainees can access on tablets, it is not discussed at all in the detainee handbook.

130.    Plaintiffs never received a copy of the detainee handbook, and have never been informed about the grievance policy.

131.    In practice, the grievance process at CJC is opaque and confusing, and practically inaccessible by detainees due to staff stonewalling or refusing to cooperate in providing or delivering informal resolution requests ("IRRs") or grievance documents to the relevant, required recipient.

132.    Derrick Jones has filed handwritten IRRs regarding the conditions of his confinement, but has never received a response to those IRRs.

133.    He also has filed grievances on his tablet. He has never received a response to those, either.

134.    After the macing incident in December, Derrick Jones completed an IRR addressing the incident, and gave the IRR to CO Trece. The wing in which Derrick is locked in solitary confinement does not have a box or any other formal location where detainees can deliver grievances. CO Trece received the IRR, but Mr. Jones has never received a response.

135.    Per the grievance policy, the Grievance Coordinator must respond to grievances within 15 working days.

136.    On or about December 28, 2020, after receiving no response to the written IRR, Derrick completed a grievance on his tablet.

137.    Derrick did not receive a response to the electronic grievance, so in early March 2021, he filed an appeal on his tablet. The grievance policy requires staff respond to appeals within 10 business days. Despite this, as of March 26, 2021, the tablet still indicated that the grievance appeal was under review.

138.    As of the filing of this Complaint, Derrick Jones still has not received any response to his IRR or grievances regarding CJC staff's excessive use of mace.

139.    Derrick also used the tablet to file a grievance complaining about the improper and inhumane practice of shutting the water off in his pod in early March 2021. He received no response and so, after several weeks, he filed an appeal on his tablet. Derrick did not receive a response to that appeal within the 10 working days set out in the policy for staff to respond.

140.    Jerome Jones, too, tried to grieve his macing incident. He completed an IRR, but jail staff refused to accept the form, thus preventing him from being able to access the grievance process at all.

141.    Darnell Rusan asked for an IRR form and was denied. When he persisted in requesting an IRR form to grieve Defendants' use of mace, he was threatened with mace yet again. For a few months following the incidents, Darnell did not have access to a tablet.

142.    Immediately after he was maced, Marrell Withers tried to file an IRR form. There is no IRR box in his unit, so the only way to file an IRR form is by delivering it directly to correctional staff. He gave it to his case manager, Ms. Gordon.

143.    After he asked about it, Ms. Gordon told him it was "above her pay grade" and had him fill out a second IRR on a different form. He got a photocopy of the IRR he wrote, but never a written acknowledgment that it was received. He has never received a response.

144.    Marrell tried on numerous occasions to ask when he will get an IRR response. Both his case manager and the housing unit staff refuse to give him an answer. By way of explanation, the housing unit manager told him that CJC does not have an IRR officer on staff right now.

145.    On or around February 28, 2022, Marrell tried to file his IRR on the tablet. The tablets have no method for detained individuals to file a grievance or appeal.

146.     The tablets also cost money to use, and detained individuals only get 15 free minutes of access a day. Marrell also received no response to this IRR.

147.     Marrell has even tried to file an IRR contesting the lack of responses to his other IRR.  Again, he received no response.

148.     Marrell has never seen another detained individual get a response to an IRR.

149.     Eric Williams has witnessed COs rip up IRRs on multiple occasions.

150.     The practice of denying detainees access to the grievance process—either by refusing to give forms to detainees or never responding to IRRs or grievances—is very common at CJC, and presents an impediment to the informal resolution of conflict or issues with conditions at the jail.

## Class Allegations

151.     Plaintiffs bring this suit on their own behalf and on behalf of all individuals who currently are or will be detained at the St. Louis City Justice Center and who are at risk of being subjected to the systemic practice of excessive force and water shut offs described above.

152.     The Medical Subclass is defined as all qualifying individuals who are or will be detained at CJC and who have a disability that makes them particularly susceptible to serious harm from chemical agents ("disabilities").

153.     The class and subclass Plaintiffs seek to represent meet the Requirements of Rule 23 as follows:

*Numerosity*

154.     The class and subclass are so numerous that joinder of all members is impractical. The CJC Class is comprised of over 500 individuals, including future unknown class members.

155.     The class and subclass also include an unknown and unknowable number of future class members, since the detained population at CJC varies daily. New class members are being

added on a regular basis as individuals are arrested on new charges or alleged parole or probation violations. And individuals will regularly leave the class and the subclass because they leave CJC via release or transfer to a state or federal prison.

