UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

Derrick Jones, Jerome Jones, and
Darnell Rusan,

     PLAINTIFFS,

v.

City of St. Louis, et al.,

     DEFENDANTS.

Cause No. 4:21-cv-600-NCC

## DEFENDANTS CITY OF ST. LOUIS, FOWLKES, TURNER, BORDERS, WILLS, JONES, AND ALEXANDER'S MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT

Come now Defendants City of St. Louis, Javan Fowlkes, Aisha Turner, Direll Alexander, Freddie Wills, Douglas Jones, and Bruce Borders and in support of their Motion to Dismiss Plaintiffs' Third Amended Complaint state the following:

**I. Plaintiff's failed to state a claim for relief in Counts I, II and III of the Second Amended Complaint alleging excessive force by individual officers in violation of the Fourteenth Amendment because they have alleged merely *de minimis* injuries.**

Defendants Fowlkes, Turner, Borders, Alexander, Wills, and Jones are entitled to qualified immunity on plaintiffs' individual claims of excessive force.

1

The officers are shielded "from liability if their conduct does not violate clearly established constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 420 U.S. 308 (1975). A two-step inquiry is generally employed when making a determination of qualified immunity: whether there was a constitutional violation, and if so, whether the violation was of a clearly established right a reasonable officer should know. *Saucier v. Katz*, 533 U.S. 194 (2001). "The Court may address either question first." *Lombardo v. Saint Louis City*, 361 F. Supp. 3d 882, 893 (E.D. Mo. 2019)(*citing Boude v. City of Raymore*, 855 F.3d 930, 933 (8th Cir. 2017)). "If either question is answered in the negative, the public official is entitled to qualified immunity." *Id.* quoting *Norris v. Engles*, 494 F.3d 634, 637 (8th Cir. 2007).

The inquiry in an excessive force case brought by a pretrial detainee is whether there has been a violation of his Fourteenth Amendment right to due process. *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). The analysis employed by the Eighth Circuit in evaluating whether force is excessive in violation of the Fourteenth Amendment looks at whether the force used by an officer is unreasonable:

> "Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. We do not

consider this list to be exclusive. We mention these factors only to illustrate the types of objective circumstances potentially relevant to a determination of excessive force. *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)(internal citation omitted).

The reasonableness inquiry necessarily requires some evaluation of the significance or amount of force used as well as the significance or severity of resulting injuries. Because uses of force The Eighth Circuit has held that "[a] *de minimis* use of force is insufficient to support a claim, and it may well be that most plaintiffs showing only *de minimis* injury can show only a corresponding *de minimis* use." *Robinson v. Hawkins*, 937 F.3d 1128, 1136 (8th Cir. 2019). And while evidence of *de minimis* injury may not necessarily foreclose a claim of excessive force, it has significant weight in bearing on the question of whether the force was reasonable under the circumstances. *Chambers v. Pennycook*, 641 F.3d 898 (8th Cir. 2011)(finding that it was reasonable for officers to believe "they remained within constitutional bounds" when their use of force caused only *de minimis* injury).

This Eighth Circuit has never held that pepper spray necessarily causes more than *de minimis* injury, *Peterson v. Kopp,* 754 F.3d 594 (8th Cir. 2014), and the absence of significant injury has a bearing on whether force used was more than *de minimis.* A burst of pepper spray that causes momentary pain or discomfort is not excessive force at all times and under all circumstances. Rather, like a knee in the back, it can be regarded as a *de minimis* use of force. Cf. *White v. Jackson,* 865

3

F.3d 1064.

Plaintiffs Derrick Jones, Jerome Jones, Darnell Rusan, and Marrell Withers have alleged only *de minimis* injuries caused by the defendants uses of force. The lack of significant injury experienced from pepper spray supports the determination that the officers' uses of force not only reasonable under the totality of the circumstances, but *de minimis* uses of force, entitling the officers to qualified immunity on these claims.

