## Page 1

```
 1           UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF MISSOURI
 2                   EASTERN DIVISION
 3   DERRICK JONES, et al.,    )
                               )
 4   Plaintiffs,               )
                               )
 5   vs.              ) Cause No. 4:21-cv-600
                               )
 6   CITY OF ST. LOUIS, et al.,)
                               )
 7   Defendants.               )
 8
 9
10
11        THE DEPOSITION OF EDWARD ROTH
                  VOLUME II
12
13
14        Taken on behalf of Plaintiffs
15              January 6, 2023
16
17
18              LEXITAS LEGAL
              711 N. 11TH STREET
19            ST. LOUIS, MO 63101
                (314) 644-2191
20
```

## Page 2

```
 1         INDEX OF EXAMINATION
 2
 3   WITNESS:  EDWARD ROTH
 4     Examination By Ms. Hanlon .............5
 5
 6
         INDEX OF EXHIBITS
 7
     Exhibit 14 .............................8
 8     Notes
 9   Exhibit 15 ............................35
       Nesbitt PowerPoint Presentation
10
     Exhibit 16 ............................36
11     Holman PowerPoint Presentation
12   Exhibit 17 ............................61
       Deposition Testimony of Dale Glass
13
     Exhibit 18 ............................68
14     Policy
15
16   The original exhibits were retained by COUNSEL.
```

## Page 3

```
 1           UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF MISSOURI
 2                   EASTERN DIVISION
 3   DERRICK JONES, et al.,    )
                               )
 4   Plaintiffs,               )
                               )
 5   vs.              ) Cause No. 4:21-cv-600
                               )
 6   CITY OF ST. LOUIS, et al.,)
                               )
 7   Defendants.               )
 8
 9
10
11        VOLUME II OF THE DEPOSITION OF EDWARD
12   ROTH, produced, sworn, and examined on behalf of the
13   Plaintiffs, January 6, 2023, between the hours of eight
14   o'clock in the forenoon and five o'clock in the
15   afternoon on that day, at the City Counselor's Office,
16   City Hall, Room 314, 1200 Market Street, St. Louis,
17   Missouri 63103, before Rebecca L. Tuggle, a Registered
18   Professional Reporter, Certified Court Reporter, and
19   Certified Shorthand Reporter within and for the State
20   of Missouri.
```

## Page 4

```
 1              APPEARANCES
 2   FOR THE PLAINTIFFS:
 3     MAUREEN HANLON
       BRITTNEY WATKINS (via telephone)
 4     ArchCity Defenders, Inc.
       440 North Fourth Street, Suite 390
 5     St. Louis, MO 63102
       (855) 724-2489
 6     mhanlon@archcitydefenders.org
 7     SHUBRA OHRI
       Roderick & Solange MacArthur Justice Center
 8     906 Olive Street, Suite 420
       St. Louis, MO 63101
 9     (314) 254-8540
       shubra.ohri@macarthurjustice.org
10
11   FOR THE DEFENDANTS:
12     LAWRENCE PRATT
       Assistant City Counselors
13     1200 Market Street, Room 314
       St. Louis, MO 63103
14     (314) 622-3361
       prattl@stlouis-mo.gov
15
16   REPORTED BY:
17     REBECCA L. TUGGLE, RPR, CCR, CSR
       Lexitas Legal
```

Page 21

1  away from the facility, that she would be able to
2  observe.
3     Q   So is there only one master control room?
4     A   I don't know. I don't know the layout.
5     Q   Do you know if there's -- the master control
6  room is continuously monitored, like -- or
7  continuously staffed?
8     A   I believe it's continuously staffed.
9     Q   Okay. Okay. Do you know under what
10 circumstances lieutenants or captains would be tasked
11 with reviewing sort of live camera footage?
12    A   I don't know.
13    Q   Do lieutenants and captains also have the
14 ability to -- well, sorry, let me back up one second
15 and go to the next question which might help ground me
16 here.
17        So I see you say that the live feed is -- is
18 continuous and not sort of motion activated or
19 movement activated cameras?
20    A   That's true.
21    Q   So the -- you're making an excellent point
22 that we don't say the cameras are rolling, but
23 there's -- there's a -- there's a live feed?
24    A   Yes.
25    Q   Is that live feed then automatically saved

Page 22

1  or recorded by some mechanism?
2     A   Yes.
3     Q   For every camera?
4     A   Yes.
5     Q   Okay. And where is that recording of the
6  live feed stored?
7     A   In a dedicated server that's situated in the
8  facility itself, in the detention facility itself.
9     Q   Okay. Do you know who can access that --
10 the stored recordings?
11    A   I'm -- I'm not sure of the totality. You
12 know, I would assume the commissioner has plenary
13 authority to access whatever she sees fit and to
14 delegate to -- subject to, you know, the trained
15 ability to access it, the -- the -- the stored part of
16 it. I know that the staff investigator for the CJC,
17 Percy Harrington, has the ability to -- to do -- to
18 access archived or saved recordings.
19    Q   Yeah. So -- and I see you wrote here that
20 the recordings are maintained 60 days, but that at 60
21 days, the system over- -- automatically overwrites
22 recordings?
23    A   Yes.
24    Q   And I'm assuming that that is due to just
25 the space constraints of keeping 24/7 camera footage?

