# Exhibit 2

(Unredacted version filed under seal)

# Draft Report of Dora B. Schriro, EdD, JD
## Plaintiffs' Expert

*Derrick Jones, Jerome Jones, Darnell Rusan, and Marrell Withers et al v. City of St. Louis et al, Cause No. 4:21-cv-600*

## I.    The Assignment

1. I was engaged by Arch City Defenders and co-counsel, MacArthur Justice Center, Rights Behind Bars, and St. Louis University School of Law Legal Clinics to prepare an Expert report on the Uses of Force, at issue in this case, and the training, supervision, and jail management at issue in this matter; specifically, all individuals detained at the St. Louis City Justice Center (CJC) subjected to, or are at risk of being subjected to, the misuse of chemical agents and unnecessary water shut-offs by CJC correctional staff.

## II.  Qualifications

2. I am a career public servant who has served as an executive-level administrator, policy maker, and homeland security advisor. I have led three state and two city criminal justice agencies and a federal office in the U.S. Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE).

3. I was Commissioner of two city jail systems, the St. Louis City Division of Corrections from 2001 to 2003, and the New York City (NYC) Department of Correction from 2009 to 2014. Previously, I served as Warden of the Medium Security Institution, a city jail in St. Louis City (SLC), Missouri, from 1989 to 1993, and Assistant Commissioner for Program Services in the NYC Department of Correction from 1985 to 1989.

4. Additionally, I was Director of two state correctional systems, the Missouri Department of Corrections from 1993 to 2001, and the Arizona Department of Corrections from 2003 to 2009. During my tenure as Director of the Missouri Department of Corrections, I was a recipient of the Association of Correctional Administrators' Award for Outstanding Leadership. During my tenure in Arizona, our department was the first correctional system in the country to receive the Kennedy School Innovations in American Government award for a prison-based reform, Getting Ready, a systemwide pre-release preparation initiative imbued with the community's norms and values, in which all inmates regardless of their custody level and release date, participated throughout their incarceration.

5. I was also Commissioner of the Connecticut Department of Emergency Services and Public Protection consisting of six state agencies including the Connecticut State Police and Police Officer Standards and Training (POST), the state's local police departments credentialing authority, from 2014 through 2018. I served concurrently as Connecticut's Homeland Security Advisor from 2016 through 2018. My U.S. Department of Homeland Security (DHS) security clearance was Top Secret. In both Arizona and Connecticut, I also served as an ex officio member of the state's POST Council.

6. Additionally, I served at DHS, first as Senior Advisor to Secretary Janet Napolitano on Immigration and Customs Enforcement (ICE) Detention and Removal and then, as the founding Director of the ICE Office of Detention Policy and Planning in 2009. During my tenure at DHS, I authored "ICE Detention Policies and Practices: A Recommended Course of Action for Systems Reform," a report that DHS adopted as its template for immigration detention reform.

7. Concurrently, I was an adjunct instructor at the University of Missouri-St. Louis Department of Criminology from 1990 to 1998, St. Louis University School of Law from 2000 to 2002, and Arizona State University Sandra Day O'Connor School of Law from 2005 to 2008.

8. I am knowledgeable about the case law impacting pre-trial and sentenced populations and civil detainees as well as the American Correction Association (ACA) Standards for both Adult Correctional and Local Detention Facilities and ICE's Performance-Based and National Detention Standards upon which they are based. I also participated in revision of the American Bar Association (ABA) Treatment of Prisoners, the Bar's professional standards for state and local correctional systems, and the ABA's drafting of Civil Immigration Detention Standards for facilities used by ICE. I am also an Expert in the administration and operation of correctional facilities and immigration detention centers, the selection, training, and supervision of their workforces, and each system's responsibilities for the people in their custody.

9. I have served as a Corrections and Immigration Detention expert since 2013. My clients have included the California Department of Justice, the Hampton County, MA Sheriff's Department, Disability Rights California, a quasi-governmental agency, St. Louis University School of Law Clinic, the American Civil Liberties Union, Southern Poverty Law Center, Human Rights First, Refugee and Immigrant Center for Education and Legal Services, the MacArthur Justice Center, Arch City Defenders, and a number of law firms.

## Professional Vita

10. A complete and correct Résumé including a list of my publications from the last ten years, and related professional affiliations and recognition, is attached as Appendix A.

## Other Cases

11. I testified by deposition as a Corrections Expert in the matters of Endicott v. Hurley et al., No. 2:14-CV-107 DDN (E.D. Mo.) in 2020; Doe v. Senger et al., No. 20-cv-3217-DPR (W.D. Mo.) in 2021, and Humphrey v. LeBlanc, 20-cv-233-JWD (M.D. La.) and Lewis et al v. Cain et al, Case 3:15-cv-00318-SDD-RLB in 2022. I also testified at trial in the matters of Doe v. Senger et al. (W.D. Mo.) and Lewis et al v. Cain et al. (M.D. La.) in 2022.

## Materials Considered

12. The materials I considered in forming my opinions are cited throughout this report and listed in the attached Appendix B. I reserve the right to supplement or amend my report if additional information becomes available (including the affidavits and depositions of Defendants and other witnesses and/or additional materials subpoenaed by the Defendants).

## Compensation

13. I am being compensated for my work on this matter at a rate of $250/hour.

### III. Summary of Opinion

14. Named Plaintiffs and numerous other individuals detained at the CJC have been subjected repeatedly to unauthorized and excessive Uses of Force, notably, chemical agents, and the withholding access to potable water to drink, and water to bathe and flush waste, both of which are contrary to the field's standard of care and expressly prohibited by Division of Corrections (DOC) policy. These impermissible conditions remain firmly in place, the result of inadequate problem-solving processes and infirm training, supervision, and jail management.

### IV. The St. Louis City Justice Center

15. The St. Louis City Justice Center (CJC) is a five-story cell-block correctional facility, capacity 860 beds, which opened in 2002.[1] The Medium Security Institution, capacity, 1,138 beds, closed on June 17, 2021, has reopened. On March 2, 2023, a total of 559 beds were occupied.[2]

16. The most recent monthly report on DOC's website is dated November 2021 at which time, CJC reported just 19 uses of force (UOF) of any kind. Yet, Defendants' document production yielded 71 UOF involving Oleoresin Capsicum (OC) spray for 2021 but there were whole months in 2021 for which no reports were provided. Plaintiffs' production, enhanced by a "sunshine request," yielded 113 UOF involving OC in Quarter 1 of 2021 alone, a far more accurate indicator of the extent to which CJC continues to abuse use of force and the extent to which the DOC is unable or unwilling to disclose that which is actually occurring.

17. On February 21, 2023, Defendants permitted Plaintiffs' Counsel and Corrections Expert to inspect the facility, in part. On Floor 1, we were only afforded access to the Armory and part of the Watch Command room. ███████████████████████████████████████████████ ████████████████████████████████ We also asked but were not shown where the handheld video cameras were stored. In both instances, we had been led to believe they were in the Captain's office on each floor but that was not the case. We were not afforded access to Floor 2, an area which upon information and belief, includes the Medical unit, Pre-Admissions holding tanks, and Detox, all of which is crucial to this matter, with the exception of one medical examination room and a visiting booth in the Medical Unit. We were afforded access to only some of the housing units on Floors 3 (Housing Units B and D) and 4 (Housing Units A, C and D). ███████████████████████████████████████████████████ ████████████████████████

████████████████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████████████████████

---

[1] City Justice Center, https://www.stlouis-mo.gov/government/departments/public-safety/corrections/city-justice-center.cfm.
[2] *Id.*, Inmate Population Data, total confined, Mar. 6, 2023, https://www.stlouis-mo.gov/government/departments/public-safety/corrections/index.cfm.



18. My assessment of the modifications to the housing units is mixed. Review of several hundred Use of Force reports revealed inmates are most often maced when they kick their cell door or flood their cell – the primary reason that they do so, to attract the attention of custody or healthcare staff who repeatedly ignore their requests for assistance -- knowing that doing so is more likely than not to result in being sprayed with Oleoresin Capsicum (OC), a chemical agent, compounding the problems that caused them to take this drastic measure in the first place. Thus, merely fixing the intercom, replacing the locks, reducing the seating capacity, and moving the ██████████████████████████████████████████████████████████████████████████ will not improve the conditions of their confinement, and may make it worse, unless and until the workforce is ready, willing, and able to assist the people in the city's custody.

19. Plaintiffs requested but have not yet received much information about DOC and CJC. Still missing, are (1) its operating and capital improvement budgets, (2) the allocation of beds (general population versus special management housing, notably administrative and disciplinary housing), specialized housing (Pre-Admission Housing (PAH), Suicide Watch, Infirmary, and Detox) by type per floor and the custody levels and/or classifications of inmates assigned, (3) the holding tanks capacity and characteristics, (4) CJC's staffing plan including the number of funded versus filled positions by job title and any limitations on its use of overtime to backfill vacant positions, and (5) general information about the inmate population including admissions, releases, most serious charge, custody classification, average length of stay, and gender or gender identity by year. Also outstanding, are requests for (6) descriptions of key processes and procedures and related forms associated with (a) pre-Admission activities and Fit for Confinement determinations, (b) Classification, (c) "Detox," and (d) Suicide Watch, (7) Correctional Medical Series (CMS), DOC's healthcare provider, protocol when an inmate has come in contact with OC, (8) custody staff's corresponding responsibilities to provide a shower

---

[3] General Housing Unit Inmate Orientation, a 2-page form issued to inmates.

and clean clothes, (9) a copy of the forms (a) DOC uses to periodically reassess each inmate's custody classification and housing requirements, and (b) Internal Affairs completes upon investigating allegations of excessive or unnecessary uses of force, and (10) how DOC cares for mentally ill and seriously mentally ill inmates in as much as CJC does not have a Mental Health Unit and MSI has no healthcare staff.[4] Plaintiffs did provide limited information about training; specifically, a vendor's slide deck about OC, and some forms that six defendants signed committing to periodically review specific policies; if this is all the Academy uses, it clearly is not enough.

20. It is my opinion; key information has been withheld and as a result, there may have been consequential changes in operations about which we are unaware. For example, according to the Use of Force spreadsheet the City produced, 202 of the 766 incidences it reported – about 26 percent – happened on the second floor encompassing Admit, pre-Admit, tanks, and open seating. Blocking our access to this area and information only increases concern about what is actually occurring.

21. What Plaintiffs do know to be true, or information upon which they rely, is that the DOC promulgated a set of Policies and Procedures, which are supposed to incorporate federal and state law, City Ordinances and regulations, and ACA standards, and are periodically reviewed and revised. Further the DOC is supposed to provide sufficient training and supervision so that the Division's employees conform and comply.[5] As the actual number of UOF reported for the several months for which there is data in paragraph 16, above, is significantly greater than DOC reported, and the same violations of policy and procedures continue to occur it is well-established, noncompliance is widespread and ongoing at every level.


## V.  A Jail Administrator's Perspective

22.  The Total Institution, a sociological construct, is a place of work and residence where a significant number of similarly situated people, cut off from the community at-large for a considerable time, lead an enclosed, formally administered life together.[6] The goal of the total institution is to take away from every individual it is supposed to serve, their own sense of themselves, replacing it with a new one that is more in keeping with its needs. Several of the ways in which the total institution diminishes the self-identities of the people in its care – or its custody and secures their conformity to its rules is to take their "identity kit" – all that they use and for which they are known -- replacing their clothes with a uniform, regulating the length of their hair and beard, issuing everyone a number by which they will be known as long as they remain a member in lieu of their name. There are several types of total institutions and they include correctional facilities, the military, and certain religious orders. Although membership varies by the institution – voluntary or involuntary – every total institution including CJC have four main characteristics – "batch living" which it to say all of every inmate's day is lived in a

---

[4] *Id.*
[5] City of St. Louis Division of Corrections Policy and Procedures 1.1.1 Legal Authority, II. Responsibilities, https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/procedures/upload/1-1-1-Legal-Authority.pdf.
[6] Erving Goffman, On the Characteristics of Total Institutions, Holt, Rinehart and Winston, 1961.

locked housing unit, "binary management" wherein a few correctional officers control hundreds of prisoners, the "inmate's role" – to comply or forfeit the few privileges they have such as being let out of their cell for an hour or two a day to shower, make a phone call, and may get some fresh air "outdoors" on the recreation deck, the view of its surrounding also obscured, and indoctrination of the "institutional perspective" – that those in its custody are owned little and entitled to less.

23. My assessment of the information collected in this matter to date and familiarity with St. Louis City and its correctional system is consistent with that of a total institution. Plaintiffs do not count and as such, cannot count on the Division of Corrections for conditions that meet or exceed its policy and procedures. DOC's enforcement of its rules is uneven at best, and unnecessarily excessive. Neither assurance of access to necessities, an equitable system of discipline, nor recourse to redress grievances and to right wrongs are in place and cannot be assured. The DOC, an integral part of the City's justice system, is unjust. It has considerable work to do and not a moment to lose.


## VI. Use of Force

24. Correctional practice is premised primarily upon case law, establishing minimum standards with which correctional systems and their staffs must comply, improved upon when the field's best or promising practices are incorporated.

25. The authority to use force is reserved for only a few disciplines of which Corrections is one. Use of force comes with the binding condition however, that custody staff's application of force must be *no more than needed to regain or maintain control*. Generally, within the correctional facility, the expectation is that verbal instruction is sufficient.[7]

26. It is an industry expectation, and my experience, detecting and solving problems before there is a need for force is the responsibility of all correctional professionals. Interpersonal communication (IPC)[8] and Direct Supervision[9] are two widely recognized and highly effective means by which correctional systems are able to prevent whenever possible and otherwise, diffuse conflict amongst inmates or with custody and civilian personnel. St. Louis City Division of Corrections policy and procedures recognize both of these practices as powerful and incorporated them in its policy and procedures. Should these efforts fail however, after a good faith effort to apply them, force may be used to prevent serious injury or death, then and only

---

[7] Craig Hemmens and Eugene Atherton, Use of Force, Current Practice and Policy, Lanham MD: ACA, 1999.

[8] St. Louis City Division of Corrections, Policy & Procedures 1.4.1 Training and Employee Development, IV. Procedures, C. Academy Training Design and Delivery Techniques, 2. Curriculum Development, a. Program Objectives, 5, https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/procedures/upload/1-4-1-Training-Employee-Dev.pdf.

[9] Frequent, nonscheduled observation and personal interaction by custody staff with inmates. See 3.1.3 Inmate Housing Supervision, III. Definitions, https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/procedures/upload/3-1-3-Housing-Unit-Supervision.pdf

then, *when applied professionally, using the amount and type of force that is reasonable under the circumstances to ensure safety and control; and under no circumstances, relied on as a long term solution to managing individuals in Corrections' custody*.[10] The American Correctional Association (ACA) set forth the field's standard to which DOC states it subscribes, accordingly: The use of force is restricted to instances of justifiable self-defense, protection of others, protection of property, and prevention of escapes, *and then only as a last resort* and in accordance with appropriate statutory authority.[11] *In no event, is force ever to be used as punishment*.[12]

27.  It is my opinion, named Plaintiffs and members in the Class were and continue to be harmed by Defendants. Staffs' encounters with inmates entail all manner of unauthorized and excessive force and constitute punishment; notably, the misuse and abuse of chemical agents and also deprivation of water to drink, bathe, flush waste, *and* wash away the OC. The abuse includes and is compounded by the failure of staff in every rank to justify use of restraints and to report or to report accurately, their actions. Each violation is actionable in its own right, and the pattern and practice that it represents must be *recognized* for what it is – impermissibly punitive.


**Named Plaintiffs' Encounters with Excessive Force at DOC**

28. Named Plaintiffs' repeated exposure to excessive uses of force at CJC are representative of violations for which many other detainees in DOC's custody also suffer.

a.  Derrick Jones was in the custody of the DOC from November 3, 2020, through  August 12, 2022, when he was sentenced to the Missouri Department of Corrections (MoDOC) and transferred shortly thereafter.[13]  He was detained at CJC until November 1, 2021, then moved to the Medium Security Institution, (MSI), and returned to CJC in December  2022. During his detention at DOC, Derrick was maced three times in one use of force and witnessed numerous other instances of excessive and unnecessary uses of OC by staff. Derrick was diagnosed previously with schizophrenia ███████████, conditions that were documented ████████████████ Upon his return to CJC on November 1, 2021, and until January 7, 2022, Derrick was locked in cell 23 or more of 24 hours daily. There was no natural light and for most of that time, the only light fixture was broken. In January 2022, he was locked-in all day, every day. According to his institutional records, he suffered immensely under these conditions.

b.  Jerome Jones spent over two years at CJC awaiting trial before his acquittal in March/2021. During his incarceration he was sprayed with an excessive amount of OC in a small room with no ventilation then left to "marinate" for approximately 30 minutes. He also witnessed numerous other instances of excessive and unnecessary uses of OC by CJC staff. To this day,

---

[10] Hemmens and Atherton, pp. 77-78.

[11] American /Correctional Association, Adult Local Detention Facilities, Fourth Edition, Use of Force, 4-ALDF-2B-01, June 2004.

[12] *Id*.

[13] Derrick Jones, Jerome Jones, Darnell Rusan, and Marrell Withers v. City of St. Louis, et al, Cause No. 4:21-cv-600, Third Amended Complaint, P. 16.

Jerome still experiences respiratory issues which, upon information and belief, were caused by his exposure to excessive chemical agents at the CJC.[14]

c.   Darnell Rusan has been detained at CJC since late November 2020. Since then, Darnell has been maced on at least on two occasions, December 19, 2020[15] and February 3, 2021[16]  and witnessed countless other instances of excessive and unwarranted uses of OC by CJC staff.[17] Darnell is prone to ███████████████, a condition that was documented in his medical chart upon his admission, and for which he must take medication to keep his ███████ under control.

d.   Marrell Withers was detained by DOC from late November 2020 to September 2022 when he was sentenced and transferred to the MoDOC. During his incarceration, he was maced twice in a use of force whole his hands were cuffed behind his back and face was towards the wall, and he witnessed countless other instances of excessive and unwarranted uses of OC by CJC staff. Marrell is an asthmatic, a condition that was documented in his medical chart upon his admission and is treated with medication.[18] Use of chemical agents is counter indicated for anyone with a respiratory condition.

29. Defendants' uses of force and corresponding deprivation of water to achieve the most punitive and degrading effects, are contrary to industry standards and DOC's policy and procedures. Named Plaintiffs' affidavits and testimony and other class members' declarations are consistent in their reporting of Defendants' misuse and abuse of force and are further validated by videotape recordings in those instances that Defendants recorded and preserved videotapes of the force they applied. It is also important to note, where there are videotape recordings, only one was filmed using a handheld camera, all the rest were captured by the fixed camera in each housing unit. DOC's failure to use handheld video cameras as policy requires, is another indicator of DOC unwillingness to identify and address its deficiencies. The record shows hundreds of detainees were maced without cause, its use of chemical agent exceeded policy, and Defendants intentional amplification of OC's punitive effects by routinely shutting off the water to housing units where force was deployed, left them with nothing to drink, wash, flush waste – or extinguish a fire.

