# Exhibit 13

(Unredacted version filed under seal)

**Expert Report on of Dr. Homer Venters Regarding St. Louis City Justice Center**

## Contents

A. Reviewer qualifications ........................................................................................................... 1

B. Methodology and information reviewed ................................................................................ 3

C. Review of Plaintiff Declarations and Medical Records .......................................................... 4

D. Review of Facility Staff Depositions, video footage and other Facility Information ............. 9

E. Findings and Concerns ......................................................................................................... 14

F. Summary ............................................................................................................................... 21

### A. Reviewer qualifications

1. I am a physician, internist, and epidemiologist with over a decade of experience in providing, improving, and leading health services for incarcerated people. My clinical training includes residency training in internal medicine at Albert Einstein/Montefiore Medical Center (2007) and a fellowship in public health research at the New York University School of Medicine (2009). My experience in correctional health includes two years visiting immigration detention centers and conducting analyses of physical and mental health policies and procedures for persons detained by the U.S. Department of Homeland Security. This work included and resulted in collaboration with U.S. Immigration and Customs Enforcement ("ICE") on numerous individual cases of medical release, the formulation of health-related policies, as well as testimony before the U.S. Congress regarding mortality inside ICE detention facilities.

2. After my fellowship training, I became the Deputy Medical Director of the Correctional Health Services of New York City. This position included both direct care to persons held in NYC's 12 jails, as well as oversight of medical policies for their care. This role included oversight of chronic care, sick call, specialty referral and emergency care. I subsequently was promoted to

1

the positions of Medical Director, Assistant Commissioner, and Chief Medical Officer. In the latter two roles, I was responsible for all aspects of health services including physical and mental health, addiction, quality improvement, re-entry and morbidity and mortality reviews as well as all training and oversight of physicians, nursing and pharmacy staff. In these roles, I was also responsible for evaluating and making recommendations on the health implications of numerous security policies and practices including correctional officer responses to patients in distress and medical observation. My responsibilities during this time also included review and approval of all medical and mental health policies including those relating to intake health assessments, hunger strike protocols, medical isolation and observation, infirmary care and transfer of patients for higher levels of care.

3. I have also led the design and implementation of mental health programs and housing areas that were essential to elimination of segregation/solitary confinement as a management strategy for people with serious illness. I have also provided training to correctional staff, reviewed and made contributions to correctional policies regarding de-escalation and management strategies for incarcerated people with serious illness and advised security leadership on the health effects of OC exposure.

4. In March 2017, I left Correctional Health Services of New York City to become the Director of Programs for Physicians for Human Rights. In this role, I oversaw all programs of Physicians for Human Rights, including training of physicians, judges and law enforcement staff on forensic evaluation and documentation, analysis of mass graves and mass atrocities, documentation of torture and sexual violence, and analysis of attacks against healthcare workers.

5.  Between December 2018 and April 2020, I served as the Senior Health Fellow and President of Community Oriented Correctional Health Services ("COCHS"), a nonprofit organization that promotes evidence-based improvements to correctional practices across the United States. I have also worked as a medical expert in cases involving correctional health since 2017 and I wrote and published a book on the health risks of jail (*Life and Death in Rikers Island*) that was published in early 2019 by Johns Hopkins University Press.

6.  Since April 2020, I have worked on COVID-19 responses in detention settings. During this time I have conducted court-ordered inspections of detention facilities to assess the adequacy of their COVID-19 responses in ICE detention centers, county jails, state and federal prisons. I was also named as an independent monitor for COVID-19 response on Connecticut State Prisons, Hawaii Department of Corrections and was named as COVID-19 inspector by a Federal Court of the Bureau of Prisons facility in Lompoc, CA. I have also been named as Federal Court appointed monitor for the health services in the Santa Barbara, CA county jail and the Fluvanna Prison for Women, VA Department of Corrections.

7.  A copy of my curriculum vitae is attached to this report which includes my publications, and a listing of depositions and testimony I have provided is attached as **Appendix 1**.

8.  I am being compensated at a rate of $500 an hour for consulting, advising, research, and testimony, and $250 an hour for travel time. My fee is in no way contingent upon the nature of my findings, presentation of the findings, or the outcome.

**B.  Methodology and information reviewed**

9.  I was retained by plaintiffs' counsel in *Jones v. City of St. Louis* (Cause No. 4:21-cv-600). I was asked to review information relating to the care and treatment of several named plaintiffs

in this case during their detention at the St. Louis City Justice Center (CJC), as well as other information provided to me that is relevant to the lawsuit.

10. In order to come to the findings I report below, I have reviewed medical records of detained people, deposition transcripts of both plaintiffs and staff, as well as photos and video of the facility, and other administrative records. A complete listing of information I have reviewed to formulate my opinions is attached as **Appendix 2**. I also spoke with Dr. Dora Schriro, another expert in this case, subsequent to her visit to the facility. Any observations that she relayed to me are specifically referenced when it is part of the information I relied upon to formulate my opinions in this case.

11. My opinions are based on review of the medical records of plaintiffs in this case, as well as the other available information listed above. My approach has been to review multiple types of information in review of the use of force and exposure to chemical agents experienced by plaintiffs in this case. I reserve the right to supplement my opinion should additional relevant information become available.

## C.  Review of Plaintiff Declarations and Medical Records

12. I have reviewed the declarations of plaintiffs, as well as medical records of some of the plaintiffs for information relating to the use of force, medical care surrounding use of force, and exposure to OC spray.

13. Mr. Derrick Jones reports that during an altercation with correctional staff in December 2020, he was spayed in the face with OC, beaten by staff, and again sprayed with OC a second time. He also reports being left in a cell to "marinate," according to correctional officers, as a further infliction of pain and suffering.

14. Mr. Jerome Jones reports that he was also sprayed with OC in February 2021, and left in the room for approximately 30 minutes without the ability to shower, clean his face or eyes and during which time he experienced difficulty breathing. while placed into a visiting room,

15. Mr. Darnell Rusan reports that he was similarly sprayed with OC in February 2021, and that at least once he was left in a room where OC had been sprayed for more than an hour, and while he was naked.

16. , Mr. Marrell Withers reported being sprayed with OC two times in January when he was already restrained because expressed concern about COVID-19 exposure. In addition, Mr. Withers told security staff that he had asthma and asked them not to spray him with OC because of this issue. Mr. Withers also reported that he was exposed to OC during an earlier use of force, in early 2021, when security staff sprayed a large number of people who were uninvolved in a conflict, including Mr. Withers.

17. One of the common threads to these reports is that OC was utilized without any meaningful effort to de-escalate conflict and further, that it was often deployed without warning, and when the person being sprayed was not posing any security threat.

18. Review of the medical records of Mr. Derrick Jones show that despite reporting community treatment for serious mental illness including schizophrenia, he was given an ███████ ███████████████ at CJC. ████████████████████████████████████████ ████████████████████ but upon return, was placed into an isolation setting on suicide watch instead of a medical infirmary and instead of being assessed for ██████████████████ . ██ ████████████████████████████████████████████████████████████ ████████████████████████ During his detention, Mr. Jones reported being beaten and sprayed with OC by correctional staff on December 14, 2020 and also being sprayed with OC

on February 9, 2021. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ Similarly,

the mental health encounters that Mr. Jones has appear to almost exclusively occur at the cell

side, or through a locked cell door.

19. Review of the medical records for Mr. Jerome Jones indicate that while being held, he

experienced worsening of his █████████████████, and that he was also not taken to

███████████████ because he was in solitary confinement. As a result, his records

indicate that he either missed appointments or was seen in the shower of the unit where he

was being held. He was prescribed ████████ ████████ in December 2020 and

scheduled for encounters with ████████████████. In early March 2021, his encounter

with the ████████ took place with him standing in a locked shower stall, in full range of the

hearing of other detained people and security staff. The entire content of this encounter is as

follows ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████.

20. The next day, Mr. Jerome Jones appointment with a ████████ was cancelled because of the

logistics of bringing him from segregation to the ████████ clinic; ████████████

████████████████████████████████████████████

████████████ On the day of his reported use of force and OC exposure February 9, 2021,

there is no use of force encounter in Mr. Jones medical records. There is a same day

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████  ████████████████████████████████████████████████████████

██████████████████████████████████████████████████. The next encounter

in Mr. Jones medical record is three days later, on February 12, 2021. ██████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████  ██████████████

████████████████████████████████████████████████████████

██████ preformed through a locked steel door.

21. Review of the medical records of Mr. Darnell Rusan indicate that he was diagnosed with

    seizure disorder after childhood ██████████████████. Mr. Rusan's medical records

    document that his seizure disorder has been very poorly controlled while detained at CJC,

    with multiple falls, injuries and hospital transfers as a result of seizures. In addition, Mr.

    Rusan reported having bipolar disease to health staff, but his records indicate that he was

    only treated with an ████████████ medication. ████████████████████████████████████

    ████████████████████████████████████████████████████████

    ████████████████████████████████████████████████████████

    ████████████████████████████████████████████



While on the isolation unit, most of Mr. Rusan's contact with nursing and mental health staff appear to occur through a locked steel door, and within earshot of anyone in proximity. As with other plaintiffs, Mr. Rusan is not produced for in-person encounters with ███ health staff because of the unit he is placed on. A ███ health encounter for 2/23/21 records "█████████████████

█████████████████████████

█████████████████████ This is the same month that Mr. Rusan reported being sprayed multiple times with OC and being locked naked in a small room full of OC for more than one hour without any decontamination. During this month, there are multiple encounters in Mr. Jones record labelled segregation rounds but none of these includes any injury or post use of force sassessment and there are no other encounters present in this month where injuries and effects of OC exposure after use of force are mentioned or assessed by health staff.

22. Mr. Rusan has a nursing encounter after a use of force on 12/19/20 which leaves the box for ██████████ unchecked and fails to mention his ████████ or whether or not he has

experienced recent ██████ ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████ There is no documented effort to conduct the assessment later that day or the next day and the next documented encounter is a cell side segregation rounds note that lacks any vital signs, questions about ████████ or physical examination and simply records ████████████

████████████

23. I have also reviewed the medical records for Mr. Marrell Withers. Mr. Withers was detained in CJC and diagnosed with ████████ for which he was prescribed ████████████████ and ████████████ as well as a ████████████ for which he was prescribed a ████████████ ████████████ During his detention, Mr. Withers reported being sprayed with OC in January 2022. I do not find any record that health staff spoke with him to explain their COVID-19 related concerns or that they addressed his concerns raised about having asthma on the date of the use of force. Both of these issues were raised by him to security staff and both represented important opportunities for security staff to enlist health staff as a means to both de-escalate a conflict and also address legitimate and common patient concerns.

