**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DERRICK JONES, JEROME** | ) | |
| **JONES DARNELL RUSAN, and** | ) | |
| **MARREL WITHERS,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:21-cv-600** |
| | ) | |
| **CITY OF ST. LOUIS, *et al*.,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR**
**SUMMARY JUDGMENT**

COME NOW, Defendants, by and through undersigned counsel, and for their

Memorandum In Support Of Their Motion For Summary Judgment state as follows:

**BACKGROUND**

Plaintiffs filed their Third Amended Complaint on June 10, 2022 wherein they allege

violations of Plaintiffs' various Fourteenth Amendment civil rights under Sec. 1983 and

violations of the Americans With Disabilities Act by various Defendants.

Specifically, Plaintiff Derrick Jones alleged that Defendants Sherry Richards (hereinafter

"Richards") and Javan Fowlkes (hereinafter "Fowlkes") violated his Fourteenth Amendment

rights by exercising excessive force on Jones by applying pepper spray against him when he

failed to follow directives.

Further, Plaintiff Jerome Jones alleged that Defendant Fowlkes violated his Fourteenth

Amendment rights by exercising excessive force by applying pepper spray against Jones when

Jones failed to follow directives.

Also, Defendant Darnell Rusan (hereinafter "Rusan") alleged violation of his Fourteenth Amendment rights by exercising excessive force on three instances by Defendants Aisha Turner (hereinafter "Turner"), Dirrell Alexander (hereinafter "Alexander") and Bruce Borders (hereinafter "Borders"). First, Rusan claimed Defendant Turner used excessive force when applying pepper spray against Rusan for failing to follow directives. Second, Rusan alleged that Defendants Alexander and Fowlkes exercised excessive force by allegedly slamming Rusan's head into a wall. Third, Rusan claimed excessive force when Defendant Fowlkes applies pepper spray to him when he failed to follow directives.

Finally, Defendant Marrell Withers (hereinafter "Withers") alleged violations of his Fourteenth Amendment rights when Defendants Freddie Willis (hereinafter "Willis") and Douglas Jones (hereinafter "Jones") in applying pepper spray against Withers when he failed to follow directives.

Plaintiffs further alleged violations of their Fourteenth Amendment rights based municipal liability against Defendant the City of St. Louis (hereinafter "City") on a *Monell* theory and a pattern and practice of using excessive force against detainees in connection with the use of pepper spray and excessive force in connection with alleged deprivation of water as punishment.

## <u>ANALYSIS</u>

## I. QUALIFIED IMMUNITY-PEPPER SPRAY

"Qualified immunity shields a governmental official from suit under § 1983 if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known". *Kelsay v. Earnst* 933 F..3d 975, 979 (8th Cir. 2019). When a defendant invokes qualified immunity, the burden falls on the plaintiff to show: "(1) the

facts viewed in the light most favorable to the plaintiff[], demonstrate the deprivation of a

constitutional right; and (2) the right was clearly established at the time of the deprivation."

*Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1155 (8th Cir. 2014).

"A right is clearly established when it is sufficiently clear that every reasonable official

would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7,

11 (2015) [internal quotations omitted]. "Though there need not be a case directly on point for a

right to be clearly established, existing precedent must have placed the statutory or constitutional

question beyond debate." *White v. Pauly*, 137 S.Ct. 548, 551 (2017) [internal quotations

omitted]. It is not enough that a rule merely is "suggested by then-existing precedent." *D.C. v.

Wesby*, 138 S.Ct. 577, 590 (2018). The "clearly established" standard requires that the legal

principle clearly prohibit the official's conduct in the particular circumstances before him. Thus,

the inquiry must be undertaken in light of the specific context of the case, not a broad general

proposition." *Leonard v. St. Charles County*, 570 F.Supp.3d 707, 719 (Mo. E.D. 2021).