156.    Based on information and belief, the number of people with disabilities that makes them particularly susceptible to serious harm from chemical agents in CJC is numerous and CJC keeps records of detainees' health conditions.

157.    The fluidity of this class and subclass, as described above, is evidence of potentially hundreds of future class members who are necessarily unidentifiable.

***Commonality***

158.    There are questions of law or fact common to the class and the subclass, which include but are not limited to whether Defendants:

  a.   deploy chemical agents on detainees who do not pose a threat or are not actively resisting;

  b.   deploy chemical agents against detainees who are handcuffed or detained in a secure cell, and not posing a security threat;

  c.   utilize large, "riot-sized" cans of mace or excessive bursts of mace disproportionate to any purported need for force;

  d.   deploy chemical agents without adequate warning;

  e.   deploy chemical agents on detainees with disabilities that make them particularly susceptible to serious harm from chemical agents, such as asthma, without providing any reasonable accommodations;

  f.   use chemical agents for the malicious purpose of inflicting pain and punishment;

  g.   obstruct or disregard grievance-related documents and complaints related to instances of force;

  h.   failed to train or supervise the use of chemical agents, including but not limited to on detainees with disabilities that makes them  particularly susceptible to serious harm from chemical agents, such as asthma;

  i.   shut off detainees' access to water for punitive purposes;

       j.   failed to implement policies and practices necessary to halt the brutal systemic use of chemical agents and water shut-offs against proposed CJC Class members.

159.    Resolving these questions, including whether there is a pattern of excessive force and water deprivation that puts detainees at a substantial risk of harm, will yield a "common answer" to Plaintiffs' Fourteenth Amendment claims. The class and subclass also seek injunctive and declaratory relief.

***Typicality***

160.    Because the policies, practices and customs challenged in this Complaint apply with equal force to the named Plaintiffs and members of the class and subclass, the claims of the named Plaintiffs are typical of the class and subclass in general. Moreover, Plaintiffs Marrell Withers' and Darnell Rusan's claims are typical of the proposed Medical Subclass because they suffer from asthma and epilepsy, respectively.

***Adequacy of Representation***

161.    The named Plaintiffs will fairly and adequately represent the interests of the class and subclass. They each possess a strong personal interest in the subject matter of the lawsuit and are represented by experienced counsel from the MacArthur Justice Center, Arch City Defenders, the St. Louis University School of Law Legal Clinics, and Rights Behind Bars. The undersigned counsel have significant litigation experience in state and federal courts, including as class counsel in various civil rights actions seeking prospective relief.

162.    The Defendants have acted or refused to act on grounds generally applicable to the class: their policies, procedures, practices, acts, and omissions have affected all class members. Accordingly, final injunctive and declaratory relief is appropriate for the class and subclass as a whole.

## Claims for Relief

### COUNT I
### Excessive Force in Violation of Fourteenth Amendment under 42 U.S.C. § 1983
### (Derrick Jones against Defendants Richard and Fowlkes)

163.    Plaintiffs incorporate all preceding paragraphs as if fully set forth in this Count.

164.    Defendants Richard and Fowlkes purposefully or knowingly used objectively unreasonable force on Derrick Jones when they sprayed him with an excessive amount of chemical agents while he was restrained and again while he was confined within a secure room, and without providing a prior warning, as described more fully above.

165.    The circumstances under which Richard and Fowlkes used chemical agents against Derrick, as described above, were not rationally related to a legitimate governmental purpose or, alternatively, were excessive in relation to any legitimate governmental purpose.

166.    Alternatively, defendants Richard and Fowlkes's use of force against Derrick was objectively unreasonable.

167.    Defendants Richard and Fowlkes's above-described actions were undertaken with malice and/or reckless disregard for Derrick's constitutional rights.

168.    Defendants Richard and Fowlkes's actions were the direct and proximate cause of the violations of Derrick's constitutional rights and the damages suffered by Derrick, including pain, suffering, emotional distress, and injury.

WHEREFORE, Plaintiff Derrick Jones prays this Court enter judgment in his favor against Defendants Richard and Fowlkes, award compensatory damages, costs and attorneys' fees, and punitive damages against Defendants Richard and Fowlkes, and for such further additional relief as this Court may deem just and appropriate.