### 1.      *Count I: Derrick Jones claim against Lt. Javan Fowlkes*

Plaintiff Derrick Jones alleges he was sprayed on or around December 14, 2020, when he expressed a desire to be moved to a different cell because his cellmate was experiencing signs of COVID-19 infection. Doc. #131, para. 19. Derrick Jones alleges that a Lt. Richards engaged in conversation with him to see if moving cells was a possibility before ultimately telling him he would have to stay in his current cell. Doc. #131, para. 20-21. Plaintiff does not allege any facts confirming that the cellmate was actually positive for COVID-19 infection. Plaintiff alleges that after being told he would have to return to his cell, Lt. Richards left the wing before returning with a can of mace and other corrections officers. Derrick Jones alleges Lt. Richards then sprayed him in the eyes and face without giving any warning. Doc. Doc. #131, para. 22-24. He alleges he was then taken to the ground and beaten, put in handcuffs, and sprayed by Lt. Fowlkes

without being warned. Doc. #131, paras. 24-25.  He concludes that at the time he was sprayed, "he was not acting aggressively and was not threatening staff safety." Doc. #131, para. 26. He alleges that he was then taken to a holding cell in the medical unit where he was sprayed by Lt. Fowlkes for no reason, before being decontaminated by medical staff. Doc. Doc. #131, para. 28. He claims the pepper spray caused his face and eyes to burn, that he had difficulty breathing, and that he spent several days in the same clothes, "the burning mace clinging to his skin and clothes." Doc. #131, para. 30.

Derrick Jones' injuries amount to burning feeling on his face and eyes after he was sprayed and until he was helped to wash them off with water in the medical unit, and some burning on his skin due to mace residue being left on his clothing. While the *de minimis* injuries do not foreclose Derrick Jones' constitutional claim, they, combined with the circumstances of the occurrence, bear heavily on the reasonableness analysis. As pled, this instance of use of force occurred during a tense and uncertain time for both inmates and corrections staff as they worked to prevent the spread of COVID-19 virus in the jail. Derrick Jones was displeased with his directions to return to his cell because he believed his cellmate was experiencing symptoms of the virus. A physical confrontation ensued which resulted in Derrick Jones being restrained and transported to the medical unit. This was a tense and rapidly evolving scenario in the jail.

Plaintiffs allegations cannot support a finding that he suffered more than *de minimis* injuries after being sprayed by Lt. Fowlkes. Plaintiff's injuries as pled, combined with the circumstances of the incident establish that Lt. Fowlkes is entitled to qualified immunity. As observed by this circuit, "[a] limited application of mace may be much more humane and effective than a flesh to flesh confrontation with an inmate." *Jones v. Shields*, 207 F.3d 491, 496 (8th Cir. 2000)(internal citation omitted). Lt. Fowlkes is entitled to qualified immunity because both the use of force and resulting injuries were *de minimus*, and it would be reasonable for Lt. Fowlkes to believe his actions remained within constitutional bounds.

**2.      *Count II: Jerome Jones' claim against Lt. Javan Fowlkes***

Plaintiff Jerome Jones pleads that he was pepper sprayed on or about February 9, 2021 when staff asked him to move cells. Doc. Doc. #131, para. 32 and 35. Plaintiff then alleges the following:

> "CO Robinson and CO Allen told Jerome that Lt. Fowlkes was going to mace Jerome if he did not comply. Jerome indicated again he would not move cells, but he was not physically resisting. Jerome was in handcuffs throughout the course of this entire conversation."

Doc. #131, para. 33.

Jerome Jones then alleges that the three officers place him "in a no-contact

visiting room" before he was again asked if he was going to cooperate to move cells. Doc. #131, para. 34. Plaintiff alleges he "responded, 'No' and Lt. Fowlkes sprayed an excessive amount of mace into the visiting booth until it filled the room." Doc. #131, para. 35. Plaintiff alleges Lt. Fowlkes then closed the door to the visiting booth and plaintiff Jerome Jones was left there for approximately 25 minutes. Doc. #131, para. 36.

Plaintiff Jerome Jones alleges this use of force caused him to have difficulty breathing while being in the visiting booth after being sprayed and that he experienced burning eyes, face and body after being sprayed. Doc. #131, para. 37 and 40. He alleges he experienced respiratory symptoms, including difficulty breathing, after this incident, and that he continues to experience these symptoms. Doc. #131, para. 44. He does not allege that he received any sort of medical diagnosis or treatment for these symptoms while in jail or since being released from custody but that he personally believes these respiratory symptoms were caused by this experience of pepper spray exposure while in jail. Doc. #131, para. 44.