Page 23

1     A   That's true. For scores and scores of
2  cameras, it's a vast network.
3     Q   Who decides -- well, let me back up.
4         Once the camera -- once the recordings are
5  maintained, they're in this archive, there is, I
6  assume, a way to pull certain segments of the video to
7  save it from being automatically deleted?
8     A   Yes, that's true.
9     Q   Who makes the decisions of which recordings
10 are saved or pulled out and which are subject to
11 automatic deletion?
12    A   I would characterize it this way, that the
13 senior managers decide and identify that which should
14 be saved for any number of reasons. For litigation
15 purposes, for a response to inquiries and requests
16 from the Circuit Attorney's Office. There are many --
17 for Sunshine Law requests. And it -- I can't say this
18 categorically, but I'm largely confident that the
19 person who then executes on that and identifies the
20 camera that --
21    Q   Sure.
22    A   -- that would capture the imagery and then
23 takes the technical steps to move that or copy that
24 onto some other medium or put it into what they refer
25 to as the vault, which is the -- the area of the

Page 24

1  system that is exempt from the automatic rewriting, it
2  would be Mr. Harrington.
3     Q   Oh, okay.
4     A   That's not always -- it has not always been
5  him -- exclusively him because his office used to have
6  more people, but they've lost a lot of people.
7  Especially with COVID and other job opportunities, you
8  know.
9     Q   You said that senior managers identify that
10 which might be saved. Do you have a sense of who is
11 authorized to say we need videos of incidents XYZ?
12    A   Certainly the highest level people, and I
13 think likely the captains and lieutenants.
14    Q   Okay. Is every use of force saved and put
15 into the vault?
16    A   No.
17    Q   Who decides which videos of uses of force
18 are saved and which are not?
19    A   I would say the senior people that -- whose
20 particular identity I -- I'm not confident enough that
21 I understand. But the categories that I described,
22 the senior most level of administrator and likely the
23 captains and lieutenants.
24    Q   So it is not the case that for every --
25 every time there is a use of force by a correctional

### Page 25

1  officer on an inmate that video is -- is saved?
2  A   Well, it's saved for 60 days and can -- is
3  available for review during that 60 days.  But it's
4  not -- not every one is then taken the additional step
5  of being preserved beyond the 60-day --
6  Q   Okay.
7  A   -- review period.
8  Q   So as of today -- sitting here today, if a
9  correctional officer used OC spray on a detained
10 individual, would that video be prevented -- would
11 that video necessarily be prevented from automatic
12 deletion?
13 A   It would -- it would not categorically be
14 protected from it.  It would -- it would have to be
15 identified in a request by a senior person to preserve
16 it for it to be preserved beyond the 60 days.  It
17 might be accessed during that time before -- as part
18 of the review of it, but it would not necessarily be
19 saved or preserved.
20 Q   Okay.  And that's -- that's currently
21 true -- I mean --
22     MS. HANLON:  So this lawsuit was filed in
23 May 2021?
24     MS. OHRI:  Yeah.
25 Q   (By Ms. Hanlon) So since May 2021, it has

### Page 26

1  been the case that there are videos of the use of
2  chemical agents on detainees that were not exempted
3  from automatic deletion?
4  A   Yes.  I would say it the opposite way, that
5  not all have been saved -- have been -- steps have --
6  steps are not -- it's not part of the process or
7  procedure for all uses of force that might be captured
8  by video to be exempted from this -- the saving beyond
9  60 days.
10 Q   Okay.  I don't know how to say this.  Are
11 you sure that the City of St. Louis has not taken
12 steps to set up a process by which uses of force on
13 detained individual -- videos of uses of forces on
14 detained individuals are not subject to this automatic
15 deletion?
16 A   That was a big, long question.  Let me try
17 to restate what I'm sure of and then you can --
18 Q   Yeah.
19 A   -- you can follow up.
20 Q   Okay.
21 A   And that is that I'm sure that the process
22 of -- of retention of surveillance video at the
23 justice center is such that not every potentially
24 recorded instance of use of force, whether that's
25 chemical agent or other use of force, is saved beyond

### Page 27

1  the 60 days.
2  Q   Okay.  Has the retention process been
3  impacted in any way by the filing of this lawsuit?
4      MR. PRATT:  Objection.  Calls for
5  speculation and vague.
6      Subject to that you can answer.
7  A   I don't know.
8  Q   (By Ms. Hanlon) Okay.  Has there been --
9  well, has there been any instructions or amendments to
10 the standard process in order to ensure that relevant
11 information for this lawsuit has not been destroyed?
12     MR. PRATT:  Objection to the extent that the
13 question can be interpreted as requiring information
14 that could be covered by attorney-client privilege, we
15 assert that objection.
16     With the objection in mind, the witness can
17 answer.
18 A   I think I would cast it in terms of what the
19 practice has been at the justice center, and I would
20 say that an attempt has been made to capture more.
21 And if it were possible to do all, to do all.  But it
22 has proved impossible to do all.  And that the
23 staffing is such that -- and that competing demands
24 are such, competing demands for the -- for the time of
25 the investigator who is capable of doing it and the