**Use of Force, defined**

30. The St. Louis City Division of Corrections' forms of Force encompass chemical agents, firearms, flex cuffs, handcuffs, the restraint chair, placement in the "rubber room" and physically grasping an inmate to regain control. The Division addresses various facets of authorized and

---

[14] *Id.*, p. 9, P. 44.
[15] *Id.*, pp. 9-10, PP. 47-72.
[16] *Id.,* pp.11-12, PP. 63-72.
[17] *Id.,* pp. 9-10, PP. 45-62.
[18] *Id.,* pp. 11-12, PP. 63-72.

unauthorized force in five policies: 3.1.20 Use of Restraints and Restraint Chair,[19] 3.1.21 Use of Force,[20] 3.1.22 Firearms, Armory and Weapons Storage,[21] 3.1.27 Cell Extractions,[22]and 3.2.15 Use of Chemical Agents.[23] This is a problem in and of itself. When all the components of a policy are not contained in one document but spread across two or more, the likelihood is significantly greater that the application of force is far less likely to be executed – and enforced – as the Division intended.

31. It is DOC's policy that Force is any physical contact or the deployment of chemical agents or other authorized security devices in instances of justifiable defense, protection of others, protection of property, or prevention of escape. Physical force must be used only as a last resort and in accordance with appropriate statutory authority.[24]

32. There ae two forms of resistance, passive and active. Passive Resistance is the non-physical confrontational resistance of an order in which an inmate states what she or he will or will not do, under a non-combative stance. Active Resistance is any physical or confrontational act by an inmate that resists the order or directive of staff while he or she engages in a combative stance or refuses to surrender an object that could be used as a weapon, attempting to strike or struggle with officers, fighting with other inmates, or another action that will lead to injury.[25]

33. Reasonable Force is the least amount of force necessary to achieve voluntary compliance or to gain control of a situation.[26] *This does not mean any damage to property or every order issued warrants force.* There must be Active Resistance on the part of the inmate, a confrontational act such as a "combative stance,"[27] attempting to strike or struggle with officers, fighting with other inmates, or refusing to surrender an object that could be used as a weapon or other actions that will lead to injury.[28] In my experience, and an industry standard, even then, force is used as a last alternative after other reasonable efforts such as employing interpersonal communication skills

---

[19] City of St. Louis Division of Corrections Policy and Procedures 3.1.24 Use of Restraints and Restraint Chair, https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/procedures/upload/3-1-20-Use-of-Restraints-Restraint-Chair.pdf.
[20] City of St. Louis Division of Corrections Policy 3.1.21 Use of Force, https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/procedures/upload/3-1-21-Use-of-Force.pdf.
[21] City of St. Louis Division of Corrections Policy and Procedures 3.1.22 Firearms, Armory and Weapons Storage, https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/procedures/upload/3-1-22-Firearms-Armory-and-Weapons-Storage.pdf.
[22] City of St. Louis Division of Corrections Policy and Procedures, Cell Extractions, https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/procedures/upload/3-1-27-Cell-Extractions.pdf.
[23] City of St. Louis Division of Corrections Policy and Procedures, 3.2.15 Use of Chemical Agents, https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/procedures/upload/3-2-15-Use-of-Chemical-Agents.pdf.
[24] Policy and Procedures 3.1.21 Use of Force, III Definitions.
[25] Policy and Procedures  3.1.21 Use of Force, III Definitions.
[26] Policy and Procedures 3.1.21 Use of Force, III Definitions.
[27] A combative stance is one that connotes aggression such as leaning forward with clenched fists, a fixed glare and a frown on one's face.
[28] City of St. Louis Division of Corrections Policy and Procedures 3.1.21 Use of Force, III Definitions.

has failed.[29] Where there is Passive Resistance on the part of the inmate; that is, the inmate does not pose eminent danger to staff safety or other inmates – *and includes the inmate who is confined inside a secured cell but is disruptive in the cell* – must not be subjected to a chemical agent. Instead, dispersal of OC or another chemical agent first must be authorized by the Supervisor as a planned use of force and justified in writing.[30]

34. Division policy also identified three types of force and the circumstances under which each may be applied: (a) spontaneous,[31] (b) anticipated,[32] and (c) planned.[33]

a.  Spontaneous use of force may be warranted when an inmate demonstrates active resistance above and beyond mere non-compliance with verbal command. Of note, OC in particular may be used when a spontaneous response is required however, *only when all other minimal options and procedures prescribed have been exhausted*.[34]

    i.  Contrary to policy, CJC custody staff relies on OC as its preferred means of force whether or not it is warranted immediately, or at all. Inter-Personal Communication (IPC) and Direct Supervision are extoled in DOC policy but are not included in the Division's continuum of control which includes the command but not the manner in which it is given or the underlying relationship – hostile or empathetic – that ultimately establishes the outcome. Thus, the overwhelming majority of CJC custody staff, regardless of rank, begin their interaction with an inmate with the issuance of an order followed immediately thereafter with a burst, or more, of OC. In only a few of CJC's many Use of Force Reports that I reviewed, has a staff member asked an inmate how he is or why she was behaving badly.

b.  When an inmate is passively resistant, an anticipated use of force is best accomplished by a Response Team which has two parts.[35]

    i.  Response Team A serves as the "Show of Force" team. It responds to situations when activated by the Area Supervisor. Its composition changes day-to-day, responding staff announced daily at the Shift Briefing. The A-Team's main goal is to act as a buffer and mitigate the escalation of incidents through the application of IPC skills, to the extent circumstances permit. The members of this team also serve as Correctional Emergency Response Team (CERT) members when a cell extraction is required.[36]

---

[29] ABA Standards for Criminal Justice, Third Edition, Treatment of Prisoners, Standard 23-5.6 Use of Force, ABA: 2011.
[30] City of St. Louis Division of Corrections Policy and Procedures 3.2.15 Use of Chemical Agents, IV. Procedures 7.
[31] City of St. Louis Division of Corrections Policy and Procedures 3.1.21 Use of Force, III Definitions.
[32] *Id.*
[33] City of St. Louis Division of Corrections Policy and Procedures 3.1.27, Cell Extractions, III Definitions.
[34] City of St. Louis Division of Corrections Policy and Procedures 3.1.21 Use of Force, IV Procedures, A. 1.
[35] *Id.*, IV Procedures A, 18-20.
[36] City of St. Louis Division of Corrections Policy and Procedures 3.1.27 Cell Extraction.

    ii.  Response Team B is activated by the Area Supervisor when Team A fails to resolve the situation.

    iii.  Should neither Team A nor Team B resolve the situation, the Special Response Team (SRT) is activated. The composition of the SRT and its function are not enumerated in policy, and it is not clear whether SRT and CERT are one and the same resource.

    iv.  Based on my review of CJC's many UOF reports, it appears DOC's practice is to summon a "Response Team" consisting of an available supervisor and unassigned custody staff, thereby defaulting directly to force.

c.  It is my experience, few situations require an immediate response and any use of force that may be warranted could, and should, be planned. These instances include those where the inmate is (a) in an area that can be isolated such as a locked cell, (b) and there is no immediate, direct threat to the inmate or others. Per policy, calculated uses of force should be executed by CJC's CERT consisting of (i) the Supervisor-in-Charge, another term not defined, (ii) a cell extraction team of four specially trained correction officers, (iii) a Video Camera Operator to document the entirety of the interaction, and (iv) a medical staff member to inform the Team if the inmate has a condition that may be provoked by use of OC,[37] and to tend to any inmate or staff injuries.[38] *In the event, the inmate has a medical condition that could be aggravated by the use of OC, the Supervisor will not use the chemical agent; instead, she will direct the CERT members to enter the cell and safely extract the inmate.*[39] In sum, its goal is to resolve that encounter without force and to mitigate harm by conferring in advance with the appropriate staff such as medical or mental health providers and the Floor Supervisor.[40]

    i.  I came across only one UOF report referencing an extraction team and identifying each team member's specific assignment – shield, left leg, left arm, right leg, and right arm – and missing in that UOF was any mention of a trained video camera operator.[41]

    ii.  Former DOC Commissioner Glass testified that DOC never secured all the funds to purchase the number of handheld video cameras required to capture staffs' responses.[42]

    iii.  St. Louis City's 30(b)(6) Expert, Edward Roth when asked about handheld video cameras usage acknowledged "They (CJC) own handheld video cameras, and they're supposed to be used for (cell) extractions, planned extractions. But they aren't. They're seldom used. They just haven't been integrated that into their processes, in part because there's a prevailing sentiment, at least as I understand it, that the surveillance video, while imperfect, substantially documents the use of force issues for that purpose." [43] I am not surprised. There are no cameras in any the cells but for the two cells on Floor 5 that had

---

[37] *Id.*, IV. Procedures, B. Extraction Procedures, 6.a.
[38] *Id.*, IV. Procedures, A. General Information, 19.
[39] *Id.*, 6. b.
[40] *Id.*, III, Definitions.
[41] CITY_007617.
[42] Dale Glass deposition, p. 67.
[43] Edward Roth deposition, p.105, lines 22-24, p. 106, lines 1-6.

been used for suicide watch before they were taken offline for renovation, and in the tanks which we not permitted to see, the very places where most uses of force occur thus under current conditions, are not captured. There must be a grown-up in the room to make this happen.

iv.  In my experience, DOC's failure to incorporate a healthcare provider in its response is consequential and should be addressed. In addition to named Plaintiffs Derrick Jones' schizophrenia ████████████████, Jerome Jones continuing respiratory issues, Darnell Russan's epileptic seizure disorder, and Marrell Withers' asthma, diagnoses about which CMS, is aware, other Class Members also suffer from conditions that worsen when exposed to the continual threat and repeated application of OC and are exacerbated by DOC's failure to ensure everyone who is exposed to OC is provided the requisite medical attention, shower, and clean clothes. They include:

- David Aaron has asthma and high blood pressure. Doc.72-12.
- Hector Alejandro suffers from allergies. Doc.72-24.
- ██████████████ suffers from various health conditions including diabetes, heart problems, blindness, and a punctured lung he sustained in July 2021. Doc. 72-32.
- Andrew Bell has bronchitis. Doc 72-10.
- Antonio Carter suffers from hyperthyroidism. Doc. 72-11.
- De'vion Gordon has asthma. Doc. 72-16.
- ██████████████ lost partial use of his left eye when he was sprayed with riot-strength OC. [44]
- Martin Redmond has a serious eye injury that swells and closes each time he is exposed to OC. Doc. 72-19.
- ██████████████ has been diagnosed with asthma since childhood. Doc. 72-3.
- DeWight Williams has had asthma since he was a baby. Doc. 72-37.

35. To be clear, in the field of Corrections, use of a handheld video camera is a best practice. It is a valuable strategy, one that is widely used to deescalate potential conflicts as well as a powerful deterrent whenever an inmate or a correction officer contemplates crossing the line.

36. Commissioner Glass testified, early on in his tenure he was "more hands-on." He reviewed use of force reports as soon as they were generated or just "show up whether it was early in the morning, late at night or whatever."[45] It was his experience, that most situations did not require an immediate response, they could be planned, and a plan should reduce risk of injury to staff and inmates. He testified that he "wanted to make sure that someone was in charge of that use of force and was responsible for that plan or given direction… and able to do a good report to describe what occurred." He knew a requisite number of video cameras were necessary to put that plan in place and testified he was able to purchase some of them.

37. Mr. Barnes served as CJC's Warden under Commissioner Glass. When asked whether there always was a video recording of the use of chemical agents, Mr. Barnes admitted, "I'm going to be honest with you. We're better at our surveillance video (i.e., the fixed cameras in common

---

[44] Jones007391.
[45] Dale Glass deposition, p. 67.

areas that record continually). We've enhanced our equipment in the last several years, making sure our handheld cameras are also available. So, we have pretty good coverage of our UOF incidents. We're pretty good compared to when we first started."[46] According to Mr. Roth, whose information is more current, undercut any assurance that coverage is pretty good; as noted above, he testified the handheld cameras are not used at all, and the City provided video footage from a handheld camera for one use of force.

38. DOC's current Commissioner Clemons-Abdullah is also familiar with  DOC's uses of force. The City's 30(b)(6) Expert, Mr. Roth testified, Commissioner Clemons-Abdullah routinely receives  briefings on recent uses of force but she does not make her own review of the UOF packets.[47] He also conveyed that she has staff upon which she relies and is confident that if something arises, "She will hear about it."[48]

39. That is a mistake which Commissioner Glass made as well.[49] Although the DOC identified just seven uses of force where the senior decision-maker, unusually the Major, and occasionally, their designee, determined force was unnecessary or excessive, quite a few the other UOF had the same facts but different findings. In my review of 365 of DOC's UOF reports, all too often line officers, supervisors, and shift commanders maced inmates while secured in their cell and/or handcuffed, or were not actively resisting, and/or maced inmates longer and/or more times than policy permits. The misuse of force is so pervasive, it appears permissible.

40. Mr. Roth's acknowledgement that a hand-held video camera should be used when an inmate is extracted from their cell but, "It never caught on," is also noteworthy. Commissioner Clemons-Abdullah, for whom he was speaking, has been in office since September 2021 and has had more than ample time to reconcile, reissue, and enforce DOC's UOF policies.

41. In my experience, there is no policy more critical to conditions of confinement than Use of Force. Without crystal clear written instruction, ample training, continual supervision, and constructive feedback, the prospect of unnecessary and excessive force is ever-present. It is my opinion, making meaningful, measurable change happen requires the focus and press from leadership at every level in an organization, leadership that begins and is sustained at the top. Today, the Division's five Use of Force policies lack the necessary consolidation, clarity, and consistency to achieve a good result from custody staff in any rank every time. Compliance is dependent upon continual commitment to excellence by everyone in each rank all of the time.

## VII. Withholding of Water to Drink, Bathe, Remove Chemical Agents, and Flush Waste

42. Plaintiffs have been and continue to be at significant risk of deprivation of potable water to drink, take medication, and brush their teeth, and water to flush toilets, wash their hands and face, shower, and rinse their eyes and remove chemical agents from their bodies, and extinguish fires. It is not DOC's policy and procedure however; instead, it is CJC's longstanding,

---

[46] Adrian Barnes deposition, Oct. 12, 2022, p. 210, lines 7-15.
[47] Roth deposition, Vol. II, p. 12 lines 24-25, p. 14, lines 8-14.
[48] *Id.*, p. 15, lines 6-7.
[49] Dale Glass deposition, p. 67

entrenched, and unchecked practice to shut off detainees' access to water to drink, bathe, remove chemical agents, and flush waste as an additional form of punishment.

43. Two Division policies and procedures affirm inmates' access to water to drink, bathe, and flush waste. They are 2.5.5 Water Supply[50] and 3.3.2 Inmate Rights.[51] A third Division policy and procedures, 4.3.1 Inmate Personal Hygiene and Grooming, also requires inmates are neat and clean.[52]

44. Two additional Division policies and procedures, 3.1.21, Use of Force[53] and 3.2.15 Use of Chemical Agents[54] require medical attention and treatment shall be provided; the industry standard also requires eye wash, a shower, and a fresh set of clothes. A third Division policy and procedures, 3.2.14 Emergency Medical Response, assures the administration of basic first aid and includes eye wash.[55]



45. Policy and procedures 2.5.5 Water Supply commits CJC to comply with federal, state and local water supply laws and regulations to ensure that the health of all inmates, staff and visitors

---

[50] City of St. Louis Division of Corrections Policy and Procedures 2.5.5 Water Supply, https://www.stlouismo.gov/government/departments/publicsafety/corrections/documents/procedures/upload/2-5-5-Water-Supply.pdf.

[51] City of St. Louis Division of Corrections Policy and Procedures 3.3.2 Inmate Rights, https://www.stlouismo.gov/government/departments/publicsafety/corrections/documents/procedures/upload/3-3-2-Inmate-Rights.pdf.

[52] City of St. Louis Division of Corrections Policy and Procedures 4.3.1 Inmate Personal Hygiene and Grooming, https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/procedures/upload/4-3-1-Inmate-Personal-Hygiene-and-Grooming.pdf.

[53] City of St. Louis Division of Corrections Policy and Procedures 3.1.21, Use of Force, V. Procedures, B. Medical Treatment, https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/procedures/upload/3-1-21-Use-of-Force.pdf.

[54] City of St. Louis Division of Corrections Policy and Procedures 3.2.15 Use of Chemical Agents, V. Procedures, C. Us of the Chemical Agent, 9, https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/procedures/upload/3-2-15-Use-of-Chemical-Agents.pdf.

[55] City of St. Louis Division of Corrections Policy and Procedures 3.2.14 Emergency Medical Response, IV. Procedures, A. General Information, 1. C., https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/procedures/upload/3-2-14-Emergency-Medical-Response.pdf.

is not jeopardized.[56] The City of Saint Louis does not collect any data however, to document the frequency with which the service of water is interrupted – that is, intentionally turned off  by CJC or the dates, durations, and reasons when it occurs.[57]

46. Policy and procedure 3.3.2 Inmate Rights includes the right to (i.) adequate toilet, bathing, and laundry facilities[58] and (l.) reasonable medical, mental health, and dental care,[59] also requiring potable water to brush one's teeth and take medication as prescribed. This policy also commits to protect inmates from (9) … disease.[60] Corresponding inmate responsibilities include the requirement that they (d) cooperate fully to maintain … a clean, neat personal appearance.[61] Similarly, 4.3.1 policy and procedures Inmate Personal Hygiene and Grooming requires (4) inmates will be neat and clean at all times.[62] Compliance with all of the above necessitates access to these resources.

47. To that end, most cells in CJC's housing units are equipped with a combination toilet and small hand sink and several shower on each tier. There is also a sprinkler head in each cell and several in the dayroom in the housing units. Mr. Roth testified water may be turned off for one or more of three reasons: (1) ordinary maintenance and repairs, (2) emergency repairs or damage mitigation usually, he said, the result of inmate misuse or abuse such as causing the toilets to flood, or, (3) disabling toilets prior to cell searches or a facility shakedown to prevent the flushing of contraband.[63] He also reported the flow of water to the toilet in an individual cell can be regulated by turning on or off the corresponding valve in a locked plumbing chase adjacent to each housing unit.[64] There is, however, no comparable valve to regulate the water to the hand sink in a specific cell or the fire sprinkler system; instead, the water must be turned off to every sink or sprinkler head in that housing unit. As he summed it up, "It's all or nothing."[65]

48. Also according to Mr. Roth, CJC has no written instruction regulating the circumstances under which some or all the water to an inmate's cell or their housing unit may be shut off. Instead, he reported, it is DOC's custom and practice that a custody staff member in the rank of Lieutenant or above, may shut off the water to one or more cells for cause.[66] He offered four

---

[56] City of St. Louis Division of Corrections Policy and Procedures 2.5.5 Water Supply, I. Policy.