**D. Review of Facility Staff Depositions, video footage and other Facility Information**

24. Review of the available information reveals several concerns that are consistent with the information present in the medical records and testimony of the four named plaintiffs. One clear concern in the staff deposition testimony is the inconsistency in how or when they perceived OC should be utilized. With regard to the safe distance at which OC should be utilized, Correctional Officer Alexander testified that although the policy tells him to spray

from two feet away, he believes that is unrealistic. Deposition of Direll Alexander at 127:15-20. CO Alexander also stated that he believes the policy's instructions to limit on a person's body OC spray is deployed is unrealistic. *Id.* at 18-21.

25. Review of the CJC use of force and chemical agent policies showed that existing policy mandates that a warning should be given before any use of CO spray by correctional staff. Division of Corrections Policy 3.2.15, VIII.B.4. (p. 4). The CDC use of force and chemical agent policies clearly indicate that OC should not be used on people who are restrained or who do not pose a security risk. *Id.* at VII.7. The Chemical Agent policy specifically outlines that OC should not be use on a person who is in a cell and being disruptive or for punishment reasons. *Id.* at VII.6, 7, 9. These policies also make clear that people exposed to OC during a use of force should be provided decontamination and medical assessment immediately after their exposure occurs. *Id.* at VIII.B.9, 10. There is no specific mandate in the Chemical Agent policy for staff to attempt de-escalation prior to the use of OC. *See generally id.*

26. I have reviewed thirteen videos from CJC provided in this matter. The following are brief description of each.

- 2246. Person identified as Derrick Jones is standing still in housing area while surrounded by 8 or 9 officers. Mr. Jones is sprayed in the face with OC and then stumbles forward and is taken to the ground.

- 2247. Person identified as Darnell Rusan in dayroom, officers entering dayroom, activity unclear.

- 2248. This video is identified as Officer Lewis UOF, and shows an office in a white shirt walk up to a detained person who appear standing still, spray him in the face with OC at very close distance. After this spray, the detained person runs away,

resulting in a chase around the housing area and multiple more uses of OC cannisters. Several other detained people are present in close proximity to these deployments of OC and attempt to get out of the way of the use of force as it moves around the housing area.

- 2249. This video is identified as West Lt. UOF and appears to show the same incident as video 2248.

- 2250. This video is identified as UOF with IM Jones and shows an officer attempting to pull a blanket out of a cell food slot while the person inside holds on. This officer then sprays the towards the food slot with a large OC dispenser several times. Multiple officers are then seen removing the person in the cell and he can be seen walking to the end of the unit, and intermittently standing and bending over.

- 2251. This video appears to show the same incident as in video 2250.

- 2252. This video is identified as Hallway End of IM Jones UPF and appears to show several officers and detained people walking in a hallway.

- 4063. This video is identified as Female PAH and shows a detained person standing with their arms secured behind the back, approached from behind by an officer who sprays OC in their face from a close distance. The detained person can be heard to say they have asthma. The detained person is then led away by multiple officers, one of whom appears to be wearing a full facepiece respirator.

- 4064. This video is identified as PAH Sallyport West and despite poor quality, appears to show officers don dental or medical coverings and congregate in the far end of the area.

- 4065. This video is identified as PAH Sallyport East and appears to show officers passing through, one of whom appears to be wearing a full facepiece respirator.
- 4066. This video is identified as Sallyport South and appears to show a group of officers walking down the hallway and returning with a detained person who is rear cuffed.
- 4067. This video is identified as Sallyport North and shows several officers pass through the area and later return while escorting detained person who is rear-cuffed.
- 4068. This video is identified as Medical Sallyport West and shows a groups of officers escorting a detained person through a hallway and door.

27. At least one of the videos appears to reflect the use of OC spray into the cell of a person that mental health staff have identified as being in crisis. Among the individuals targeted with OC spray in these video, several are known to be on the metal health service and have severe mental health issues. None of the videos show any mental health staff being summoned or utilized for de-escalation efforts.

28. The use of force report for Mr. Derrick Jones (12/14/20) indicates that Mr. Jones was in a cell with a person "assumed to have COVID-19 symptoms" and that nursing staff had placed both people on medical isolation. City_000332-000348 Derrick Jones Use of Force Report 12.14.20. The report details how a MK9 fogger was used to spray Mr. Jones directly in the face, after which he reportedly stuck an officer, was restrained by multiple officers and taken to another unit. The report indicated he was taken to the medical clinic holding area where he was again sprayed with OC for kicking the cell door. There is no record of any intervention by mental health staff or indication that staff were aware that he previously reported having serious mental illness to the facility staff.

29. The use of force report for Mr. Jerome Jones (2/9/21) indicates that he refused to move into a cell with a cellmate, and after a single command by an officer, City_000349-000357 Jerome Jones Use of Force Report 2.9.21. "I gave Jones one more directive to move to his cell assignment to which he shook his head and replied 'nope'. 1 burst of OC spray was deployed directly in the face on inmate Jones at 1740 hours." *Id.* Mr. Jones had already been identified as a ███████████████████████████████████████████████ ███████ There is no record of any intervention by ████████ staff or indication that security staff were aware that he was a ██████ patient.

30. The use of force reports for Mr. Darnell Rusan are dated 12/19/20 and 2/3/21. The report from 12/19/20 indicates that Mr. Rusan indicates that staff were "uncomfortable with his comments" while he was using the phone, and that they told him to use another phone. They report that he complied but became verbally disrespectful to them. City_000371-000381 Darnell Rusan Use of Force Report 12.19.20. They also report that he was directed to put his mask on despite other people in the unit not having masks on and that he also complied with this order. They report that he continued to be disrespectful and that he refused an order to return to his cell, as which time he was sprayed in the face with OC. This initiated a chase throughout the unit with more OC being utilized until Mr. Rusan stopped running away from officers. The second use of force report is dated 2/3/21 and indicates that Mr. Rusan refused to cooperate during a strip search, specifically when told to "comply with directives given to turn around, bend at the waist and spread his buttocks for inspection." City_000358-000370 Darnell Rusan Use of Force Report 2.3.21. This refusal resulted in direct spray of OC to Mr. Rusan's face. Neither of these uses of force include any reference to Mr. Rusan's history of

████████████████, being a mental health patient or any attempt by mental health staff to de-escalate the conflicts.

31. I reviewed the use of force report for Marrell Withers. City_004050-004062 Marrell Withers Use of Force Report 1.6.22. In the report, Plaintiff Withers stated he would not enter a cell because another inmate was in there. The officers called the Response Team, who deployed mace twice to Mr. Withers face. The report does not mention COVID or Mr. Withers reporting that he has asthma. There is a note from a supervisor on CITY_004057 that the inmate was passively resistant and in handcuffs, and states "this incident does not appear to be justifiable."

32. Discussion with Dr. Dora Schriro and review of photos from the partial facility inspection of CJC indicate that a single eye washing station is present near the medical unit. In addition, discussion with Dr. Schriro and photos indicate that an ████████████████████████ ████████████████, taking the officers above the living spaces and outside an additional locked door.

**E. Findings and Concerns**

33. I have three major findings regarding the use of force and exposure to OC among people detained in CJC based on the information I have reviewed.

34. First, CJC appears to simply ignore correctional standards and their own policies regarding health assessments after use of force. It is essential for health staff to conduct an injury assessment after each use of force and document their assessment and plan in the patient's medical records. Simply marking limited information on a security for, such as a use of force report, is no substitute for the clinical standard of care, which requires that medical encounters be documented on the patient's medical records. This is essential because

subsequent care often relies heavily on the medical assessment and plan documented in the initial use of force encounter. For example, I have encountered numerous instances in my experience in which a patient reported minor facial pain during the initial use of force encounter, but then returned to care the following day with worsened pain and new swelling. The initial clinical note is required for health staff to review basic information about the mechanism and extent of their initial injury, vital signs and other basic medical information.

35. It is also essential to have health staff document their injury/use of force encounters in the patient's medical records so that they may accurately and freely document their assessment. Health staff in jail and prison settings routinely experience the pressure of security staff on their care, especially in the wake of a use of force. Health staff may feel compelled to document the nature, extent or mechanism of injury in a manner that conforms with the demands or expectations of security staff, and this pressure, known as "dual loyalty" is so prevalent that in the NYC jail system, we developed a mandatory dual loyalty training for all health staff. One of the scenarios involved a patient reporting that they were injured by correctional staff despite the correctional staff reporting to the physician, and writing on their use of force report, that the patient was injured in a fight with another detained person. When we surveyed health staff who were completing this training, 93% said they had encountered or heard about this type of situation.[1]

36. A second major failure of the CJC is their failure to employ health staff in efforts to de-escalate conflict, especially with people who are in the mental health service. Reports from individual plaintiffs is very consistent with review of video footage in that CJC makes clear than even when staff have time to don protective coverings and otherwise prepare for a use of

---

[1] https://www.hhrjournal.org/2015/03/data-driven-human-rights-using-dual-loyalty-trainings-to-promote-the-care-of-vulnerable-patients-in-jail/

15

force, there is no effort made to de-escalate the conflict using mental health staff. This missing step is a standard role for health staff, who often have a more therapeutic relationship with detained people than security staff, especially for those who are patients in the mental health service. One video shows housing area staff in a tug of war with a person in their cell, apparently trying to extract a blanket through a food slot, shortly before they spray OC into the cell. This case highlights a related problem in CJC, the lack of basic treatment pathways for people with mental health problems. The deposition testimony of officer Douglas Jones makes clear that the use of OC as a response to people who do not want to change into suicide garments is a common reason for this type of use of force. When discussing instances when OC spray is used against a person who is passively resisting, he stated "For the most part somebody don't want to dress up for suicide watch. That's most of the time where I see it." Deposition of Douglas Jones at 65:13-24.