### A. DERRICK JONES

On December 14, 2020 and during the national COVID-19 lockdown, Jones shared was

assumed to have COVID-19 symptoms along with his cell mate. Nurse Kristina Davis directed

both Jones and his cellmate in isolation. Lt. Richards directed Jones to enter his cell for purposes

of COVID isolation. Statement of Uncontroverted Material Facts (hereinafter "SOF") #1. Jones

refused this directive and multiple further directives from Lt. Richards. Lt. Richards left the

housing unit and returned with a cannister of pepper spray. SOF #2. Upon returning, Lt. Richards

gave multiple further directives, along with Corrections Officer Conrad Eastling (hereinafter

"CO Eastling"), to Jones to enter his cell. SOF #3. Jones refused these directive and began

moving around the common area of the housing unit. At one point Jones crosses the red line into

the "officer only" section of the common area near the control podium and behind CO Eastling. SOF #4. Lt. Richards calls for additional corrections officers while she continued to try and persuade Jones to comply. Jones continued to refuse. SOF #5. Throughout this encounter, Lt. Richards prominently displays the can of pepper spray and tells Jones she will spray him if he does not comply. Ultimately, Lt. Richards applies one quick burst of pepper spray to Jones. SOF #6. Where upon Jones attacks Lt. Richards and pulls her to the ground. SOF #7. Multiple corrections officers are necessary to subdue Jones, he is handcuffed, and is taken to the medical department for decontamination. SOF #8.

Section VIII(A)(1) of the City of St. Louis City Justice Center (hereinafter "CJC") Inmate Handbook states: "Inmates will obey and follow all instructions of the Housing Unit/Dormitory Officer." SOF #9. As the video evidence illustrates, that Lt. Richards gave Jones multiple directives to enter his cell for lockdown and isolation. Jones refuses to follow all these instructions.

Further, Section VIII(A)(4) of the Inmate Handbook instructs:

> The "out of bounds" area is marked by a red line in housing units The Housing Unit Officer's workstation is always "out of bounds". Do not cross over a red line, lean on the officers' workstation, or remove anything from the desk at any time. Do not approach the Officer's station unless you have permission.

SOF #10.

As can be seen in the video, Jones then crosses the red security perimeter line and passes behind Officer Eastling at the control station podium. Jones knew that crossing the red line and going behind Officer Eastling was a violation of CJC rules. SOF #11. As also can be seen in the video, other inmates are either refusing to enter their cells when instructed to or are only slowing complying in order to watch the incident being created by Jones unfold. SOF #12. Further, Jones was aware of the disturbance he had caused. SOF #13. Said incident represented a direct threat to

4

the security and order of the CJC.

The Due Process Claus of the Fourteenth Amendment protects pretrial detainee from the use of excessive force amounting to punishment. *Hampton v. City of St. Louis*, 2022 WL 2643507 *2. The Court must determine whether Plaintiff suffered an actual violation of a constitutional right. Then the Court must determine if the right was clearly established at the time of the alleged violation. *Jones v. Shields*, 207 F.3d 491, 494 (8th Cir. 2000). In the instant case, Jones had no clearly established constitutional right to not have pepper spray applied to him after he refuse multiple directives to enter his assigned cell, violated the security perimeter of the guard's podium, and attacked Lt. Richards.

A pretrial detainee must show that the force purposely or knowingly used against him was objectively unreasonable. *Hampton* at *2. Whether the force used was objectively reasonable turns on the facts and circumstances of each particular case. Which recognizes the principle that officers facing disturbances are often forced to make split second-judgments-in circumstances that are tense, uncertain, and rapidly evolving. *Hampton* *2.

In *Graham v. Connor*, 490 U.S. 386 (1989) the court has stressed the need to view the use of force from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. *Id.* at 397.

Relevant factors in evaluation the reasonableness of the use of force include: (1) the relationship between the need for the use of force and the amount of force used, (2) the extent of the plaintiff's injury, (3) any effort made by the officer to temper or to limit the mount of force used, (4) the severity of the security problem at issue, (5) the threat reasonably perceived by the officer and (6) whether the plaintiff was actively resisting. *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). However, the court went on to hold that "We do not consider this list to be

exclusive. We mention these factors only to illustrate the types of objective circumstances potentially relevant to a determination of excessive force. *Id.* at 397.