## COUNT II
### Excessive Force in Violation of Fourteenth Amendment under 42 U.S.C. § 1983
### (Jerome Jones against Defendant Fowlkes)

169.    Plaintiffs incorporate all preceding paragraphs as if fully set forth in this Count.

170.    Defendant Fowlkes purposefully or knowingly used objectively unreasonable force on Jerome Jones when he sprayed him with an excessive amount of chemical agents while he was restrained and within a secure room, as described more fully above.

171.    The circumstances under which Defendant Fowlkes used  chemical agents against Jerome, as described above, were not rationally related to a legitimate governmental purpose or, alternatively, were excessive in relation to any legitimate governmental purpose.

172.    Alternatively, Defendant Fowlkes's use of force against Jerome was objectively unreasonable.

173.    Defendant Fowlkes's above-described actions were undertaken with malice and/or reckless disregard for Jerome's constitutional rights.

174.    Defendant Fowlkes's actions were the direct and proximate cause of the violations of Jerome's constitutional rights and the damages suffered by Jerome, including pain, suffering, emotional distress, and injury.

WHEREFORE, Plaintiff Jerome Jones prays this Court enter judgment in his favor against Defendant Fowlkes, award compensatory damages, costs and attorneys' fees, and punitive damages against Defendant Fowlkes, and for such further additional relief as this Court may deem just and appropriate.

## COUNT III
**Excessive Force in Violation of Fourteenth Amendment under 42 U.S.C. § 1983
(Darnell Rusan against Defendants Turner, Alexander, Borders, and Fowlkes)**

175.    Plaintiffs incorporate all preceding paragraphs as if fully set forth in this Count.

176.    Defendants Turner, Alexander, Borders, and Fowlkes purposefully or knowingly used objectively unreasonable force on Darnell Rusan when they sprayed him three times with an excessive amount of chemical agents, including once while he was restrained and months later when he was fully nude and confined within a secure room. In each instance, he was not actively resisting or threatening staff and was sprayed without prior warning, as described more fully above.

177.    Defendant Alexander also purposefully or knowingly used objectively unreasonable force on Darnell Rusan when he slammed Darnell's head into the elevator wall after macing him, and when he hit and choked Darnell, telling him, "we'll kill your little ass in here." Darnell's head still hurts from those beatings.

178.    The circumstances under which Turner, Alexander, Borders, and Fowlkes used mace against Darnell, as described above, where not rationally related to a legitimate governmental purpose or, alternatively, were excessive in relation to any legitimate governmental purpose.

179.    Alternatively, Defendants Turner, Alexander, Borders, and Fowlkes's use of force against Darnell was objectively unreasonable.

180.    Defendants Turner, Alexander, Borders, and Fowlkes's above-described actions were undertaken with malice and/or reckless disregard for Darnell's constitutional rights.

181.    Defendants Turner, Alexander, Borders, and Fowlkes's actions were the direct and proximate cause of the violations of Darnell's constitutional rights and the damages suffered by Darnell, including pain, suffering, emotional distress.

WHEREFORE, Plaintiff Darnell Rusan prays this Court enter judgment in his favor against Defendants Turner, Alexander, Borders, and Fowlkes, award compensatory damages, costs and attorneys' fees, and punitive damages against Defendants Turner, Alexander, Borders, and Fowlkes, and for such further additional relief as this Court may deem just and appropriate.

**COUNT IV**
**Excessive Force in Violation of Fourteenth Amendment under 42 U.S.C. § 1983**
**(Marrell Withers against Defendants Willis and Jones)**

182.   Plaintiffs incorporate all preceding paragraphs as if fully set forth in this Count.

183.   Defendants Willis and Jones purposefully or knowingly used objectively unreasonable force on Marrell Withers when they sprayed him with an excessive amount of chemical agents while he was restrained, as described more fully above.

184.   The circumstances under which Defendants Willis and Jones used  chemical agents against Marrell, as described above, were not rationally related to a legitimate governmental purpose or, alternatively, were excessive in relation to any legitimate governmental purpose.

185.   Alternatively, Defendants Willis' and Jones' use of force against Marrell was objectively unreasonable.

186.   Defendants Willis' and Jones' above-described actions were undertaken with malice and/or reckless disregard for Marrell's constitutional rights.

187.   Defendants Willis' and Jones' actions were the direct and proximate cause of the violations of Marrell's constitutional rights and the damages suffered by Marrell, including pain, suffering, emotional distress, and injury.