Plaintiff Jerome Jones pleads that he was sprayed by Lt. Fowlkes when he repeatedly refused to cooperate with the officer's directions. At this point, and plausibly, Lt. Fowlkes was put in a position that required some use of force to compel Jerome Jones' obedience. As plead by Plaintiffs, Lt. Fowlkes asked Jerome

Jones to cooperate and warned him that he would be required to use spray if Jones would not comply. The force used by Lt. Fowlkes was reasonable under the circumstances, especially in light of Jones' defiance and lack of measurable injury which can be interpreted to have resulted from this incident. The *de minimis* injuries combined with plaintiff's admitted defiance and lack of alternatives for the officer to pursue should persuade this court to find that Lt. Fowlkes is entitled to qualified immunity on Jerome Jones' claim of excessive force in Count II.

3.      *Count III: Plaintiff Darnell Rusan's claim against Defendants Lt. Aisha Turner, Lt. Bruce Borders, and Lt. Javan Fowlkes*

Plaintiff Darnell Rusan alleges that while in custody since "around Thanksgiving of 2020" and "[h]e has been personally maced at least three times, and has witnessed countless other instances of excessive and unwarranted making by CJC staff." Doc. #131, para. 45. One of these instances of use of mace was on December 19, 2020. Doc. #131, para. 47-50. Darnell Rusan alleges he was outside his cell to make a phone call when Defendant Aisha Turner sprayed him while he was in the process of terminating the phone call and without warning him. Doc. #131, para. 50-51. He then alleges he was beaten and threatened by other officers including Defendant Direll Alexander while they transported him to the medical unit and then to another unit in the jail. Doc. #131, para. 53-54. Plaintiff Rusan also alleges he was sprayed with mace by Lt. Fowlkes on February 3, 2021 when

he was being strip searched. Doc. #131, para. 58-61. Plaintiff Rusan alleges that he refused to allow Lt. Fowlkes to search him because he had already been searched and was uncomfortable, which led to Lt. Fowlkes spraying him. Doc. #131, para. 61. He also alleges that he made a joke to one of the searching officers asking, "do you actually like this job?" prior to being searched. Doc. #131, para. 59. Plaintiff Rusan's alleges no measurable injuries after being sprayed by Lt. Fowlkes other than the discomfort caused by the spray.

The extent of Plaintiff Rusan's injuries as alleged include burning eyes and skin after being pepper sprayed, pain, dizziness and some bleeding. Doc. #131, para. 54 and 56. Plaintiff Rusan alleges that he sought, but was denied medical treatment for his injuries, which would presumably have included washing his eyes and face and having his bleeding wound assessed. Doc. #131, para. 62. In addition to evaluating Plaintiff Rusan's allegations about his treatment and injuries at the hands of Lt. Turner, Borders and Alexander, this Court may take judicial notice that on June 24, 2021, Plaintiff Rusan was indicted by grand jury for his conduct in CJC on or about December 19, 2021, on charges of felony and misdemeanor assault for causing physical injury to Officer Lewis by throwing a chair at her and beating her, and placing Lt. Turner in apprehension of physical injury by throwing a chair at her. Facts Plaintiff omits from his Third Amended Complaint. See cause no. 2122-CR00762, pending in the 22nd Judicial Circuit, State of Missouri. The

charging documents in this case demonstrate that the incident giving rise to the indictment is the same incident Rusan complains of in this proceeding. See Exhibit A, Probable Cause Statement in Cause No. 2122-CR00762.

Plaintiff's allegations of injury experienced at the hands of Lt. Turner in December of 2021, amount to no more than *de minimis* injuries resulting from the officers' reasonable use of force, entitling these officers to qualified immunity. As pled, Lt. Turner sprayed Darnell Rusan while he was outside his cell near the phones in the housing unit. Rusan himself admits he picked up a chair, which is corroborated by the charging documents in his pending criminal case. Doc.#9, 48. He experienced, merely burning eyes and skin attributable to the pepper spray, used by Turner and Lewis. This, in light of the fact that he was charged for placing Lt. Turner in apprehension of immediate physical injury, and in fact causing physical injury to another corrections officer, Michelle Lewis, allows the Court to conclude that his injuries were merely *de minimis* and the use of force was reasonable under the circumstances.