### Page 28

1  process itself of identifying which of the cameras for
2  what period of time would be germane is such that it
3  has been unable to even remotely keep up with the
4  amount of work that is required to attempt -- even
5  attempt to capture.
6      Given the number of camera angles, it would
7  have to be -- that have to be reviewed to determine
8  whether anything was captured, and given the amount of
9  other demands from the circuit attorney, from Sunshine
10 Law requests, from other security issues, from
11 workplace injuries, other things such as that, that
12 moving beyond the standard protocol, which is to save
13 those which are -- have been identified by senior
14 management and by detainee name and date and time has
15 just proved to be impossible.
16 Q   So the answer to the initial question is --
17 is, no, the City has not changed any processes since
18 the filing of this lawsuit?
19 A   Well, the answer that I gave is that I don't
20 know and I'm -- that I'm -- that I'm not sure.  But I
21 am sure, indirectly, that based on the review of the
22 discovery materials, that extensive video evidence,
23 surveillance video evidence has been produced in this
24 case.
25 Q   I'm aware of maybe four to six videos that

### Page 105

1  personnel follow up with or check on detainees past --
2  past the initial evaluation of the detainee
3  post-spray?
4      So did that question make sense or do you
5  want me to rephrase it?
6      A  Yeah, no, I understand it.
7      Q  Okay.
8      A  I would answer it in a general way saying
9  that the -- that the medical unit is available to the
10 detainees broadly and for whatever conditions they
11 want to bring to the attention of their medical
12 providers, that they -- that access is freely given.
13     Q  Okay. But there's no specific policy or
14 procedure that directs, someone's been sprayed, do the
15 initial evaluation, and then two hours later check on
16 them, four hours later check on them, something like
17 that?
18     A  There is -- there is follow up from
19 correctional staff, but I'm not aware of any, in the
20 absence of symptoms, that would justify automatic
21 follow up by medical staff.
22     Q  Okay. So medical staff actually don't
23 routinely or systematically see individuals past the
24 initial consult?
25     A  In the absence of a complaint by the

### Page 106

1  individual, I would say that that's probably true.
2      Q  Okay.
3          MS. HANLON:  All right. I have no further
4  questions. Do you have any follow-up?
5          MR. PRATT:  No.
6          MS. HANLON:  Great.
7          THE WITNESS:  Do you want me to read or do
8  you want to waive?
9          MR. PRATT:  Let's read it.
10         COURT REPORTER:  Orders on the record.
11         MS. HANLON:  E-tran, please.
12         MR. PRATT:  Same.
13         (Whereupon, Volume II of the deposition of
14 EDWARD ROTH was concluded at 12:45 p.m.)

### Page 107

                    REPORTER CERTIFICATE
        I, REBECCA L. TUGGLE, a Registered
Professional Reporter, Certified Court Reporter, and
Certified Shorthand Reporter within and for the State
of Missouri, do hereby certify that there came before
me on January 6, 2023, at City Counselor's Office,
City Hall, Room 314, 1200 Market Street, St. Louis,
Missouri 63103
                    EDWARD ROTH
who was by me first duly sworn; that the witness
was carefully examined; that said examination was
reported by myself, translated and proofread using
computer-aided transcription; and the above transcript
of proceedings is a true and accurate transcript of my
notes as taken at the time of the examination of this
witness.
        I further certify that I am neither attorney
nor counsel for nor related nor employed by any of the
parties to the action in which this examination is
taken; further, that I am not a relative or employee of
any attorney or counsel employed by the parties hereto
or financially interested in this action.

        Dated this 10th day of January, 2023.


                    _____
                    Rebecca L. Tuggle, RPR, CCR, CSR

### Page 108

            LEXITAS LEGAL

January 10, 2023

LAWRENCE PRATT
Assistant City Counselors
1200 Market Street, Room 314
St. Louis, MO 63103

IN RE: DERRICK JONES, et al. v. CITY OF ST. LOUIS, et al.

Dear Mr. Pratt:

Please find enclosed your copies of the deposition of EDWARD ROTH taken on January 6, 2023 in the above-referenced case. Also enclosed is the original signature page and errata sheets.

Please have the witness read your copy of the transcript, indicate any changes and/or corrections desired on the errata sheets, and sign the signature page before a notary public.

Please return the errata sheets and notarized signature page within 30 days to our office at 711 N 11th Street, St. Louis, MO 63101 for filing.

Sincerely,


REBECCA L. TUGGLE

Enclosures