[57] CJC Deposition, Edward Roth, Vol. I, p. 98, lines 16-21.

[58] City of St. Louis Division of Corrections Policy and Procedures 3.3.2 Inmate Rights, IV. Procedures, A. General Information, 1. i., https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/procedures/upload/3-3-2-Inmate-Rights.pdf.

[59] *Id.* A. General Information, 1. 1.

[60] *Id.*, B. Inmate Rights, 9.

[61] *Id.*, A. General Information, 3. d.

[62] City of St. Louis Division of Corrections Policy and Procedures 4.3.1 Inmate Personal Hygiene and Grooming, C. Provision for Hygiene Items and Personal Cleanliness, 4, https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/procedures/upload/4-3-1-Inmate-Personal-Hygiene-and-Grooming.pdf.

[63] CJC Deposition, Edwin Roth, Vol. I, pp. 78, lines 22-25, p. 79. lines 1-2.

[64] *Id.*, p. 54, lines 4-8.

[65] *Id.*, p. 56, lines 2-5, 12-15.

[66] *Id.*, p. 77, lines 18-19.

reasons, two of which are in response to Class 1 Disciplinary Violations:[67] (1) Creating a disturbance[68] and (2) Engaging in a Riot,[69] and two of which are operational: (3) In preparation for cell searches to prevent the flushing of contraband, and (4) To prevent or stop an inmate from flooding their cell or the housing unit.[70] In Mr. Barnes' deposition, he added that there is no monitoring for how long the water is shut off or a record of the reason and times it was turned off and then back on.[71]

49. Mr. Roth also acknowledged there are no written provisions to ensure inmates have access to potable water and periodic flushing of waste when the water is turned off to one or more cells. Instead, he reported when CJC cuts off the water to the toilet in a cell occupied by an inmate who "persistently" floods their cell, it is the facility's practice that the water to the toilet is turned off for 50 minutes then turned back on for 10 minutes, at the same time every hour for an unspecified number of hours or days. Mr. Glass reported the same in his deposition, referring to it as "the toilet schedule."[72] There is something to be said when two sources say the same thing and still, it is my experience it is highly unlikely that "the toilet schedule," if it exists, could or would be adhered to given CJC's chronically short staffing and the frequency with which officers are being summoned to one incident or another not to mention a number of officers who would not mind if some inmates had to live with their waste for a while, or longer, as it was in their view, a mess of their making. Also missing is the definition of a "persistent offender;" apparently defined as well by custom and practice but not policy thus, subject to abuse and over-use.[73] Moreover, there is compelling evidence to the contrary; notably, Plaintiffs' sworn testimony, discussed below.

50. Another deficiency in this area concerns the absence of policy and procedures to document when, why, and for how long the water to one or more cells or a housing unit is shut off, more so because shutting off some or all the water to one or more cells or housing areas is not a reportable event.[74] Mr. Roth defended this practice – or lack thereof – insisting it is implied in the corresponding work order,[75] an assertion that cannot be substantiated. Plaintiffs identified 38 UOF attributed to flooding incidents, the reporting of which never indicated whether any of those inmates were moved to a dry cell or tier and how long the water would be shut off

---

[67] City of St. Louis Division of Corrections Policy and Procedures 3.10 Incident Reporting, IV. Procedures. A. General Information, n. An event which seriously impacts normal operation of the unit.
[68] City of St. Louis Division of Corrections Policy and Procedures 3.2.9, Disturbance and Riot, III. Definitions. Disturbance: Any act by one or more inmates that are intended to cause disruption of routine activities of inmates, interference with the performance of employee duties, or hinder the general functions of the facility, https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/procedures/upload/3-2-9-Disturbances-and-Riots.pdf.
[69] Id., III. Definitions. Riot: Any concerted violent act by inmates that are intended to cause personal injury, bodily harm, or property damage.
[70] City of St. Louis Division of Corrections Policy and Procedures 3.10 Incident Reporting, IV. Procedures. A. General Information, 5.f. Minor destruction of city property.
[71] Deposition, Adrian Barnes. p. 105, line 25.
[72] Deposition, Dale Glass, p. 49, lines 12-16, p. 50, lines 8-15.
[73] Id., p. 87, lines 11-17.
[74] Id., p. 58, lines 21-23.
[75] Id., p. 78, lines 1-9.

16

51. Another informal practice identified in the course of discovery concerns who decides when those restrictions are lifted; evidentially, it is the ranking officer who imposed them,[76] another highly subjective and ultimately uneven practice if carried out as Mr. Roth incorrectly assumed that water is turned off no longer than a shift "because that's when the person who imposed it leaves for the day."[77] Mr. Withers was kept in a dry cell in Disciplinary Segregation eight days.[78]

52. Mr. Roth also argued there is no need for a rule requiring inmates are moved when the water is turned off because it is CJC's custom and practice when the flow of water is interrupted to a cell or an entire housing unit, the affected inmates are moved.[79] In my opinion, Mr. Roth is not a reliable reporter in this and any other instances where he argues an organization premised upon policy and procedure does not need a policy and procedure to ensure inmates in its custody have unimpeded access to something as basic as water for hydration, sanitation, health and hygiene.

53. When deposed, Plaintiffs Derrick Jones,[80] Jerome Jones,[81] Darnell Rusan,[82] and Marrrell Withers[83] were all questioned by Defendants' City Counselor about "water deprivation."

a.  Derrick Jones has been in DOC's custody since November 2020 and housed at CJC until November 2021 then moved to MSI in December 2022. He testified the first time that the water in his housing unit was turned off  during his time at CJC was on February 12, 2021, for approximately 12 hours.[84] He reported there was no special reason why it happened; it was something that Lt. Fowlkes had a reputation for doing, "Like he do this all the time."[85] As to how long the water is cut off, "Like a whole shift. Like sometimes, days."[86] And what it has been since then, he replied, "It happens a lot."[87]

b.  Jerome Jones was detained at CJC between December 2018 and March 2021. Mr. Jones testified he was deprived access to water in housing assignments on Floor 5 prior to the disturbance of February 6, 2021,[88] and in general population housing on Floor 4 beginning February 6, 2021, when the water was shut off for several weeks;[89] shortly after which, he was acquitted and released from custody. Contrary to representations made by Mr. Roth, Jerome stated CJC never turned on the water for brief periods of time during a black-out period nor were bottles of water ever distributed; all that they received was a small

[76] Roth deposition, Vol. II, p. 87, lines 18-21.

[77] Id., p. 88, lines 4-5.

[78]  Plaintiffs Second Amended Complaint, Cause No. 4-21-cv-600, May 6, 2022.

[79] Roth deposition, Vol. II , p. 60, lines 3-8.

[80] Derrick Jones deposition, January 12, 2023.

[81] Jerome Jones deposition, October 28, 2022.

[82] Darnell Rusan deposition, October 27, 2022.

[83] Marrell Withers deposition, January 13, 2023.

[84] Id., p. 64.

[85] Derrick Jones deposition, p.64, line 11.

[86] Id., p. 63, lines 15, 17, 21-22, 25.

[87] Id., p. 65.

[88] Jerome Jones deposition, p. 32, lines 17-19.

[89] Id., p. 35, lines 20-23.

Styrofoam cup of water with the meal.[90] Mr. Jones summed up his access to water after it was turned off, "It was off."[91]

Jerome also brought to the fore; how critical it is to have unimpeded access to water to counteract the quantity of OC to which most detainees at CJC have been exposed. In his case, he was maced well in excess of the 1-2 second burst, filling the room while in restraints, then left "to marinate" in chemical agent, still in restraints, about 30 minutes in a room just three feet by five feet with only a crack under the door where air could pass. From there, he was put in a cell, its water was shut off.  By time he was able to shower the next day, his body was so saturated with chemical agent that it took about three days before the burning sensation abated and for weeks after that, he had difficulty breathing. To this day, Mr. Jones has ███████████████████████████████ which, upon information and belief, are attributed to his extraordinary exposure to chemical agents at the CJC.[92]

c.  Darnell Rusan has been in DOC's custody and detained at CJC since November 2020. As is the case with the other named Plaintiffs, Darnell was subjected to OC on at least three occasions. Each encounter with OC entailed repeated and protracted spraying of OC in close quarters, then being left "to marinate" an interminable amount of before being reassigned a different cell thereby, bypassing the requisite Medical assessment, shower, and clean clothes.

Also of note, Darnell is prescribed ██████ for seizure disorder, He is supposed to take this medication twice a day with food and remain hydrated;[93] however, the Medical Unit does not dispense medication at mealtime,[94] and when he requested water to take his seizure medication, he was threatened with mace by a CO in the Medical Unit.[95]

Darnell's testimony helps to explain when and why CJC turns off the water. It is primarily to maximize the impact of chemical agents on as many detainees as possible, and not to pre-emptively mitigate the damage that flooding may do in those relatively rare instances when flooding occurs. In Darnell's own words:

> Okay, let me explain it like this: In 5 Bravo, it's four sides, 1 side, 2 side, 3 side, 4 side. I was housed on 4 side at that -- approximately at that moment that you're speaking of. If somebody on 1 side that's next to us get maced over there, if Mace gets sprayed over there or in the hallway, all these vents is connected to each other, so if the Mace come through the vent, everybody on 5 Bravo be affected by the Mace, you hear coughing and gagging and choking throughout the whole place, throughout the whole wing or whatever. And if you turn the water off in 5 Bravo, don't nobody in 5 Bravo got water. You can't flush your toilet, you can't turn the sink on, it don't work.[96]

---

[90] Jerome Jones deposition, p. 37, lines 17-19.
[91] *Id.*, p. 36, line 4.
[92] *Id.*, p. 40, lines 13-14, 24-25.
[93] *Id.,* p. 29, lines 224-25.
[94] *Id.*, p. 7, lines 24-25.
[95] Darnell Rusan deposition, p. 136, lines 7-21.
[96] *Id.*, p. 110, lines 7-21.

The last several questions Darnell was asked in his deposition summed it up succinctly.

Q: Could he remember the last time the water was shut off with a macing incident?
A: Yes, just last weekend. The water was shut off Saturday midday until Monday, about 36 hours.[97]

Q: Did he know how often does the water shutoff along with a macing happen?
A: Yes, "It happens a lot. I know it takes place a lot… And I have to fill up, like I buy - - I got a lot of 'sodie' bottles from commissary that's empty that I fill up with water and have to the side just to be, just in case the water get shut off. I have water to take my medicine and try to have enough water to flush the toilet, something like that. I learned how to try to survive in here, but it take place, but I can only do nothing but, like I say, figure a way to get around it." [98]

d. Marrell Withers suffered from asthma. While detained at CJC, on he was about to be put in a housing unit with COVID-positive detainees.[99] When he expressed his concern to custody staff, he was cuffed then sprayed him. He did his best to remain calm and then was maced a second time when Capt. Wills incorrectly assumed it had not taken effect., then put in a cell with no running water to drink, bathe, or flush waste for eight days. As was the case with Jerome Jones, above, the only water Marrell was given to drink was from a little cooer at mealtimes.[100]

e. In my experience, the customary practice is when a cell is inoperable, that cell is taken off-line to ensure no one is assigned a bed in a space that is not fully functional. Not only does DOC use inoperable cells, but it also renders operable cells inoperable, shutting off the water then putting someone in that cell for an indefinite period of time as a further form of punishment.

54. Named Plaintiffs are representative of a much larger class of individuals detained by the DOC at CJC. I had opportunity to review 43 sworn declarations of other people detained at CJC (each a putative class member). All but five identified one or more times during their detention at CJC having had no water to drink, bathe, rinse their eyes, brush their teeth, flush the toilet, or shower, all of which is a significant hardship and a threat to their safety and wellbeing. These are extracts from their declarations.

a. David Aaron. During the time around January 2021 in HU 5D, the Lt. would cut off the water for the whole 8-hour shift. They would not turn on the water. People could not use the bathroom and could only get drinks during mealtimes. Doc. 72-12.

b. John Thomas Albert. The CO used a key to turn off the pipe outside the detainee's cell so he couldn't wash the mace off. The staff of the jails should not be using mace and water shut offs this way. Doc. 72-34.

---

[97] *Id*. p. 170, lines 19-25.
[98] *Id*. p. 171, lines 1-9, 11-13, 15-22.
[99] Third Amended Complaint, pp. 11-12.
[100] Marrell Withers deposition, Jan. 23, 2023, p. 69, lines 19-25.

c.  DeJuan Allen. The sprinkler in my cell was broke and sprayed black-looking water into my cell. COs shut off all the water in my cell, including drinking water. I was left in the cell with the water shut-off for a day or two. Doc. 72-2.

d.  Joshua Amerson. Throughout my time at CJC they turn off the water to the cells in the Hole. During the riots, they kept the water off for 1½ days and left the water off and didn't give us our meals either. Doc. 72-25.

e.  Marcus Ausler. Earlier this month (March 2022), I was in 5A. When Lt. Fowlkes came on shift, our water got shut off. The water doesn't work, toilet doesn't work, we had to wait for his entire shift, 8 hours. We were never given a reason why the water was off. No one flooded their cell. It is some type of control, vindictive behavior by the COs. Doc.72-14.

f.  Andrew Bell. I know that they have shut off the water to the cells for days. Lt. Fowlkes turns off the water when he feels like it. Doc.72-10.

g.  Andrew Brummell. When supervisors were called, they responded with mace. They sprayed everywhere, then I was locked in a cell with no water. Doc. 72-28.

h.  Stephen.Cannon. Two years ago, I was in "the hole" for four months; the COS would shut off the water as punishment on a regular basis.  Doc. 72-7.

i.  Antonio. Carter. Sometimes they shut off the water to our cells and I'm not sure why. Sometimes the water stays off for over an hour. Doc. 72-11.

j.  Tevin  Collins. In January 2022, I was locked down for 10 days in  5A, cell 14, and the water was shut off the whole time and I didn't get a shower the entire time. Doc. 72-35.

k.  Ronald Deandre Fisher. In addition to the macing, the water has been shut off several times, especially on the 5th floor. They turn the water off for punishment, and during these shut offs, we aren't able to flush our toilets or get water to drink. Sometimes the water is shut off for 24-hour periods of time. Doc. 72-38.

l.  De'vion Gordon. During late fall 2019, other detainees in 5B flooded their cells but I didn't flood my cell. COs shut off water to all the cells in 5B 1-side. COs will shut off water to all units on a side for punishment, when only a few people flood their cells. Doc. 72-16.

m.  Lerron Harris. In August 2021, we had no beds and no water in our cells for days. Doc. 72-13.

n.  Alex Hudson. I have seen times when the water to the cells is turned off. Lack of water sometimes lasts for days. Doc. 72-9.

o.  Honor Johnson. On February 16, 2021, I was moved up to 5D. Our water was off for days. We were kept in handcuffs. You can't use the bathroom; we were stuck in the cell with feces.

They only let us flush the toilet once by turning it on for a minute. I know the COs intentionally did it. Doc. 72-29.

p.  Joseph Demetrius Jones. Officers use water shut offs as a form of punishment and intimidation. In May 2021, detainees could not access water for two days. At this time, it was common practice to routinely shut off the water for 8 hours at a time to punish detainees. To me, this is the worst place in the world I could be. In CJC, everything gets swept under the rug. Doc. 72-39.

q.  Robert Judd. After the February riots the next day, I was taken up to 5D. We didn't have a mattress and the water to our cells was shut off. Two or three days later, Lt. Fowlkes came back. I still hadn't showered since the last time I was sprayed. The COs still shut off water to our cells. One week ago, in 5A they shut off our water because other people were not locking down. Or if someone is kicking the door, they'll shut off the water. Doc. 72-30.

r.  Terrion Phillips. On or about January 2021, I was in 3D. They shut off everyone's access to water for 16 hours including mine. They claimed there was a riot in 4D but we were in a completely separate wing. On or about February 6, 3022, I was in 5A. The water to my cell was shut off for 7 hours with no explanation and for no reason to me. Doc. 72-22.

s.  Ronald. Roberts. Sometimes COs shut off the water to detainees' cells after macing them. Doc. 72-21.

t.  Ovell Smith Jr. I was maced three times. The first and second times I was locked down for two weeks each, I was not allowed to shower. The third time, all the water in my cell was turned off and I was made to wait four days before being able to shower. [Mr. Ovell is an asthmatic and now is experiencing difficulty breathing.] Doc.72-3.

u.  Darnell Warren. I was moved to the bullpen. I didn't shower for four days. They do it to be petty. Doc. 72-31.

v.  Steven Washington. I was put in a cell with no water. After I was moved, the water was also turned off in that cell, both times because I had asked a CO to help me. On or about January 29, 2021, I was in PAH male side and the water was shut off to all the cells there. We were told the reason was due to a protest on another floor. Doc. 72-4.

w.  Devon Watson. Another time in 2021, I was maced. They placed me in a visitation room. I told them I had to use the bathroom and I couldn't hold it. I was forced to use the bathroom in the visitation room with no toilet. I had no access to water. Doc. 72-27.

x.  DeAndre Wilkins. In the last two months, the water was off in our cell for a whole day. We couldn't get drinking water or flush the toilet. They didn't tell us anything or explain why. Doc. 72-15.

y.  DeWight Williams. On Thanksgiving Day 2021, I was maced because I was accused of being rude to a CO. I was not taken to Medical or given a new set of clothes. I waited an hour

before I was allowed to take a three-minute shower. I filed an IRR and did not receive a response. Doc. 72-37.

**Flooded Cells as a Rationale to Use Force and Cut Off Detainees' Access to Water is a Red Herring**

55. Several groups of individuals most of whom appear to be vulnerable or have special needs, are representative of the many arrestees and inmates who were subjects of excessive force; primarily, the dispersal of chemical agents, in response to flooding incidents. Some of these arrestees and detainees are disoriented and confused, others are agitated, and a number appear to suffer from mental illness, have limited problem solving skills and/or need special housing, primarily suicide watch or protective custody, and a number who are newly admitted individuals trying to get information about their case, all but one of them discussed below getting staff's attention the only way that works for them, by flooding their cell. Likewise, correctional staff and supervisors default to and/or deploy force as their first or only recourse – by definition, unnecessary and excessive – thereby exploiting or exacerbating those interactions, the vast majority of which could and should have been resolved by personnel utilizing interpersonal communication, individuals with a reputation for good listening skills, fairness, and follow-through. To illustrate this point are representative examples found in custody staffs' UOF reports, in order of their occurrence.