37. When people with mental health problems are managed with punishment responses to their behavioral problems, including placement in solitary confinement, use of force and being sprayed with OC, not only do their behaviors worsen, but health and security staff alike are placed into harms ways as conflicts worsen. My experience in leading the health service in the NYC Jail System was that as we developed treatment units for people with mental health problems, and eliminated these punishment responses, medication compliance, injuries and use of force all improved significantly. This link between punishment responses to mental health problems in jails and prisons and increased use of force incidents has been well reviewed and documents, and a review of this topic is available on the U.S. Department of Justice's National Institute of Corrections library.[2]

---

[2] https://nicic.gov/callous-and-cruel-use-force-against-inmates-mental-disabilities-us-jails-and-prisons

38. For people with severe mental illness, being placed into locked units creates a predictable worsening of their symptoms, and they and staff become locked into a downward spiral of conflict because of this lack of treatment. The units we created in the NYC jail system focused on having multiple types of therapy and programs for people outside their cells, and this engagement approach improved both security and health outcomes. Importantly, because patients were being treated and experiencing fewer exacerbations of their mental health, staff were also safer on these units. Dr. Schriro reported that CJC has ███████████████ ████████████████████████████ ██ ███████████████████████████████ ███████████████████████████████████████ This worsens an already alarming situation, because staff will be even farther from people who will predictably experience worsening health problems, and when staff do respond it is likely to be in the context of even more force and less treatment for patients experiencing a health crisis. This increased distance is also very concerning for patients who have seizure disorders and other health problems who need frequent checks and the distance to officers, as well as their inability to hear people call out, will impede people's ability to request and receive assistance. In discussing people who need higher levels of care and surveillance, the NCCHC provides this guidance for both custody and health staff proximity to patients, "The more security barriers between the response personnel and the patient (e.g., multiple locked doors or sliders, housing on a complex far removed from health staff), the less likely it is that a qualified health care professional can respond in a timely manner."[3] In discussing suicide prevention in jails and prisons, both the NCCH and the American Foundation for Suicide Prevention are clear that "Other supervision

---

[3] https://www.ncchc.org/spotlight-on-the-standards/infirmary-level-care/

aids (e.g., closed circuit television, inmate companions or watchers) can supplement, but never substitute for, direct staff monitoring."[4]

39. By moving officer posts further away from patients, CJC will likely worsen this problem. I have conducted interviews with patients who engage in extreme behaviors like smearing feces in their cells and spraying staff with urine and feces, and the one consistent theme that emerged from those interviews was that their efforts to have a concern or problem heard by staff went ignored. Many described an escalation that started with calling out to staff, then escalating to banging on their door or yelling, and finally, more extreme measures such as attempting to injure, assault staff. While these patients did often have serious mental illness, it was clear that being locked into cells where their concerns were ignored dramatically worsened their own state of mind and created a volatile and dangerous situation for staff, hence our decision to eliminate solitary confinement for people with serious mental illness in the NYC jails in 2014. It is my opinion that removing staff form the housing areas in these types of units will worsen this type of problem.

40. The reliance on use of force and OC spray at CJC appears to extend to their response to other health problems as well, including people with potential COVID-19 and those with traumatic brain injury.

41. The CDC has identified that people with TBI are overrepresented in correctional settings, and our own work in the NYC jails identified that approximately half of all people entering one of the jails had a history of TBI.[5] People experiencing the effects of TBI may have slower processing times for new information or commands, and also may experience more

---

[4] https://www.ncchc.org/wp-content/uploads/Suicide_Prevention_Resource_Guide.pdf
[5] https://www.cdc.gov/traumaticbraininjury/get_the_facts.html and
https://pubmed.ncbi.nlm.nih.gov/24529834/

difficulties in regulating their emotions. The punitive response to failure to comply with a command among people with symptoms of TBI create a predictable and harmful cycle of more and more violence for people who may simply need more time and de-escalation when faced with now orders. We recognized this cycle of conflict and physical harm over a decade ago in the NYC jails and initiated TBI training of correctional staff. There's no evidence this type of training occurs at CJC.

42. One of the barriers to improving policies and practices in CJC appears to be an unfounded resistance to communication between health and security staff. Multiple depositions by CJC staff made clear that they may not be aware of a person's serious mental illness or indeed any illnesses before using force. Deposition of Che Boatman at 66:10-14, 145:17-21; Deposition of Anthony Spencer at 50:17-51:2; Deposition of Direll Alexander at 173:7-20; Deposition of Javan Fowlkes at 44:10-46:23. The testimony also states officers routinely use force (including OC) on people who have serious mental illness and may even be on suicide watch without any communication with mental health staff before force is utilized. Deposition of Che Boatman at 81:24-82:15. It is crucial that CJC officers communicate with mental health staff about the appropriate level of monitoring and suicide watch precautions, as well as confer with them about a patient's triggers and status. This type of communication is essential for the patient's well-being and need not involve disclosing a patient's diagnosis, medications or other protected information. Instead, this communication, especially on mental health units, is designed to ensure staff are on the same page about how a patient is faring, their current symptoms, and whether they need more engagement, care or other services. This element of communication was so vital to our mental health units that is was the first task of the day for security and health staff to do together. **Appendix 3, CAPS**.

43. A third problem revealed by this information is that the routine use of 'fogger' and other large scale OC dispensers creates widespread exposure for staff and detainees. The current policy use of force/chemical agent policy does not provide guidance on how to determine what detained people other than the intended target have been impacted by OC devices. See Division of Corrections Policy 3.2.15. The way that these weapons are utilizes in cells and closed housing areas, it is inevitable that staff and detained people other than the intended target will experience symptoms from OC exposure, and there should be a clear mandate to assess anyone who was potentially exposed.

44. This approach should be matched with an effort to identify upon intake (or whenever determined by clinical staff) people who should not be exposed to OC because of respiratory or other illness. Right now, officers in CJC routinely spray individuals with medical conditions which make them particularly vulnerable to OC spray, and do not have any process for accommodating those with those illnesses. Identifying individuals with respiratory illnesses who should not be subjected to OC spray is standard correctional practice. My own experience in the NYC jail system was that health staff would not only identify people who required special precautions in these scenarios with security staff, but that security staff would add these precautions to the door placards or signs posted in segregation units to assist custodial staff. People with asthma, COPD and other respiratory illness should be identified by health staff as facing increased risks from OC, just as people with implanted defibrillators, pacemakers and other heart disease should be identified as higher risk for being shocked via electrical conductive devices. The Federal Bureau of Prisons uses the following criteria in the Use of Force policy in requiring a person's health status to be reviewed by medical staff before any planned use of force with chemical sprays

"the inmate's medical file must be reviewed by these personnel to determine whether the inmate has any diseases or conditions which would be dangerously affected if chemical agents or non-lethal weapons are used. This includes, but is not limited to: asthma, emphysema, bronchitis, tuberculosis, obstructive pulmonary disease, angina pectoris, cardiac myopathy, or congestive heart failure."[6]

45. The CJC also needs to install multiple additional eye wash stations, so that detained people and staff can quickly decontaminate their eyes and face after a use of force with OC. This is essential for minimizing pain and inflammation in the minutes after exposure. People wearing contact lenses, people with eye and respiratory illness especially require prompt access to decontamination.

**F. Summary**

The CJC facility is stuck in a cycle of using force and OC spray as a means to respond to mental health crises and other predictable health problems. The lack of de-escalation and quick use of OC, as well as the reliance on locking people in their cell for most or all of the day, has created an extremely toxic situation for detained people and staff alike. Solutions to these problems are well-established and include provision of mental health treatment rather than punishment, as well as training staff to engage more positively. The current moves to remove staff from housing areas will make this situation more dire and should be reconsidered. In addition, health and security staff should coordinate to ensure that people with serious mental illness and other serious health problems receive care and are not punished for experiencing a health crisis, which requires significantly more communication and coordination between health and security staff.

---

[6] https://www.bop.gov/policy/progstat/5566_006.pdf

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 6th day of March, 2023 in Goleta, CA.

Signed,

Homer Venters MD, MS

# Dr. Homer D. Venters

hventers@gmail.com,

---

**Health Administrator**                    **Physician**                    **Epidemiologist**

## *Professional Profile*

○ Award winning epidemiologist focused on the intersection of health, criminal justice and human rights.
○ Leader in provision and improvement of health services to patients with criminal justice involvement.
○ Successful implementer of nations' first electronic health record, performance dashboards and health information exchange among pre-trial patients.
○ Human rights leader with experience using forensic science, epidemiology and public health methods to prevent and document human rights abuses.

## *Professional Experience*

**Medical/Forensic Expert**, 3/2016-present
○ Independent correctional health monitor
  ➢ Fluvanna Women's Correctional Center, VA (ongoing). Serve as independent, court-appointed health services monitor in a women's prison.
  ➢ Santa Barbara County Jail, CA (ongoing). Serve as independent, court-appointed monitor of health services in a County Jail Complex.
  ➢ HI Department of Corrections (COVID-19 only 9/2021-3/2022)
  ➢ CT Corrections Department (COVID only, 2020). Oversee and report on the adequacy of COVID-19 responses with other monitoring panel members throughout CT DOC combined jail/prison system.
  ➢ VI Department of Corrections (ongoing). Serve as independent, court-appointed monitor of health services in 2 detention facilities.
○ U.S. Department of Justice, Civil Rights Investigations medical expert, 2019-present. Work with the USDOJ to investigate correctional health conditions and provide recommendations for addressing.
○ Review COVID-19 policies and procedures in congregate settings including in-person inspections of;
  ➢ MDC Brooklyn (BOP), NY
  ➢ MCC Manhattan (BOP), NY
  ➢ FCI Danbury (BOP), CT
  ➢ Cook County Jail, IL
  ➢ Broome County Jail, NY
  ➢ Sullivan County Jail, NY
  ➢ Shelby County Jail, TN
  ➢ Farmville Detention Center (ICE), VA
  ➢ Lompoc Prison (BOP), CA
  ➢ Southern Mississippi Correctional Facility, MS
  ➢ Central Mississippi Correctional Facility, MS
  ➢ FDC Philadelphia (BOP), PA
  ➢ Osborn Correctional Institution, CT
  ➢ Robinson Correctional Institution, CT

- ➢ Hartford Correctional Center, CT
- ➢ Dallas County Jail, TX
- ➢ Cheshire Correctional Institution, CT
- ➢ Calhoun County Jail, MI
- ➢ York Correctional Institution, CT
- ➢ Chesapeake Detention Facility Re-inspection, MD
- ➢ Pender Correctional Institution, NC
- ➢ Craven Correctional Institution, NC
- ➢ Central Prison, NC
- ➢ North Carolina Correctional Institution for Women, NC
- ➢ Chesapeake Detention Facility Re-inspection, MD
- ➢ Broward County Jail, FL
- ➢ Lompoc Prison Re-inspection (BOP), CA
- ➢ Maricopa County Jail, AZ
- ➢ Northeast Florida State Hospital, FL
- ➢ Florida State Hospital, FL
- ➢ Western Regional Jail, WV
- ➢ Northern Regional Jail, WV
- ➢ Tygart Regional Jail, WV
- ➢ Women's Community Correctional Center, HI
- ➢ Halawa Correctional Facility, HI
- ➢ Oahu Community Correctional Center, HI
- ➢ Maui Community Correctional Center, HI
- ➢ Kauai Community Correctional Center, HI
- ➢ Clayton County Jail, GA
- ➢ Cummings Unit Prison, AK
- ➢ Varner Unit Prison, AK
- ➢ Ouachita Unit Prison, AK
- ➢ East Arkansas Regional Unit, AK
- ➢ Southern Regional Jail, WV
- ➢ North Central Regional Jail, WV
- ➢ Eastern Regional Jail, WV
- ➢ Lompoc Prison Re-inspection (BOP), CA

- o Conduct analysis of health services and outcomes in detention settings.
- o Conduct site inspections and evaluations in detention settings.
- o Produce expert reports, testimony regarding detention settings.