Further, the court in *Montoya v. City of Flandreau*, <u>669 F.3d 867, 871</u> (8th Cir. 2012) in commenting on the objective reasonableness standard of the Fourth Amendment, held: "Further, in reviewing whether the use of force was reasonable, we consider the totality of the circumstances,…"

**1. Richards use of pepper spray was objectively reasonable.**

In the instant case, the video evidence clearly shows Lt. Richards instructing Jones to step into his cell and Jones refusing to do so even though the nurse had placed him on isolation due to COVID precautions. Jones not only refused to enter his cell, but then crosses the red line into the officers only area near the podium containing the housing unit controls including the cell door locking mechanisms and behind Officer Eastling thereby threatening the safety of Officer Eastling and the security of the CJC. An area Jones knew he was prohibited from entering. Further, Jones continued to refuse to enter quarantine in his cell, moving throughout the common area of the housing unit to avoid Lt. Richards efforts to get him to enter his cell.

While there is no Eighth Circuit case with exactly the facts present in the instant case, *Burns v. Eaton*, <u>752 F.3d 1136</u> (8th Cir. 2014) is instructive.

In *Burns*, jail authorities were faced with an inmate who was in the shower, and after being directed to produce his hands for handcuffing and to return to his cell, refused. The court held:

> At this point, [Corrections Officer] Eaton no longer faced the relatively simple task of cuffing [Inmate] Burns and escorting him back to his cell. Eaton now faced a recalcitrant inmate. he could not simply leave Burns in the Isolation Unit shower cell, where he did not belong. Either Burns must be persuaded to comply with the command to return to his cell, or someone must enter the shower cell and forcibly remove him. thus, Burn's contention that he posed no threat because he

was alone in a locked cell ignores the reality of what was required to maintain or
restore discipline in this situation.

*Id*. at 1139.

Lt. Richards faced the same type of situation as Officer Eaton in the *Burns* case. On
December 21, 2020 the nation was still in the grip of the COVID-19 pandemic. SOF #14. The
CJC nurse believed that Jones had been exposed for several days to the COVID-19 virus and
ordered him into isolation to prevent the spread of the disease throughout the jail population. Yet
Jones adamantly refused to go into isolation. As the video evidence shows, both Lt. Richards and
Officer Eastling directed Jones to enter his cell for isolation repeatedly yet he refused. Lt.
Richards left the housing unit and returned with a can of pepper spray, a fact Jones was
obviously aware. Jones testified that he could see that Lt. Richards was holding the pepper spray
can. Jones continued to refuse to enter his cell and Lt. Richards administered one burst of pepper
spray to Jones. Once subdued, Jones was taken to the medical unit for decontamination.

As in *Burns*, Jones became a "recalcitrant inmate" when he refused to enter his cell
justifying the use of pepper spray to control Jones. At time index 01:17, the video (Exh. B)
shows Lt. Richards specifically showing Jones the pepper spray container prior to using it. Then
at index 02:55, almost two minutes later the video clearly shows Lt. Richards apply one short
burst of pepper spray to Jones. Jones knew that if he did not comply he would be sprayed, yet he
continued to refuse to comply. As in *Burns*, a limited application of capstun [pepper spray] to
control a recalcitrant inmate constitutes a tempered response by prison officials when compared
to other forms of force. Further, that [mace] is approved, in small quantities, to control a
recalcitrant inmate. *Id*. at 1140.

**2. Lt. Fowlkes' use of pepper spray was objectively reasonable.**

Jones continued his attack Lt. Richards and resist the officers attempts to subdue him. As

the video indicates, Lt. Fowles, one of the officer who responded to Lt. Richards' call for help, applied a one second burst of pepper spray to Jones. SOF #16. Jones was then handcuffed and taken to the medical division for decontamination and medical evaluation. SOF #8.

Jones pled that: "At the time [Derrick] was maced, he was not acting aggressively and was not threatening anyone safety." Doc. #131, ¶26. Notwithstanding Jones' misrepresentation of his conduct, the video of the incident, shows otherwise. Jones failed to plead his own specific conduct during the incident. He merely makes conclusory statements misrepresenting his conduct.

In *Watkins v. City of St. Louis*, 2022 WL 4534947 (Mo. E.D. September 28, 2022), the Plaintiff was sprayed with pepper spray by an arresting police officer. The court held that because Plaintiff had not pled any specific facts as to her behavior at the time of the incident. "The Complaint provides no basis for the Court to infer that the individual Defendants' actions were not 'proportionate to the situation.' *Id*. at *6.