WHEREFORE, Plaintiff Marrell Withers prays this Court enter judgment in his favor against Defendants Willis and Jones, award compensatory damages, costs and attorneys' fees, and punitive damages against Defendant Willis and Jones, and for such further additional relief as this Court may deem just and appropriate

**COUNT V**
**Class Action Claim for Prospective Relief for Excessive Use of Force in Violation of the**
**Fourteenth Amendment under 42 U.S.C. § 1983**
**(Class Claim against the City of St. Louis)**

188.    Plaintiffs incorporate all preceding paragraphs as if fully set forth in this Count.

189.    Plaintiffs and the class they represent were deprived and continue to be deprived by Defendants of their rights under the Fourteenth Amendment to the United States Constitution to due process of law and to be free from excessive force.

190.    The widespread use of force at the City Justice Center, including Defendants' failure to take reasonable precautions against macing detainees with disabilities that makes them particularly susceptible to serious harm from chemical agents, and Defendants' failures to take appropriate steps to curb this brutality are objectively unreasonable and taken together or individually, constitute deliberate indifference to Plaintiffs' rights to be free from cruel and unusual punishment.

191.    Defendants know of and disregard a substantial risk of serious injury that detainees housed in the City Justice Center face at the hands of staff.

192.    Upon further information and belief, supervisory staff, including Superintendent Barnes and Commissioner of Corrections Clemons-Abdullah are aware of these unconstitutional practices and violations of written policy, but are deliberately indifferent to these unconstitutional practices and have not taken adequate steps to reprimand, discipline, or train staff who are responsible for the violations described herein.

WHEREFORE, Plaintiffs pray this Court enter judgment in their favor against the City of St. Louis, and enter an order against the City prohibiting the unconstitutional use of chemical agents going forward, and for such further additional relief as this Court may deem just and appropriate.

## COUNT VI
### *Monell* Claim for Excessive Force in Violation of
### Fourteenth Amendment under 42 U.S.C. § 1983
### (Individually Named Plaintiffs against the City of St. Louis)

193.    Plaintiffs incorporate all preceding paragraphs as if fully set forth in this Count.

194.    Plaintiffs have experienced and witnessed countless instances of staff's indiscriminate, excessive, and unnecessary use of mace on detainees. These instances occur with shocking frequency, and have been occurring with frequency for their entire detention.

195.    During the relevant time period, Superintendent Barnes and City Commissioner Clemons-Abdullah and her predecessors had or should have had notice of widespread practices by employees under which detainees were sprayed excessively with mace without proper warning and absent any security need warranting the use of chemical agents, and under which detainees were sprayed with mace for the malicious purpose of infliction of pain and punishment.

196.    These widespread practices are the result of the lack of formal training and supervision on the use of chemical agents, and lack of repercussions for the excessive and inappropriate use of chemical agents.

197.    These widespread practices were allowed to flourish and become so well-settled as to constitute de facto policy of the City jails because governmental policymakers with authority over the jails exhibited deliberate indifference to the problem, thereby effectively ratifying it.

198.    Additionally, these practices are allowed to flourish because staff routinely obstruct and completely disregard detainee IRRs and other complaints regarding instances of force by correctional officers, so as to cover-up and insulate staff from sanctions both civil and criminal repercussions when targeting and abusing detainees.

199.    Plaintiffs' injuries were caused in substantial party by these widespread policies, practices, and procedures promulgated by the City jail staff.

WHEREFORE, Plaintiffs pray this Court enter judgment in their favor against the City of St. Louis, award compensatory damages, costs and attorneys' fees, and punitive damages against each of the Individual Defendants in their individual capacities, enter an order against the City prohibiting the unconstitutional use of chemical agents going forward, and for such further additional relief as this Court may deem just and appropriate.

**COUNT VII**
**Class Action Claim for Prospective Relief for Violation of**
**the Americans with Disabilities Act**
**(Medical Subclass against the City of St. Louis)**

200.    Plaintiffs incorporate all preceding paragraphs as if fully set forth in this Count.

201.    Plaintiffs Withers, Rusan and the Medical Subclass they represent have experienced the indiscriminate, excessive, and unnecessary use of chemical agents on detainees with disabilities that make them particularly susceptible to serious harm from chemical agents, including asthma and epilepsy.

202.    The City Justice Center is a "public entity" as defined under 42 U.S.C. § 12131(1)(A).

203.    Each member of the Subclass has a disability within the meaning of 42 U.S.C. § 12102(1) and 28 C.F.R. § 35.104 that renders them particularly susceptible to serious harm from chemical agents.