Similarly, Lt. Fowlkes is entitled to qualified immunity on this claim. He is alleged to have sprayed an inmate who, even if misunderstood, was uncooperative during a strip search being conducted at a tumultuous, sensitive and dangerous time in the jail. These circumstances combined with Plaintiff Rusan's lack of measurable injuries entitled Lt. Fowlkes to qualified immunity on this claim of

excessive force.

Because Rusan has failed to plead facts alleging more than *de minimis* injury, he is unable to state a claim for more than *de minimis* force, and the officers are entitled to qualified immunity.

**4.      *Count IV: Plaintiff Marrell Withers claim against Defendants Freddie Wills, and Officer Douglas Jones.***

Plaintiff Withers pleads that on January 7, 2022, correctional officers with the City of St. Louis Justice Center told Plaintiff Withers he was to be housed in a particular unit for COVID positive detainees. Doc. #131, para. 65. Plaintiff Withers refused to comply with the transfer order and was handcuffed. Doc. #131, para. 67. Plaintiff does not plead that he actually complied with correction officer's order at any point. Doc. # 131, Plaintiffs' Third Amended Complaint.  Plaintiff Withers pleads Defendant Wills told Defendant Jones to mace Plaintiff Withers. Doc. #131, para. 68. Defendant Jones maced Plaintiff Withers. Plaintiffs' Doc. #131, para. 69. Plaintiff Withers further pleads that he was taken to the hospital unit, but does not plead any physical injury as the result of the incident. Doc. #131, para. 72.

Apparently, given his pleadings, Plaintiff Wither's did not suffer even *de minimus* injuries as the result of the above-referenced incident as Plaintiff pleads none.

11

Further, Plaintiff Withers' pled that he was sprayed with mace after he refused to comply with Defendant Willis' and Jones' orders. Given Plaintiff Withers' refusal to cooperate and comply with the correction officer's directions some degree of force relative to Plaintiff Withers would appear to have been appropriate. In the words of the *Jones* court again, "[a] limited amount application of mace may be much more humane and effective than a flesh to flesh confrontation with an inmate." *Jones* at 496.

For the foregoing reasons Defendants Wills' and Jones' use of force was reasonable given the totality of the circumstances and they are protected by the doctrine of qualified immunity.

**II.     Plaintiffs' claims against the City must be dismissed because Plaintiffs have failed to show the existence of a widespread custom or policy condoning use of excessive force; or deprivation of water and inhumane housing conditions.**

In addition to suing multiple individual officers at CJC, Plaintiffs sued the City of St. Louis. In order to obtain relief under 42 U.S.C. §1983 against these Defendants, Plaintiffs must plead and prove an actionable municipal policy or custom that caused the claimed constitutional violation. See *Bd. Of County Commissioners v. Brown*, 520 U.S. 397 (1997); *Marsh v. Phelps County*, 902 F.3d 745 (8th Cir. 2018). In order to adequately plead an actionable custom or policy

under §1983, a plaintiff must do more than allege conclusions. The complaint must state a claim with "facial plausibility," i.e., the plaintiff pleads factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

A plaintiff cannot establish §1983 liability by only identifying conduct properly attributable to the municipality; instead, a plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights. Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee. In *Soltesz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941, 947 (8th Cir. 2017), the Eighth Circuit observed that, "The Supreme Court has set a high bar for establishing municipal liability under § 1983."

Proof of "custom" liability under §1983, therefore, requires (1) proof of existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the municipality's employees; (2) deliberate indifference to or tacit authorization of such conduct by the municipality's officials after notice of the

misconduct; and (3) the pattern of misconduct was the "moving force" behind the plaintiff's injury. *Metler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). "Notice is the touchstone of deliberate indifference in the context of § 1983 municipal liability." *Atkinson v. City of Mountain View*, 709 F.3d at 1216.

The Eighth Circuit has not directly addressed the quantum of "continuing, widespread, persistent" conduct that can establish liability, but its view closely parallels the Fifth Circuit's view that when a plaintiff uses prior incidents to allege a pattern, the prior incidents "must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of [the municipality's] employees." *Webster v. Houston*, 735 F.2d 838, 842 (5th Cir. 1984). Both the Eighth and Fifth Circuits reason that to hold municipalities liable for conduct that does not rise to the level of continuing, widespread frequency would create the *respondeat superior* liability that the Supreme Court repeatedly has rejected in §1983 actions. When a plaintiff alleges an unwritten or unofficial policy, there must be evidence of a practice, so permanent and well-settled as to constitute a custom, that existed--a custom having the force of law. *See Brewington v. Keener*, 902 F.3d 796, 801 (8th Cir. 2018).