56. On November 10, 2020, at 17:26 hours, in 5-Bravo, ▮▮▮▮▮▮▮▮ was reported to have flung a large quantity of feces, food, and liquid from his food slot.[101] CO Spencer approached and issued several directives to stop. Instead, ▮▮▮▮▮ stuffed some articles of clothing into the toilet, flooding his cell. Lt Fowlkes directed CO Spencer to apply a burst of OC through the food slot "to prevent destruction of property," while he turned off the water to the toilet from the pipe chase. When questioned about his behavior, ▮▮▮▮▮ threw back his head and laughed, "My name is Crazy Crip and I have herpes… I needed to get to Medical, Lieutenant!" Lt. Fowlkes noted in his report, "I believe that ▮▮▮▮▮ needs to be seen by mental health. He exhibits bizarre behavior and has random fits of rage and calm." The concern that Lt. Fowlkes expressed did not deter him however, from directing the use of OC on someone who was not only distraught but also secured in his cell, a violation of DOC UOF policy and procedures.[102]

57. On February 14, 2021, at 16:00 hours in Pre-Admissions, Floor 2, ▮▮▮▮▮▮▮▮▮▮, an arrestee, told Lts. While and Wilborn that he was depressed and wanted to be put on suicide watch. They took him to the shower and gave him a suicide smock. After refusing several directives to change into the smock, Lt. Wilborn dispersed one burst of OC at his face then cuffed and escorted him to Medical for treatment for exposure to OC, but not to also see a mental health provider.

---

[101] Jones003102 ff.

[102] City of St. Louis Division of Corrections Policy and Procedures 3.2.15, Us of Chemical Agents, IV. Procedures, A. General Information, 7. An inmate that does not pose eminent danger to staff safety, other inmates, is passive resistant, or is confined in a secured cell but is disruptive in the cell, will not be pepper sprayed to punish he inmate for being disruptive.

58. On June 10, 2021, at 20:45 hours, in 4-Bravo, ███████████, known to be a special needs inmate, flooded his cell and the surrounding area on his floor on the 1st shift and again on the 2nd shift, using Styrofoam cups and trays, and excess articles of clothing and blankets, to clog the toilet.[103]  The response team, led by Lt. Fowlkes, cuffed ████████ removed anything that could cause the toilet to overflow, and then issued him a suicide smock to prevent him from flooding his cell again, a misuse of that garment. ██████████ told them that he flooded his cell because he wanted to get to the rec yard. CO Hamilton stated in her report Mr. ████████ was aggressive; and still, the other reports reflect when he was questioned, he did not speak; he just stared at the wall. Also of note, an incident report entry indicated Maintenance was supposed to return at 14:30 to turn the water back on, which would be 17.75 hours after it was turned off, contrary to representations by former Commissioner Glass and Mr. Roth.

59. On July 26, 2021, at 11:22 hours, in 3-Alpha, ████████████████ told CO Turner when he is at work someone is taking things out of his cell and asked to be moved to another housing unit.[104] She told him that he would be moved to 5-Charlie on Protective Custody status. ████████ was upset about the change to protective custody and the delay; then commenced to flood his cell.

60. On August 6, 2021, at 14:55 hours, on Floor 5, ███████████████ was reported to have flooded his cell when he did not receive his commissary, after refusing the commissary delivered the time before.[105] ████████ told CO Turner, that until it is fixed, "he was gonna flood every chance he got." He tried to explain to her, "They lied to me, Ms. Turner, Commissary told me they were bringing me the right bag in here."

61. On August 7, 2021, at approximately 15:48 hours, in 4-Bravo Medical Isolation, ██████████ ██████ was kicking his cell door and flooding his cell, trying to get a CO's attention to call Admissions.[106] He was certain that he was supposed to go to the St. Louis County Police Department and from there, released to go home. Lt. Fowlkes responded and he saw the water coming out from under his cell door. He did not get ██████████ the information he was seeking instead, issued him a disciplinary ticket for "damage to the facility" and an order for restitution.

62. On November 4, 2021, at 08:20 hours, in the Medical unit, Tank B, ████████████████ was on suicide watch in a locked cell.[107] Lt. Wilborn noticed he was not wearing the suicide smock he had been issued and gave him several orders to put it back on. ████████ refused, "No, I'm not walking nowhere in no dress," after which, he got up and began swinging his arms at him. The Lt. unlocked the tank door then reported he dispersed one burst of OC at his facial area. Lt. Wilborn was in Medical area but he did not request medical assistance; instead, he unlocked and entered the tank to disperse OC contrary to DOC UOF policy and procedures.

63. On November 21, 2021, at 18:20 hours in Admissions, Tank 2, ████████████ flooded Tank 5. He was protesting "being held unlawfully, against his will."[108] He was moved to Tank 2. There,

---

[103] CITY_001902 ff.
[104] CITY_001899 ff.
[105] CITY_001908 ff.
[106] CITY_001910 ff.
[107] CITY_010942 ff.
[108] CITY_010983 ff

he picked up a plastic chair and began hitting a window; then, started to flood that cell as well. When he refused to stop, CO Demerath dispersed two blasts of MK-9 cell buster under the cell door, violations of DOC UOF policy and procedures.[109] However, the hoodie that he was wearing protected him and the chemical agent had no effect. Lt. Fowlkes directed CO Demerath deploy another burst into the cell, a third violation of DOC UOF policy and procedures. When ███ arrived at Medical, he asked to be placed on suicide watch. He was issued a suicide smock and blanket and put on Full Suicide Watch.

64. On December 26, 2021, at approximately 21:47 hours, in Admissions, Tank 2, ███ ███ stuffed several shirts in the toilet, flooding the cell and surrounding area.[110] Capt. Brock directed Lt. Fowlkes to secure her a restraint chair. Per DOC policy, use of a restraint chair requires a minimum of one supervisor and two correction officers to place the person in the chair, utilizing a handheld video camera to record what is a use of force as long as she remained in the restraint chair.[111] While being escorted to the chair, ███ "slipped" out of one of the handcuffs – something that should not have occurred if adequate supervision had been provided and the cuffs were applied correctly. The report stated CO Webb deployed two bursts of OC to her facial area before she stopped resisting. Once restrained in the chair, the Capt. decided she remain in the restraint chair past the conclusion of the second shift. The record does not reflect how long she remained restrained and whether the requisite welfare checks every 30 minutes for a minimum of four hours for a reaction to the chemical agent[112] and at least hourly for anyone in a restraint chair[113] were conducted as required.

65. On January 27, 2022, at approximately 19:07 hours, on Floor 2 in the Medical area, ███ ███ repeatedly told COs Kind and Tyler that he could not keep anything down.[114] They brought him two trays and two cups of juice and about ten minutes later he had vomited again. He asked them for another tray and they conferred with Nurse Jones who said he should not eat anything else; instead, he needed to drink more fluids. Upon hearing this, ███ became irate and started to throw water from his toilet onto the floor and under the cell door. Capt. Freddie Wills directed Lt. Javan Fowlkes to respond. When ███ refused to stop flooding his cell, Lt. Fowlkes reported dispersing one bust of MK-9 cell buster into the cell, contrary to policy, and when that did not secure his compliance, issued a second burst. ███ was ill enough to be housed in the Medical Unit but no one in Medical came to speak with him.

66. On February 6, 2022, at 12:41 hours, in Pre-Admissions, Tank 2, ███ ███, an arrestee, believed he should have been released and began yelling at the Processing Clerks why was he still in custody.[115] When no one responded, he smeared feces on the walls and widows

---

[109] *Id.*
[110] CITY_011052 ff
[111] Policy 3.1.20 Use of Restraints and Restraint Chair, IV. Procedures, C. Placement in the Restraint Chair, c. 1.
[112] City of St. Louis Division of Corrections Policy and Procedures, 3.2.15 Use of Chemical Agent, C. Use of the Chemical Agent, 12.a.
[113] Policy 3.1.20 Use of Restraints and Restraint Chair, IV. Procedures, D. After placement in Restraint Chair, 1.d.
[114] Jones004566 ff.
[115] Jones004621 ff.

and flooded the cell. CO Pickney responded, issued several directives to stop, and when ███████ refused, Lt. Brock opened the cell door and CO Pickney deployed one burst of OC at his facial area contrary to policy, after which he was restrained, examined by Medical, and then returned to Tank 2.

## VIII. DOC's Grievance Procedures

67. The DOC's grievance procedures to address informal, formal, and emergency situations are intended to afford  inmates in its custody administrative remedies for conditions of their detention that contravene policy.[116] DOC policy also provides for a Constituent Services Unit to direct and process citizen complaints.[117]

68. The DOC grievance procedure includes timelines for inmates and staff; fixed for inmates under ordinary circumstances and fluid for staff. Inmates must file informal grievances within 10 days of the aggrieved occurrence and a response from DOC usually within seven working days; formal grievances within five days and a reply from DOC within 15 working days; and an emergency grievance concerning matters that under regular time limits would subject the inmate to substantial risk of personal injury or cause other serious and/or irreparable harm to the inmate.[118] DOC's Inmate Rights policy requires inmates "receive information on grievance procedures."[119] The Inmate Handbook,[120] the most recent edition published in 2019, contains some information about the grievance process but makes no mention of the emergency grievance.

69. Commissioner Glass introduced the electronic tablet towards the end of his tenure at which time, only some were available and not every inmate had one.[121] One of the tablet's features is it enables inmates to file grievances online. Mr. Roth confirmed that is still the case. Unfortunately, neither DOC's grievance procedure nor Inmate Handbook referenced the role of the electronic tablet or explained how to pursue a grievance during and after the transition from paper and pencil to the electronic device.[122] Both the policy and the Handbook still direct inmates to complete a paper form then deposit it in the locked box in their housing unit to initiate the grievance process or to file an appeal. However, there is no longer a grievance box in any of the housing units that we inspected. ███████████████████████████

---

[116] City of St. Louis Division of Corrections Policy and Procedures 3.3.3 Inmate Grievance, II. Purpose, https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/procedures/upload/3-3-3-Inmate-Grievance-2.pdf.

[117] City of St. Louis Division of Corrections Policy and Procedures 3.1.3 Inmate Housing Supervision, III. Definitions, https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/procedures/upload/3-1-3-Housing-Unit-Supervision.pdf.

[118] *Id.*, IV. Definitions, Emergency Grievance Procedure.

[119] City of St. Louis Division of Corrections Policy and Procedures 3.3.2 Inmate Rights, IV. Procedures, A. General Information, e.

[120] City of St. Louis, Dept. Public Safety, Division of Corrections, Inmate Handbook, Apr. 2019, pp. 18-19, https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/inmate-handbook.cfm.

[121] Glass Deposition, p. 93, lines 10-14.

[122] Glass deposition, p. 93 lines 19-25.

also came across a form in an empty cell titled, General Housing Unit Inmate Orientation. It briefly addressed 11 topics, one of which was Use of Tablets, but it did not say anything about using the tablet to file or track a grievance or an appeal online,[123] and Grievance System was not one of the remaining ten topics.

70. Mr. Roth acknowledged staff routinely fail to check for new grievances filed on the tablet and those delays have created an undue burden for inmates as they are still obligated to meet the policy's tight timelines,[124] and that creating problems is contrary to its intent – to facilitate resolution of complaints. He also acknowledged these complaints are not new.[125] Apparently, failing to check for new grievances is not a new phenomenon. During the inspection, we noticed a locked grievance box at the officer's station in the corridor outside the housing units and they appeared to be full.

71. Plaintiffs would agree with Mr. Roth's acknowledgement that DOC's grievance system is deficient. Both Derrick Jones and Darnell Rusan were asked in their depositions whether they tried to resolve their lack of access to water vis a vis DOC's grievance procedure. Darnell testified he attempted to seek resolution utilizing a tablet,[126] but there are more detainees than tablets.[127] Until the number of tablets increased, he submitted his complaints about the "macings and water shutoffs" in writing.[128] He never received responses to any of the informal or formal complaints he filed on paper or electronically.[129] Asked whether he still had access to anything he filed online, he replied, "After 30 days, everything erases." Derrick Jones testified he also filed three or four grievances including an emergency grievance, all of them concerning access to water, and never received a response.[130]

72. In addition to named Plaintiffs, several members in the Class who submitted a Declaration in which they also described their difficulties with DOC's grievance policy and procedures.

a. ████████████ attested, "I wrote IRRs on mace and water shutoffs a few times. I have two to Fowlkes and one to a CO. They never got turned in." Doc. 72-17.

b. ████████████ found conditions at CJC so unbearable, he engaged in self-harm. He attested, "1-2 days after I returned from the hospital. I submitted a paper IRR about the macing. I also put IRRs on the tablets. I went three to four months without a response. I was told they lacked adequate staff because the prior CSU had quit. I was finally seen concerning the

---

[123] In its entirety it stated, "Inmates may use the tablets to communicate with friends and family via video visits and/or email. Inmates who are indigent will have 15 free minutes to use the tablet. After the 15 minutes use, you will not be able to use the tablet again for 2 hours. Your family can purchase minutes for you to extend the use of the tablet. More information is available within the unit."
[124] *Id.*, pp. 70-71.
[125] *Id.*, p. 73, lines 16-25.
[126] Darnell Rusan deposition, p. 162, lines 17-19.
[127] *Id*, p. 163, lines 4-5, 7-8.
[128] *Id*, p. 163, lines 18-22.
[129] *Id*, p. 164, lines 1-11.
[130] *Id.*, p. 67, lines 6-10, 12.

electronic IRRs. Those went without resolution. I was never seen about my paper IRR. I filed a formal grievance on paper. I never received a written response, and I've never sat with anyone about it." Doc. 72-8.

c. ███████████ attested, "When I was on MAS (Maximum Assault Status) I was in my cell for a month and a half. No shoers, no rec, none of that. I complained. I tried to file an IRR, but it never seemed to get out. I've seen COs rip up IRRs on multiple occasions." Doc. 72-6.

73. It is my experience; a grievance system only works when the DOC is genuinely committed to strive towards excellence. It is difficult to know how many people in custody have concerns or complaints when there are so many impediments. What is easier to ascertain, is whether or not DOC cares. The frequency with which OC is dispersed, detainees are deprived of water, and inmates file grievances are three strong indicators that the DOC has failed. Commissioner Glass reported receiving on average five grievances a year about the misuse of force. He thought was a good thing, and it would be if it accurately reflected what was occurring. But that is not the case. It is clear, uses of force overall and excessive and unnecessary uses of force in particular, are a significant, ongoing issue. If asked, I expect Mr. Roth would have reported the same. To be seen as a viable means for recourse, the grievance process must be reliable, the review must be impartial, and the remedy resolve the root causes of reoccurring complaints.

## IX. Staff Training

74. The DOC commits to accomplish its mission to ensure the safety and security of staff and inmates and to provide opportunity for inmates to become more productive citizens upon their release through the professional development of its workforce consistent with ACA Standards, federal and state laws, City Ordinances and regulations, and Divisional Procedures.[131]

75. To that end, the Division's policy is to provide its workforce with training and staff development opportunities to enable them to function in a safe, effective and professional manner.[132] CO Alexander was assigned to the Training Academy much of the time this matter encompasses and he expressed doubts about the extent to which the training provided prepared custody staff. Regarding OC instruction he stated during his deposition, "The unrealistic part is that someone believes that you will always be able to put yourself in the position to spray from exactly two feet away. That's not realistic. Someone believes that, you know, that you will always be able to only just spray the eyes or only just spray the hand or only just spray the arm. It's not realistic."[133] CO Alexander failed to identify the underlying issue – whether force was necessary. He did not know what to do as an Officer – CO Alexander also misused force and is a

---

[131] City of St. Louis Division of Corrections Policy and Procedures 1.1.2 Mission Statement, IV. Procedures, A. Mission, Philosophy and Goals, 3.b, https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/procedures/upload/1-1-2-Mission-Statement-Core-Values-and-Goals.pdf.

[132] City of St. Louis Division of Corrections Policy and Procedures 1.4.1 Training and Employee Development, I. Policy, https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/procedures/upload/1-4-1-Training-Employee-Dev.pdf.

[133] Dirrell Alexander deposition, July 8, 2022, p.127, line 21.

Defendant – and he did not know what to do about it as the Academy's Training Coordinator: To use force as intended, the initial training must be competent, comprehensive, and coupled with ongoing supervision and annual in-service instruction.

76. The several hundred incident reports that I reviewed, few of which included a video recording, documented all manner of force employed but demonstrated a clear preference for the use of chemical agents Moreover, its use is vastly under-reported, most often claiming to have dispersed a one-to-two second burst, or one burst of OC, when the surveillance video captures most custody staff running around the housing unit with their finger on the can of OC emitting one continual spray of a chemical agent, waving it as if it was an air fresher. CO Alexander acknowledged that slippery slope, without realizing, when added, "Well, there's nothing that's guaranteeing that every situation is going to have you spraying from two feet, you know. Oh, well you can't spray OC – this OC spray can't be used for this, it can only be for this. Well, number one, it's all the same chemical composition. As a result, it really doesn't matter. One is just high capacity. The other one is not. You know what I mean. You know, oh, don't spray in the cell. Right. But only spray in the cell if he's destructing property. Well, you know, let me just tell you. You know, there's just certain things that are unrealistic."[134] Well, I do know. It is my experience, if a system says one thing but continually allows its staff to do another, whatever training it has provided will not matter.

77. Per DOC policy, the Division does not staff its Training Academy with dedicated, fulltime employees; instead, a supervisory level staff member usually, with no prior experience, is selected to plan, coordinate, and oversee its Academy[135] and other staff members are selected to serve as instructors.[136] It is a cost saving measure that all-too-often, is quite costly. Adult education is its own discipline, the development and delivery of curriculum best left to educators accomplished in the science and practice of adult learning. Likewise, Corrections is a discipline based on case law and informed by the field's best practices. In my experience, only someone who is knowledgeable about adult learners and fully informed about correctional policy and practice should be considered.

78. Per DOC policy, its training program objectives include (a) informing new hires of the agency's mission, philosophy, and goals; (b) informing new employees about the Division's policy, procedures, and programs; and (c) developing their inter-personal communication skills (IPC) for use when interacting with the inmate population.[137] An indicator of how far afield its training program is from its policy, is a text apparently still in use at the DOC and referenced enthusiastically by several Defendants.[138] Games Inmates Play[139] was published in 1981, its objective to alert "unsuspecting correctional staff to a series of subtle steps – the 'set-up' – used by prisoners to manipulate prison staff into breaking the law," clearly at odds with the field's

---

[134] *Id.*, p. 204-205, line 25, 1.
[135] *Id.*, IV. Procedures, B. General Responsibility 1.a.
[136] *Id.*, 1.b.
[137] *Id.* C. Academy Training Design and Delivery Techniques, 2. Curriculum Development.
[138] Deposition, Javan Fowlkes, p.74, 11; Deposition, Anthony Spencer, Sep. 12, 2022, p.73, lines 11-23.
[139] Bud Allen and Diana Bosta, Games Inmates Play: How You Can Profit by Knowing Them, Petaluma, CA: Rae John Publishing Co., 1981.

best practices – notably, IPC and Direct Supervision – both of which DOC incorporated in its policy and procedures, if not it practices.