**Member, Biden-Harris COVID-19 Health Equity Task Force,** 2/26/21-10/31/21
- ➢ Work with Task Force members to provide President Biden with interim recommendations to address COVID-19 Health inequities.
- ➢ Work with Task Force and Federal partners to produce final report, recommendations and implementation plan for reducing inequities in COVID-19 and other pandemic responses.

**President**, Community Oriented Correctional Health Services (COCHS), 1/1/2020-4/30/20.
- o Lead COCHS efforts to provide technical assistance, policy guidance and research regarding correctional health and justice reform.
- o Oversee operations and programmatic development of COCHS
- o Serve as primary liaison between COCHS board, funders, staff and partners.

**Senior Health and Justice Fellow**, Community Oriented Correctional Health Services (COCHS), 12/1/18-12/31/2018

o        Lead COCHS efforts to expand Medicaid waivers for funding of care for detained persons relating to Substance Use and Hepatitis C.
o        Develop and implement COCHS strategy for promoting non-profit models of diversion and correctional health care.

**Director of Programs,** Physicians for Human Rights, 3/16-11/18.
o        Lead medical forensic documentation efforts of mass crimes against Rohingya and Yazidi people.
o        Initiate vicarious trauma program.
o        Expand forensic documentation of mass killings and war crimes.
o        Develop and support sexual violence capacity development with physicians, nurses and judges.
o        Expand documentation of attacks against health staff and facilities in Syria and Yemen.

**Chief Medical Officer/Assistant Vice President**, Correctional Health Services, NYC Health and Hospitals Corporation 8/15-3/17.
o        Transitioned entire clinical service (1,400 staff) from a for-profit staffing company model to a new division within NYC H + H.
o        Developed new models of mental health and substance abuse care that significantly lowered morbidity and other adverse events.
o        Connected patients to local health systems, DSRIP and health homes using approximately $5 million in external funding (grants available on request).
o        Reduced overall mortality in the nation's second largest jail system.
o        Increased operating budget from $140 million to $160 million.
o        Implemented nation's first patient experience, provider engagement and racial disparities programs for correctional health.

**Assistant Commissioner,** Correctional Health Services, New York Department of Health and Mental Hygiene, 6/11-8/15.
o        Implemented nation's first electronic medical record and health information exchange for 1,400 staff and 75,000 patients in a jail.
o        Developed bilateral agreements and programs with local health homes to identify incarcerated patients and coordinate care.
o        Increased operating budget of health service from $115 million to $140 million.
o        Established surveillance systems for injuries, sexual assault and mental health that drove new program development and received American Public Health Association Paper of the Year 2014.
o        Personally care for and reported on over 100 patients injured during violent encounters with jail security staff.

**Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 1/10-6/11.
o        Directed all aspects of medical care for 75,000 patients annually in 12 jails, including specialty, dental, primary care and emergency response.
o        Direct all aspects of response to infectious outbreaks of H1N1, Legionella,

Clostridium Difficile.
o       Developed new protocols to identify and report on injuries and sexual assault among patients.

**Deputy Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 11/08-12/09.
o       Developed training program with Montefiore Social internal medicine residency program.
o       Directed and delivered health services in 2 jails.

**Clinical Attending Physician,** Bellevue/NYU Clinic for Survivors of Torture, 10/07-12/11.

**Clinical Attending Physician,** Montefiore Medical Center Bronx NY, Adult Medicine, 1/08-11/09.

## *Education and Training*
**Fellow, Public Health Research,** New York University 2007-2009. MS 6/2009
Projects: Health care for detained immigrants, Health Status of African immigrants in NYC.
**Resident, Social Internal Medicine**, Montefiore Medical Center/Albert    Einstein University7/2004- 5/2007.
**M.D.,** University of Illinois, Urbana, 12/2003.
**M.S.** Biology, University of Illinois, Urbana, 6/03.
**B.A.** International Relations, Tufts University, Medford, MA, 1989**.**

## *Academic Appointments, Licensure*
Adjunct Faculty, New York University College of Global Public Health, 5/18-present.

Clinical Instructor, New York University Langone School of Medicine, 2007-2018.

M.D.   New York (2007-present).

## *Print articles and public testimony*
Testimony: United States House of Representatives Subcommittee on Crime, Terrorism, and Homeland Security, Judiciary Committee 1/21/22.

Oped: Four ways to protect our jails and prisons from coronavirus. The Hill 2/29/20.

Oped: It's Time to Eliminate the Drunk Tank. The Hill 1/28/20.

Oped: With Kathy Morse. A Visit with my Incarcerated Mother. The Hill 9/24/19.

Oped: With Five Omar Muallim-Ak. The Truth about Suicide Behind Bars is Knowable. The Hill 8/13/19.

Oped: With Katherine McKenzie. Policymakers, provide adequate health care in prisons and detention centers. CNN Opinion, 7/18/19.

Oped: Getting serious about preventable deaths and injuries behind bars. *The Hill*, 7/5/19.

Testimony: Access to Medication Assisted Treatment in Prisons and Jails, New York State Assembly Committee on Alcoholism and Drug Abuse, Assembly Committee on Health, and Assembly Committee on Correction. NY, NY, 11/14/18.

Oped: Attacks in Syria and Yemen are turning disease into a weapon of war, *STAT News*, 7/7/17.

Testimony: Connecticut Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for prisoners. Hartford CT, 2/3/17.

Testimony: Venters HD, New York Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for juveniles in New York. July 10, 2014. NY NY.

Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.
Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.

Oped: Venters HD and Keller AS, The Health of Immigrant Detainees. Boston Globe, April 11, 2009.

Testimony: U.S. House of Representatives, House Judiciary Committee's Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law: Hearing on Problems with Immigration Detainee Medical Care, June 4, 2008.

## *Peer Reviewed Publications*

Parmar PK, Leigh J, **Venters H**, Nelson T. Violence and mortality in the Northern Rakhine State of Myanmar, 2017: results of a quantitative survey of surviving community leaders in Bangladesh. Lancet Planet Health. 2019 Mar;3(3):e144-e153.

**Venters H.** Notions from Kavanaugh hearings contradict medical facts. *Lancet.* 10/5/18.

Taylor GP, Castro I, Rebergen C, Rycroft M, Nuwayhid I, Rubenstein L, Tarakji A, Modirzadeh N, **Venters H**, Jabbour S. Protecting health care in armed conflict: action towards accountability. *Lancet.* 4/14/18.

Katyal M, Leibowitz R, **Venters H**. IGRA-Based Screening for Latent Tuberculosis Infection in Persons Newly Incarcerated in New York City Jails. *J Correct Health Care.* 2018 4/18.

Harocopos A, Allen B, Glowa-Kollisch S, **Venters H**, Paone D, Macdonald R. The Rikers Island Hot Spotters: Exploring the Needs of the Most Frequently Incarcerated. *J Health Care Poor Underserved*. 4/28/17.

MacDonald R, Akiyama MJ, Kopolow A, Rosner Z, McGahee W, Joseph R, Jaffer M, **Venters H**.  Feasibility of Treating Hepatitis C in a Transient Jail Population. *Open Forum Infect Dis*. 7/7/18.

Siegler A, Kaba F, MacDonald R, **Venters H**. Head Trauma in Jail and Implications for Chronic Traumatic Encephalopathy. *J Health Care Poor and Underserved*. In Press (May 2017).

Ford E, Kim S, **Venters H**. Sexual abuse and injury during incarceration reveal the need for re-entry trauma screening. *Lancet*. 4/8/18.

Alex B, Weiss DB, Kaba F, Rosner Z, Lee D, Lim S, **Venters H,** MacDonald R. Death After Jail Release. *J Correct Health Care*. 1/17.

Akiyama MJ, Kaba F, Rosner Z, Alper H, Kopolow A, Litwin AH, **Venters H**, MacDonald R. Correlates of Hepatitis C Virus Infection in the Targeted Testing Program of the New York City Jail System. *Public Health Rep.* 1/17.

Kalra R, Kollisch SG, MacDonald R, Dickey N, Rosner Z, **Venters H**. Staff Satisfaction, Ethical Concerns, and Burnout in the New York City Jail Health System. *J Correct Health Care.* 2016 Oct;22(4):383-392.

**Venters H.** A Three-Dimensional Action Plan to Raise the Quality of Care of US Correctional Health and Promote Alternatives to Incarceration. *Am J Public Health*. April 2016.104.

Glowa-Kollisch S, Kaba F, Waters A, Leung YJ, Ford E, **Venters H**. From Punishment to Treatment: The "Clinical Alternative to Punitive Segregation" (CAPS) Program in New York City Jails. *Int J Env Res Public Health.* 2016. 13(2),182.

Jaffer M, Ayad J, Tungol JG, MacDonald R, Dickey N, Venters H. Improving Transgender Healthcare in the New York City Correctional System. *LGBT Health.* 2016 1/8/16.

Granski M, Keller A, Venters H. Death Rates among Detained Immigrants in the United States. *Int J Env Res Public Health.* 2015. 11/10/15.

Michelle Martelle, Benjamin Farber, Richard Stazesky, Nathaniel Dickey, Amanda Parsons, **Homer Venters**. Meaningful Use of an Electronic Health Record in the NYC Jail System. *Am J Public Health*. 2015. 8/12/15.

Fatos Kaba, Angela Solimo, Jasmine Graves, Sarah Glowa-Kollisch, Allison Vise, Ross MacDonald, Anthony Waters, Zachary Rosner, Nathaniel Dickey, Sonia Angell, **Homer Venters**. Disparities in Mental Health Referral and Diagnosis in the NYC Jail Mental Health Service. *Am J Public Health.* 2015. 8/12/15.