The court went on to hold "Without knowing what Plaintiff's conduct was, it is impossible to plausibly infer that [defendant officer] Metcalf's response was unreasonable in response thereto." *Id*. at *7. In so holding, the court made note of the plaintiff's allegations:

> Plaintiff does assert that the Individual Defendants sprayed her with pepper spray and hit her with a baton 'without provocation,' but that is a 'wholly conclusory statement' without factual support. Whether there was sufficient provocation to justify the Individual Defendant' use of force is the very question of law that the objective reasonableness test is meant to address. Plaintiff has alleged no facts from which the Court could infer a lack of provocation. Aside from an implicit admission Individual Defendants had to 'secure her cooperation,' Plaintiff is silent as to her own conduct.

*Id*. at *7.

In *Watkins* the court went on to hold that, based on the plaintiff's omission regarding her own conduct, all of the officers were protected by the doctrine of qualified immunity. *Id*. at *13.

8

What Jones failed to plead and what the video evidence shows is that Jones continued to resist officers, continued to constitute a danger to corrections officers especially since he had just attacked Lt. Richards, and continued to threaten the safety and security of the CJC. Therefore, Lt. Fowlkes' actions in applying pepper spray in a short burst to Jones while he was resisting officers was objectively reasonable.

After Jones was finally subdued, corrections officers escorted him to the medical unit for decontamination and a medical check. Doc. #131, ¶28. While housed in a holding cell Jones continued to act aggressively and began kicking the cell door violently. Lt. Fowlkes directed Jones to stop kicking the door, but he refused. Lt. Fowlkes applied a short burst of pepper spray to Jones and he ceased kicking the door. SOF #17.

The Court must take in to consideration the totality of the circumstances that the officer knew at the time in order to make the determination as to whether the officer's conduct was objectively reasonable, in this case that includes the conduct of Jones. For the foregoing reasons, the corrections officers actions in applying pepper spray to Jones on December 14, 2020 was objectively reasonable. As such, Lt. Fowlkes and Richards a protected by the doctrine of qualified immunity and entitled to summary judgment.

**B. JEROME JONES**

Plaintiff Jerome Jones (hereinafter "Jones") pled that on February 9, 2021, he was directed to move from a one-man cell to a two-man cell and that he refused. Doc. #131, ¶32. Corrections Officers Hopgood and Eastling instructed Jones to comply with the directive or Lt. Fowlkes was going to apply pepper spray to him. Doc. #131, ¶33. Officers Hopgood and Eastling placed Jones in a visiting room sometimes used as temporary holding facilities. Doc. #131, ¶34. Lt. Fowlkes approached the visiting booth and asked Jones again if was willing to

cooperate. He refused and Lt. Fowlkes applied one short burst of pepper spray to Jones whereupon he complied.

Jones pled also that he was handcuffed at the time of these interactions. Doc. #131, ¶33.

This incident with Jones must be placed in the larger context of circumstances at the CJC at the time. As previously discussed, the country was in the grips of a worldwide pandemic as well as a nationwide quarantine lockdown with its attendant staffing and housing complications. However, what must be remembered it that a riot had just occurred at the CJC on February 6, 2021, just 3 days earlier prior. SOF #19. Jones' refusal to comply with staff directives concerning COVID-19 isolation threatened the safety of staff and detainees and the security of the CJC.

The court in *Soto v. Dickey,* 744 F.2d 1260 (7th Cir. 1984), when considering the excessive force claim of Plaintiff who was maced for refusing to submit to a strip search and a co-plaintiff for being maced for refusing to exit a cell, encapsulated the challenges faced by CJC staff not only daily, but especially in the middle of the pandemic and in the immediate aftermath of the aforementioned riot when it held:

> Discipline in a maximum security correctional institution no doubt is difficult, but it is essential if the prison is to function and provide for the care, safety and security of the staff and inmates. Services to provide food, clothing, health, medical, cleaning, laundry and all other services would come to an end without discipline. Mob rule would take over. There would not, and could not, be any protection for staff or inmates. Orders given must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them. Someone must exercise authority and  control. One can quickly reason what would happen in a maximum security prison without proper discipline.

*Id*. at 1267.

Again, just as in *Burns* case, Lt. Fowlkes was justified in using a single short burst of pepper spray to obtain cooperation from a recalcitrant detainee, here Jerome Jones.