204.    Each member of the Subclass is "a qualified individual with a disability" within the meaning of 42 U.S.C. § 12131(2) and 28 C.F.R. § 35.104.

205.    Use of force practices and policies at CJC are programs, services, or activities within the scope of the ADA. *See Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998).

206.    Defendants have not fulfilled their affirmative obligation to reasonably accommodate people with disabilities who are detained at CJC. As such, Defendants subject

members of the Medical Subclass to discrimination by failing to provide reasonable accommodations in its use of force involving chemical agents.

207.    Defendants have no policy or practice requiring jail staff to conduct medical conditions inquiries before a planned use of force involving chemical agents to determine whether an individual's medical condition counsels against the use of chemical agents, nor do they have any practice or policy instructing accommodation of a person's disability before using chemical agents.

208.    The failure to provide reasonable accommodations results in discrimination which violates 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(b)(7)(i)

WHEREFORE, Plaintiffs pray this Court enter judgment in their favor against the City of St. Louis, and enter an order against the City prohibiting the use of chemical agents against detainees with disabilities absent provision of a reasonable accommodation, including a medical conditions check, and for such further additional relief as this Court may deem just and appropriate.

## COUNT VIII
### Claim for Damages for Violation of the Americans with Disabilities Act
### (Marrell Withers and Darnell Rusan against the City of St. Louis)

209.    Plaintiffs incorporate all preceding paragraphs as if fully set forth in this Count.

210.    Paragraphs 200-208 are incorporated as if fully set forth herein.

211.    Defendants were aware of Withers' and Rusan's disabilities from their medical records and when they were told about them by Withers and Rusan

212.    Defendants had reason to know that failing to accommodate Withers and Rusan when deploying chemical agents would result in serious harm.

213.    Defendants nonetheless deployed chemical agents against Withers and Rusan without even attempting to reasonably accommodate their disabilities.

WHEREFORE, Plaintiff Marrell Withers and Darnell Rusan pray this Court enter judgment in their favor against the City of St. Louis, award him compensatory damages, costs and attorneys' fees, and allow such further additional relief as this Court may deem just and appropriate.

## COUNT IX
**Conditions of Confinement Amounting to Punishment in Violation of the Fourteenth Amendment under 42 U.S.C. § 1983**
**(Derrick Jones and Jerome Jones against Defendant Fowlkes and CO John Doe )**

214.    Plaintiffs incorporate all preceding paragraphs as if fully set forth in this Count.

215.    Defendants Fowlkes and CO Doe purposefully or knowingly took actions to cut off the water source bringing water to detainees' cells.

216.    These correctional officers' regular action of shutting off water to detainees' cells is expressly and intentionally taken to punish entire groups of detainees for speech, minor infractions, or misbehavior from one detainee.

217.    Alternatively, the correctional officers' regular action of shutting off water to detainees' cells is not rationally connected to a legitimate non-punitive purpose and is excessive in relation to any such legitimate purpose.

218.    Alternatively, defendants acted intentionally to improperly deprive detainees of water, or defendants recklessly failed to act with reasonable care to mitigate the risk that withholding water in this way posed on Derrick and Jerome even though they knew, or should have known, that the condition posed an excessive risk to health or safety.

219.    Defendants CO Doe and Fowlkes's above-described actions were undertaken with malice and/or reckless disregard for Derrick and Jerome's constitutional rights.

220.     Defendants CO Doe and Fowlkes's actions were the direct and proximate cause of the violations of Derrick and Jerome's constitutional rights and the damages suffered by Derrick and Jerome, including pain, suffering, emotional distress.

WHEREFORE, Plaintiffs pray this Court enter judgment in their favor against Defendants Fowlkes and CO Doe, award compensatory damages to Jerome Jones, nominal damages to both Derrick Jones and Jerome Jones, costs and attorneys' fees, and punitive damages against Defendants CO Doe and Fowlkes in their individual capacities, declare these practices as unconstitutional and enter an order against all Defendants prohibiting the use of water deprivation as a tactic to unconstitutionally punish of detainees going forward, and for such further additional relief as this Court may deem just and appropriate.