Plaintiffs also make various conclusory allegations regarding individuals not parties to this case in which Plaintiffs allege that mace was used. Doc. #131, para.

73-77. If taken as true, Plaintiffs' allegations are still insufficient as they amount to nothing more than a recitation of the use of mace on other nonparties. Plaintiffs do not plead whether these above-referenced incidents were justified under the circumstances or the City's policy 3.3.15 regarding the Use of Chemical Agents.

1.      *Count VI: Claims against the individual Defendants and the City for the existence of a custom of Excessive Use of Pepper Spray*

Plaintiffs allege a variety of instances of use of pepper spray in support of their claim that the City and Defendants "have a widespread custom of using excessive mace on CJC detainees, without adequate warning, and for the purpose of inflicting pain." Doc. #131, para. 77. In support of this claim Plaintiffs plead the Division of Corrections' policy on use of force which explicitly provides that pepper spray is not to be used as punishment, as well as a handful of specific instances of use of pepper spray in the manner Plaintiffs describe including: one instance of use of pepper spray in November of 2020; one instance in December 2020 (in addition to the Derrick Jones incident); two instances in January 2021 (one when an inmate was "refusing to put his cigarette out" while inside his cell); four instances in February 2021 (one when another inmate was "standing outside someone's cell, trying to defuse tension between that third person" and another corrections officer); and one instance in May of 2021 (involving a captain spraying an allegedly compliant inmate in his cell). Doc. #131, para. 77.

Apart from the allegations of the individual Plaintiffs and their own experiences and conclusory references to non-parties the Third Amended Complaint is bereft of specific facts details and facts regarding additional instances of excessive use of pepper spray. Plaintiffs do allege vague generalities of their observance of excessive use of mace on "multiple occasions when there was no security threat and the detainee was not acting aggressively or actively resisting staff," Doc. #131, para. 75.

In support of the claim that there is a widespread custom amounting to a prescribed policy of using pepper spray on compliant or passive inmates and as a form of punishment for lack of cooperation, Plaintiffs cite and provide a link to Division of Corrections' monthly reports[1] for October 2020 to March 2021 and allege that they report "zero allegations of use of force, and zero instances where staff used force that required minor first aid." Doc. #131, para. 89. Plaintiffs attempt to suggest that there is a lack of reporting of instances of use of force; therefore, jail administration is effectively condoning this form of excessive force. However, Plaintiffs have omitted from their pleading the fact that these reports reflect that anywhere from 19 to 50 uses of force (including pepper spray) involving no injuries to inmates or staff are investigated each month. See Division

---

[1] These monthly reports are published by the Corrections division of the City of St. Louis and provide data regarding various issues in the jail such as instances of contraband seizure, allegations of excessive force by inmates, number of inmates receiving mental health treatment and so on.

of Corrections Monthly Reports.[2]

As discussed above, notice to the municipality and its officials is essential to succeeding on a *Monell* claim for liability. If, as Plaintiffs suggest (and Defendants deny), they were all thwarted in their attempts to grieve the practices of excessive force in pepper spraying, jail administration almost certainly did not have notice of Plaintiffs' grievances. See Doc. #131, para. 138. While Defendants dispute Plaintiffs' allegations about inaccessibility of the grievance process, Plaintiffs' allegations fail to state a claim for relief under  the *Monell* case.