79. DOC training requirements are limited. Every newly hired officer must satisfactory complete a minimum of 160 hours of training during the first year of employment, the equivalent of four weeks, with as few as 40 hours – just one week – to be completed prior to being independently assigned to a post in the jail.[140] [141] This is also unwise. After just one week of instruction, new hires are assigned to a shift and sent to work unsupervised. That which they are most likely to see – how the majority of officers interact with inmates, and how frequently force is used – is also that which they are most likely to do. Bad habits take hold quickly.

80. DOC policy also provides for a Field Training Officer (FTO) program consisting of tenured custody staff who, in addition to their duties, volunteer to facilitate the transition of Probationary Correctional Officers from the Training Academy to CJC.[142] It is unclear whether FTOs are in use. There is nothing in Defendants' production of discovery to indicate that it is. The same reservation applies to this practice as relying solely on custody staff as Academy instructors.

81. When policies and procedures are as unclear and inconsistent and applied as unevenly as are the Division's five sets of UOF instructions, the number of excessive uses is high and the need to train new recruits and provide ample annual in-service instruction for tenured officers is urgent. Defendants provided only minimal information about its courses and their content, and it was underwhelming – one rough draft of a lesson plan focusing on how to apply force with nothing about why or when to do so,[143] a vendor's power points as how to disperse chemical agents,[144] and partial training records for some of the defendants – Aisha Turner,[145] Javan Fowlkes,[146] Michelle Lewis,[147] Dirrell Alexander,[148] Freddie Wills,[149] and Douglas Jones[150] – along with receipts they signed attesting each would periodically review four of the five UOF policies – 3.1.20 Restraints, 3.1.21 Use of Force, 3.1.27 Cell Extractions, 3.2.15 Use of Chemical Agents. Based on UOF reports in which Defendants participated, they failed to follow the written instruction they were provided. Further, Defendants have not produced any material to indicate custody staff received instruction in support of Direct Supervision or developing Interpersonal Communication skills, both of which are key to reducing unnecessary and excessive force.

---

[140] City of St. Louis Division of Corrections Policy and Procedures 1.4.1 Training and Employee Development, D. Training and Development Programs, c. and d.

[141] See also City of St. Louis Division of Corrections Policy 1.4.2 New Employee Orientation, https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/procedures/upload/1-4-2-New-Employee-Orientation.pdf.

[142] City of St. Louis Division of Corrections Policy and Procedures 1.4.1 Training and Employee Development, IV. Procedures, E. Field Training for Custody Staff, 1.

[143] Lesson Plan Rough Draft, CITY_003743,

[144] Sabre OC Pepper Spray Student Program, CITY_003751.

[145] Aisha Turner, partial training records, CITY_003552

[146] Javan Fowlkes, partial training records, CITY_003407.

[147] Michelle Lewis, partial training records,CITY_003540.

[148] Dirrell Alexander, partial training records, CITY_011143.

[149] Freddie Wills, partial training records, CITY_013879.

[150] Douglas Jones, partial training records, CITY_013865.

## X. Staff Supervision

82. The City of St. Louis promulgated a Code of Conduct, holding the City and Appointing Authorities, City Supervisors, and City employees accountable commensurate with their rank and in accordance with Standards of Behavior.[151] These include as examples, the City and its Appointing Authorities' responsibility to set acceptable standards of performance for each job; City Supervisors' obligation to benchmark competence and ethical behavior; and City employees to sustain a workplace that respects the standards and behaviors promoted by this Code.[152]

83. The Division of Corrections is led by the Commissioner of Corrections, a Mayoral appointee. The City Justice Center's workforce consists primarily of civil service employees, most of whom have direct inmate contact and include the Detention Center Superintendent, Chief of Security (Major), Shift Supervisors (Captains), Correctional Officers II (Lieutenants), Correctional Officers I (Officers), Unit Managers, and Correctional Caseworkers.[153]

| Job Class | Job Description |
|---|---|
| **General Administration** | |
| Detention Ctr. Superintendent | Plans, organizes, coordinates and controls the work unit's operations and programs to establish operational priorities, coordinate these operations with other functions within the facility, and ensure program objectives and standards are established, attained and congruent with overall goals. |
| **Housing, Custody and Security** | |
| Chief of Security | Among other functions, the Major advises subordinates and supervisory personnel regarding security policies and procedures; monitoring detention activities and detention facility activities to evaluate effectiveness of security policies and procedures and need for new or amended policies and procedures. Responds to security emergencies. |
| Shift Supervisor | Among other functions, the Captain plans, assigns and directs the work activities of subordinate staff; confers with and counsels subordinate staff and/or explain work policies, procedures and guidelines; identify work-related problems, problem characteristics, impact and formulate possible solutions. |
| Corr. Officer II | The Lieutenant Conducts searches of inmates, visitors, cells and other areas as well as counts and roll calls. Supervises and observes inmate activities and movement. Physically breaks up fights and altercations between inmates; operates manual and electronic security equipment, writes reports, and completes forms. |
| Corr. Officer I | The CO conducts searches; supervises and observes inmates activities, movement and maintains order; conducts inmate counts; operates manual and electronic security equipment; completes activity logs, incident reports and forms; escorts inmates; transports inmates; physically breaks up fights and altercations between inmates; supervises sanitation, |

---

[151] City of St. Louis, Employee Code of Conduct, https://www.stlouis-mo.gov/government/departments/personnel/documents/upload/Code-of-Conduct_-6_21_ForWeb.pdf.
[152] *Id.*, p. 1.
[153] City of St. Louis Division of Corrections Policy and Procedures 1.3.12 Corrections, Job Class, Job Description and Essential Functions, https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/procedures/upload/1-3-12-Job-Class-Description-and-Essential-Functions.pdf.

| | serving meals, laundry inventory, issues supplies and other housekeeping functions. Resolves inmate complaints and grievances. |
|---|---|
| **Housing, Social Services and Programs** | |
| Unit Manager | Among other functions, develops and directs implementation of operational plans pertinent to managed operations to ensure the establishment of appropriate goals and the development of action steps to achieve these goals; develops and implements contingency plans for a measured response to varying staffing or supply conditions to insure a reasonable situational risk; responds to changes in operational needs, objectives, and priorities and to improve the effectiveness of managed operations. |
| Corr. Caseworker | Interviews inmates and compiles information. Defines service needs and determines short and long-term client goals; refers inmates to medical, psychological, substance abuse and other services; provides orientation to new inmates; answers questions; identifies inmate infractions and appropriate disciplinary determinations; contacts inmate families and legal representatives to provide needed information; maintains inmate files, case notes, contact reports, and social service files. |

84. Consistent with the City's Code of Conduct, DOC commits, "It is the policy of the Division of Corrections to provide humane housing and maintain a safe and secure living environment for legally confined individuals. The Division endorses the principles of Direct Supervision to facilitate personal contact and interaction between staff and inmates."[154]

85. Direct Supervision is a method of inmate management that ensures continuing direct contact between inmates and staff by posting officers inside the housing unit or adjacent to the inmate living area. Officers in general housing units are not separated from inmates by a physical barrier. Officers provide frequent, nonscheduled observation and personal interaction with inmates.[155] ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████

86. It is my opinion, Defendant DOC supervisory personnel assigned to CJC failed to comply with the City's Code of Conduct and DOC's policy and procedures before any renovation as evidenced by the following and many other unnecessary and avoidable uses of force in which they participated. And no information has been provided to suggest it is any better since then.

a. <u>Derrick Jones, Plaintiff.</u> Location: CJC, 4-Charlie, Date and Time: December 14, 2020, 17:23 hours., named Defendants: Lt. Javan Fowlkes, Lt. Sherry Richard.[156]

---

[154] City of St. Louis Division of Corrections Policy and Procedures 3.1.3 Inmate Housing Supervision, I. Policy, https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/procedures/upload/3-1-3-Housing-Unit-Supervision.pdf.
[155] *Id.*, III. Definitions.
[156] CITY_000332 ff.

Once he learned that his cellmate had tested positive for coronavirus, Derrick refused to comply with Lt. Richards' directives that he return to his cell. He told her that he would not comply because he did not want to contract COVID-19. He was not actively resisting. Lt. Richard summoned available officers but did not request CERT. Lt. Fowlkes and three correctional officers responded. Lt. Richards dispersed the canister of MK-9 fogger at his face. Derrick was surprised, blinded and in pain; he tried to shield his eyes and made unintentional contact with her face.[157] Both the assigned housing officers and those who responded, a total of six custody staff, tackled and took him the ground then, kicked him on the back of his head and on his body and sprayed him again with OC as they cuffed him. The Housing Unit videorecording captured the takedown.[158] Upon arrival at Medical, they left Derrick in a holding cell. He pounded on the door, pleading for help. Lt. Fowlkes returned and maced him a third time. About 20 minutes later, Medical staff flushed his eyes with water but he was not offered a shower or given a fresh set of clothes.[159] Instead, Derrick was moved directly to 5B, disciplinary segregation, bypassing the due process that should have been provided per policy,[160] where he remained for eight days "to marinate."[161] Derrick suffers from schizophrenia ██████████████  The assault followed by isolation was detrimental to his health and well-being.

b.  <u>Jerome Jones, Plaintiff</u>. Location: 5-Delta, Date and Time: February 9, 2021, 17:00 hours., named Defendant: Lt. Javan Fowlkes.[162]

CO Hopgood and CO Eastling directed Jerome to move from a single bed to a double-bed cell. Jerome told them he did not want to move and he would not comply. They told him Lt. Fowlkes would mace him if he did not comply. Jerome indicated again he would not change cells but he was not physically resisting. In fact, Jerome was in handcuffs throughout this conversation. Lt. Fowlkes and CO Spencer responded. Lt. Fowlkes and COs Robinson and Allen moved him to a visiting room, approximately three feet by five feet where Lt. Fowlkes asked him again whether he would change his cell; Mr. Jones said he would not. Lt. Fowlkes dispersed an excessive quantity of chemical agent, then left him in that OC-filled small, secured space almost a half-hour then moved him to a double-cell, one where its water had been shut off. He was not allowed to shower that day and his requests to see Medical to remove the OC also went unanswered. Mr. Jones still experiences ████████████ which, upon information and belief, are caused by his exposure to excessive chemical agents at the CJC.

c.  <u>Darnell Rusan, Plaintiff</u>. Location: CJC 4-Alpha, Date and Time: December 19, 2020, 08:56 hours, named Defendants: Lt. Aisha Turner, CO Michelle Lewis, and CO Bruce Borders.[163]

---

[157] Derrick Jones deposition, p. 32, lines 2-7.
[158] City_002246 12.14.20 Derrick Jones Video Clip.
[159] CJC Amended Complaint, pp, 6-7, P. 30.
[160] City of St. Louis Department of Public Safety/Division of Corrections, Policy & Procedures, 3.3.6, Rule Violations and Disciplinary Hearing, https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/procedures/upload/3-3-6-Rule-Violations-Disciplinary-Hearing.pdf.
[161] Third Amended Complaint, 21-cv-600, p, 7, P. 29.
[162] CITY_ 000349 ff.
[163] Jones 003978 ff.

Darnell was in his housing unit's dayroom on the phone with his sister. CO Lewis told him to hang up the phone and lock-in for the remainder of the day. The video captured Darnell standing by the phone with no indication of aggression when Lt. Turner dispensed OC at him and he ran from the dayroom.[164] CO Alexander and CO Borders found Mr. Darnell in the shower room where he was washing his face and trying to remove the OC on his body. They cuffed then put him on the elevator to the medical unit. En route, CO Alexander slammed his head against its cage, choked him, and warned "We'll kill your little ass in here." Once in the medical unit, both COs continued to hit and choke him, all the while he remained cuffed. He did not see a provider in Medical; instead, COs Alexander and Borders brought him back to 5 Bravo, put him into one of the visiting booths, then commenced choking him. Mr. Jones was still cuffed. He was dizzy and struggled to catch his breath. As the COs left, one of them dispersed more OC into the room. He was left there for about nine hours. When he was removed, custody staff continued to refuse to take him to Medical. Darnell is prone to epileptic seizures. Darnell could have died from that assault and OC and then left unattended.

d.  Darnell Rusan, Plaintiff. Location: CJC 5-Bravo Visiting Booth, Date and Time: February 3, 2021, 16:38 hours, named Defendants: Lt. Javan Fowlkes.

Darnell was maced again by CJC staff upon his refusal to submit to a second cavity search during the same shakedown. The order for the second cavity search was excessive as Darnell had been under continual supervision since the first strip search was completed and Lt. Fowlkes directed it should be conducted for solely punitive purposes. The Lt. told him to "get comfortable," then, sprayed Darrell, who was naked, with an excessive quantity of OC, filling the visiting room to which he had been moved, then locking him in for hours. Once again, he was denied access to Medical for an assessment and to water to rinse his eyes and his body.

e.  Marrell Withers, Plaintiff. Location: Pre-Admission Housing (PAH)-Female,[165] Date and Time: January 6, 2022, 17:25 hours, named Defendants: Capt. Freddie Lewis, Lt. Javan Fowlkes, and CO Douglas Jones.[166]

Marrell was housed in 4C at CJC. He is asthmatic, a condition treated with medication. Although he had recently received a COVID test indicating that he was COVID-negative, custody staff informed him, he was going to be reassigned to a wing at CJC set-aside for COVID-positive detainees. Marrell was aware the Omicron variation was surging and he fearful he would become infected if he was moved. He asked the COs to call Medical and confirm the result of his PCR test so that he could remain in place. The COs did not call Medical; instead, although he was not physically resisting, they handcuffed him behind his back. Then Capt. Wills instructed CO Jones to mace him. Marrell begged that he not because he suffered from asthma, an important fact that was omitted in the use of force report. CO Jones maced Marrell in his face and when his efforts to remain calm worked and he appeared

---

[164] City_002248 Darnell Rusan video.
[165] It is believed that male Arrestees were assigned to Pre-Admission Housing cells set aside for female Arrestees on an overflow basis and on those occasions, the female side was co-ed.
[166] Jones004448 ff.

not to have been affected, Capt. Wills instructed CO Jones to discharge more OC. Marrell
was taken to Medical but was not afforded a shower or change of clothes. Instead, he was put
in a cell in disciplinary segregation with no running water for eight days during which time,
the only water he was provided came from a small cooler, at mealtimes.[167]

87. What Supervisory staff does matters. Supervisors are assigned to all three shifts, seven days
every week including holidays. Frequently, the most senior officer in the facility, the Shift
Commander, is a Lieutenant. Although supervisory staff lack the authority to create policy and
procedures, the manner in which they do or do not interpret and enforce written instruction
makes a material difference. They determine which rules are enforced and decide how
enforcement is achieved. It is my opinion, more attention to their selection, training, and
supervision is required.

88. The DOC has not yet kept this commitment. The CJC is a secure detention facility. Inmate
movement is regulated on every floor. ████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████ Ordinarily, no one leaves their floor, or
their Unit, except to go to the Medical area or Court. Regardless of their custody classification –
low, medium, or high – the majority of an inmate's day is spent locked in their cell, in their Unit,
on their floor. Meals are served and medication is dispensed to them in their cells. When an
inmate is let out of their cell, CJC says he or she is at "Rec" (recreation) but that is not the case.
Depending upon their custody classification, one, two, several, or more inmates may come out of
their cells at a time to shower, make a quick phone call, watch TV, or heat up a commissary item
in the microwave oven. It is unclear whether inmates have had any access to outdoor recreation
on the roof since the pandemic was declared.

89. All of this is to say, as many days, months, or years, as an inmate is detained at CJC, their
world is not much bigger than their housing unit, and how those days, months, and years pass has
much to do with the character and competence of the custody staff and supervisors with whom
they interact. This only changes when the chain of command – the City of St. Louis embodied in
the Director of Public Safety, the Commissioner of Corrections, the Correctional Superintendent
and Deputy Superintendent resolve to strive towards excellence.


## XI. Jail Management

---

[167] Marrell Withers deposition, p. 69, lines 19-25.
[168] City of St. Louis Division of Corrections Policy and Procedures 3.4.1 Administrative Segregation and
Protective Custody, https://www.stlouis-mo.gov/government/departments/public-
safety/corrections/documents/procedures/upload/3-4-1-Admin-Seg-Protective-Custody.pdf.
[169] City of St. Louis Division of Corrections Policy and Procedures, 3.4.4 Disciplinary Segregation,
https://www.stlouis-mo.gov/government/departments/public-
safety/corrections/documents/procedures/upload/3-4-4-Disciplinary-Segregation.pdf.

90. Within the Department of Public Safety, Division of Corrections, is the Office of the Commissioner. The Correctional Superintendents report directly to the Commissioner, as do the Chiefs of Security report directly to their respective Superintendent. That which is contrary to DOC policy and procedures and concerns custody management should be identified and addressed the Chief, and if that fails, then remediated and resolved by the Superintendent. Still, it is the Commissioner who is ultimately responsible for the safety and wellbeing of every inmate in DOC's custody and the actions of all the Division's employees.

91. All too often, DOC employees assigned to CJC have failed to comply with the Division's policy and procedures and all too often, the Division has failed to identify and address their deficiencies. The five Uses of Force in Plaintiff's Complaint and this Report are representative of a widespread and reoccurring practice, a perversion of  key DOC policy and procedures, practices that are rarely found or fixed at the facility, or the Commissioner's office.

a. <u>Derrick Jones, Use of Force, December 14, 2020</u>: Lt. Richard submitted CJC's Use of Force report directly to Supt. Barnes. The Report includes an investigation conducted by Lt. Morgan, reviewed by Lt. Peterson, and signed-off by the Chief of Security or Lead Captain, the signature is illegible.[170] Signatures attest their preparation and acceptance are based on a full review of all the underlying documentation in addition to the Investigator's report.