Ross MacDonald, Fatos Kaba, Zachary Rosner, Alison Vise, Michelle Skerker, David Weiss, Michelle Brittner, Nathaniel Dickey, **Homer Venters**. The Rikers Island Hot Spotters. *Am J Public*

*Health*. 2015. 9/17/15.

Selling Molly Skerker, Nathaniel Dickey, Dana Schonberg, Ross MacDonald, **Homer Venters**. Improving Antenatal Care for Incarcerated Women: fulfilling the promise of the Sustainable Development Goals. *Bulletin of the World Health Organization*.2015.

Jasmine Graves, Jessica Steele, Fatos Kaba, Cassandra Ramdath, Zachary Rosner, Ross MacDonald, Nathanial Dickey, **Homer Venters** Traumatic Brain Injury and Structural Violence among Adolescent males in the NYC Jail System *J Health Care Poor Underserved*. 2015;26(2):345-57.

Glowa-Kollisch S, Graves J, Dickey N, MacDonald R, Rosner Z, Waters A, **Venters H**. Data-Driven Human Rights: Using Dual Loyalty Trainings to Promote the Care of Vulnerable Patients in Jail. *Health and Human Rights*. Online ahead of print, 3/12/15.

Teixeira PA[1], Jordan AO, Zaller N, Shah D, **Venters H**. Health Outcomes for HIV-Infected Persons Released From the New York City Jail System With a Transitional Care-Coordination Plan. 2014. *Am J Public Health*. 2014 Dec 18.

Selling D, Lee D, Solimo A, **Venters H.** A Road Not Taken: Substance Abuse Programming in the New York City Jail System. *J Correct Health Care*. 2014 Nov 17.

Glowa-Kollisch S, Lim S, Summers C, Cohen L, Selling D, **Venters H**. Beyond the Bridge: Evaluating a Novel Mental Health Program in the New York City Jail System. *Am J Public Health*. 2014 Sep 11.

Glowa-Kollisch S, Andrade K, Stazesky R, Teixeira P, Kaba F, MacDonald R, Rosner Z, Selling D, Parsons A, **Venters H**. Data-Driven Human Rights: Using the Electronic Health Record to Promote Human Rights in Jail. *Health and Human Rights*. 2014. Vol 16 (1): 157-165.

MacDonald R, Rosner Z, **Venters H**. Case series of exercise-induced rhabdomyolysis in the New York City Jail System. *Am J Emerg Med*. 2014. Vol 32(5): 446-7.

Bechelli M, Caudy M, Gardner T, Huber A, Mancuso D, Samuels P, Shah T, **Venters H.** Case Studies from Three States: Breaking Down Silos Between Health Care and Criminal Justice. *Health Affairs*. 2014. Vol. 3. 33(3):474-81.

Selling D, Solimo A, Lee D, Horne K, Panove E, **Venters H**. Surveillance of suicidal and non-suicidal self-injury in the new York city jail system. *J Correct Health Care*. 2014. Apr:20(2).

Kaba F, Diamond P, Haque A, MacDonald R, **Venters H**. Traumatic Brain Injury Among Newly Admitted Adolescents in the New York City Jail System. *J Adolesc Health*. 2014. Vol 54(5): 615-7.

Monga P, Keller A, **Venters H**. Prevention and Punishment: Barriers to accessing health services for undocumented immigrants in the United States. *LAWS*. 2014. 3(1).

Kaba F, Lewsi A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, **Venters H**. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.

MacDonald R, Parsons A, **Venters H.** The Triple Aims of Correctional Health:  Patient safety, Population Health and Human Rights. *Journal of Health Care for the Poor and Underserved*. 2013. 24(3).

Parvez FM, Katyal M, Alper H, Leibowitz R, **Venters H.** Female sex workers incarcerated in New York City jails: prevalence of sexually transmitted infections and associated risk behaviors. *Sexually Transmitted Infections*. 89:280-284. 2013.

Brittain J, Axelrod G, **Venters H.** Deaths in New York City Jails: 2001 – 2009. *Am J Public Health*. 2013 103:4.

Jordan AO, Cohen LR, Harriman G, Teixeira PA, Cruzado-Quinones J, **Venters H.** Transitional Care Coordination in New York City Jails: Facilitating Linkages to Care for People with HIV Returning Home from Rikers Island. *AIDS Behav. Nov.* 2012.

Jaffer M, Kimura C, **Venters H.** Improving medical care for patients with HIV in New York City jails. *J Correct Health Care*. 2012 Jul;18(3):246-50.

Ludwig A, Parsons, A, Cohen, L, **Venters H.** Injury Surveillance in the NYC Jail System, *Am J Public Health* 2012 Jun;102(6).

**Venters H**, Keller, AS. *Psychiatric Services*. (2012) Diversion of Mentally Ill Patients from Court-ordered care to Immigration Detention. Epub. 4/2012.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2011) Mental Health Concerns Among African Immigrants. 13(4): 795-7.

**Venters H,** Foote M, Keller AS. *Journal of Immigrant and Minority Health.* (2010) Medical Advocacy on Behalf of Detained Immigrants. 13(3): 625-8.

**Venters H,** McNeely J, Keller AS. *Health and Human Rights.* (2010) HIV Screening and Care for Immigration Detainees. 11(2) 91-102.

**Venters H,** Keller AS. *Journal of Health Care for the Poor and Underserved*. (2009) The Immigration Detention Health Plan: An Acute Care Model for a Chronic Care Population. 20:951-957.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2009) African Immigrant Health. 4/4/09.

**Venters H**, Dasch-Goldberg D, Rasmussen A, Keller AS, *Human Rights Quarterly* (2009) Into the Abyss: Mortality and Morbidity among Detained Immigrant. 31 (2) 474-491.

**Venters H**, *The Lancet* (2008) Who is Jack Bauer? 372 (9653).

**Venters H**, Lainer-Vos J, Razvi A, Crawford J, Shaf˙on Venable P, Drucker EM, *Am J Public Health* (2008) Bringing Health Care Advocacy to a Public Defender's Office. 98 (11).

**Venters H**, Razvi AM, Tobia MS, Drucker E. *Harm Reduct J.* (2006) The case of Scott Ortiz: a clash between criminal justice and public health. Harm Reduct J. 3:21

Cloez-Tayarani I, Petit-Bertron AF, **Venters HD**, Cavaillon JM (2003) *Internat. Immunol.* Differential effect of serotonin on cytokine production in lipopolysaccharide-stimulated human peripheral blood mononuclear cells.15,1-8.

Strle K, Zhou JH, Broussard SR, **Venters HD**, Johnson RW, Freund GG, Dantzer R, Kelley KW, (2002) *J. Neuroimmunol.* IL-10 promotes survival of microglia without activating Akt. 122, 9-19.

**Venters HD,** Broussard SR, Zhou JH, Bluthe RM, Freund GG, Johnson RW, Dantzer R, Kelley KW, (2001) *J. Neuroimmunol.* Tumor necrosis factor(alpha) and insulin-like growth factor-I in the brain: is the whole greater than the sum of its parts? 119, 151-65.

**Venters HD,** Dantzer R, Kelley KW, (2000) *Ann. N. Y. Acad. Sci.* Tumor necrosis factor-alpha induces neuronal death by silencing survival signals generated by the type I insulin-like growth factor receptor. 917, 210-20.

**Venters HD,** Dantzer R, Kelley KW, (2000) *Trends. Neurosci.* A new concept in neurodegeneration: TNFalpha is a silencer of survival signals. 23, 175-80.

**Venters HD,** Tang Q, Liu Q, VanHoy RW, Dantzer R, Kelley KW, (1999) *Proc. Natl. Acad. Sci. USA.* A new mechanism of neurodegeneration: A proinflammatory cytokine inhibits receptor signaling by a survival peptide, 96, 9879-9884.

**Venters HD,** Ala TA, Frey WH 2nd , (1998) Inhibition of antagonist binding to human brain muscarinic receptor by vanadium compounds. *Recept. Signal. Transduct.* 7, 137142.

**Venters HD,** Tang Q, Liu Q, VanHoy RW, Dantzer R, Kelley KW, (1999) *Proc. Natl. Acad. Sci. USA.* A new mechanism of neurodegeneration: A proinflammatory cytokine inhibits receptor signaling by a survival peptide, 96, 9879-9884.

**Venters HD,** Ala TA, Frey WH 2nd , (1998) Inhibition of antagonist binding to human brain muscarinic receptor by vanadium compounds. *Recept. Signal. Transduct.* 7, 137142**.**

**Venters HD**, Bonilla LE, Jensen T, Garner HP, Bordayo EZ, Najarian MM, Ala TA, Mason RP, Frey WH 2nd, (1997) Heme from Alzheimer's brain inhibits muscarinic receptor binding via thiyl radical generation. *Brain. Res.* 764, 93100.

Kjome JR, Swenson KA, Johnson MN, Bordayo EZ, Anderson LE, Klevan LC, Fraticelli AI, Aldrich SL, Fawcett JR, **Venters HD** Ala TA, Frey WH 2nd (1997) Inhibition of antagonist and agonist binding to the human brain muscarinic receptor by arachidonic acid. *J. Mol. Neurosci.* 10, 209217.

## *Honors and Presentations (past 10 years)*

**Invited presentation,** COVID-19 and Carceral Health, Stanford University Schools of Engineering and Public Health, 2/23/22.
**Invited presentation,** Screening and treatment for sexually transmitted infections in justice. National Academy of Sciences Committee on Law and Justice, remote,

September14th, 2020.

**Invited presentation,** Screening and treatment for sexually transmitted infections in justice. National Academy of Sciences Committee on Law and Justice, remote, September14th, 2020.

**Invited presentation,** Vaccination for COVID-19 in correctional settings. National Academy of Sciences Committee on Law and Justice, remote, August 20th, 2020.

**Invited Presentation,** Documenting Deaths in Custody, National Association for Civilian Oversight of Law Enforcement (NACOLE), remote, August 3rd, 2020.

**Invited Presentation,** Decarceration and Health. Radcliffe Institute/Harvard University. Policy Series. Remote. 6/23/20.

**Invited presentation,** COVID-19 in correctional settings. Briefing for U.S. Senate Staff, sponsored by The Sentencing Project, remote, May 29, 2020

**Invited presentation,** COVID-19 in correctional settings. Briefing for Long Island Voluntary Organizations Active in Disaster , sponsored by The Health & Welfare Council of Long Island, remote, May 29, 2020.