Jones pled that he was handcuffed and in a visiting booth when he was sprayed with

pepper spray; however, this is irrelevant to the aforesaid analysis. Jones refused to leave the booth and go to his new cell. Merely because he had on handcuffs and was in a visiting booth does not make it unreasonable to use pepper spray to compel his compliance. The court in *Soto v. Dickey,* 744 F.2d 1260 (7th Cir. 1984)  went on to hold:

> The use of mace, tear gas or other chemical agent of the like nature when reasonably necessary to prevent riots or escape or to subdue recalcitrant prisoners does not constitute cruel and inhuman punishment and this is so whether the inmate is locked in his prison cell or is in handcuffs.

*Id.* at 1270.

While the *Soto* court was evaluating that case in the context of the Eighth Amendment the analysis is similar to the Fourteenth Amendment claims of Jones and the conclusion must be the same. *See, Haggins v. Sherburne County*, 2012 WL 4372562 (D.C. Minn. April 17, 2012).

For the foregoing reasons, Lt. Fowlkes use of pepper spray on Jerome Jones on February 9, 2021 was objectively reasonable under the circumstances. Thus, Lt. Fowlkes is protected by the doctrine of qualified immunity and entitled to summary judgment in this case.

### C. DARNELL RUSAN

#### 1. Lt. Turner/Officer Lewis spraying of Rusan with pepper spray.

On December 19, 2020, Plaintiff, Darnell Rusan (hereinafter "Rusan") was being held at the CJC in Housing Unit 4 Alpha as a pretrial detainee. SOF #20. Corrections Officer Michelle Lewis called Lt. Aisha Turner to the unit because she believed that detainees had been smoking in the unit due to the smell of smoke. Lt. Turner responded to the unit in response to Officer Lewis' call. Lt. Turner brought with her a large can of pepper spray. SOF #21.

When Lt. Turner arrived and began talking about detainee smoking on the unit, Rusan overheard Officer Lewis and Lt. Turner discussing detainee smoking and became angry. Rusan repeatedly interjected himself into Lt. Turner and Officer Lewis conversation regarding the

smoking. At the time, Rusan was sitting at the telephone bank nearest to the officer's podium. Lt. Turner believed that Rusan was trying distract her and Officer Lewis from the smoke. Lt. Turner also believed Rusan to be under the influence of whatever drug had generated the smoke in the housing unit.  SOF #22. Lt. Turner also felt unsafe at the time due to Rusan continue to argue with her and Officer Lewis.  SOF #23. Lt. Turner told Rusan to use a telephone farther away. SOF #24. Rusan continued to argue with Lt. Turner and Officer Lewis and cursing at them. Rusan then began threatening Lt. Turner with physical violence and that he was going "call his people." Lt. Turner, in an attempt to deescalate Rusan, began to leave. At that point Rusan began calling Lt. Turner and Officer Lewis names and continued cursing at them. Lt. Turner walked back to Rusan and repeated instructed him to "step in" to his cell to be locked down as can be seen in the video of the incident. SOF #26. Rusan refused.  Lt. Turner then sprayed Rusan with pepper spray. Rusan immediately attacked Lt. Turner with a chair. SOF #27. When Officer Lewis came to Lt. Turner's aid and sprayed Rusan as well, Rusan attacked her with a chair as well. Rusan continued to refuse to lock down in his cell. Officer Lewis continued to attempt to get Rusan in his cell until Rusan attacked her and knocked her to the ground.[1] SOF #28. Throughout this entire time six other detainees were present and near to both Lt. Turner and Officer Lewis. SOF #29.

Even if you disregard all of Lt. Turner's testimony as to Rusan's threatening behavior, as the video of the incident clearly shows Lt. Turner was holding the can of pepper spray *in her hand* and it was clearly visible while she was directing Rusan to go to his cell yet Rusan continued to refuse. For reasons already discussed in connection with Derrick Jones' conduct, it was objectively reasonable for Lt. Turner to use pepper spray to attempt to coerce Rusan into his

---

[1] Rusan is currently charged with felony assault in connection with this incident. Cause No. 2122-CR00762-01 in the Twenty-Second Judicial Circuit Court of the State of Missouri.

cell. Rusan's recalcitrance further amplified the legitimate safety concerns his behavior created in the presence of other detainees near by Lt. Richards and Officer Lewis.