### COUNT X
***Monell* Claim for Conditions of Confinement Amounting to Punishment in Violation of the Fourteenth Amendment under 42 U.S.C. § 1983**
**(Individually Named Plaintiffs against the City of St. Louis)**

221.     Plaintiffs incorporate all preceding paragraphs as if fully set forth in this Count.

222.     Plaintiffs and countless others have been subjected to punitive and retaliatory water shut-offs at the City Justice Center. These deprivations occur sporadically but regularly, and are imposed not in response to misconduct related to plumbing, but as punishment for minor and non-threatening misconduct, such as asking questions or "getting an attitude." These shut-offs have persisted for months, and continue to take place.

223.     During the relevant time period Superintendent Barnes, Commissioner Clemons-Abdullah, and her predecessors had or should have had notice of widespread practices by employees at the CJC under which detainees were intentionally deprived of drinking water and water for their toilets, for the malicious purpose of infliction of pain and punishment.

224.     These widespread practices were allowed to flourish and become so well-settled as to constitute de facto policy of the CJC because governmental policymakers with authority over the jail—namely, Superintendent Barnes and Commissioner Clemons-Abdullah,—exhibited deliberate indifference to the problem, thereby effectively ratifying it.

225.     These practices also are allowed to flourish because CJC staff fail to apprise detainees of the jail's grievance process, and routinely obstruct and completely disregard detainee IRRs and other complaints so as to cover-up and insulate staff from sanctions both civil and criminal repercussions when targeting and abusing detainees.

226.     Plaintiffs' injuries were caused in substantial party by these widespread policies, practices, and procedures promulgated by the CJC.

WHEREFORE, Plaintiffs pray this Court enter judgment in their favor against the City, award nominal damages, costs and attorneys' fees, and enter an order against the City prohibiting the unconstitutional practice of water shut-offs as punishment going forward, and for such further additional relief as this Court may deem just and appropriate.

## COUNT XI
### Class Action Claim for Prospective Relief for Conditions of Confinement Amounting to Punishment in Violation of the Fourteenth Amendment under 42 U.S.C. § 1983
### (Class Claim against the City of St. Louis)

227.     Plaintiffs incorporate all preceding paragraphs as if fully set forth in this Count.

228.     Plaintiffs and the class they represent were deprived and continue to be deprived by the Defendants of their rights under the Fourteenth Amendments to the United States Constitution to due process of law on account of correctional officers' regular action of shutting off water to their cells

229.     During the relevant time period Superintendent Barnes, Commissioner Clemons-Abdullah, and her predecessors had or should have had notice of widespread practices by

42

employees at the CJC under which detainees were intentionally deprived of drinking water and water for their toilets, for the malicious purpose of infliction of pain and punishment.

230.    The widespread practice of water-shut offs and Defendants' failures to take appropriate steps to curb theses water shut-offs is objectively unreasonable and constitutes deliberate indifference to Plaintiffs' rights to be free from cruel and unusual punishment.

WHEREFORE, Plaintiffs pray this Court enter judgment in their favor against the City of St. Louis, and enter an order against the City prohibiting the unconstitutional practice of water shut-offs as punishment going forward, and for such further additional relief as this Court may deem just and appropriate.

Dated: March 15, 2022                    Respectfully submitted,


By:   /s/ Shubra Ohri
   Amy E. Breihan (MBE #65499MO)
   W. Patrick Mobley (MBE #63636MO)
   Shubra Ohri (E.D. Mo. Bar No. 63098241L)
   906 Olive Street, Suite 420
   Saint Louis, Missouri 63101

RODERICK & SOLANGE MACARTHUR
JUSTICE CENTER


/s/ Maureen Hanlon

   Blake A. Strode (MBE #68422MO)
   Jacki Langum (MBE #58881MO)
   John M. Waldron (MBE #70401MO)
   Maureen Hanlon (MBE #70990MO)
   Brittney Watkins (MBE #73992MO)
   Emanuel Powell (E.D. Mo. Bar No. #706171MA)
   Nathaniel R. Carroll (MBE #67988MO)
   440 N. 4th Street, Suite 390
   Saint Louis, MO 63102

ARCHCITY DEFENDERS, INC.

/s/Brendan Roediger

Brendan Roediger (E.D. Mo. Bar No. #6287213IL)
Lauren Bartlett (MBE #71698MO)
100 N. Tucker Blvd.
Saint Louis, MO 63101-1930

SAINT LOUIS UNIVERSITY SCHOOL OF
LAW LEGAL CLINICS

 /s/Oren Nimni

Oren Nimni *admitted pro hac vice
416 Florida Avenue, NW #26152
Washington, D.C. 20001

RIGHTS BEHIND BARS

*Attorneys for the Plaintiffs*