### 2.    *Count X: Custom of shutting off water as punishment for inmate misconduct*

Plaintiffs allege in Count X of their Third Amended Complaint that "on February 6, following the uprising of CJC detainees that started the prior evening, some detainees formerly housed in the fourth-floor pods were moved up to the fifth floor that same day." Doc. #131, para. 98. Plaintiffs alleges that the water supply in the unit on the fifth floor was cut off in the days following the uprising. Doc. #131, para. 99. According to the pleading, Plaintiffs were not receiving drinking water and were not able to flush the toilets during the three days following the uprising. Doc. #131, para. 100. Plaintiffs allege additional instances of water deprivation,

---

[2] As provided in the first amended complaint, these monthly reports are available on the City website at https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/monthly-reports-2021.cfm.

arguing that the water shut-offs are a result of malicious and punitive intentions. Doc. #131, para. 106-113. In addition to the instance immediately following the widely reported on and sensational riot in the jail in early February, 2021, plaintiffs allege three instances of water shut-offs performed by Lt. Fowlkes (March 5, 2021, May 13, 2021, and May 18, 2021), and one instance of water shut off by a C.O. Smith on April 25, 2021. Plaintiffs do not allege with specificity any other instances of the water being shut off in CJC, but do acknowledge that water is shut off when inmates commit vandalism such as purposely flooding their cells. Doc. #131, para. 116.

For the following reasons, Plaintiffs' *Monell* claim regarding punitive water deprivation fails. A claim against a municipality and its official capacity employees must allege a practice that has "occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of [the municipality's] employees." *Webster,* 735 F.2d 838 at 842. Plaintiffs simply failed to show that a water shut off following a violent riot which involved significant damage to the plumbing of the jail, combined with two instances of Lt. Fowlkes shutting off inmate water, and one instance of Officer Smith shutting off inmate water, constitutes a custom that is continuing, widespread and persistent. Additionally, Plaintiffs were unable to avail themselves of any grievance process it

is unclear how City policy makers would have notice of this practice.

## III. Plaintiffs' Counts V, VI, VII, IX, X, and XI fail to state a claim for injunctive relief.

In the final paragraph of each of Plaintiffs' above-referenced counts Plaintiffs pray for injunctive relief. In Counts V and VI Plaintiffs plead:"… and enter an order against the City prohibiting the unconstitutional use of chemical agents going forward, …" Doc. #131, pages 38, 39, 41, 42, and 43.

Further, in Count VII Plaintiffs plead:

> WHEREFORE, Plaintiffs pray this Court enter judgment in their favor against the City of St. Louis, and enter an order against the City prohibiting the use of chemical agents against detainees with disabilities absent provision of a reasonable accommodation, including a medical conditions check, and for such further additional relief as this Court may deem just and appropriate.

Doc. #131, at 39.

In Count IX, X, and XI Plaintiffs plead:

> … declare these practices as unconstitutional and enter an order against all Defendants prohibiting the use of water deprivation as a tactic to unconstitutionally punish of [sic] detainees going forward…

Doc. #131, at 41, 42, and 43.

The Prisoner Litigation Reform Act ("PLRA") states:

> (A) Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court

19

finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantive weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 USCS Sec. 3626(a)(1)(A).

Plaintiffs prayer that the court issue an injunction "prohibiting all unconstitutional use of chemical agents going forward" is precisely the type of request for injunctive relief the PLRA specifically prohibits. There is no method for determining "constitutionality" as prayed for by Plaintiffs. In effect, Plaintiffs ask the court to issue an injunction banning all use of chemical agents in the area of inmate control. Plaintiffs' pray for what, in effect, is a complete ban on the use by the CJC of chemical agents at any time under any circumstances.

Likewise, in Count VII Plaintiff pray for "reasonable accommodations" and a "medical condition check." In support, Plaintiffs themselves attached to their Third Amended Petition the City's Department of Public Safety/Division of Corrections policy on Use of Chemical Agents as Exhibit A. Said policy states as its purpose:

I. POLICY
It is the policy of the St. Louis City Division of Corrections to issue chemical agents to custody staff for use, to protect themselves or others from *imminent danger, prevent escapes, and willful destruction of facility property* if the custody staff concludes that a lesser degree

20

of force will not be successful. [*Emphasis added*].

Leaving aside what either "reasonable accommodations" or "medical condition check" actually mean, a medical condition check would be impractical if not impossible under the circumstance in which chemical agents are deemed necessary by CJC staff under the language of the above-referenced policy.

In Counts IX, X, and XI, Plaintiffs pray for injunctive relief:

> …against all Defendants prohibiting the use of water deprivation as a tactic to unconstitutionally punish of detainees going forward,…

Again as discussed above, Plaintiffs pray for an injunction that is vague, thus unduly intrusive and overly board.