<u>Ranking Officers' Assessments</u>: Lt. Pearson concluded force was necessary and appropriate.[171] Chief of Security/Lead Captain concurred, "Based on the report information, force was appropriate." [172]

<u>Expert's Observations</u>: (1) The DOC's Use of Force Log indicates there is no video recording; this is incorrect.[173] There is an audio-video recording and it is compelling. Lt. Richard who had already retrieved the riot-sized can of OC, sprayed Derrick and then, when incapacitated, he was pulled to the floor by six custody staff who piled on top of him.[174] Perhaps, unaware of the recording, participants and witnesses varied in their descriptions of the force they applied – pushed,[175] guided, [176] or placed [177] to the floor. (2) Per policy, "The use of the MK-9 Cell Buster must be authorized by the Shift Supervisor and deployed in a planned use of force and then, only when warranted and justified in advance in writing,"[178] none of which had occurred. Had CERT, a specially trained team, each member with a specific assignment, rigorously trained and arriving with protective equipment, along with a

---

[170] This comment applies to each illegible signature in this section.
[171] CITY_000346.
[172] *Id.*
[173] CITY_000348.
[174] City_002246 12.14.20 Derrick Jones video.
[175] CITY_000336.
[176] CITY_000337.
[177] CITY_000338.
[178] City of St. Louis Division of Corrections Policy and Procedures 3.2.15 Use of Chemical Agents, IV. Procedures, 10.

videographer and healthcare provider, been summoned,[179] which is what policy requires when a cell extraction is to be undertaken, CJC could have provided the requisite "show of force" without dispersing any chemicals.[180] (3) While restrained on the floor in handcuffs, Lt. Fowlkes sprayed him again. It also disconcerting that two of the supervisors on the scene failed to accurately report how many times OC was sprayed. In sum, the force used was neither necessary nor appropriate. It was unnecessary and excessive.

b.  <u>Jerome Jones, Use of Force, February 9, 2021</u>: Lt. Javan Fowlkes submitted CJC's Use of Force report directly to Supt. Barnes. The Report includes an investigation conducted by Lt. Shirley Hassell, reviewed by Capt. Williams, and signed-off by the Chief of Security /Lead Captain. Signatures attest their acceptance is based on a full review of all the underlying documentation in addition to the Investigator's report.

<u>Ranking Officers' Assessments</u>: Lt. Hassell concluded, "The use of force was necessary and carried out in the manner called for. He was given instructions and refused to comply."[181] Capt. Williams concurred, "OC was necessary and appropriate."[182] Chief of Security/Lead Captain also agreed, "Force appropriate to address incident."[183]

<u>Expert's Observations</u>: Lt Fowlkes violated DOC policy. Mr. Jones was passively resisting thus spontaneous force was not warranted and its use was contrary to policy. A cell extraction should have been initiated thereby summoning CERT including a videographer and a healthcare provider thus presenting a show of force without dispersing OC.

c.  <u>Darnell Russan, Use of Force, December 19, 2020</u>: Lt. Turner submitted CJC's Use of Force report to Capt. Gooch. The Report includes an investigation conducted by a Lieutenant,[184] reviewed by Capt. Gooch, and signed-off by the Chief of Security /Lead Captain. Signatures attest their acceptance is based on a full review of all the underlying documentation in addition to the Investigator's report.

<u>Ranking Officers' Assessments</u>: Lt. Turner concluded, "…the force used was necessary…" [185] Capt. Gooch concurred, "Use of Force was necessary and appropriate."[186] Chief of Security/Lead Captain also agreed, "Based on info provided, use of force was appropriate."[187]

---

[179] City of St. Louis Division of Corrections Policy and Procedures 3.1.27 Cell Extractions, IV. Procedures.
[180] *Id.*
[181] CITY_000355.
[182] CITY_000346.
[183] CITY_000356.
[184] Signature not legible.
[185] Jones003985.
[186] Jones003986.
[187] *Id.*

Expert's Observations: This is another instance where the Report indicates there is no video recording when on fact, there is.[188] Lt. Turner and CO Lewis violated DOC policy. They instigated and then exacerbated their interactions with Mr. Rusan. Whereas a two to three second bust of OC may be dispersed to the subject's facial area, *when necessary*, several minutes also should pass for it to take effect before dispersing OC a second time.[189] Furthermore, Lt. Turner was less than an arm's length away. Their repeated and extensive spraying of OC was excessive. In this instance both the Investigating Supervisor and Lead Captain identified and criticized (i) staffs' failure to control the incident instead, escalating it. Specifically, (ii) Lt. Turner should have called for assistance before disbursing OC, and (iii) both Lt. Turner and CO Lewis failed to lockdown the unit, but they also concluded force was necessary and the amount employed was not excessive. Also of note, **a**ttached to Darnell's disciplinary file is a copy of his IJMS Long Profile, Inmate Journal History.[190] An entry dated December 6, 2020, indicated Darrell had been placed on ██████████████ the week before this incident on December 6, 2020, at 17:24 hours. Direct Supervision requires custody staff to know who is housed in the unit to which they are assigned and to interact with them according. Had CERT been summoned, the responding healthcare provider should have been prepared to provide that information.

d.  Darnell Russan, Use of Force, February 3, 2021: Lt. Javan Fowlkes submitted CJC's Use of Force report directly to Supt. Barnes. The Report includes an investigation conducted by Lt. Sanders-Morgan, reviewed by Capt. Lenharth, and signed-off by the Chief of Security /Lead Captain. Signatures attest their acceptance is based on a full review of all the underlying documentation in addition to the Investigator's report.

Ranking Officers' Assessments: Investigating Supervisor, Lt. Sanders-Morgan, concluded, one burst of OC to the facial area was necessary to get Darnell to comply with directives.[191] Capt. Lenharth agreed that force was necessary and the amount of OC was appropriate.[192] Chief of Security/Lead Captain concurred, the use of force was appropriate for the incident.[193]

Expert's Observations: Lt. Fowlkes violated DOC policy. Darnell was passively resisting thus, should not have been subjected to spontaneous force. He also failed to report Darnell had already undergone a strip search and remained under the direct supervision of custody staff. Subjecting him to a second strip search served no legitimate penological purpose; it was strictly retaliatory. Also of note, Lt. Fowlkes directed this Use of Force report to CJC Supt. Adrian Barnes. There is no indication what action, if any, Supt. Barnes may have taken.

---

[188] City_002248 Darnell Rusan video.
[189] City of St. Louis Division of Corrections Policy and Procedures 3.2.15, Use of Chemical Agents, IV. Procedures, C. Use of the Chemical Agent, 5, 6 , 7.
[190] CITY_001848 ff.
[191] CITY_000363.
[192] CITY_000364.
[193] CITY_000364.

e. <u>Marrell Withers, Use of Force, January 6, 2022</u>: Capt. Wills submitted CJC's Use of Force report to Chief of Security, Major Harry. The Report includes an investigation conducted by Lt. Fowlkes, reviewed by Capt. Williams, and signed-off by Chief of Security, Major Harry. Signatures attest their acceptance is based on a full review of all the underlying documentation in addition to the Investigator's report.

<u>Ranking Officers' Assessments</u>: Investigating Supervisor Fowlkes concluded dispensing OC twice was necessary and appropriate because Mr. Withers refused to transfer from a single to a double cell.[194] Capt. Williams concurred.[195]  Chief of Security, Major Harry disagreed, noting Mr. Withers was "passive resistant." She added, given a "show of force" had been assembled, he should have been cuffed, then moved to his assigned cell. "Use of OC in this instance did not appear to be justified. Officer and supervisor spoken to about this matter."

<u>Expert's Observations</u>: Here again, the Report indicates there is no video recording when in fact, there is.[196] Marrell told them he had asthma and would have difficulty breathing if he was maced but they did not stop to check whether he had a caution code in JMIS, DOC's database. Instead, they proceeded to spray Marrell twice; his hands cuffed behind his back, both violations of policy.[197] The investigative report also omits Marrell's reason for refusing to move: He feared sharing a cell with someone who had tested positive for coronavirus, putting him at heightened risk of contracting COVID-19. Furthermore, Instead, the Investigator's Report merely, and misleadingly, stated, "Inmate Withers reported he did not want to move to the PAH female side with a cellmate.[198]

92. It is my opinion that DOC policy and practice are completely out of alignment. Policy states, use of a chemical agent may be used only in limited circumstances. There are two instances when spontaneous force may be warranted: (a) bodily harm to a staff member or another person or (b) an inmate is attempting to escape from an officer or the facility. *None of situations in which Plaintiffs found themselves warranted spontaneous force.* There are also two instances when planned force may be used: (a) the inmate is actively resisting or (b) the inmate is in the process of willfully destroying property, and *not* merely banging on a cell wall or kicking a cell door.[199] Policy further requires the facility maintain a CERT team to perform the cell extraction when a planned use of force is warranted. Contrary to policy, CJC routinely summons available staff who invariably dispense OC, usually in excess of that which policy allows, whether or not the inmate is secured in a cell and/or handcuffed, and most often not when persons, property, or the physical plant are at considerable risk, also as policy requires.

---

[194] Jones004455.
[195] Jones 004456.
[196] *Id.*
[197] 3.2.15. Use of Chemical Agents, IV. Procedures, A. General Information, 6.
[198] Jones004455.
[199] Division of Corrections Policy and Procedures 3.2.15 Use of Chemical Agents, IV. Procedures. C. Use of the Chemical Agent, a. and b.

93. It is my experience, and of great concern to me, based on my training and experience, that DOC reported 736 uses of force between Quarter 4 of 2017 and Quarter 1 of 2022;[200] first because that number is so large; second, because a considerable number of months of data is incomplete or missing altogether indicating the actual number is appreciably greater; and third, because of the 736 uses of force DOC reported, it determined only seven were unnecessary or excessive *including* the force CJC applied to Marrell Withers. The other six uses of force between Quarter 4 of 2017 and Quarter 1 of 2022 that DOC determined were unnecessary or excessive involved ████████████ in 2017, ████████ and ████████re in 2019, ████ in 2020, and ████████████, and ████████ in 2021. The purpose in pointing out these seven of 736, is to demonstrate competent review would have revealed a far more consistent and accurate result: That most of the force that DOC staff use is unnecessary and excessive, and supervisors' repeated failure to identify and address the frequency with which force is used, and its abuse is overlooked, is, in my opinion, because most staff do know what policy requires, or choose to disregard those regulations.

a. ████████████: Location 5-Bravo, Date and Time: September 9, 2017, 17:30 hours.[201]

Summary of Facts: CO Tillery and CO Douglas were arguing with one another while distributing food trays. ████ was upset by CO Tillery's comments and threw his tray through the food trap at him. In turn, CO Tillery applied two bursts of OC through the food trap at him.

Ranking Officers' Assessments: Investigating Supervisor, Lt. Sanders, determined the UOF was justified but Capt. Lenharth questioned whether (1) force was warranted, (2) the amount of OC dispersed was excessive, and (3) if CO Tillery had escalated the incident. Major VanTreece concluded (1) the UOF was not warranted, (2) the officers should not have been arguing in front of an inmate, and (3) Lt. Sanders should have warned Mr. ████████ before dispersing OC.

Expert's Observations: Force was unwarranted thus, also excessive. Per DOC policy, "An inmate confined in a secured cell but is disruptive in the cell, will not be pepper sprayed to punish the inmate for being disruptive."[202]

b. ████████████, Location: 5-Alpha, Date and Time: January 26, 2019, 21:00 hours.[203]

Summary of Facts: While out of cell for "rec," CO Norbi directed ████ several times not to block an entrance. Staff reported Mr. ████ was disrespectful, and CO Norbi responded by dispersing OC at him.

---

[200] CITY_013464-013728.
[201] CITY_006507 ff.
[202] City of St. Louis Division of Corrections Policy and Procedures 3.2.15 Use of Chemical Agents, VII. General Information, 7.
[203] CITY_005161 ff.

<u>Ranking Officers' Assessments</u>: Investigating Supervisor, Lt. Lenharth, determined the force used was unwarranted. Capt. Brock also concluded the threat to staff was minimal and force was unnecessary. Major VanTreece concurred; force was unnecessary and not justified.

<u>Expert's Observations</u>: It is DOC's policy that chemical agents are issued to custody staff  to protect themselves and others from imminent danger, prevent escapes, and willful destruction of facility property if the custody staff concludes that a lesser degree of force will not be successful.[204] ████'s reportedly disrespectful remarks meet none of these criteria. That is not to say however, his behavior is not actionable by means of the DOC disciplinary policy; it definitely is. It is also the case, an officer's excessive and/or unauthorized use of force is also actionable but Defendants provided no information how frequently, if ever, DOC takes remedial or disciplinary action.

c.   ████, Location: Admissions Tank 8, Date and Time: August 20, 2019, 20:45 hours.[205]

<u>Summary of Facts</u>: After fighting with another inmate in Tank 4, CO Rhone cuffed ████ an arrestee, for escort to Tank 8 to separate them from one another. When CO Jones and CO Rhone directed him to move to Tank 8, they reported ████ began to curse at them and refused to comply. Inexplicably, CO Rhone directed him to stand against the wall in the Admissions area, an unsecured space, then left him unsupervised. When he returned, ████ was reported still to be belligerent. Still handcuffed, CO Rhone then administered two bursts of OC at him.

<u>Ranking Officers' Assessments</u>: Investigating Supervisor, Lt. Willis, found the force was excessive as ████ was already handcuffed. Capt. Lenharth concurred. He noted the arrestee had already complied with cuffs; any threat was not reasonably perceived, and CO Jones was in the area and available to assist. He concluded CO Rhone had escalated the situation. He also recommended officers receive need more training in authorized use of force, inmate movement, and monitoring of inmates." Major VanTreece concurred, also noting, handcuffed inmates shall not be pepper sprayed.

 <u>Expert's Observations</u>: Arrestees appear to be exceptionally fragile and are subject to quite a few uses of force. The conditions in Pre-Admissions, Admissions, and Detox areas on Floor 2 contribute. No one has been classified yet and so, the various custody levels are comingled and anyone with a mental health issue has not yet been identified. Some who are undergoing Detox may stay in a tank for days. It can get quite crowded, there are no hot meals, direct access to drinking water – at least for those undergoing detox, cots, toiletries, and clean clothes, conditions that can and do spark conflict. When there is no more room for males on the men's side, the overflow is put in tanks in PAH-Female. There could be some initial sorting of new arrivals but that does not appear to be the case. Everyone on this floor is dependent on staff for all manner of relief but staffing is limited and those who are assigned,

---

[204] City of St. Louis Division of Corrections Policy and Procedures 3.2.15 Use of Chemical Agents, I. Policy.
[205] CITY_006373 ff.

receive little supervision. Further, until Arrestees are admitted, they are not issued an Inmate Handbook or able to file a grievance.

d. █████████, Location: 5-Bravo, Date and Time: October 12, 2020, 12:22 hrs.[206]

Summary of Facts: While distributing food trays, █████ and CO Collins exchanged words. █████ told CO Collins that he was going to throw his juice at him and CO Collins replied, "Do what you got to do." █████ threw the juice and CO Collins stated that he dispersed one burst of OC at him.

Ranking Officers' Assessments: Investigating Supervisor, Lt. Evans, determined force was unnecessary; he should have notified his supervisor. Capt. Adams concurred: CO Collins escalated the exchange. Major VanTreece agreed,

Expert's Observations: Custody staff is issued OC to use when force is necessary and must be applied spontaneously.[207] "An inmate who does not pose eminent danger to staff safety, other inmates; is passive resistant, or is confined inside a secured cell but is disruptive in the cell, will not be pepper sprayed to punish the inmate for being disruptive."[208] DOC's disciplinary policy provides the necessary recourse.[209]

e. █████████████, Location: 5-Charlie, Date and Time: March 4, 2021, 16:05 hours.[210]

Summary of Facts: Lt. Fowlkes was conducting a supervisor's round in the housing unit. As he passed by █████████ cell, he called out to the Lt., "I need to holla at you, man. I'm tired of being put on lockdown by your officers. You sign off on them. I'll hit one of your officers then you're going to say I'm wrong." Lt. Fowlkes claimed that he feared for his officers therefore, directed █████████ to cuff up for a move to 5-Bravo pending a disciplinary hearing. █████████ replied, "Go get a Team. I am going to f—k you up. I know people." Following a second refusal to cuff-up, Lt. Fowlkes deployed OC into his cell through the food pass at his face.

Ranking Officers' Assessments: Investigating Supervisor, Lt. Morgan, determined OC was necessary. Capt. Lenharth disagreed, noting Lt. Fowlkes responded to a verbal threat with force. Maj. Tonya Harry concurred; OC was unnecessary and not authorized. The inmate posed no immediate threat to staff. She added, "Lt. Fowlkes will receive █████."[211]

---

[206] Jones002608 ff.

[207] City of St. Louis Division of Corrections Policy and Procedures 3.2.15 Use of Chemical Agents, IV. Procedures. A. General Information, 1.

[208] *Id.*, A. General Information, 7.

[209] City of St. Louis Division of Corrections Policy and Procedures 3.3.6 Rule Violations and Disciplinary Hearing, https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/procedures/upload/3-3-6-Rule-Violations-Disciplinary-Hearing.pdf.

[210] CITY_009891 ff.

[211] The DOC conducts a pre-disciplinary review when an employee is issued an Employee Action Report (EAR). City of St. Louis Division of Corrections Policy and Procedures 1.3.13, Employee Discipline, IV. Procedures, A. General Information, 1. Pre-disciplinary Review, https://www.stlouis-

Expert's Observations: The DOC issues chemical agents to custody staff for use, to protect themselves or others from imminent danger, prevent escapes, or willful destruction of facility property *if* a lesser degree of force will not be successful.[212] ████████ was disruptive however; he was disruptive while confined inside a secured cell.[213] There was no reason he could not remain in that cell until a cell extraction as assembled.

f.    ████████, Location: 5-Bravo, Date and Tine: December 16, 2021, 20:05 hours.[214]

Summary of Facts: While escorting another inmate from the shower area, CO Robinson reported ████ threw a shoe from his cell, striking his right arm. He turned towards him then dispersed one burst of OC at his open food pass in his cell.

Ranking Officers' Assessments: Investigating Supervisor, Lt. Jackson, concluded the force was appropriate and necessary. However, Capt. Wills disagreed; he determined force was not necessary. He also noted ████' food pass should have been secured. Major Harry concurred with Capt. Wills.

Expert's Observations: CO Robinson was deficient in the performance of his duties. He was not vigilant; he fail to spot and to secure an open food pass. Instead, he maced a disruptive inmate who was secured in his cell. The DOC inmate disciplinary policy and procedure provides the means to address Mr. ████████'s misconduct.[215]

94. DOC Policy and Procedures 1.1.14 Internal Affairs lists allegations subject to investigation, one of which is excessive or unauthorized use of force.[216] Every Correctional staff member is a mandatory reporter.[217] In my review of UOF reports between 2017 and 2022, I came across only one request for an Employee Action Report (EAR), an internal DOC document used to charge an employee with a violation of Division or City of St. Louis policy and procedure, an act of misconduct, or a performance deficiency.[218] It was issued by Maj. Harry in March 2021 when ████ ████deployed OC into ████████'s cell through the food pass at his face.[219]

95. Not only has DOC repeatedly failed to call out its staffs' unwarranted and wonton uses of force, on the few occasions that DOC did, the sanctions imposed were as weak as staffs' uses of

mo.gov/government/departments/public-safety/corrections/documents/procedures/upload/1-3-13-Employee-Discipline.pdf.

[212] City of St. Louis Division of Corrections Policy and Procedures 3.2.15 Use of Chemical Agents, I. Policy.

[213] *Id.*, IV. Procedures, A. General Information, 7.

[214] CITY_011031 ff.