**Invited presentation,** COVID-19 in correctional settings. National Academy of Sciences Committee on Law and Justice, remote, May 12, 2020.

**Invited presentation,** COVID-19 in correctional settings. National Association of Counties, Justice and Public Safety Committee, remote, April 1, 2020.

**Keynote Address**, Academic Correctional Health Conference, April 2020, Chapel Hill, North Carolina, postponed.

**TedMed Presentation**, Correctional Health, Boston MA, March 15, 2020.

**Finalist, Prose Award for Literature**, Social Sciences category for *Life and Death in Rikers Island*, February, 2020.

**Keynote Address,** John Howard Association Annual Benefit, November 2019, Chicago IL.

**Keynote Address,** Kentucky Data Forum, Foundation for a Healthy Kentucky, November 2019, Cincinnati Ohio.

**Oral Presentation,** Dual loyalty and other human rights concerns for physicians in jails an prisons. Association of Correctional Physicians, Annual meeting. 10/16, Las Vegas.

**Oral Presentation,** Clinical Alternatives to Punitive Segregation: Reducing self-harm for incarcerated patients with mental illness. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Analysis of Deaths in ICE Custody over 10 Years . American Public Health

Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Medication Assisted Therapies for Opioid Dependence in the New York City Jail System. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. American Public Health Association Annual Meeting, November 2014, New Orleans, LA.

**Training,** International Committee of the Red Cross and Red Crescent, Medical Director meeting 10/15, Presentation on Human Rights and dual loyalty in correctional health.

**Paper of the Year,** American Public Health Association. 2014. (Kaba F, Lewis A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, Venters H. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.)

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. *American Public Health Association* Annual Meeting, New Orleans LA, 2014.

**Oral Presentation,** Human rights at Rikers: Dual loyalty among jail health staff. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Poster Presentation**, Mental Health Training for Immigration Judges. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Distinguished Service Award;** Managerial Excellence. Division of Health Care Access and Improvement, NYC DOHMH. 2013.

**Oral Presentation,** Solitary confinement in the ICE detention system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Self-harm and solitary confinement in the NYC jail system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Implementing a human rights practice of medicine inside New York City jails. American Public Health Association Annual Meeting, Boston MA, 2013.

**Poster Presentation,** Human Rights on Rikers: integrating a human rights-based framework for healthcare into NYC's jail system. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Poster Presentation**, Improving correctional health care: health information exchange and the affordable care act. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Management of Infectious Disease Outbreaks in a Large Jail System. American Public Health Association Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Diversion of Patients from Court Ordered Mental Health Treatment to Immigration Detention. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Initiation of Antiretroviral Therapy for Newly Diagnosed HIV Patients in the NYC Jail System. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Medical Case Management in Jail Mental Health Units. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Injury Surveillance in New York City Jails. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Ensuring Adequate Medical Care for Detained Immigrants. Venters H, Keller A, American Public Health Association Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** HIV Testing in NYC Correctional Facilities. Venters H and Jaffer M, *American Public Health Association,* Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** Medical Concerns for Detained Immigrants. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Growth of Immigration Detention Around the Globe. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Role of Hospital Ethics Boards in the Care of Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Health Law and Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Bro Bono Advocacy Award,** Advocacy on behalf of detained immigrants. Legal Aid Society of New York, October 2009.

**Oral Presentation,** Deaths of immigrants detained by Immigration and Customs Enforcement. Venters H, Rasmussen A, Keller A, *American Public Health Association* Annual Meeting, San Diego CA, October 2008.

**Poster Presentation,** Death of a detained immigrant with AIDS after withholding of prophylactic Dapsone. Venters H, Rasmussen A, Keller A, *Society of General Internal Medicine* Annual Meeting, Pittsburgh PA, April 2008.

**Poster Presentation,** Tuberculosis screening among immigrants in New York City reveals higher rates of positive tuberculosis tests and less health insurance among African immigrants. *Society of General Internal Medicine* Annual Meeting, Pittsburgh PA, April 2008.

**Daniel Leicht Award for Achievement in Social Medicine,** Montefiore Medical Center, Department of Family and Social Medicine, 2007.

**Poster Presentation**, Case Findings of Recent Arestees. Venters H, Deluca J, Drucker E. *Society of General Internal Medicine* Annual Meeting, Toronto Canada, April 2007.

**Poster Presentation,** Bringing Primary Care to Legal Aid in the Bronx. Venters H, Deluca J,

Drucker E. *Society of General Internal Medicine* Annual Meeting, Los Angeles CA, April 2006.

**Poster Presentation**, A Missed Opportunity, Diagnosing Multiple Myeloma in the Elderly Hospital Patient. Venters H, Green E., *Society of General Internal Medicine* Annual Meeting, New Orleans LA, April 2005.

## *Grants: Program*

San Diego County: Review of jail best practices (COCHS), 1/2020, $90,000.

Ryan White Part A - Prison Release Services (PRS). From HHS/HRSA to Correctional Health Services (NYC DOHMH), 3/1/16-2/28/17 (Renewed since 2007). Annual budget $ 2.7 million.

Ryan White Part A - Early Intervention Services- Priority Population Testing. From HHS/HRSA to Correctional Health Services (NYC DOHMH), 3/1/16-2/28/18 (Renewed since 2013). Annual budget $250,000.

Comprehensive HIV Prevention. From HHS to Correctional Health Services (NYC DOHMH), 1/1/16-12/31/16. Annual budget $500,000.

HIV/AIDS Initiative for Minority Men. From HHS Office of Minority Health to Correctional Health Services (NYC DOHMH), 9/30/14-8/31/17. Annual budget $375,000.

SPNS Workforce Initiative, From HRSA SPNS to Correctional Health Services (NYC DOHMH), 8/1/14-7/31/18. Annual budget $280,000.

SPNS Culturally Appropriate Interventions. From HRSA SPNS to Correctional Health Services (NYC DOHMH), 9/1/13-8/31/18. Annual budget $290,000.

Residential substance abuse treatment. From New York State Division of Criminal Justice Services to Correctional Health Services (NYC DOHMH), 1/1/11-12/31/17. Annual budget $175,000.

Community Action for Pre-Natal Care (CAPC). From NY State Department of Health AIDS Institute to Correctional Health Services (NYC DOHMH), 1/1/05-12/31/10. Annual budget $290,000.

Point of Service Testing. From MAC/AIDS, Elton John and Robin Hood Foundations to Correctional Health Services (NYC DOHMH), 11/1/09-10/31/12. Annual budget $100,000.

Mental Health Collaboration Grant. From USDOJ to Correctional Health Services (NYC DOHMH), 1/1/11-9/30/13. Annual budget $250,000.

## *Teaching*

**Instructor,** Health in Prisons Course, Bloomberg School of Public Health, Johns Hopkins University, June 2015, June 2014, April 2019.

**Instructor**, Albert Einstein College of Medicine/Montefiore Social Medicine Program Yearly lectures on Data-driven human rights, 2007-present.

*Other Health & Human Rights Activities*

**DIGNITY Danish Institute Against Torture**, Symposium with Egyptian correctional health staff regarding dual loyalty and data-driven human rights. Cairo Egypt, September 20-23, 2014.

**Doctors of the World,** Physician evaluating survivors of torture, writing affidavits for asylum hearings, with testimony as needed, 7/05-11/18.

**United States Peace Corps**, Draconculiasis Eradication, Togo West Africa, June 1990-December 1991.

*Books*

**Venters H.** *Life and Death in Rikers Island*. Johns Hopkins University Press. 2/19.

*Chapters in Books*

**Venters H.** Mythbusting Solitary Confinement in Jail. In Solitary Confinement Effects, Practices, and Pathways toward Reform. Oxford University Press, 2020.

MacDonald R. and **Venters H.** Correctional Health and Decarceration. In Decarceration. Ernest Drucker, New Press, 2017.

*Prior Testimony and Deposition*

- Benjamin v. Horn, 75–cv–03073–LAP (S.D.N.Y.). Expert for Defendants 2015.
- Newbrough v. Piedmont Regional Jail Authority, 3:10CV867–HEH (E.D.V.A. 2011). Expert for Plaintiffs.
- Rodgers v. Martin, 2:16-cv-00216 (N.D.T.X.). Expert for Plaintiffs 10/19/2017
- Fikes v. Abernathy, 7:16-cv-00843-LSC (N.D.A.L.). Expert for Plaintiffs 10/30/20017
- Fernandez v. City of New York, 17-CV-02431 (GHW)(SN) (S.D.N.Y. 2017). Defendant in role as City Employee, 4/10/2018.
- Charleston v. Corizon Health Inc., 2:17-cv-03039-MAK (E.D. P.A.). Expert for Plaintiffs 4/20/2018.
- Atencio v. Board of Cnty. Comm. of Sante Fe Cnty., 1:17-CV-00617 WJ/KK (N.M.). Expert for Plaintiffs 7/23/2018.
- Hammonds v. Dekalb Cnty. , 4:16-cv-01558-KOB (M.D.A.L.). Expert for Plaintiffs 11/30/2018.
- Mathiasen v. Rio Arriba Cnty., 17-CV-1159 JHR/KBM (N.M.). Expert for Plaintiff 2/8/2019.
- Hutchinson v. Bates, 2:17-cv-00185-WKW-SMD (M.D.A.L.). Expert for Plaintiff 3/27/2019.
- Lewis v. East Baton Rouge Parish, 3:16-cv-00352-JWD-RLB (M.D.L.A.). Expert for Plaintiff 6/25/2019, 7/1/2019.