## 2. Lt. Fowlkes spray of Rusan

On February 3, 2021, CJC staff were conducting a "shake down" of Housing Unit 5 Bravo looking for contraband. Rusan was assigned to said housing unit and temporarily held in a visiting booth during the search. While in the visiting booth Rusan was personally searched as well. A corrections officer gave Rusan a directive to submit to a strip search. Rusan removed his clothes, but refused to cooperate further. The corrections officer contacted Lt. Fowlkes and reported Rusan's refusal to cooperate. Lt. Fowlkes again directed Rusan to bend over and spread his buttocks. Rusan again refused. At which point Lt. Fowlkes applied one short burst of pepper spray. Rusan then complied with the aforesaid directive. SOF #30.

For the reasons cited above in connection with the conduct of Derrick Jones, Jerome Jones, and Rusan's own previous incident Lt. Fowlkes' use of pepper spray when Rusan was in a visiting booth objectively reasonable. Lt. Fowlkes is protected by the doctrine of qualified immunity; therefore, he is entitled to summary judgment in this case.

## D. MARRELL WITHERS

On January 6, 2022[2], Marrell Withers (hereinafter "Withers") was confined in the CJC having been brought there by writ from another institution. SOF #31. There was concern at the CJC that Withers had COVID-19 at the time. SOF #32. During Withers' intake process the medical staff so they directed that Withers go into the isolation unit. SOF #33. Capt. Wills and Corrections Officer Doug Jones directed Withers to go into an isolation cell and he refused.

---

[2] Plaintiffs plead that the incident occurred on January 7, 2022. However, Defendants believe this to by inaccurate as CJC records indicate it was January 6, 2022. Exh. P, City_004063, Thursday, January 06, 2022 5:08.12 p.m. CJC video of Marrell Withers.

Withers was handcuffed at the time. Withers adamantly refused to enter the cell and told Capt. Wills and Officer Jones that they would "have to spray" him twice. SOF #34.

In the video of January 6, 2022 Withers can be seen pacing in an agitated manner. SOF #35. Withers then sits down and begins arguing with Officer Jones and swearing at him in an angry tone. Withers continues to act in an agitated and argumentative manner then threatens to kick the computer monitor at the officer's podium and throw it against the wall. SOF #36. The corrections officer calls for Capt. Wills to deal with Withers. Capt. Wills directs Withers to enter the cell and again he refuses. Withers declares he will not go in the cell and tells Officer Jones he will have to "spray [him]." SOF #34. Officer Jones applies one short burst of pepper spray to Withers. Withers declares again he is not going in the cell and again says repeatedly that Officer Jones will have to spray him. Officer Jones then applies a second short burst of pepper spray. Capt. Wills asks Withers if he will go in the cell and he again refuses. Capt. Wills then directs Officer Jones and other corrections officer to take Withers to the medical unit. SOF # 37.

The conduct of Capt. Wills and Officer Jones was objectively reasonable and necessary to maintain the safety and security of the CJC. As such, they are entitled to the protection of the doctrine of qualified immunity and summary judgment in this case.

## II. MUNICIPAL LIABILITY - *MONELL*

In County VI of their Third Amended Petition Plaintiffs attempted to plead a violation of their Fourteenth Amendment rights in connection with the use of pepper spray at the CJC based on a theory of municipal liability under *Monell v. Dep't of Social Servs*., 436 U.S. 658, 691 (1978). They have failed.

The court in *Soltesz v. Rushmore Plaza Civic Ctr.*, <u>847 F.3d 941, 947</u> (8th Cir. 2017) citing *Pembaur v. City of Cincinnati*, <u>475 U.S. 469, 479</u> (1986) enunciated the principle behind municipal liability:

> The Supreme Court has set a high bar for establishing municipal liability under § 1983, and demands careful analysis from district courts, to avoid any risk that liability could be imposed under a theory of respondeat superior.

*Id.* at 691.