For the foregoing reasons, Defendants pray this court dismiss Plaintiffs' prayer for injunctive relief in Counts V, VI, and VII.

## IV. Plaintiffs failed to state in claim in Counts V and VII for class certification.

In Counts V and VII Plaintiffs pray for class certification regarding excessive use of force and unconstitutional water shut-offs. Doc. #131, para. 188-192 and 200-208.

Rule 23 Fed. R. Civ. Pro. govern the pleading and certification of class actions in federal court. Rule 23(a) requires:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) The representative parties will fairly and adequately protect the interests of the class.

Rule 23(a) Fed. R. Civ. Pro.

All Defendants were pretrial detainees at the time of the events in question in this case. As such, excessive use of force claims against pretrial detainees is analyzed under the Fourth Amendments "objective reasonableness" standard. *Winnett v. Saline County Jail*, 2009 U.S. Dist. LEXIS 148722\*, \*6; *Winnett v. Saline County Jail*, 372 Fed. Appx. 688 (affirmed per curium). The objective reasonableness standards is "…whether, judging from the perspective of a reasonable officer at the scene of the [arrest], the totality of the circumstances justifies the use of the force used." *Moore v. Novak*, 146 F.3d 531, 535 (8th Cir. 1998), quoting, *Foster v. Metropolitan Airports Comm'n*, 914 F.2d 1076, 1081 (8th Cir. 1990). Further, the objective reasonableness of a given Defendant's conduct must be conducted ***on a case by case basis***. *Graham v. Connor*, 490 U.S. 386, 396. (1989). [***Emphasis added***].

The objective reasonableness and totality of the circumstances standard require that each Defendant's conduct be examined specifically in the context of a

22

given circumstance, that each potential class members' conduct be examined in the same circumstance, and an independent determination made by the jury of the objective reasonableness of the a given Defendants actions on a given day relative to a given Plaintiff relative to that Plaintiff's actions in the same circumstance. These requirements fundamentally conflict with Rule 23(2)'s requirement that each potential member's potential claim contain the same questions of fact or law.

Further, Plaintiffs as potential class representatives, cannot be said to fairly and adequately protect the interests of the class pursuant to Rule 23(4). In order to do so under the objective reasonableness and totality of the circumstance's standard every single potential class members' claim would have to be tried individually within the context of a single case. Plaintiffs claim that this potential class consists of "…over 500 individuals, including future unknown class members." Doc. #131, para. 154. Certifying this case as a class action and Plaintiffs as class representatives would still require Plaintiffs to prove that relative to every class member that each Defendants' actions were not objectively reasonable in every given circumstance. The court would effectively conduct "over 500" trials within the context of this one case.

For the foregoing reasons, Defendants pray this court grant Defendants' Motion to Dismiss Plaintiffs' Counts V and VII failure to state a claim.

**V. Plaintiffs' fail to state a claim in Counts VII and VIII against all**

**Defendants for violation of the Americans With Disabilities Act ("ADA").**

The ADA applies to Qualified Individuals with a Disability. 42 USC §12132.§ 12131(2) of the ADA, the definition section, defines a Qualified Individual with a Disability as a person for whom accommodations must be made "…for the *receipt of services* or the *participation in programs* or *activities* provided by a public entity." 42 USCS § 12131(a) [*Emphasis added*]. Nowhere do Plaintiffs plead that the exercise of force, excessive or otherwise, or the punitive shutting off of water constitutes a service, program, or activity of the City Justice Center under the ADA. Doc. #131.

For the foregoing reasons, Plaintiffs' Counts VII and VIII fail to state a claim and should be dismissed.

## CONCLUSION

For the reasons stated above Defendants hereby pray this court dismiss Plaintiffs' Third Amended Complaint in its entirety for failing to state a claim and for any other and further relief this court deems appropriate in the circumstance.

Respectfully submitted,


SHEENA HAMILTON,
CITY COUNSELOR

By: /s/ Lawrence L. Pratt #41324
   Assistant City Counselor
   1200 Market Street
   City Hall Room 314

St. Louis, Missouri 63103
Phone: 314-641-8317
Fax: 314-622-4956
PrattL@stlouis-mo.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on **June 30, 2022** the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all attorneys of record.

<u>   /s/ Lawrence Pratt</u>