[215] City of St. Louis Division of Corrections Policy and Procedures. 3.3.6 Rule Violations and Disciplinary Hearing, I. Policy, https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/procedures/upload/3-3-6-Rule-Violations-Disciplinary-Hearing.pdf.

[216] City of St. Louis Division of Corrections Policy and Procedures 1.1.14 Internal Affairs, IV. Procedures, A. General Information, 5.e.,  https://www.stlouis-mo.gov/government/departments/public-safety/corrections/documents/procedures/upload/1-1-14-Internal-Affairs.pdf.

[217] *Id.*, IV. Procedures, B. Reporting of Misconduct and/or Illegal Act, 1.

[218] *Id.*, III. Definitions.

[219] CITY_009891 ff.

force were harsh. Mr. Barnes testified, while Superintendent, he recommended forced
(administrative, i.e., unpaid) leave somewhere "in the ten to 20 range."[220]

96. As troubling as is DOC's cursory review and extremely sporadic response to unnecessary
and excessive force, the bigger point to be made is the frequency with which staff violates
DOC's use of force policies is as great as the ferocity with which it is applied. The seven
violations that senior supervisors called out are not CJC's sum total. They are merely
representative of widespread and reoccurring violations of policy and procedures. It is opinion
based on the several hundred reports that I reviewed, most of the reviewers made the same
mistakes as did the reviewers in the seven uses of force that were reversed. It is further my
opinion that DOC's abuse of policy is open and ongoing, and it must stop, ideally before force is
applied but no later than its review after its application. No jail may punish its prisoners. Only
those sentenced to serve time, serve time *as* punishment.


## XII. Summary and Conclusions

97. Use of Force, indeed, the abuse of Force, by employees of the St. Louis City Division of
Corrections is a significant, system-wide problem. The number and the nature of the uses of
force, its ferocity and the frequency with which they occur cannot be understated. It is my
opinion, the overwhelming majority of the DOC's workforce's understanding of  policy and
procedures is as severely limited as its interest and ability to effectively employ problem-solving
techniques, and both are significantly impeded by the gaps and gaffs within and between the
ranks. Most troubling, the majority of bad actors appear to apply force as forcefully as they do in
the belief that inmates should be punished and that they have the right to do so.

98. Withholding Water to Drink, Bathe, and Flush Waste is another form of punishment that CJC
staff do not hesitate to administer. An organization is at a low point when the people in its
custody routinely handle and hurl their excrement at those who exercise power over them and
then, the people who exercise power over them return fire, preventing them from flushing their
waste. The inmates are so filled with despair, they take their excrement and rub it over
themselves and the cells and tanks in which they are secured. Denying anyone access to water to
drink, to bathe, and flush waste, conveys to me how little regard DOC's workforce has for the
people they promised to serve and protect, as well as for themselves.

99. Inmate Rights and the opportunity to seek redress vis a vis a viable Grievance System is a
core component of every correctional system. Inmates in the custody of the St. Louis City
Division of Corrections have so little confidence in DOC's grievance system, on average they
appealed  fewer than five grievances a year.[221] Executive staff asserts the low number is evidence
all is well.[222] It is my experience, the low number reflects DOC's system clearly does not work
for them. It is also my experience, that which is not resolved, does not go away. It gets bigger

---

[220] Deposition, Adrian Barnes, Jan. 12, 2023, p. 51, line 22.
[221] Glass Deposition, p 31, lines 22-24.
[222] Glass Deposition, p. 34, lines 13-17; Roth Deposition, p. 66, lines 2-15.

and sometimes, it blows up. The disturbances that recently roiled the Division came in three waves – December 2020, February 2021, and July and August 2021.

100. The Division's Training Academy is its investment in its staff. DOC invests little. Its policies aspire to produce correctional professionals but its limited instruction graduates "guards." The DOC workforce consists of individuals of various ages and previous employment in security, food services, and other semi-skilled fields. That which they know about the Division is what DOC teaches them. The Academy is led and its classes are taught by custody staff, however. Their familiarity with the subject matter and ability to produce course material is limited. The only outlines that Defendants provided are several power points that its vendor of chemical agents developed. Also of concern, the Academy requires staff to signify in writing that they periodically review and fully understand DOC's policies absent any independent assessment, shifting the responsibility from instructor to officer to ascertain whether they mastered the material. Cost cutting measures such as these coupled with the continual use of questionable information such as contained in the text, Games Inmates Play, are practices that come at a significant cost to the City, the workforce, and inmates. If the City must cut corners, this is not the place to do it.

101. Staff Supervision is as critical to the operation of CJC as is Staff Training and it, too, is severely lacking. Theory and practice are dynamic, enduring, and inexorably intertwined. Everything that happens on the floor, in a holding tank, and in Medical, as examples, are teachable moments. Staff either gets it right, or wrong. Supervisors are also teachers and staff are learning everyday how their jobs should be, or how they will be, done at CJC. In the course of any day, Supervisors are the highest ranking officers on the shift. Much of what they think they know, is incorrect. Unless, and until, their performance improves, little will get better.

102. One of the Plaintiffs stated in his affidavit, "To me, this is the worst place in the world I could be. In CJC, everything gets swept under the rug."[223] Facility Management, the fewest number of staff, their charge, to have the greatest impact on CJC's operation, to husband scarce resources wisely – the scarcest and most valuable of all, the workforce – to achieve the best outcome – a place that is safe and sound for everyone, a place that complies with policy and procedures, incorporates Corrections' best practices, and achieves measurable results for the City of St. Louis not the least of which is a sustained and significant reduction in uses of force. It is my opinion, DOC's management team, at both the facility and division levels, is largely disengaged and ill-informed, unwilling or unable to recognize and respond to conditions that are now chronically entrenched. A clean sweep is warranted.

I swear under penalty of perjury that the foregoing is true and correct. I reserve the right to amend this report as additional information becomes available.

---

[223] Doc. 72-39.

Respectfully submitted this 6th day of March 2023

_____

Dr. Dora B. Schriro EdD JD

# Appendix A

## DORA B. SCHRIRO, Ed.D. J.D.
### EXECUTIVE EXPERIENCE

*State of Connecticut,* Middletown CT (2014–2018)
**Commissioner,** Department of Emergency Services & Public Protection (2014–2018)
**CT Homeland Security Advisor** (2016–2018), DHS clearance, Top Secret, appointed by Gov. Dannel Malloy
- Responsible for CT State Police, Emergency Management & Homeland Security, Scientific Services, Fire Prevention & Control, Police Officer Standards & Training, Statewide Telecommunications
- FY2018 operating budget, $185M; federal grants, $348M; bond funding, $79M; 1817 employees
- Public Safety & Service, Homeland Security, and Emergency Response, Recovery & Resiliency
- Accomplishments: A Comprehensive Procedural Justice Initiative with body-worn cameras for state police on patrol, a civilian complaint process, 21st century curricula for state & local police, annual reports of uses of force, traffic stops & police pursuits, an investigative protocol for officer-involved shootings, and an ICE-interface protocol; Drug Intervention & Enforcement, equipping all troopers and training first responders to administer naloxone, and convening a dark-web opioid taskforce; and Other Harm Reduction Efforts including a statewide cybersecurity investigative unit and comprehensive gun control

*City of New York,* New York, New York (2009–2014)
**Commissioner,** New York City Department of Correction, appointed by Mayor Michael Bloomberg
- Responsible for adult detention, prisoner processing, and operation of criminal court pens, an average of 12,000 inmates daily and 100,000 pretrial and city-sentenced inmate admissions annually
- FY2014 operating budget, $1.065B, capital budget, $691.9M; 10,440 employees
- Focus: Special Populations; Intake, Classification and Discharge Planning; Staff Accountability; Alternatives to Disciplinary Segregation; Alternatives to Detention
- Accomplishments: 1st U.S. Social Impact Bond funded program, adolescent pre-release initiative; Justice Reinvestment funded pre-release preparation for adults; pre-trial & post-plea diversion for the mentally ill; comprehensive reform of disciplinary segregation with clinical alternatives for special populations; centralized intake with risk & needs classification, gang identification, and discharge planning

*US Department of Homeland Security,* Washington DC (2009–2009)
**Senior Advisor to Secretary on ICE Detention and Removal,** appointed by DHS Sec. Janet Napolitano
**Director, ICE Office of Detention Policy and Planning,** appointed by ICE Asst. Sec. John Morton
- Focus: Design a civil, civil detention system meeting all its health and safety needs and legal requirements
- Authored, *2009 Report on ICE Detention Policies and Practices: A Recommended Course of Action for Systems Reform,* DHS' template to transform immigration detention and alternatives to detention
- Opened the Office of Detention Oversight and within the first 100 days, deployed detention experts to the field, reassigned facility inspections to occur outside of ERO, brought online the detainee locator and death notification systems, undertook review of IHSC, detention standards, and risk assessment, and reduced family detention to under 100 beds

*State of Arizona,* Phoenix, Arizona (2003–2009)
**Department Director,** Arizona Department of Corrections, appointed by Gov. Janet Napolitano
- Responsible for adult corrections and community supervision including 39,000 inmates and 7,200 parolees daily and 55,000 felons annually (21,000 admissions/11,500 case openings)
- FY2009 operating budget, $1.23B; 9,750 employees
- Focus: Systems reform, re-entry, victim services, strategic planning, privatization oversight
- Winner, 2008 Innovations in American Government, and its first prison-based reform awards recipient

Dora B. Schriro, Ed D. J.D.
Page 2

*City of St. Louis*, St. Louis, Missouri (2001–2003)
**Commissioner of Corrections**, St. Louis City Division of Corrections, appointed by Mayor Francis Slay
- Responsible for adult detention, prisoner processing, and city probation and parole including 1,500 jail inmates and 2,000 offenders on supervision daily (9,000 admissions/63,000 bookings annually)
- FY2003 operating budget, $68M; 615 employees
- Focus: Population management, alternative sentencing initiatives, staff development
- Opened and operated the city's first combined police prisoner processing and detention center

*State of Missouri*, Jefferson City, Missouri (1993–2001)
**Department Director**, Missouri Department of Corrections, appointed by Gov. Mel Carnahan
- Responsible for adult corrections and probation and parole services including 28,000 prisoners and 65,000 offenders on community supervision daily, 35,000 admissions/72,000 case openings annually
- FY2002 operating budget, $500M; 11,000 employees
- Focus: Systems and sentencing reform, litigation reduction, restorative justice, capital construction
- Winner, Council of State Governments Innovations award program, and Innovations in American Government 1997 Finalist and 1998, 1999 and 2000 Semi-Finalist

*City of St. Louis*, St. Louis Missouri (1989–1993)
**Correctional Superintendent**, St. Louis City Division of Correction, appointed by Mayor Vince Schoemehl
- Responsible for 600 pre-trial and city sentenced inmates, 4,000 admissions annually
- FY1993 operating budget, $26M; 210 employees
- Focus: Court oversight, overcrowding, certified juveniles, community relations

*City of New York*, New York, New York (1984–1989)
**Assistant Commissioner**, New York City Department of Correction, appointed by Mayor Ed Koch
- Responsible for design and delivery of inmate programs services, programs development, grants
- Services provided to 100,000 pre-trial and city sentenced inmates annually by 200 employees
- Focus: Public-funded and accredited education, school-aged inmates; contracts management
**Assistant Deputy Director**, Office of the Mayor, Coordinator of Criminal Justice
- Grants administration, federal and state funded systems reforms, $189M annually
- Focus: Alternatives to detention, intermediate sanctions, policy analysis, applied research

## CONSULTING SERVICES

Dora B. Schriro Consulting Services, LLC (est. 2013), Expert, Corrections and Immigration innovation, evaluation, and advocacy. Clients include the California Department of Justice, American Civil Liberties Union, Southern Poverty Law Center, Refugee and Immigrant Center for Education and Legal Services, Human Rights First, Disabilities Rights California, the Promise of Justice Initiative, St. Louis University School of Law Clinic, Sheriff's Department, Hampton County, Massachusetts, and Arch City Defenders.

## EDUCATION

St. Louis University, St. Louis, Missouri, Juris Doctorate, School of Law (2002)
Columbia University, New York, New York, Doctor of Education, Teachers College (1984)
University of Massachusetts at Boston, Massachusetts, Master of Education (1974)
Northeastern University, Boston, Massachusetts, Bachelor of Arts cum laude (1972)

Dora B. Schriro, Ed D. J.D.
Page 3

## MANAGERIAL PROGRAMS

Council of State Governments, Toll Fellowship (2018)
Harvard University, JFK School of Government, Innovations in Governance (2005)
Harvard University, JFK School of Government, Strategic Public Sector Negotiations (1996)
Harvard University, JFK School of Government, Senior Executives in State and Local Government (1992)

## HONORS AND AWARDS, INNOVATIONS

Innovations in American Government, 2008 Winner, Getting Ready: Keeping Communities Safe
Innovations in American Government, 2000 Semi-finalist, Correcting Corrections
Innovations in American Government, 1999 Semi-finalist, Constituent Services
Innovations in American Government, 1998 Semi-finalist, Pre-Promotional Training
Innovations in American Government, 1997 Finalist, Constituent Services
Council of State Governments, 1998 Innovations Award Winner, Waste Tire to Energy
Council of State Governments, 1997 Innovations Award Regional Finalist, Pre-Promotional Training
Council of State Governments, 1996 Innovations Award Finalist, Constituent Services

## OTHER HONORS AND AWARDS

U.S. Department of Justice, Office for Victims of Crime, Allied Professional Award, 2012
Florida Immigrant Advocacy Center, American Justice Award, 2011
Hofstra University (Hempstead, New York) Presidential Medal, 2010
National Governors Association, Distinguished Service to State Government Award, 2006
Arizona Parents of Murdered Children, Filling Empty Shoes, 2006 Honoree
Farmingdale Public Schools (Farmingdale, New York), Wall of Fame, 2001 Inductee
St. Louis Forum, Trailblazer Award, 2000
Association of Correctional Administrators, Michael Francke Award for Outstanding Leadership, 1999
Jefferson City (Missouri) Ten Most Influential Women, 1998
Missouri Governor Award for Quality and Productivity, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000
Missouri Governor Torch of Excellence Gold Award, 1999
Missouri Governor Torch of Excellence Award, 1997
International Association of Correctional Training Personnel Award, Pre-Promotional Training, 1996
Women's Self-Help Center, Twenty Distinguished Women, 1996
St. Louis (Missouri) YWCA Special Leadership Award for a Government Official, 1995
Jefferson City (Missouri) News Tribune Statesman of the Month, June 1995

## PUBLICATIONS, IMMIGRATION DETENTION REFORM

*ICE Detention Standards: Immigration Detention Facilities' Responsibilities and Detained Individuals' Rights: A Guide for Practitioners*, ABA Commission on Immigration (December 2022)
*Navigating Immigration Detention: A Guide for Family and Friends of Individuals in Detention*, ABA Commission on Immigration (October 2022)
*On the Other Side of the Looking Glass: COVID-19 Care in Immigration Detention*, MDPI, Soc. Sci. 2021, 10(10)
*Access to Counsel in Immigration Detention in the Time of COVID-19*, ABA Commission on Immigration (2020)
*Weeping in the Playtime of Others: The Obama Administration's Reform of ICE Family Detention Practices*, in Journal on Migration and Human Security, The Law that Begot the Modern U.S. immigration Enforcement System: IIRIRA 20 Years Later (December 2018)
*Women and Children First: An Inside Look at the Impediments to Reforming Family Detention in the U.S.*, in Challenging Immigration Detention, ed. by Flynn and Flynn. Edward Elgar Publishing (September 2017)
*Afterword, Intimate Economies, Anomie and Moral Ambiguity*, in Intimate Economies of Immigration Detention:

Critical Perspectives, ed. by Conlon and Hiemstra. Routledge Publishers (2016)

*Improving Conditions of Confinement for Immigrant Detainees: Guideposts toward a Civil System of Civil Detention* in The New Deportation Delirium, ed. by Kanstroom and Lykes. NYU Press (2015)

*Family Immigration Detention: The Past Cannot be Prologue,* ABA Commission on Immigration (2015)

*Envisioning a Civil System of Civil Detention: Our Opportunity, Our Challenge* (Foreword), in Outside Justice, ed. by Brotherton, Stageman and Leyro. Springer Press (2013)

Improving Conditions of Confinement for Criminal Inmates and Immigrant Detainees, American Criminal Law Review, Georgetown University Law Center (Fall 2010)

The 2009 Report on ICE Detention Policies and Practices: A Recommended Course of Action for Systems Reform, U.S. Department of Homeland Security (October 2009)

Rethinking Civil Detention and Supervision, Arizona Attorney (July–August 2009)

## PUBLICATIONS, CORRECTIONS REFORM

*Smart and Safe: Making the Most of Adolescents' Time in Detention, the Physical Plant, Our Workforce, and the "What Works' Literature,* in The State of Criminal Justice, American Bar Association (2013)

*Corrections: The Justice-Involved Mentally Ill, A Practitioner's Perspective,* in The State of Criminal Justice, American Bar Association (2012)

*Good Science, Good Sense: Making Meaningful Change Happen – A Practitioner's Perspective,* Criminology & Public Policy, Vol. 11, No. 1, Special Issue (February 2012)

*Is Good Time a Good Idea?* Federal Sentencing Reporter, Vol. 21, No. 3 (February 2009)

*Correcting Corrections: The Arizona Plan: Creating Conditions for Positive Change in Corrections,* Confronting Confinement: A Report of the Commission on Safety and Abuse in American Prisons (2006)

*Missouri's Parallel Universe: Blueprint for Effective Prison Management,* Corrections Today (April 2001)

*Correcting Corrections: Missouri's Parallel Universe,* Papers from the Executive Sessions on Sentencing and Corrections, U.S. Department of Justice, Office of Justice Programs (May 2000)

*Avoiding Inmate Litigation: The 'Show-Me' State Shows How,* Sheriff's Magazine, (March–April 1999)

*Best Practices: Excellence in Corrections,* American Correctional Association (August 1998)

*Reducing Inmate Litigation,* Corrections Today (August 1998)

Corrections Management Quarterly, Issue Editor, Aspen Publications (1997)

Currents, Leadership St. Louis, Danforth Foundation (1992)

*What Makes Correctional Education Educational,* Journal of Correctional Education (September 1986)

Safe Schools, Sound Schools, ERIC Clearinghouse on Urban Education (January 1985)

*What Works with Serious Juvenile Offenders: US Experience,* Juvenile Delinquency in Australia (1984)

What Makes Correctional Education Educational: Ethnography of an Instructionally Effective School, University Microfilm (1983)

## STANDARDS, SENTENCING AND RELATED CIVIL-CRIMINAL JUSTICE REFORM ACTIVITIES

Women's Refugee Commission, Commissioner (2012–2021)

American Bar Association, Commission on Immigration, Special Advisor (2019–2021)