- Belcher v. Lopinto., 2:18-cv-07368-JTM-DPC (E.D.L.A.). Expert for Plaintiffs 12/5/2019.
- Zavala v. City of Baton Rouge, (NO. 3:17-656-JWD-EWD). Expert for Plaintiff. 3/6/2020.
- Imperati v. Semple, 3:18-cv-01847-RNC (C.T.) Expert for Plaintiffs 3/11/2020.
- Camera v. Semple, 3:18-cv-01595 (C.T.). Expert for Plaintiffs 9/23/2020.
- Staten v. Semple, 3:18-cv-01251 (VAB) (C.T.). Expert for Plaintiffs 2020.
- Woodward v. Lopinto, 2:18-cv-04236-MVL-KWR (E.D.L.A). Expert for Plaintiffs 12/1/2020.
- U.S. v. Pratt, 2:19-cr-00213-DWA (W.D.P.A.). Expert for Defendant 4/28/2020 (Video hearing).
- U.S. v. Nelson, 1:19-cr-00021-DSC (W.D.P.A.). Expert for Defendant 5/4/2020 (Video hearing).
- Chunn v. Edge, 1:20-CV-01590-RPK-RLM (E.D.N.Y.) Expert for Plaintiffs 4/30/2020 (Video deposition), 5/12/2020 (Video hearing).
- Martinez-Brooks v. Easter, 3:20-cv-569 (MPS) (C.T.). Expert for Plaintiffs 6/8/2020 (Video deposition), 6/11/2020 (Video hearing).
- Baxley v. Jividen et al. NO. 3:18-cv-01526, 7/1/21 Expert for Plaintiffs (Video Hearing).
- Busby v. Bonner, 2:20-cv-02359-SHL (W.D.T.N.). Expert for Plaintiffs 7/10/2020 (Video hearing).
- Braggs v. Dunn, 2:14-cv-601-MHT (M.D.A.L.). Expert for Plaintiffs 10/19/2020 (Audio testimony).
- Royston v. Christian, 6:19-cv-00274-RAW (E.D.O.K.). Expert for Plaintiffs 3/26/21 (Video deposition).
- Fraihat v. U.S. Immigration and Customs Enforcement, 5:19-cv-01546-JGB-SHK (C.D.C.A.). Expert for Plaintiffs 2020.
- Torres v. Milusnic, CV 20-04450-CBM-PVC(x) (C.D.C.A). Court appointed expert 5/24/21 (Video deposition).
- Sanchez v. Brown, 20-cv-832-E (N.D.T.X.). Expert for Plaintiffs 5/25/21 (Video deposition).
- Barnett v. Tony, No 0:20-cv-61113-WPD 10/13/21 Expert for plaintiffs (Video hearing).
- Fenty, et al., v. Penzone, et al., No. 2:20-cv-01192. Expert for Plaintiffs 10/21/2021 (Video hearing).
- Scott v. Clarke 3:12CV36. Court appointed monitor. Hearing 2/7/22 (Video testimony).
- Thomas Rainey v. County of San Diego, et al., No CASE NO. No.: 19-cv-01650-H-AGS.. 3/21/22 Expert for Plaintiffs (Video Deposition).
- Frankie Greer v. County of San Diego, et al., No CASE NO. 19-CV-0378-GPC-DEB. 4/27/22 Expert for Plaintiffs (Video Deposition).

*Consulting Rates*

- *$500/hour for consulting*
- *$2,500 per day of testimony*
- *$250/hour for travel time plus expenses*

**Appendix 2: List of Documents Reviewed**

**Declarations**
1. Declaration of Adrian M. Barnes.
2. Exhibit 1: Declaration from Dejuan Allen
3. Exhibit 2: Declaration from Ovell Smith, Jr.
4. Exhibit 3: Declaration from Steven Washington
5. Exhibit 4: Declaration from Rodney Robertson
6. Exhibit 5: Declaration from Eric J. Williams
7. Exhibit 6: Declaration from Stephen Cannon
8. Exhibit 7: Declaration from Courtnee Poke
9. Exhibit 8: Declaration from Alex Hudson
10. Exhibit 9: Declaration from Andrew Bell
11. Exhibit 10: Declaration from Antonio Carter
12. Exhibit 11: Declaration from David Aaron
13. Exhibit 12: Declaration from Leron Harris
14. Exhibit 13: Declaration from Marcus Ausler
15. Exhibit 14: Declaration from DeAndre Wilkins
16. Exhibit 15: Declaration from De'vion Gordon
17. Exhibit 16: Declaration from Isaiah Gholson
18. Exhibit 17: Declaration from Kevin Moore
19. Exhibit 18: Declaration from Martin Redmond
20. Exhibit 19: Declaration from Reginald Smith
21. Exhibit 20: Declaration from Ronald Roberts
22. Exhibit 21: Declaration from Terrion Phillips
23. Exhibit 22: Declaration from Earnest Moore
24. Exhibit 23: Declaration from Hector Alejandro
25. Exhibit 24: Declaration from Joshua Amerson
26. Exhibit 25: Declaration from Willie Frazer
27. Exhibit 26: Declaration from Devon Watson
28. Exhibit 27: Declaration from Andrew Brummel
29. Exhibit 28: Declaration from Honor Johnson
30. Exhibit 29: Declaration from Robert Judd
31. Exhibit 30: Declaration from Darnell Warren
32. Exhibit 31: Declaration from Samual Bailey
33. Exhibit 32: Declaration from Maurice Owens
34. Exhibit 33: Declaration from John T. Albert
35. Exhibit 34: Declaration from Tevin Collins
36. Exhibit 35: Declaration from Montrell Tickens
37. Exhibit 36: Declaration from DeWight Williams
38. Exhibit 37: Declaration from Ronald Fisher
39. Exhibit 38: Declaration from Joseph D. Jones
40. Exhibit 40: Affidavit of Cynthia West

**Deposition Transcripts**

41. Deposition of Captain Freddie Wills.
42. Oral Deposition of Sherry Richards.
43. Videotaped Deposition of Tonya Harry.
44. Video-Recorded Deposition of Anthony L. Spencer.
45. Videotaped Deposition of Douglas Jones.
46. Video-Recorded Deposition of Che A. Boatman.
47. Video-Recorded Deposition of Bruce Borders, Jr.
48. Deposition of Direll Alexander.
49. Deposition of Javan Folkes
50. Deposition of Michelle Lewis
51. Deposition of Aisha Turner
52. Deposition of Captain Freddie Wills
53. CJC Roster. City_000001_000106.
54. Plaintiff's notice of depositions


## Medical Records

55. Derrick Jones
    a. CJC Med Records. Jones 000001-303.
    b. Derrick Jones Injuries. Jones 004082-004096.
    c. Review of Jones Medical Records.
    d. Summary of Jones Medical Records.
56. Jerome Jones
    e. Jerome Jones Med Records. Jones 000304-746.
57. Darnell Rusan
    f. Index Review of Darnell Medical Record.
    g. Summary of D. Rusan Medical Records.
    h. BJC Hosp Med Rec. Jones004147-004187.
    i. Christian Hosp Med Rec. Jones004188-004307.
    j. SLU Hospital Records. Jones004308-004398.
    k. St. Mary's Hospital Records. Jones004399-004421.
    l. CJC Med Records. Jones000747-1095.
58. Marrell Withers
    m. Confidential Medical Report for Marrell Withers. Jones 007400-007580.
    n. Jones007581-007788.
    o. Jones007789-007891.
    p. Jones007892-008013.
    q. Jones008014-008103.
    r. Jones008104-008258.
    s. Jones008259-008412.
    t. Jones008413-008639.
    u. Jones008640-008875.
    v. Jones008876-009043.
    w. Jones009044-009193.
    x. Jones009194-009338.
    y. Jones009339-009453.

z. Jones009454-009604.
aa. Jones009605-009731.
bb. Jones009732-009860.
cc. Jones009861-010014.
dd. Jones010015-010169.
ee. Jones010170-010362.

## Policies
59. OC Spray – Lesson Plan. City_003743-003750.
60. OC Spray – PowerPoint. City_003751-003804.
61. Division of Corrections Policy and Procedures. City_004070-004900.
62. Policy Re Chemical Agents. SO15366-3.2.15.
63. Use of Force Policy.

## SEC OC Documents
64. Declaration of Stepen Whiteel. Jones011442-011444.
65. Standard Specification for Less Lethal Aerosol Devices Used by Law Enforcement, Corrections, and Other Public Safety Officers. Jones011445-011452.
66. Aerosol Projectors: Acuter Inhalation Toxicity Study in Rats. Jones011453.
67. Federal Register Rules & Regulations. Jones011454-11455.
68. Chemistry Requirements for the Registration of Manufacturing Concentrates. Jones011456.
69. United States EPA R.E.D. FACTS. Jones011457-011461.
70. SHUs and Major Capsaicinoids Report of HPLC Analysis. Jones011462-011463.
71. SHUs and Major Capsaicinoids Report of HPLC Analysis. Jones011464-011465.
72. Test Report: Quantitative Analysis of Sabre Red. Jones011466-011471.
73. Sabre Red H20 & CFT Safety Data Sheet. Jones011472-011474.
74. AOAC Official Method 995.03 Capsaicinoids in Capsicums. Jones011475-011476.
75. Warning Label. Jones011477.
76. Warning Label on Bottle. Jones011667.

## Smart Comm. Grievances + OC
77. ███████████ Grievance. Jones004793.
78. ████████████ Grievance. Jones004883.
79. ████████████ Grievance. Jones004886.
80. ████████████ Grievance. Jones004888.
81. ██████████ Grievance. Jones004899.
82. ██████████ Grievance. Jones004905.
83. █████████ Grievance. Jones004906.
84. ████████████ Grievance. Jones004921.
85. ███████████ Grievance. Jones005006.
86. ██████████ Grievance. Jones005007.
87. ███████████ Grievance. Jones005008.
88. █████████████ Grievance. Jones005010.
89. ████████████ Grievance. Jones005012.
90. ██████████ Grievance. Jones005013.

91. Grievance. Jones005015.
92. Grievance. Jones005018.
93. Grievance. Jones005021.
94. Grievance. Jones005042.
95. Grievance. Jones005080.
96. Grievance. Jones005081.
97. Grievance. Jones005082.
98. Grievance. Jones005083.
99. Grievance. Jones005086.
100. Grievance. Jones005088.
101. Grievance. Jones005089.
102. Grievance. Jones005090.
103. Grievance. Jones005091.
104. Grievance. Jones005132.
105. Grievance. Jones005144.
106. Grievance. Jones005205.
107. Grievance. Jones005444.
108. Grievance. Jones005545.
109. Grievance. Jones005652.
110. Grievance. Jones005740.
111. Grievance. Jones006027.
112. Grievance. Jones006048.
113. Grievance. Jones006363.
114. Grievance. Jones006393.
115. Grievance. Jones006496.
116. Grievance. Jones006538.
117. Grievance. Jones006594.
118. Grievance. Jones006595.
119. Grievance. Jones006610.
120. Grievance. Jones006620.
121. Grievance. Jones006657.
122. Grievance. Jones006710.
123. Grievance. Jones006715.
124. Grievance. Jones006727
125. Grievance. Jones006728
126. Grievance. Jones006730
127. Grievance. Jones006736.
128. Grievance. Jones006762.
129. Grievance. Jones006940.
130. Grievance. Jones006988.
131. Grievance. Jones006990.
132. Grievance. Jones006993.
133. Grievance. Jones006994.
134. Grievance. Jones007005.
135. Grievance. Jones007046.
136. Grievance. Jones007145.