A plaintiff seeking to impose liability on a municipality is required to identify either an official policy or a widespread custom or practice that was the moving force behind the plaintiff's constitutional injury. See *Brown*, <u>520 U.S. at 403</u>; *Crawford v. Van Buren County, Ark.*, <u>678 F.3d 666, 669</u> (8th Cir. 2012).  An official policy represents the decisions of a municipality's legislative body, or of an official who maintains the final authority to establish governmental policy. *Board of County Com'rs of Bryan County, Okl. v. Brown*, <u>520 U.S. 397, 403</u> (1997); *Ware v. Jackson County, Mo.*, <u>150 F.3d 873, 880</u> (8th Cir. 1998).  Plaintiffs pled no official, widespread policy of the CJC regarding the excessive use of pepper spray that violates detainees' constitutional rights.

For a municipality to be held liable on the basis of custom, "there must have been a pattern of 'persistent and widespread' unconstitutional practices which became so 'permanent and well settled' as to have the effect and force of law." *Jane Doe "A" v. Special School Dist.*, <u>901 F.2d 642, 646</u> (8th Cir. 1990); *Monell v. Dep't of Social Servs.*, <u>436 U.S. 658, 691</u> (1978).

In order to state a claim for municipal liability based on a custom or practice, Plaintiff is required to allege facts "by which one could begin to draw an inference that the conduct complained of . . . resulted from an unconstitutional policy or custom." *Crumpley-Patterson v.*

*Trinity Lutheran Hosp*., 388 F.3d 588, 591 (8th Cir. 2004) citing *Doe v. Sch. Dist. of Norfolk*,

340 F.3d 605, 614 (8th Cir. 2003).

> "[T]o establish the existence of a governmental custom or failure
> to receive, investigate, or act on complaints of violations of
> constitutional rights, a plaintiff must prove: 1) The existence of a
> continuing, widespread, persistent pattern of unconstitutional
> misconduct by the governmental entity's employees; 2) Deliberate
> indifference to or tacit authorization of such conduct by the
> governmental entity's policymaking officials after notice to the
> officials of that misconduct; and 3) That plaintiff was injured by
> acts pursuant to the governmental entities custom, i.e., that the
> custom was the moving force behind the constitutional violation."

*Special School Dist*., 901 F.2d at 646.

In the context of this case, each allegation of excessive force must be individually

evaluated to make a determination if the degree of force was justified. *Leonard v. St. Charles*

*County*, 570 F.Supp.3d 707, 719 (Mo. E.D. 2021). Here Plaintiffs make sweeping generalizations

about non-parties in their complaint regarding the use of pepper spray within the CJC; however

they failed to plead and will not be able to present evidence of any instances of the use of pepper

spray similar to those alleged by Plaintiff Jones, Jones, Rusan, and Withers individually.

Plaintiffs do not contest that the CJC has a policy that governs the use of force in all

instances. SOF #38. Further, the CJC has a methodology it implements for reporting, tracking

and investigating uses of force as evidenced by the requirement that every use of force be

documented and reviewed. The policy is robust as evidenced by the Use Of Force Report for the

aforementioned incident with Marrell Withers. In this report Major Tanya Harry who reviewed

the incident as part of the Use Of Force review process *disagreed* that the use of pepper spray

was appropriate in the circumstance. SOF #39.

Capt. Wills and Officer Jones' use of pepper spray to restore and maintain order in the quarantine unit and coerce Withers to comply was objectively reasonable in itself as discussed above. Beyond that, this is an excellent example of the level of substantive review and analysis of staff conduct regarding use of force that exist now and at all relevant times at the CJC and that belies any allegation that CJC staff were deliberately indifferent to detainee civil rights violations in connection with the use of pepper spray or that there was a custom or practice "with the force of law" that existed or was tolerated by CJC staff to violate detainees civil rights.

Plaintiffs will be unable to adduce any evidence that will support their claims of municipal liability against the City of St. Louis in connection with the use of pepper spray. As such, the City of St. Louis is entitled to summary Judgment in this case.

## III. AMERICANS WITH DISABILITIES ACT

In Count VIII Plaintiffs Rusan and Withers attempt to plead violations of the Americans With Disabilities Act (hereinafter "ADA") against the City of St. Louis, in connection with the CJC staff's use of pepper spray. However, the ADA does not apply to the activities alleged by Plaintiffs.

§ 12132 of the ADA states:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or by denied the benefits of the *services, programs*, or *activities* of a public entity, or be subjected to discrimination by any such entity. [*Emphasis added*].