American Bar Association, Commission on Immigration, Advisory Board Member (2017–2019)

American Bar Association, Commission on Immigration, Standards for the Custody, Placement and Care; Legal Representation, and Adjudication of Unaccompanied Alien Children in the United States (2018)

U.S. Dept. of Homeland Security, DHS Family Residential Ctr. Advisory Committee, member (2015–2016)

American Bar Association, Commission on Immigration, Commissioner (2014–2016)

American Bar Association, Commission on Immigration, Co-chair, Standing Subcommittee on Punitive

Dora B. Schriro, Ed D. J.D.
Page 5
Segregation, (2012–2014)

American Bar Association, Commission on Immigration, Civil Detention Standards Task Force (2011–2012)
American Bar Association, Criminal Justice Standards Subcommittee, ACA representative (2005–2008)
Arizona State University School of Law, Sentencing Policy Seminar (2004–2005)
Arizona Attorney General Sentencing Advisory Committee (2004–2008)
St. Louis University School of Law, Instructor, Sentencing Policy Seminar (2000–2002)
Missouri Sentencing Advisory Commission, Vice Chair (1994–2001)
U.S. Department of Justice Executive Sessions on Sentencing and Corrections, in conjunction with Harvard University JFK School of Government and University of Minnesota Law School (1997–2000)
Partnership for Criminal Justice Workshop, Institute on Criminal Justice, University of Minnesota Law School, State Partner (1997–2000)
State Sentencing and Corrections Program, Vera Institute of Justice, National Associate (1999–2002)
U.S. Dept. of Justice, Bureau of Justice Assist., Discretionary Grant Program, Peer Reviewer (1994–2002)

### PRE-DOCTORAL EMPLOYMENT, LECTURING AND RELATED EXPERIENCE

Employment
- Executive Director, Planned Parenthood of Bergen County, Hackensack, New Jersey (1983–1984)
- Director, Correctional Education Consortium, Long Island City, New York (1982–1983)
- Supervising Social Worker, Franklin Public Schools, Franklin, Massachusetts (1978–1981)
- Director, Adult and Continuing Education, Franklin Public Schools, Franklin, MA (1978–1981)
- Director, Staff Development, Wrentham State School, Wrentham, Massachusetts (1977–1978)
- Program Administrator, Medfield-Norfolk Prison Project, Medfield, Massachusetts (1974–1976)

Academic Experience
- Instructor, Arizona State University School of Law, Corrections Law Seminar (2005–2008)
- Instructor, St. Louis University School of Law, Sentencing Policy (2000–2002)
- Senior Policy Fellow, Public Policy Research Center, University of Missouri-St. Louis (2001)
- Visiting Lecturer, Strategic Planning, National Institute of Corrections (1998–2002)
- Adjunct Professor, Criminal Justice, University of Missouri-St. Louis (1990–1998)
- Adjunct Professor, Criminal Justice, Long Island University at CW Post (1986–1988)
- Instructor, Innovation, Open Center of New York City (1987)
- Teaching Assistant, Field Research Methodology, Administrative Intern to the School Superintendent, Franklin Public Schools, Franklin, Massachusetts (1979)
- Visiting Lecturer, Special Education, Framingham State College, Framingham, Massachusetts (1979)
- Adjunct Professor, Psychology, Fischer Junior College, Boston, Massachusetts (1978)

Related Activities
- Institutional Research Board, St. Louis University (2002–2003)
- Institutional Research Board, University of Missouri-St. Louis (2001–2003)

**Contact information:**

611 King Avenue
City Island, NY 10464
917-710-7029
dora.schriro@gmail.com

Professional References available upon request

# Appendix B

## <u>Jones- Documents Reviewed by Dr. Schriro</u>

### <u>Court Documents</u>
Doc. 009 Complaint
Doc. 009-1 Exhibit A
Doc. 009-2 Exhibit B
Doc. 009-3 Exhibit C
Doc. 105_Second Amended Complaint
Doc. 105-1_Exhibit A
Doc. 72-1 Memo in Support of Plaintiffs' Motion for Class Cert

### <u>Declarations</u>:
<u>Doc. 72</u>
Exhibit 1: Declaration from Dejuan Allen
Exhibit 2: Declaration from Ovell Smith, Jr.
Exhibit 3: Declaration from Steven Washington
Exhibit 4: Declaration from Rodney Robertson
Exhibit 5: Declaration from Eric J. Williams
Exhibit 6: Declaration from Stephen Cannon
Exhibit 7: Declaration from Courtnee Poke
Exhibit 8: Declaration from Alex Hudson
Exhibit 9: Declaration from Andrew Bell
Exhibit 10: Declaration from Antonio Carter
Exhibit 11: Declaration from David Aaron
Exhibit 12: Declaration from Leron Harris
Exhibit 13: Declaration from Marcus Ausler
Exhibit 14: Declaration from DeAndre Wilkins
Exhibit 15: Declaration from De'vion Gordon
Exhibit 16: Declaration from Isaiah Gholson
Exhibit 17: Declaration from Kevin Moore
Exhibit 18: Declaration from Martin Redmond
Exhibit 19: Declaration from Reginald Smith
Exhibit 20: Declaration from Ronald Roberts
Exhibit 21: Declaration from Terrion Phillips
Exhibit 22: Declaration from Earnest Moore
Exhibit 23: Declaration from Hector Alejandro
Exhibit 24: Declaration from Joshua Amerson
Exhibit 25: Declaration from Willie Frazer
Exhibit 26: Declaration from Devon Watson
Exhibit 27: Declaration from Andrew Brummel
Exhibit 28: Declaration from Honor Johnson
Exhibit 29: Declaration from Robert Judd
Exhibit 30: Declaration from Darnell Warren
Exhibit 31: Declaration from Samual Bailey
Exhibit 32: Declaration from Maurice Owens
Exhibit 33: Declaration from John T. Albert

Exhibit 34: Declaration from Tevin Collins
Exhibit 35: Declaration from Montrell Tickens
Exhibit 36: Declaration from DeWight Williams
Exhibit 37: Declaration from Ronald Fisher
Exhibit 38: Declaration from Joseph D. Jones
Jones007386-007399: Declarations of

- ███████████
- ███████████████
- ████████████
- ████████████████
- ████████████, 

**Deposition Transcripts**

Deposition of Direll Alexander
Deposition of Dale Glass
Deposition of Javan Fowlkes
Deposition of Michelle Lewis
Deposition of Aisha Turner
Deposition of Freddie Wills
Deposition of Sherry Richard
Deposition of Tonya Harry
Deposition of Anthony Spencer
Deposition of Douglas Jones
Deposition of Che Boatman
Deposition of Adrian Barnes parts 1 and 2
30(b)(6) Deposition of Eddie Roth parts 1 and 2
Deposition of Jerome Jones
Deposition of Derrick Jones
Deposition of Darnell Rusan
Deposition of Marrell Withers

**Discovery Responses**

Defendant City's Responses to Plaintiffs' First Set of Requests for Production
Defendants' Responses to Plaintiffs' Second Requests for Production
Defendants' Third Supplemented Responses to Plaintiffs' Third Request for Production
Defendants' Response and First Supplemental Response to Plaintiffs' First Interrogatories
Defendants' Response and First Supplemental Response to Plaintiffs' Second Interrogatories
Defendants' Response to Plaintiffs' Third Interrogatories
Defendants' Response to Plaintiffs' First Request for Admissions
Defendants' Response to Plaintiffs' Second Request for Admissions

**Facility Documents**

City_000001-000106 CJC rosters 12-1-20-12-10-20
City_001899-001916 Flooding incident reports 1 of 7
City_002256 May 18, 2021 safety supply update
City_002257-002268 Pepper spray vouchers 102118-042121
Jones001096-Jones001414 - January Use of Force Reports

**Records Related to Individual Plaintiffs**

City_000358-000370 Darnell Rusan Use of Force Report 2.3.21
City_000371-000381 Darnell Rusan Use of Force Report 12.19.20
City_001844-001863 Darnell Rusan Long Profile
City_002247 135-Dayroom 4A.101 – inmate Darnell Rusan
City_002248 135-Dayroom 4A.101 – Officer Lewis UOF
City_002249 135-Dayroom 4A.101 – West Lt. Turner Officer M. Lewis Injury Report
Darnell video clip (2).asf (Saturday, December 19 2020 8:56 AM

City_000332-000348 Derrick Jones Use of Force Report 12.14.20
City_001864-001879 Derrick Jones Long Profile
City_002246 12.14.20 Derrick Jones …
City_002250 (A)POD3-N-…
City_002251 (B)POD3-S…
City_003363 (C)POD Hallway End…
City_002253-002255 Incident Report Derrick Jones 12.7.21
City_012163-012194 Derrick Jones Incident Report
Derrick video clip.asf

City_004050-004062 Marrell Withers Use of Force Report
City_004063-City_004069 Marrell Withers videos
City_013812-013864 Withers long profile and incident reports
Marrell video clip.asf

City_000349-000357 Jerome Jones
City_000349-000357 Jerome Jones Use of Force Report 2.9.21
City_001880-001898 Jerome Jones Long Profile
City_012195-012200 Jerome Jones Incident Report

**Policies**

1-4-1 Training Employee Dev
1-4-2 New Employee Orientation
1-4-3 Staff Field Training
1-5-3 Inmate Custody Records
City_004284-004292: 3-1-10 Incident Reporting
3-1-20 Use of Restraints Restraint Chair
City_004354-004360: 3-1-21 Use of Force
City_004365-004377: 3-1-24 Restraint Chair
City_004381-004391: 3-1-27 Cell Extractions
City_004497-004499: 3-3-1 Inmate Handbook

City_004500-004504: 3-3-2 Inmate Rights
City_004504-004526: 3-3-3 Inmate Grievance
City_004528-004533: 3-3-6 Rule Violations Disciplinary Hearing
City_004534-004537: 3-3-7 Criminal Violations
City_004546-004547: 3-3-9 Inmate Access to Policy Procedures
City_004550-004559: 3-4-1 Admin Seg Protective Custody
City_004560-004565: 3-4-2 Admin Seg Stepdown Program
City_004566-004573: 3-4-4 Disciplinary Segregation
Doc. 009-1 – Exhibit A (Use of Chemical Agents Policy)
Inmate-Handbook 2019 English final Edition

**Defendants' UOF Spreadsheet**
City_013464-013728

**Use of Force Reports Randomized 25% per Quarter**

| | |
|---|---|
| **2018 Q4** | Jones003190-003199 |
| City_004956-004968 | Jones003200-003212 |
| City_004969-004977 | Jones003274-003284 |
| City_005072-005083 | Jones003285-003293 |
| **2019 Q1** | Jones003348-003362 |
| City_005182-005193 | Jones003382-003394 |
| City_005194-005206 | Jones003426-003436 |
| City_005207-005215 | Jones003447-003455 |
| City_005216-005228 | Jones003538-003542 |
| City_005233-005246 | Jones003543-003553 |
| City_005247-005258 | Jones003674-003682 |
| City_005371-005383 | Jones003704-003712 |
| **2019 Q2** | Jones003713-003725 |
| City_005481-005490 | Jones003776-003787 |
| City_005522-005531 | Jones003800-003810 |
| City_005554-005564 | Jones003829-003837 |
| City_005587-005598 | Jones003838-003847 |
| City_005685-005697 | Jones003858-003867 |
| City_005751-005761 | Jones003937-003943 |
| City_005848-005859 | Jones003978-003988 |
| City_005888-005899 | |
| City_005948-005962 | **2021 Q1** |
| City_005983-005994 | City_000358-000370 |
| City_005995-006005 | City_009795-009811 |
| **2019 Q3** | City_009827-009836 |
| City_006030-006041 | City_009837-009849 |
| City_006160-006169 | City_009921-009930 |
| City_006171-006192 | **2021 Q1-2** |
| City_006203-006213 | Jones001096-001106 |
| City_006247-006258 | Jones001135-001144 |

| | |
|---|---|
| City_006274-006286 | Jones001145-001153 |
| City_006287-006299 | Jones001163-001171 |
| City_006250-006361 | Jones001172-001180 |
| City_006405-006415 | Jones001241-001255 |
| City_006446-006454 | Jones001271-001283 |
| City_006541-006551 | Jones001284-001291 |
| **2019 Q4** | Jones001303-001311 |
| City_006668-006678 | Jones001312-001321 |
| City_006679-006691 | Jones001331-001345 |
| City_006775-006787 | Jones001346-001358 |
| City_006818-006829 | Jones001367-001382 |
| City_006830-006839 | Jones001403-001411 |
| City_006852-006862 | Jones001607-001619 |
| City_006929-006940 | Jones001620-001633 |
| City_007057-007064 | Jones001669-001674 |
| City_007065-007077 | Jones001727-001735 |
| City_007141-007154 | Jones001745-001752 |
| City_007156-007165 | Jones001803-001815 |
| City_007166 -007181 | Jones001840-001855 |
| City_007233-007243 | Jones001924-001933 |
| City_007263-007285 | Jones001948-001955 |
| **2020 Q1** | Jones002006-002015 |
| City_007286-007295 | Jones002016-002023 |
| City_007306-007317 | Jones002053-002060 |
| City_007318-007328 | Jones002099-002107 |
| City_007446-007456 | Jones002174-002183 |
| City_007457-007471 | Jones002221-002234 |
| City_007472-007482 | **2021 Q2** |
| **2020 Q2** | City_010020-010029 |
| City_007889-007900 | City_010165-010179 |
| City_007966-007977 | City_010193-010205 |
| City_007978-007988 | City_010206-010214 |
| **2020 Q3** | City_010265-010278 |
| City_008171-008179 | City_010346-010356 |
| City_008289-008297 | City_010387-010397 |
| City_008311-008322 | City_010481-010487 |
| City_008353-008362 | **2021 Q2-2** |
| City_008363-008373 | Jones002283-002292 |
| City_008403-008416 | Jones002324-002330 |
| | Jones002409-002419 |
| **2020 Q4** | Jones002463-002473 |
| City_008648-008655 | Jones002474-002482 |
| City_008788-008796 | **2021 Q3** |
| City_008819-008830 | City_010521-010531 |
| City_008937-008946 | City_010543-010552 |
| City_008956-008965 | City_010604-010611 |

| | |
|---|---|
| City_009168-009179<br>City_009202-009212<br>City_009234-009251<br><br>**2020 Q4-2**<br>Jones002506-002518<br>Jones002575-002586<br>Jones002646-002654<br>Jones002678-002690<br>Jones002702-002722<br>Jones002735-002749<br>Jones002781-002789<br>Jones002956-002964<br>Jones002988-002998<br>Jones003101-003109<br>Jones003110-003120<br>Jones003121-003134<br>Jones003135-003146<br>Jones003166-003180 | City_010693-010705<br>City_010839-010857<br>**2021 Q4**<br>City_002269-002278<br>City_010898-010906<br>City_010917-010929<br>City_010963-010971<br>City_011031-011036<br>**2022 Q1**<br>City_011094-011104<br>Jones004447-004463<br>Jones004461-004471<br>Jones004471-004481<br>Jones004590-004600<br>Jones004637-004650<br>Jones004659-004669<br>Jones004739-004752<br>Jones004773-004782 |

## Other Use of Force Reports

| | |
|---|---|
| City_00641-006657<br>City_001899-001901<br>City_010942-010962<br>City_010898-010906<br>City_011051-011060<br>City 001899-001901<br>City_001906-001916<br>City_010982-010992<br>City_004945-004955<br>City_004969-004991<br>City_005072-005083<br>City_005124-005135<br>City_005161-005170<br>City_005233-005246<br>City_005506-005564<br>City_005599-005609<br>City_005720-005750<br>City_005772-005789<br>City_005801-005811<br>City_005836-005847<br>City_005860-005871<br>City 005936-005972 | City_006841-006851<br>City_007057-007064<br>City_007101-007140<br>City_007156-007165<br>City_007195-007207<br>City_007208-007328<br>City_007233-007243<br>City_007350-007365<br>City_007616-007632<br>City_007656-007676<br>City_007827-007838<br>City_007901-007910<br>City_008045-008054<br>City_008123-008132<br>City_008417-008429<br>City_008457-008470<br>City_008576-008587<br>City_008722-008731<br>City_009009-009026<br>City_009049-009069<br>City_009159-009167<br>City 009202-009212 |

| | |
|---|---|
| City_005983-005994 | City_009223-009233 |
| City_006019-006029 | City_009827-009836 |
| City_00673-006081 | City_009891-009900 |
| City_006098-006106 | City_009971-009989 |
| City_006120-006170 | City_010082-010094 |
| City_006160-006170 | City_010165-010179 |
| City_006247-006258 | City_010229-010236 |
| City_006287-006313 | City_010256-010264 |
| City_006373-006382 | City_010346-010356 |
| City_006340-006349 | City_010375-010386 |
| City_006497-006590 | City_010398-010409 |
| City_006602-006620 | City_010481-010487 |
| City_006632-006640 | City_0100684-010692 |
| City_006679- 006726 | |
| City_006737-006751 | |
| City  006803-006817 | |

**Training Materials**

| | |
|---|---|
| Jones001415-001668 | Jones 003101-003109 |
| Jones 001768-001781 | Jones003554-003563 |
| Jones 002255-002263 | Jones003838-003847 |
| Jones 002619-002630 | Jones 003101-003109 |
| Jones 002565-002574 | Jones003554-003563 |
| Jones 002735-002759 | Jones003838-003847 |
| Jones002800-002810 | Jones004031-004543 |
| Jones002850-002859 | Jones004566-004575 |
| Jones002912-002920 | Jones004618-004636 |
| Jones002988-002998 | Jones004650-004658 |
| Jones000302-000303 | |

| | |
|---|---|
| City_003407-003539 Fowlkes Training | City_012201-012220 Master Re-Cert |
| City_003540-003551 Lewis Training | City_012222-012226 Certification of OC |
| City_003552-003742Turner Training | City_013865-013878 D. Jones Training |
| City_003743-003750 OC Spray Lesson Plan | City_013879-013914 F. Wills Training |
| City_003751-003804 OC Spray Power Point | City_011498-011574 A. Turner Discipline |
| City_011736-0012162 Certification of OC and Completed Training | City_011143-011334 D. Alexander Training |
| | City_0103729-013811 UOF Training |

**City's Use of Force Spreadsheet**
   City_013464-013728 Use of Force Spreadsheet

**SEC – Sabre Subpoena Production**

Jones0 1442-011667

**<u>Yes Care Subpoena Production</u>**

Jones0 10403-011441

**<u>Publications</u>**

American /Correctional Association, Adult Local Detention Facilities, Fourth Edition, Use of Force, 4-ALDF-2B-01

ABA Standards for Criminal Justice: Treatment of Prisoners, Third Addition, 2011

Erving Goffman, On the Characteristics of Total Institutions, Holt, Rinehart and Winston, 1961

# Appendix C