137. ██████████ Grievance. Jones007147.
138. ██████████ Grievance. Jones007239.
139. ██████████ Grievance. Jones007252.

## **Use of Force Reports**

140. Use of Force Spreadsheet. City_013464-013728.
141. January 1-18th, 2021 report
142. January 18-31st, 2021 report
143. February 1-12th, 2021 report
144. February 13th-17th, 2021 report
145. February 18-28th, 2021 report
146. March 1st-15th, 2021 report
147. March 16-25th, 2021 report
148. March 26-31st, 2021 report
149. April 2-18th, 2021 report
150. April 19-30th, 2021 report
151. Jan 4th, 2022 ████████ and ████████ report
152. Jan 5th, 2022 ████████ & ██████████ report
153. Jan 6th, 2022 ████████ report
154. Jan 6th, 2022 Marrel Withers report
155. Jan 7th, 2022 ██████ report
156. Jan 7th, 2022 ████████ Report
157. Jan 11th, 2022 ██████████ report
158. Jan 11th, 2022 ██████████ report
159. Jan 13th, 2022 ████████ Report
160. Jan 15th 2022 ██████████ Report
161. Jan 16th, 2022 ████████ report
162. Jan 16th, 2022 ████████ report
163. Jan 18th, 2022 ██████████ report
164. Jan 25th, 2022 ████████ report
165. Jan 27th, 2022 ██████ report
166. Jan 28th, 2022 ██████████ report
167. January 30th, 2022 ██████████ report
168. January 31st, 2022 ████████ report
169. February 6th, 2022 ██████████ report
170. February 8th, 2022 ████████ report
171. February 9th, 2022 ████████ and ████ report
172. February 14th, 2022 ██████ report
173. February 16th, 2022 ████████ report
174. February 17th, 2022 ██████ and ████ Report
175. February 17th, 2022 ██████ and ██ report
176. February 17th, 2022 ████ and ████ report
177. February 18th 2022 ██████ Report
178. February 23rd, 2022 ██████ and ████ report
179. February 25th, 2022 ██████████ report
180. February 25th, 2022 ██████ and ██████ report

181. February 28th, 2022 ███████████ report
182. February 28th, 2022 ███████████ report
183. October 2-23, 2020 report
184. October 15-24, 2020 report
185. October 25-31, 2020 report
186. November 2-12, 2020 report
187. November 13-19, 2020 report
188. November 20-30, 2020 report
189. December 1-14, 2020 report
190. December 15-31, 2020 report
191. City_004945
192. City_004978
193. City_005072
194. City_005124
195. City_005283
196. City_005437
197. City_005481
198. City_005506
199. City_005522
200. City_005533
201. City_005542
202. City_005554
203. City_005565
204. City_005599
205. City_005669
206. City_005720
207. City_005733
208. City_005772
209. City_005801
210. City_005860
211. City_005872
212. City_005936.
213. City_005963.
214. City_006019.
215. City_006073.
216. City_006098.
217. City_006120.
218. City_006135.
219. City_006160.
220. City_006247
221. City_006287
222. City_006300
223. City_006340
224. City_006392
225. City_006497
226. City_ 006520

227. City_006632
228. City_006568
229. City_006632
230. City_006679
231. City_006692
232. City_006706
233. City_006716
234. City_006737
235. City_006762
236. City_006803
237. City_006841
238. City_006954
239. City_007057
240. City_007104
241. City_007115
242. City_007132
243. City_007156
244. City_007208
245. City_007318
246. City_007423
247. City_007433
248. City_007656
249. City_007664
250. City_007709
251. City_007799
252. City_007816
253. City_007827
254. City_007901
255. City_008045
256. City_008123
257. City_008218
258. City_008279
259. City_008457
260. City_008678
261. City_008862
262. City_008890
263. City_009159
264. City_009202
265. City_009223
266. City_009827
267. City_009980
268. City_010082
269. City_010165
270. City_010229
271. City_010256
272. City_010320

273. City_010346
274. City_010375
275. City_010387
276. City_010398
277. City_010481
278. City_010684
279. City_010729
280. City_010942
281. JONES000001
282. JONES001096_00001
283. JONES001096_00004
284. JONES001096_00011
285. JONES001096_00019
286. JONES001096_00021
287. JONES001096_00026
288. JONES001096_00027
289. JONES001096_00029
290. JONES001096_00038
291. JONES001096_00057
292. JONES001096_00058
293. JONES001096_00064
294. JONES001096_00078
295. JONES001096_00082
296. JONES001096_00083
297. JONES001096_00106
298. JONES001096_00113
299. JONES001096_00125
300. JONES001096_00132
301. JONES001096_00133
302. JONES001096_00146
303. JONES001096_00153
304. JONES001096_00154
305. JONES001096_00157
306. JONES001096_00158
307. JONES001096_00177
308. JONES001096_00187
309. JONES001096_00189
310. JONES001096_00217
311. JONES001096_00237
312. JONES001096_00253
313. JONES001096_00256
314. JONES001096_00257
315. JONES001096_00260
316. JONES001096_00270
317. JONES001096_00271
318. CITY_010942

319.    JONES 001096_00189
320.    JONES 001096_00270
321.    JONES 004422_00015
322.    JONES 004422_00020
323.    Derrick Jones UOF report. City_000332-000348.
324.    Jerome Jones UOF report. City_000349-000357.
325.    Darnell Rusan UOF report. City_000358-000370.
326.    Darnell Rusan UOF report. City_000371-000381.

## Videos

327.    Derrick Jones Assault on Lt. Sherry Richards. City_002246.
328.    Dayroom – Darnell Rusan. City_002247.
329.    Dayroom – Officer Lewis UOF City_002248.
330.    Dayroom – Officer Lewis Injury Report. City_002249.
331.    ███████ UOF. City_002250.
332.    ███████UOF. City_002251.
333.    Hallway – ██████ & Jones. City_002252.
334.    Dayroom – Chemical/Inmate Withers. City_004063.
335.    Sallyport – Chemical/Inmate Withers. City_004064.
336.    UOF Withers. City_004065.
337.    Sallyport Withers. City_004066.
338.    Sallyport Withers. City_004067.
339.    Medical Sallyport Withers. City_004068.

## Other

340.    Plaintiff's Motion for Leave to File Instanter an Oversized Memorandum in Support of Their Motion for Class Certification
341.    Memorandum in Supp. of Plantiffs' Motion for Class Certification
342.    Exhibit 39: St. Louis City DOC Inmate Roster
343.    Second Amended Complaint.

encounters and community meetings with patients, health and security staff (Table 1). The CAPS units are lock-out units, meaning patients are encouraged to spend their days outside their cells interacting with others unless there is a clinical reason to be in their cell. Patients in the NYC jail system are categorized by their level of mental health needs. Any patient who has three or more encounters with the jail mental health service is designated as "M Status", while those patients designated as having SMI are those with more serious needs and a higher level of functional impairment, based on criteria established by the NY State Office of Mental Health [10]. In general, the patients identified for CAPS placement were those with SMI.

**Table 1.** CAPS Overview.

| Time/Activity | Description/Staff |
| --- | --- |
| 7:00 Count | DOC; officer will count all patients. |
| 7:30 Security Inspection | DOC; officer will conduct a security inspection. |
| 8:00–8:30 Staff Communication Meeting | All clinical staff and DOC officers; discuss issues from the previous tours and to set the tone for the day. |
| 9:00–9:30 Rounds | Mental Health Treatment Aides will round on all patients on Suicide Watch, Mental Health Clinicians and Psychiatrists will round together on the entire unit's patient census. |
| 9:30–9:45 Community Meeting | All clinical and DOC staff with all patients; set the tone for the day. New patients will be introduced to the treatment milieu. |
| 9:45–11:00 Clinical Group Programming | Mental Health Clinician, Mental Health Treatment Aides supplemented with Clinical Supervisors and Therapists. DOC officers will remain on the periphery during clinical programming sessions unless needed to respond to an emergency. |
| 11:00–11:30 Lunch | DOC with the assistance of the Mental Health Treatment Aides. |
| 12:00–13:00 Therapeutic Activity Group | Therapists (art, music, yoga, writing) with treatment aides; therapeutic groups supplement the clinical groups and provide an opportunity for the patients to engage in art, music, yoga and writing exercises. |
| 13:00–14:00 Clinical Group Programming | Mental Health Clinician, Mental Health Treatment Aides supplemented with Clinical Supervisors and Therapists. DOC officers will remain on the periphery during clinical programming sessions unless needed to respond to an emergency. |
| 14:30–16:00 DOC Count/Treatment Team Case Conference | DOC: officers will count the patients and conduct a security inspection. Mental Health Treatment Aides; available to interact with patients as necessary to ensure compliance, however this time will allow patients a break from programming. During this time the clinical treatment team will meet (Clinical Supervisor, Mental Health Clinician, Psychiatrist and Mental Health Treatment Aide) to discuss the patient population, address treatment issues. |
| 16:00–17:00 Rest/Individual Treatment | Mental Health Treatment Aides will remain on the unit to perform their duties. Patients are encouraged to rest during this down time and to complete any homework assignments they may have. Individual treatment will take place during this time on the unit by (Mental Health Clinicians and Psychiatrists). |
| 17:00–17:30 Dinner | DOC officers with the assistance of Mental Health Treatment Aides will be responsible for overseeing the provision of all meals on the unit. They will ensure that all patients are fed. |
| 17:30–18:00 DOC and Clinical Staff Communication Meeting | All clinical and DOC staff will be in attendance to discuss issues from the previous tours and to set the tone for the evening programming. |
| 18:00–19:00 Clinical Group Programming | Mental Health Clinician, Mental Health Treatment Aides supplemented with Clinical Supervisors and Therapists. DOC officers will remain on the periphery during clinical programming sessions unless needed to respond to an emergency. |
| 19:00–20:00 Rest/Individual Treatment | Mental Health Treatment Aides will remain on the unit to perform their duties. Patients are encouraged to rest during this down time and to complete any homework assignments they may have. Individual treatment will take place during this time on the unit by (Mental Health Clinicians and Psychiatrists). |

A key design component of the CAPS unit was to form a team with health and security staff working together to promote improved clinical and security outcomes. The CAPS units typically employ dedicated social workers (4), psychologist (1), nurse (1), psychiatrist (0.5) and mental health treatment aides (4) located on each unit, which is a far richer staffing matrix than that of traditional mental health units. The inclusion of mental health treatment aides in the CAPS units is new for our