42 U.S.C.A § 12132.

Nowhere have Plaintiffs pled a legal basis to conclude that uses of force on recalcitrant detainees involving pepper spray is a "service, program, or activity." Plaintiffs' own complaint refutes the notion that the CJC staff's use of pepper spray is discriminator as they claim its use was "wide spread," not just limited to individuals with disabilities. Doc. #131, ¶197.

17

Contrary to Plaintiffs' apparent position, to the degree Plaintiffs Withers and Rusan may or may not have a disability, this does not entitle them to refuse to follow staff directives in violation of CJC policy or to engage in acts of violence that threaten the safety of staff and detainees or the security of the CJC.

In *Baribeau v. City of Minneapolis*, 578 F. Supp.2d 1201 (8th Cir.2008), reversed on other grounds, the court was called upon to evaluate the applicability of the ADA to an inmate whose prosthetic leg had been seized by jail staff for safety reasons. In finding for the defendants the court held: "Neither the ADA [nor the MHRA], however, requires jails or prisons to take actions that unduly jeopardize their safety and security." Further, the court held that seizure of the prosthetic was relationally related to a legitimate penological purpose, thus not a violation of the ADA. *Id*. at 1222.

For the foregoing reasons Plaintiffs will not be able to adduce evidence sufficient to support their claim above-reference. As such, Defendants are entitled to summary judgment.

## IV. CONDITIONS OF CONFINEMENT-WATER SHUT OFF

### A. INDIVIDUAL DEFENDANTS

In Count IX, Plaintiffs Derrick Jones and Jerome Jones alleged that the water their individual cells was shut off with the intention to punish said Plaintiffs. Plaintiffs' allegations are vague, conclusory and speculative.

Plaintiffs allegations conclude that water may be turned off at any given time for nefarious reasons, but whole fail to consider other alternative explanations such as maintenance and repair or why those explanations cannot be true. Further, Plaintiffs again fail to plead their own conduct. Such as instances where they had stopped up the toilet or sink or broken sprinkler heads necessitate turning off water to prevent flooding and water damage. SOF $40.

Plaintiffs Derrick Jones and Jerome Jones' allegations are all the more extraordinary as during their depositions both Plaintiffs *denied* having their water turned off.

> Q: So, before that riot, your water had never been turned off before?
>
> A. No, I was on like the – the third floor before and the same guy that maced me was the one that sent me to the fourth floor and the fifth floor.

SOF #41.

> Q: Okay. So, you were in 4D for less than a month before the incident that we're here about?
> A: Yes.
> Q. Okay. And while you were in 4C, before this incident that December ---- on December 14, 2020, when was the first time your water was turned off?
> A: In 4C?
> Q. In 4C.
> A. The water wasn't turned off.

SOF #42.

Plaintiffs will be unable to adduce evidence and meet their burden of proof that Lt. Fowlkes or anyone else at the CJC intentionally deprived them of water for punitive purposes. Any loss of water at the CJC at any given time was either as the result of maintenance or repairs or was rationally related to a legitimate penological purpose, namely safety and security.

Further, Lt. Fowkes is protected by the doctrine of qualified immunity for the reasons previously stated and is entitled to summary judgment regarding Plaintiffs' claims against him related to water shut offs.

### B. *MONELL* CLAIM – WATER SHUT OFF

Just as with Plaintiffs' claims regarding excessive use of force, Plaintiff pled vague, conclusory and speculative allegations with no actual factual assertions that are substantially similar to each other or the those of the named Plaintiffs. Plaintiff will be able to adduce no evidence that the City of St. Louis was deliberately indifferent to a custom or practice of

intentionally turning of water in detainee cells for punitive purposes. As such, Defendants are entitled to summary judgment in this case.

<u>**CONCLUSION**</u>

For the foregoing reasons Defendants pray this Court grant Defendants' Motion For Summary Judgment.

Respectfully submitted,

SHEENA HAMILTON,
CITY COUNSELOR

By: <u>/s/ Lawrence L. Pratt #41324</u>
Assistant City Counselor
1200 Market Street
City Hall Room 314
St. Louis, Missouri 63103
Phone: 314-641-8317
Fax: 314-622-4956
PrattL@stlouis-mo.gov

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 26, 2023 the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all attorneys of record.

<u>  /s/ Lawrence Pratt</u>