**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| DERRICK JONES, JEROME JONES, MARRELL WITHERS and DARNELL RUSAN, | ) ) ) |
| on behalf of themselves and all similarly situated individuals, | ) ) Cause No. 4:21-cv-600 |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| CITY OF ST. LOUIS, *et al.*, | ) ) |
| Defendants. | ) ) |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
<u>MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

Table of Authorities.........................................................................................................iv

Introduction.........................................................................................................................1

Summary Judgment Standard............................................................................................2

Summary of Facts...............................................................................................................2

   I.   Marrell Withers ......................................................................................................2

   II.   Jerome Jones ...........................................................................................................4

   III.   Darnell Rusan .......................................................................................................5

     A.   December 19, 2020 Attacks on Darnell Rusan...............................................5

     B.   February 3, 2021 Attack on Darnell Rusan .....................................................6

   IV.   Derrick Jones ........................................................................................................7

   V.   Facts Supporting Plaintiffs' *Monell* Claims ......................................................8

     A.   Evidence of a Widespread Pattern of Excessive Use of OC Spray Against CJC Detainees .8

     B.   Pattern of Abusive and Inhumane Water Shut-Offs at the CJC Jail ......................................13

Argument ...........................................................................................................................14

   I.   Defendants Are Not Entitled to Qualified Immunity or Summary Judgment on Plaintiffs' Excessive Force Claims .....................................................................................................14

     A.   Applicable Excessive Force Legal Standard and Qualified Immunity ...................................14

       1.   The correct legal standard governing Plaintiffs' claims is objective reasonableness.........14

       2.   Defendants waive any arguments with respect to whether Plaintiffs' rights were "clearly established" for the purposes of qualified immunity. ...................................................................15

     B.   Defendants' Motion for Summary Judgment on Jerome Jones's Excessive Force Claims Should Be Denied ............................................................................................................................16

       1.   Defendants Fail to Address All of Jerome Jones' Claims of Abuse...................................16

       At the outset, Defendants do not assert any defense, for the prolonged period (25 minutes) that Lt. Fowlkes left Jerome, locked in a spray filled room, soaked in OC spray, and without means or opportunity to wash the burning spray from his eyes or body, following Defendant Fowlkes initial OC spray attack on him. Nor do they assert any defense for the full day Jerome sat in a cell, soaked in OC spray, without the ability to wash or clean the burning OC spray from his clothes, eyes, or body. Because Defendants assert no defense for that piece of Jerome's claim, that claim must proceed to trial...........................................................................16

       2.   Lt. Fowlkes's excessive use of OC spray against Jerome Jones is not shielded by qualified immunity.............................................................................................................................................17

C.    Defendants' Motion for Summary Judgment on Marrell Withers' Excessive Force Claim Should Be Denied...................................................................................................................20

D.    Defendants' Motion for Summary Judgment on Darnell Rusan's Excessive Force Claims Should Be Denied...................................................................................................................22

    1.    Defendant Turner sprayed Darnell excessively, without warning or justification.............22

    2.    Defendants Border and Alexander assaulted Darnell, and exposed him to excessive amounts of OC Spray. .......................................................................................................24

    3.    Defendant Fowlkes unnecessarily sprayed Darnell and left him to marinate in the chemical agents for hours. ...............................................................................................25

E.    Defendants' Motion for Summary Judgment on Derrick Jones' Excessive Force Claims Should Be Denied...................................................................................................................26

    1.    It is undisputed that Richards and Fowlkes deployed OC Spray on Derrick Jones without any verbal warning.............................................................................................27

    2.    Questions of material fact exist as to the quantity of OC Spray used by Lt. Richards and Lt. Fowlkes against Derrick Jones and whether Derrick was fully decontaminated after........28

    3.    Defendants' use of chemical agents was accompanied by additional physical force and other conduct demonstrating malicious intent. ..................................................................29

    4.    Material facts exist as to whether Derrick Jones posed a security risk justifying the use of OC Spray while he was in the housing unit.........................................................................29

    5.    Derrick Jones posed no risk to safety or security while he was in the medical unit, and the record demonstrates Lt. Fowlkes' malicious intent in deploying OC Spray against Derrick in medical.........................................................................................................................31

II.    Defendants Are Not Entitled to Summary Judgment on Plaintiffs' *Monell* Claims...................32

A.    The St. Louis City Commissioner of Corrections is the *Monell* Final Policymaker .............33

B.    Defendants' Pattern or Practice of Excessive, Punitive, and Unjustified Use of OC Spray34

    1.    There is a continuing, widespread, persistent pattern of unconstitutional excessive use of OC spray at the CJC jail. ..................................................................................................34

    2.    The City of St. Louis was deliberately indifferent to the widespread and entrenched practice of excessive use of force against detainees. ......................................................37

    3.    The unconstitutional custom of excessive use of force was the moving force behind Plaintiffs' injuries. ...........................................................................................................42

C.    Pattern and Practice of Water-Shut Offs...........................................................................43

    1.    There is a continuing, widespread, persistent pattern of City of St. Louis employees at the CJC intentionally shutting off water to detainee cells for non-legitimate penological, punitive purposes ...........................................................................................................44

2.   City of St. Louis policymaking officials demonstrate deliberate indifference to or tacit authorization of the water shutoffs after notice to the officials of those punitive water shutoffs ................................................................................................................................45

3.   The unconstitutional custom of punitive water-offs was the moving force behind Plaintiffs' injuries ............................................................................................................46

III.    A Reasonable Jury Could Decide that Defendants Violated Plaintiffs' Claims Under the ADA  47

IV.    Plaintiffs Are Entitled to Adverse Inferences Based on Defendants' Discovery Misconduct  49

Conclusion ................................................................................................................................50

# TABLE OF AUTHORITIES

## Cases

*Acuity, a Mut. Ins. Co. v. Simler*, No. 4:17-CV-02197 JAR, 2018 WL 2223684 (E.D. Mo. May 15, 2018) ........................................................................................................................................ 2, 25

*Alberts vs. Wills*, No. 3:20-CV-3008, 2020 WL 7427215 (W.D. Ark. Dec. 18, 2020) ........................... 20

*Alexander v. Choate*, 469 U.S. 287 (1985) ............................................................................................. 48

*Anderson v. City of Atlanta*, 778 F.2d 678 (11th Cir. 1985) .................................................................. 45

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .............................................................................. 2

*Angarita v. St. Louis County*, 981 F.2d 1537 (8th Cir.1992) ................................................................. 34

*Atkinson v. City of Mt. View*, 709 F.3d 1201 (8th Cir. 2013) ................................................................ 33

*Baribeau v. City of Minneapolis*, 578 F. Supp. 2d 1201, 1221 (D. Minn. 2008), *aff'd in part, rev'd in part and remanded*, 596 F.3d 465 (8th Cir. 2010) ........................................................................................ 49

*Baribeau v. City of Minneapolis*, 596 F.3d 465, 484 (8th Cir. 2010) .............................................. 47, 49

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397 (1997) ................................ 37, 42, 46

*Bell v. Wolfish*, 441 U.S. 520 (1979) ...................................................................................................... 43

*Bielevicz v. Dubinon*, 915 F.2d 845 (3d Cir. 1990) ......................................................................... 42, 46

*Bonenberger v. St. Louis Metro. Police Dep't*, 956 F. Supp. 2d 1059 (E.D. Mo. 2013) ...................... 15

*Bordanaro v. McLeod*, 871 F.2d 1151 (1st Cir. 1989) .......................................................................... 35

*Boswell v. Sherburne Cnty.*, 849 F.2d 1117 (8th Cir. 1988) ................................................................. 43

*Brewington v. Keener*, 902 F.3d 796 (8th Cir. 2018) ........................................................................... 35

*Brown v. City of Ft. Lauderdale*, 923 F.2d 1474 (11th Cir. 1991) ....................................................... 39

*Brown v. City of Golden Valley*, 574 F.3d 491 (8th Cir.2009) ............................................................. 15

*Burns v. Eaton*, 752 F.3d 1136 (8th Cir. 2014) ................................................................. 14, 19, 27, 30

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................................. 2, 16

*Connick v. Thompson*, 563 U.S. 51 (2011) ........................................................................................... 39

*Farmer v. Brennan*, 511 U.S. 825 (1994) ............................................................................................. 37

*Folkerts v. City of Waverly*, 707 F.3d 975 (8th Cir. 2013) ................................................................... 49

*Gatlin ex rel. Est. of Gatlin v. Green*, 362 F.3d 1089 (8th Cir. 2004) ................................................. 37

*Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998) ................................................................................. 48

*Hayward v. City of New Orleans,* No. CIV.A. 02-3532, 2004 WL 258116 (E.D. La. Feb. 12, 2004) ....... 38

*Hickey v. Reeder*, 12 F.3d 754 (8th Cir. 1993) .................................................................................... 26

*Kampouris v. St. Louis Symphony Soc.*, 210 F.3d 845 (8th Cir. 2000) ................................................. 26

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015) ............................................................................... passim

*Lawrence v. Bowersox*, 297 F.3d 727 (8th Cir. 2002) ..................................................................... passim

*Leonard v. St. Charles Cnty.*, 570 F. Supp. 3d 707 (E.D. Mo. 2021) ................................................... 33

*Mann v. Yarnell*, 497 F.3d 822 (8th Cir. 2007) .................................................................................... 27

*Mettler v. Whitledge*, 165 F.3d 1197 (8th Cir. 1999) .................................................................... 38, 40

*Michael v. Trevena*, 899 F.3d 528 (8th Cir. 2018) ............................................................................... 26

*Mitchell v. Kirchmeier*, 28 F.4th 888 (8th Cir. 2022) .......................................................................... 33

*Osborn v. E.F. Hutton & Co., Inc.*, 853 F.2d 616 (8th Cir. 1988) .......................................................... 2

*Owens v. Scott County Jail*, 328 F.3d 1026 (8th Cir. 2003) ................................................................. 43

*Parrish v. Luckie,* 963 F.2d 201 (8th Cir. 1992) ............................................................ 34, 38, 40, 41

*Peebles v. Potter,* 354 F.3d 761 (8th Cir. 2004) ..................................................................................48

*Pennsylvania Dep't of Corr. v. Yeskey,* 524 U.S. 206 (1998) .............................................................47

*Perkins v. Hastings,* 915 F.3d 512 (8th Cir. 2019) .............................................................................35

*Plamp v. Mitchell Sch. Dist. No. 17-2,* 565 F.3d 450 (8th Cir. 2009) ................................................35

*Rademacher v. HBE Corp.,* 645 F.3d 1005 (8th Cir. 2011) ..................................................................2

*Robinson v. Adams,* No. 5:10-CV-00013-JMM, 2010 WL 4942163 (E.D. Ark. Nov. 9, 2010) ........ 43, 44

*Ryan v. Armstrong,* 850 F.3d 419 (8th Cir. 2017) ..............................................................................15

*Shannon v. Koehler,* 673 F. Supp. 2d 758 (N.D. Iowa 2009) .............................................................41

*Soto v. Dickey,* 744 F.2d 1260 (7th Cir. 1984) .............................................................................14, 18

*Spencer v. Dawson,* No. 04 C 5048, 2006 WL 3253574 (N.D. Ill. Nov. 7, 2006 ...............................47

*Spires v. Paul,* 581 F. App'x 786 (11th Cir. 2014) ............................................................................43

*Stearns v. Inmate Servs. Corp.,* 957 F.3d 902 (8th Cir. 2020) ...........................................................44

*Tatum v. Robinson,* 858 F.3d 544 (8th Cir. 2017) .............................................................................24

*Thelma D. v. Board of Educ.,* 934 F.2d 929 (8th Cir. 1991) ..............................................................37

*Thomas v. Cook Cnty. Sheriff's Dep't,* 604 F.3d 293 (7th Cir. 2010) .................................................45

*Thompson v. Zimmerman,* 350 F.3d 734 (8th Cir.2003) ....................................................................24

*Tilson v. Forrest City Police Dep't,* 28 F.3d 802 (8th Cir. 1994) ..................................................39, 46

*Tirado v. City of Minneapolis,* 521 F.Supp. 3d 833 (D. Minn. 2021) ...........................................35, 37

*Treats v. Morgan,* 308 F.3d 868 (8th Cir. 2002) ........................................................................passim

*Trudeau v. Wyrick,* 713 F.2d 1360 (8th Cir. 1983) ......................................................................42, 46

*UniGroup, Inc. v. Winokur,* 45 F.3d 1208 (8th Cir. 1995) .................................................................18

*Walker v. Bowersox,* 526 F.3d 1186 (8th Cir. 2008) ..........................................................................29

*Ware v. Jackson Cnty., Mo.,* 150 F.3d 873 (8th Cir. 1998) ..........................................................passim

*Warren v. District of Columbia,* 353 F.3d 36 (D.C. Cir. 2004) ..........................................................39

*Watson v. Boyd,* 447 F. Supp. 3d 924, 950 (E.D. Mo. 2020), *overturned on other grounds by Watson v. Boyd,* 2 F.4th 1106 (8th Cir. 2021) ...................................................................................................35

*Wealot v. Brooks,* 865 F.3d 1119 (8th Cir. 2017) ..............................................................................22

*White v. Jackson,* 865 F.3d 1064 (8th Cir. 2017) ..............................................................................26

*Williams v. Jackson,* 600 F.3d 1007 (8th Cir. 2010) ..........................................................................32

*Wilson v. City of N. Little Rock,* 801 F.2d 316 (8th Cir. 1996) ..........................................................34

*Wilson v. City of Southlake,* 936 F.3d 326 (5th Cir. 2019) .................................................................47

*Wishon v. Gammon,* 978 F.2d 446 (8th Cir. 1992) ............................................................................43

## Statutes

42 U.S.C. § 12132 ................................................................................................................................47

## Rules

FED. R. CIV. P. 56(a) ..............................................................................................................................2

FED. R. CIV. P. 56(c)(1) ........................................................................................................................16

# INTRODUCTION

For at least half a decade, individuals detained at the City Justice Center jail (CJC) have lived under the near-constant threat of torturous attacks by means of chemical agents and prolonged water shut-offs. Chemical agents[1] are used to punish detainees for merely hesitating or asking a correctional officer a question. They are used on detainees while in their cells, locked in visiting rooms, or otherwise restrained, who present no physical threat to officers. They are used on detainees trapped in cells who are trying to get the attention of correctional officers because they are suffering and in need of help. They are used in large quantities: officers deploy multiple bursts of chemical agents on individual detainees or they simply attack an individual with chemical agents meant for riots or crowds. They are regularly used on people who are on suicide watch or otherwise in need of health care, with no consideration for the impact of the chemicals on someone already in a vulnerable condition. In essence, chemical agents are used by CJC correctional officers reflexively, in response to any disruption or perceived inconvenience. This atmosphere of abuse is amplified by prolific and prolonged water-shut offs, depriving detainees of a minimal life necessity and forcing detainees to live under the threat of serious injury or even death. Officers are permitted to engage in this abuse with impunity.

It is against this backdrop that the four Plaintiffs in this case, Jerome Jones, Darnell Rusan, Derrick Jones, and Marrell Withers[2], were brutalized by excessive force at the hands of the individual Defendants and forced to suffer without water for days at a time.

---

[1] As in Plaintiffs' previous filings, the terms "chemical agents," "OC Spray" "mace" and "pepper spray" are used interchangeably.
[2] Plaintiffs' Renewed Motion for Class Certification is pending before this Court. Doc. 286

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Material facts" are those that "might affect the outcome of the suit," and a dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 at 248. A dispute of material fact is genuine if the evidence may prompt a reasonable jury to return a verdict for either the plaintiff or the defendant, and it is material if it would affect the resolution of a case. *Anderson,* 477 at 252, *Rademacher v. HBE Corp.*, 645 F.3d 1005, 1010 (8th Cir. 2011). If reasonable minds could differ as to the import of the evidence, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

The court must view the facts in the light most favorable to the non-moving party and give that party the benefit of any inferences that logically can be drawn from those facts. *Acuity, a Mut. Ins. Co. v. Simler*, No. 4:17-CV-02197 JAR, 2018 WL 2223684, *2 (E.D. Mo. May 15, 2018). The Court is required to resolve all conflicts of evidence in favor of the nonmoving party. *Id.* (citing *Osborn v. E.F. Hutton & Co., Inc.*, 853 F.2d 616, 619 (8th Cir. 1988)). The Court cannot weigh the evidence or decide which party's submissions and testimony are more credible. *Id.*

## SUMMARY OF FACTS

### I.  **Marrell Withers**

Marrell Withers was a pretrial detainee at CJC on January 6, 2022, when Correctional Officers (COs) informed him that they were going to move him to the COVID-19 isolation unit. He had just tested negative for COVID and was aware that the Omicron variant of COVID-19 was surging. Statement of Additional Material Facts Making Summary Judgment Improper, filed

contemporaneously herewith ("Pls.' SOF") at ¶¶1-10. Fearing for his life and believing himself to be COVID negative, he refused to enter the COVID unit and asked instead that Officers investigate his COVID-19 status with the medical unit and also asked for mental health support. Pls.' SOF at ¶¶12-20. They did neither. *Id.* Captain Wills and Officer Douglas Jones entered the area where Marrell was handcuffed and sitting down. Pls.' SOF at ¶¶21-25, 36. At the time there was nothing urgent happening in the area and neither Officers Wills or Jones believed Marrell presented a threat to person or property. Pls.' SOF at ¶¶22-27, 32. Nor did they know why or ask why Marrell was refusing to enter the COVID isolation unit. Pls.' SOF at ¶¶16-18, 33.

Nonetheless, Captain Wills directed Officer Jones to spray Marrell, who was still handcuffed, with OC spray. *Id.* at ¶¶34. Before Officer Jones sprayed him the first time, Marrell told them he had asthma, which Jones meant him to mean "you better not spray me because I've got asthma." *Id.* at ¶¶28-30. Undeterred, Jones sprayed Marrell, who was handcuffed and sitting, in the face without warning. *Id.* at ¶¶ 28-37. After being sprayed, Marrell turned to face the wall, still handcuffed. *Id.* at ¶38. He again told Captain Wills and Officer Jones he had asthma. Jones then sprayed Marrell a second time, this time reaching around his body to spray him directly in the face. *Id.* at ¶39-40. At the time he was sprayed a second time, Marrell still did not present a threat to any property or people, nor was there anything urgent occurring in the area. *Id.* at ¶¶41-44. Afterwards, Marrell was not provided a change of clothes and was not given a shower to wash the OC spray off. He was forced to remain in those chemical-soaked clothes, burning, without a shower for a full day following the attack. *Id.* at ¶¶45-49. In a subsequent review, then-Major Tonya Harry determined that the use of force against Marrell was "unjustified." Neither Captain Wills or Officer Jones were disciplined for their abuse against Marrell and Major Harry was subsequently demoted. *Id.* at ¶¶51-56.

While detained at CJC, Marrell Withers' water was shut off "like all the time" for punishment purposes. *Id.* at ¶¶61-62. At one point, Marrell was detained in a cell for seven or eight days without water. It got so bad that he broke the sprinkler just to get out of the cell. *Id.* at ¶63.

## II. <u>Jerome Jones</u>

Jerome Jones spent over two years awaiting trial in custody at CJC before he was ultimately acquitted. Pls.' SOF at ¶66. On or about February 9, 2021, CO Hopgood and CO Eastling asked Jerome to move from a single-person cell to a double-person cell. Jerome, who was handcuffed, told them there was no reason to move him. Jerome indicated he would not move cells, but he was not physically resisting. *Id.* at ¶¶67-69. The officers then put Jerome in a no-contact visiting room. *Id.* Once Jerome was in the room, Lt. Fowlkes said to Jerome, "So you're not going to move." *Id.* at ¶70. Jerome was not acting aggressively, was not threatening staff safety, and was confined inside a secured cell. *Id.* at ¶71.

Nevertheless, Lt. Fowlkes sprayed a burst of MK-9 OC spray mace into Jerome's face until it filled the room. *Id.* at ¶¶70-71. Lt. Fowlkes then closed the door and remarked, "Yeah, he feel it. Leave him in there for a minute." *Id.* at ¶72. MK-9s, or "riot sized" sprays, are bigger and stronger than normal OC spray used by COs at CJC, and are typically only allowed to be used by supervisors. MK-9s are meant to be used against crowds or during "riots." *Id.* at ¶¶97-98, 294, 296. Jerome was left in the mace-filled room for approximately 25 minutes. *Id.* at ¶73. During that time, Jerome banged on the door begging for help, shouting that he could not breathe. He had so much difficulty getting air that he lay on the floor to try to get fresh air from the crack between the door and the ground. *Id.* at ¶74. Staff finally removed Jerome from the cell and took him to medical because he was having problems breathing. *Id.* at ¶75. Jerome's eyes, face, and chest were burning from the mace, and he couldn't see. *Id.* at ¶76. Because the water was shut off in his cell, he could not flush his eyes. *Id.* at ¶77. He was not provided a shower until the following day. *Id.* at ¶78. Still, it took

4

about three days for the mace to stop burning. For weeks after the incident, Jerome would wake up in the middle of the night not able to fully breathe. Pls.' SOF at ¶79.

In fact, the water was shut off to Jerome's cell and entire unit for a couple of weeks following detainee protests. *Id.* at ¶¶81, 85-86. Water was not periodically turned on and detainees, including Jerome Jones, were forced to live without a working sink or water fountain. *Id.* at ¶¶85-86. This experience caused Jerome to reach his "breaking point." *Id.* at ¶83, 87.

### III. <u>Darnell Rusan</u>

Darnell Rusan was detained at CJC for over two years before he was acquitted of the charges that brought him there in the first place. He suffers from epilepsy, and must take medication to keep his seizures under control. *Id.* at ¶¶123-125. All told, he survived three instances of excessive force while detained at the jail.

### A. December 19, 2020 Attacks on Darnell Rusan

The first and second attacks occurred on December 19, 2020. Darnell was trying to call his sister in his housing unit when Lt. Turner instructed him to use a phone further away from her, telling him to "Get the fuck off that phone." *Id.* at ¶¶129-131. Darnell immediately complied and walked to a different phone. *Id.* at ¶132. Confused by Lt. Turner's hostility given their past positive interactions, Darnell pulled his mask down and asked Lt. Turner, "Don't you remember me?" Lt. Turner replied "I know who your short ass is" and then said "I'm going to lock your ass down." *Id.* at ¶133. Darnell walked to the second phone, called his sister and told her what had just occurred. She asked if she could file a complaint about Lt. Turner's behavior because she was trying to "trying to trigger [him] off." *Id.* at ¶¶134-140.

 Officer Lewis told him that he was being disrespectful and that he needed to "lock back down for the rest of the day." *Id.* at ¶141. At the time, Darnell was at least 10-15 feet away from both Officers and one hand by his side and the other hand on the phone. Darnell complied and began wrapping up

his conversation as Lt. Turner was telling him to lock down. Pls.' SOF at ¶144-145. But less than 30 seconds after the Officers began telling him to lock down, Lt Turner approached Darnell and sprayed him directly in the face with a large Sabre MK-9 cannister, without warning. *Id.* at ¶¶144-148. At the time he was sprayed Darnell was not under the influence of any drugs. *Id.* at ¶¶150-151.

After the incident with Lt. Turner and Officer Lewis, Darnell ran to the shower to wash the OC off because the chemicals were making his body burn. *Id.* at ¶152. COs Alexander and Borders approached Darnell outside the showers and handcuffed him without incident. They led him to the elevators where CO Alexander slammed Darnell's head into the wall, leaving blood on the wall, and threatened: "We'll kill your little ass in here." *Id.* at ¶¶153-155. Then CO Borders shoved Darnell backwards saying, "What are you going to do about it?" Darnell did not attempt to struggle with either officer. *Id.* at ¶¶156-157. Once they got to medical, COs placed Darnell in a "tank," or secure cell. CO Alexander and Borders both wrapped their hands around Darnell's neck as CO Alexander said "We'll fuck you up in here." Darnell did not resist. *Id.* at ¶¶157-158. COs Alexander and Border then brought Darnell to a visitor's booth on the fifth floor, where they choked him again and maced Darnell two more times while he was in the booth. *Id.* at ¶¶159-165. Darnell was left in there for hours; his skin burning from the OC and throwing up blood. *Id.* at ¶¶166-167. He never received medical attention after being locked and sprayed in the visitor's booth. *Id.* at ¶167. Darnell experienced a burning sensation for a week and a half after the December 19 incidents. *Id.* at ¶¶168-169.

**B. February 3, 2021 Attack on Darnell Rusan**

On February 3, 2021 CJC staff were conducting nude body cavity searches of detainees inside visiting rooms. *Id.* at ¶184. The searches made Darnell uncomfortable, so he laughed and asked CO Gates, "do you actually like this job?" after which, in retaliation, CO Gates told Darnell to "bend over and spread it again." *Id.* at ¶185. After that, Officer Norman stated, ""He doesn't have anything. Give him back his clothes…Let him go back to his cell. *Id.* at ¶186. Instead, Officer Gates

called Lt. Fowlkes over and stated that Darnell was refusing to be searched. Darnell explained to Fowlkes that he "just did everything they told [him] to do" and that the officers' conduct made him uncomfortable. Pls.' SOF at ¶187. Lt. Fowlkes then sprayed Darnell with a Sabre MK-9 spray cannister and shut the door, leaving Darnell in the visiting booth with a cloud of mace. *Id.* at ¶¶189-192. Darnell was left there, nude, for approximately three to four hours, his body covered in mace. He did not receive subsequent medical attention. *Id.* at ¶¶193-196. Darnell had a seizure the night after this attack, a seizure he believes was triggered by the OC spray attack. *Id.* at ¶198.

Following that attack, Darnell's water to his cell was shut off. The water remained off for a whole day, which prevented Darnell from taking his seizure medicine. *Id.* at ¶¶204-209. While detained at CJC, Darnell's water would be shut off for a couple days at a time. *Id.* at ¶205. As Darnell describes: "when they mace, they cut water off." *Id.* at ¶206.

## IV. Derrick Jones

Derrick Jones, who is diagnosed with schizophrenia and bipolar disorder, was subject to excessive force on at least four different instances. *Id.* at ¶¶90, 121. In December 2020, Derrick was housed in unit 4C, the epicenter of the COVID-19 outbreak at CJC. *Id.* at ¶91. On December 14, 2020, Derrick's cellmate was exhibiting signs of COVID-19 infection and his entire unit had either tested positive for COVID or demonstrated signs of infection. *Id.* at ¶93-94. Derrick was still mercifully uninfected and asked Lt. Richards if he could be moved to a different cell. Lt. Richards ultimately told Derrick that he had to stay in his cell with his infected cellmate. *Id.* at ¶¶94-96. Lt. Richards then left the wing momentarily, and returned with a Sabre Red MK-9 Spray, accompanied with other officers. *Id.* at ¶95. Derrick did not think Lt. Richards was planning on imminently deploying the OC. *Id.* at ¶99. He was wrong. Without warning, Lt. Richards sprayed Derrick in the face with the MK-9 while he was standing still with his arms crossed, surrounded by eight officers. *Id.* at ¶¶100-103. At the time he was not acting aggressively or threatening anyone's safety. *Id.*

Instinctually and to protect himself from the chemical agent, Derrick raised his hands up across his face. *Id.* at 104. Contrary to Defendants' assertion, Derrick Jones did not assault Lt. Richards. *Id.* Lt. Richards and the other COs proceeded to swiftly take Derrick to the ground, where they kicked him and punched him in head before putting him in handcuffs. Pls.' SOF at ¶¶106-108. After he was handcuffed, restrained on the ground, Lt. Fowlkes sprayed Derrick in the face with mace without warning and for no apparent reason. *Id.*

Derrick was then placed in a holding cell, still in handcuffs and behind closed doors. He was having difficulty breathing and his eyes and face were burning. *Id.* at ¶111. He pounded on the door, desperate and pleading for help. *Id.* Lt. Fowlkes responded, opened the door and sprayed Derrick for a third time without warning. *Id.* at ¶¶112-113. He then closed the door and said "let him marinate." *Id.* at ¶112. Following these brutal attacked, Derrick was not provided with clean clothes or a shower. *Id.* at ¶¶114-115. He was not allowed to properly decontaminate. In fact, he was not allowed to receive a shower until eight days after his attack. *Id.* at ¶116.

Like all Plaintiffs, Derrick survived several water shut-offs. While detained at the CJC jail, the water to his cell would be shut off "a lot of the time," and at times his water would be shut off for hours. *Id.* at ¶¶117-118. Lt. Fowlkes, who shut off water as punishment, shut off the water to Derrick's cell in February 2021 for eight hours. *Id.* at ¶¶118-119. In an IRR he wrote about the water shut offs, Derrick begged to be treated like a "human being." *Id.* at ¶120.

### V. Facts Supporting Plaintiffs' *Monell* Claims

Plaintiffs' experiences with chemical agents and water deprivation fit into startling, well-established, and entrenched unconstitutional patterns that have plagued the CJC jail for years.

### A. Evidence of a Widespread Pattern of Excessive Use of OC Spray Against CJC Detainees

Hundreds of records show that the City's use of force though OC spray is excessive and punitive. On more than 250 occasions, Defendants' own use of force reports state that CJC officers

8

sprayed detainees who engaged in passive resistance, *i.e.*, detainees who do not present a security concern. Pls.' SOF at ¶¶234-255. This unconstitutional practice violates the CJC's own policy that prohibits the use of spontaneous force in the absence of "active resistance above and beyond mere non-compliance with verbal command." *Id.* at ¶233.

Officers often punished detainees for disobeying a command by spraying them when the detainee could not possibly pose a threat. For example, on January 1, 2019, surveillance video shows that five officers opened a cell door, sprayed OC, then closed the door and left. *Id.* at ¶240. The detainee can be heard to say**, "why are you spraying me, I'm on my knees."** *Id.* Officers also sprayed detainees who were already incapacitated by other means and who thus could not pose an active security threat. *Id.* at ¶248, 261-263. An officer placed a detainee in a chokehold after they refused to lockdown. *Id.* at ¶235. **While the detainee was in a chokehold, another officer sprayed him without warning.** *Id.* **Another detainee was maced while already in a restraint chair.** *Id.* at ¶¶311, 314.

Staff regularly maced detainees who, without engaging in any aggressive conduct, temporarily declined to follow instructions or asked questions. Officers sprayed a seated detainee who refused to return to their housing unit. *Id.* at ¶243. A detainee who did not relinquish a blanket was sprayed in their cell. *Id.* at ¶246. **An officer maced a detainee in the face who, lying motionless on the floor, did not obey orders to exit the shower**. *Id.* at ¶247. Another detainee was brought to a visitor's booth and sprayed after they refused to enter a cell because the floor was covered in urine. *Id.* at ¶237.

As a demonstration of how CJC custom enables officers to use OC spray in lieu of any other actions, in more than 40 instances, officers sprayed detainees who, having been placed on suicide watch, demurred or objected when told to remove all of their clothes. *Id.* at ¶255-260. In these circumstances, the officers turn to chemical agents to deal with vulnerable individuals in the throes of a mental health crisis without attempting any other options, such as involving mental health

9

professionals. Pls.' SOF at ¶¶247, 289, 354. Video evidence depicts the use of OC spray on detainees who are clearly in the throughs of a mental health crisis. *Id.* at ¶247. Indeed, during an investigation into conditions at CJC, staff admitted they and the jail are wholly unequipped to handle mental health issues. Pls.' SOF at ¶353.

Officers frequently sprayed detainees who were restrained and present no danger to themselves, fellow detainees, or staff. *Id.* at ¶263. For instance, officers directly spray individuals who are completely restrained by handcuffs, restraint chairs, or other officers. *Id.* at ¶¶263-267. Surveillance video from 8/20/2019 portrays an officer spraying a handcuffed detainee twice in the face. *Id.* at ¶¶264, 266. One detainee was maced while cuffed and in a cell. *Id.* at ¶265. Despite being handcuffed and secured by multiple officers, another detainee was maced in the face for cussing and yelling. *Id.* at ¶264.

This type of conduct becomes especially egregious when officers spray detainees as they are trapped in their cells. *Id.* at ¶¶268-284. This means that staff are not only deploying OC spray on detainees who are secure in a cell and pose no threat; they also utilize the space's confined nature to amplify the mace's impact. In one incident an officer opened the locked cell door, sprayed OC into the cell, then closed the door to, in his words, **"let the OC take effect."** *Id.* at ¶274. Video recordings from three dates demonstrate the routine nature of this egregious conduct. On March 28, 2021, officers sprayed a riot-sized cannister of OC through the chuckhole of a closed cell then walked away without removing the detainee. *Id.* at ¶277(a). Video from February 14, 2022, shows officers deploy OC through the side of cell door, open to the door to spray more, then close the door and leave the detainee inside for nearly ten minutes. *Id.* at ¶277(b). In footage from February 21, 2022, officers can be seen spraying into an occupied cell through the chuckhole, then leaving the detainee inside for at least twenty minutes. *Id.* at ¶277(c). Officers also shut detainees in visitor booths for the express purpose of macing them and leaving them in a closed room with the lingering spray. *Id.* at ¶279.

In addressing problems involving detainees, moreover, staff deploy OC as a first resort even when less invasive solutions are potentially available, a practice that violates CJC's own policy. Pls.' SOF at ¶¶285-292. For instance, on August 7, 2019, a detainee yelled insults at staff and kicked the door of their cell because they believed that officers had failed to bring them to their court date. Rather than relaying information to the detainee, the officers sprayed multiple times into the locked cell "to control the situation." *Id.* at ¶286. On another occasion, a detainee refused to transfer to a new cell until he was told the identity of his cellmate. Officers did not share this information with the detainee; instead, they elected to secure his compliance by exposing him to OC. *Id.* at ¶287. A 2021 investigation found that officers at CJC needed training on both use of force and de-escalation tactics. *Id.* at ¶351.

When they use OC, officers routinely sprayed excessive amounts of it. Staff subjected individual detainees to mace from the "riot-sized" Sabre Red MK-9 can—a device designed for crowds only—on at least 70 documented occasions. *Id.* at ¶¶293-297. For instance, on March 23, 2021, an officer sprayed into a closed cell with the "riot-sized" can after a detainee simply asked, "what was going on?" *Id.* at ¶297(a). This brutal act made the two detainees in the cell "fight[] for breath." *Id.* Officers also sprayed excessively with the Sabre MK Cross fire, a smaller can, far surpassing the best practice of 1-2 bursts for one second each. *Id.* at ¶¶298-301 For example, on December 6, 2020, an officer sprayed a detainee, handcuffed in a visitor's cage, repeatedly until they blacked out. *Id.* at ¶301(a). When staff expose detainees to such needlessly great volumes of mace, the risk of serious injury increases. *Id.* at ¶¶293-295. Indeed, a 2021 investigation conducted into the cause of the uprisings at CJC concluded that "the overuse of pepper spray, and the general disrespect COs exhibit toward detainees, were significant causes for the uprisings that occurred in February and April 2021." *Id.* at ¶¶343-345. A female detainee told investigators that staff deploy so much mace, they can smell it coming through the vents from the men's side of the jail. *Id.* at ¶353.

Officers engage in these customs repeatedly and with the full acquiescence of their colleagues, and supervisors. For example, Defendant Lieutenant Fowlkes, repeatedly engaged in the unconstitutional conduct described above; indeed, he was notorious in CJC for his punitive, unnecessary use of mace. Pls.' SOF at ¶¶70-72, 108, 112-114, 188-190, 221, 228(d), 240, 253-254, 311, 314. Fowlkes summarized his perspective as a CO when he told a detainee, "you not human when you in jail." *Id.* at ¶314(h). In video surveillance footage, Fowlkes sprays into a cell as punishment for someone objecting to move cells, and refuses to release them even after the detainee begs and says they will agree to move cells. *Id.* at ¶240. For years, detainees complained of Fowlkes' unlawful actions. *Id.* at ¶314. On December 16, 2020, for example, one detainee submitted a grievance stating: "Lt. Fowlkes assaulted an inmate by means of spraying him in the face with a large mace can while the inmate was in wrist restraints and laying on the ground from being sprayed the first time." *Id.* at ¶314(g). In the same 2021 investigation referenced above, Superintendent Hayes admitted there was a "lack of accountability" at the jail with respect to the use of pepper spray. *Id.* at ¶356. In that same investigation, Cpt. Baker told investigators that some officers lie in use of force reports – a claim corroborated with other discrepancies noted in the City's reporting. *Id.* at ¶¶346-352.

Plaintiffs' evidence shows that as Commissioner of Corrections, Jennifer Clemons-Abdullah and Dale Glass had notice of these egregious patterns of abuse, and did nothing to remedy it. *Id.* at ¶315-322. In fact, they punished officers who dared to speak out about it. *Id.* at ¶¶53-57. After hearing evidence of this abuse at the CJC jail during its review of the United States, the United Nations' Committee on the Elimination of Racial Discrimination condemned the misuse of chemical agents, like OC spray, in U.S. jails and prisons, stating: "[The Committee] remains concerned that persons belonging to racial and ethnic minorities are overrepresented in the criminal justice system…and subjected to the use of chemical agents as pepper spray." They recommended

the United States impose "strict restrictions…on the use of chemical agents as pepper spray" to ensure compliance with international law. *Id.* at ¶323.

**B.   Pattern of Abusive and Inhumane Water Shut-Offs at the CJC Jail**

Plaintiffs' evidence also shows a widespread and longstanding interrelated practice of depriving detainees of water for long periods of time and for punishment. Pls.' SOF at ¶¶324-334. Water is a minimal life necessity, the intentional deprivation of which amounts to physical harm and psychological torture. Just as Plaintiffs, other detainees describe being deprived of water for days and weeks at a time. *Id.* Still others describe officers shutting off water to their cells as punishment, unrelated to any reasonable penological purpose. *Id.* at ¶335. Through their own initiative, and because Defendant City does not monitor water shut-offs, Plaintiffs have collected dozens of declarations from CJC detainees complaining of punitive water shut offs. *Id.* at ¶¶325, 327, 335. In addition, the record contains numerous detainee grievances documenting complaint of water shut-offs, including one documenting that he and 12 other detainees had been deprived of water for seven days. *Id.* at ¶¶325-326. In particular, Defendant Fowlkes is well-known, among detainees and officers alike, as someone who relishes shutting off access to water for no reason other than to harm detainees. *Id.* at ¶¶334-335.

Defendant City has no policies, no guidance and no training on water shut offs. *Id.* at ¶¶337-340. It has no method of tracking how long water is shut off, once it is. *Id.* It has no method of identifying which officers so shut off water to detainees' cells. *Id.* So unlike the use of chemical agents, the City does not record any instance of water-shutoffs – regardless of the purpose of length. It has knowingly created a system in which water can be shut off for any reason, for any period of time, without accountability. *Id.*

## ARGUMENT

### I. Defendants Are Not Entitled to Qualified Immunity or Summary Judgment on Plaintiffs' Excessive Force Claims

Defendants' arguments that their uses of force on Plaintiffs were reasonable are based entirely on their version of the facts, which is almost entirely disputed by Plaintiffs and at times contradicted by indisputable video evidence and Defendant officers' own testimony. Considering the facts and inferences in the light most favorable to Plaintiffs, summary judgment is inappropriate.

### A. Applicable Excessive Force Legal Standard and Qualified Immunity

1. The correct legal standard governing Plaintiffs' claims is objective reasonableness.

As a threshold issue, Defendants set forth the wrong legal standard for examining use of force in the jail context. While Defendants ostensibly appear to acknowledge the applicable **objective** legal standard for an excessive force claim articulated in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), they rely on cases examined under the **subjective** Eighth Amendment standard, namely *Soto v. Dickey*, 744 F.2d 1260 (7th Cir. 1984), and *Burns v. Eaton*, 752 F.3d 1136 (8th Cir. 2014). They cite to *Soto* and *Dickey* with respect to Derrick and Jerome Jones' excessive force claims (and refer to no caselaw in particular with respect to Marrell Withers and Darnell Rusan's excessive force claims). Defendants go as far as to assert :"While the *Soto* court was evaluating that case in the context of the Eighth Amendment the analysis is similar to the Fourteenth Amendment claims of Jones and the conclusion must be the same." Doc. 319 at 11 (citing *Haggins v. Sherburne County,* 2012 WL 4372562 (D.C.[sic] Minn. April 17, 2012)).

Defendants are wrong and the distinction is critical. The appropriate standard for a pretrial detainee's excessive force claim is solely an **objective** one. The Supreme Court recognized in *Kingsley* that pretrial detainees stand in a different position from convicted prisoners, are still entitled to the constitutional presumption of innocence, and so are protected from certain abusive conditions. It held, therefore, that pretrial detainees bringing an excessive force claim need not prove that the

defendant was **subjectively** aware that the amount of force being used was unreasonable, i.e., a purpose-to-cause-harm. Rather, detainees need only show that the defendant's conduct was **objectively** unreasonable. *Kingsley*, 576 U.S. at 396-400; *see also Ryan v. Armstrong*, 850 F.3d 419, 427 (8th Cir. 2017). Moreover, Courts must assess the actions of each officer "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Ryan v. Armstrong*, 850 F.3d at 427. When examining Plaintiffs' individual use of force claims, this Court should decline Defendants' invitation to add higher standards of proof rejected by the Supreme Court and the Eighth Circuit, and instead employ the accepted objective standard set forth in *Kingsley*.

> 2. <u>Defendants waive any arguments with respect to whether Plaintiffs' rights were "clearly established" for the purposes of qualified immunity.[3]</u>

In arguing to dismiss all Plaintiffs' claims, Defendants recite the term "qualified immunity" but do not address at all whether Plaintiffs' rights were clearly established or cite any case law on the issue. Instead Defendants focus on the constitutionality of Defendants' actions. Qualified immunity analysis, of course, entails two prongs: (1) whether the facts alleged, viewed in the light most favorable to the plaintiff, show that the defendant violated a constitutional or statutory right, and (2) whether the right at issue was clearly established at the time of the offending conduct. *Bonenberger v. St. Louis Metro. Police Dep't*, 956 F. Supp. 2d 1059 (E.D. Mo. 2013) (citing *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir.2009)). Defendants failed to address, and therefore waive any argument, that Plaintiffs' rights were not clearly established.[4] Plaintiffs address the first prong, the constitutionality of Defendants' misconduct, below.

---

[3] If this Court is inclined to consider whether Plaintiffs' rights were clearly established at the time of offending conduct sua sponte, Plaintiffs would respectfully request supplemental briefing on the issue.
[4] Even if Defendants had addressed qualified immunity, this Court has already determined that Plaintiffs' rights were clearly established. Docs. 52 and 264. In this Court's order denying Defendants' last Motion to Dismiss, this Court rightly cited a plethora of cases, including *Johnson v. Carroll*, 658 F.3d 819 (8th Cir. 2011),

**B. Defendants' Motion for Summary Judgment on Jerome Jones's Excessive Force Claims Should Be Denied**

Defendants cite only one general fact tangentially related to Jerome in their entire memorandum in support of their motion. Doc. 319 at 10 (citing a news article that there had previously been unrest at CJC). Absent any record evidence to support their factual assertions, Defendants factual assertions concerning Jerome Jones must be discounted. *See* FED. R. CIV. P. 56(c)(1) (factual assertions in summary judgment briefing must be supported by citations to record evidence); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (holding that the moving party must demonstrate the absence of a genuine issue of material fact). Moreover, Defendants make legal arguments already addressed and rejected by this Court. Defendants' motion fails to provide a path by which this Court could reasonably grant summary judgment in their favor.

1. <u>Defendants Fail to Address All of Jerome Jones' Claims of Abuse</u>

At the outset, Defendants do not assert any defense, for the prolonged period (25 minutes) that Lt. Fowlkes left Jerome, locked in a spray filled room, soaked in OC spray, and without means or opportunity to wash the burning spray from his eyes or body, following Defendant Fowlkes initial OC spray attack on him. Nor do they assert any defense for the full day Jerome sat in a cell, soaked in OC spray, without the ability to wash or clean the burning OC spray from his clothes, eyes, or body. Because Defendants assert no defense for that piece of Jerome's claim, that claim must proceed to trial.

---

*Treats v. Morgan*, 308 F.3d 868 (8th Cir. 2002), *Bauer v. Norris*, 713 F.2d 408 (8th Cir. 1983), and *Krout v. Goemmer*, 83 F.3d 557 (8th Cir. 2009), noting that, "[t]aken together these cases show that Plaintiffs' right to be free from excessive force in the alleged circumstances was clearly established." Dkt. 52 at 10.

2. <u>Lt. Fowlkes's excessive use of OC spray against Jerome Jones is not shielded by qualified immunity.</u>

As to the initial spraying of Jerome by Lt. Fowlkes, Defendants make a number of unsupported factual assertions allegedly in support of their argument. These assertions must be disregarded as they are made without citation to the record or their statement of facts. They are:

- Assertion that quarantine lockdown led to "attendant staffing and housing complications." Doc. 319 at 10 (citing nothing).

- Assertion that Jerome Jones refused to comply with staff directives concerning COVID-19. Doc. 319 at 10 (citing nothing).

- Assertion and legal conclusion that Jerome Jones threated the safety of staff and detainees and the security of the CJC. Doc. 319 at 10 (citing nothing).

- Assertion that visiting booths at CJC are "sometimes used as temporary holding facilities." Doc. 319 at 9 (citing nothing).

- Assertion that Lt. Fowlkes "applied one short burst of pepper spray to Jones…" Doc. 319 at 10 (citing nothing).

Because none of the listed factual assertions have any citation to the record, they must be disregarded in evaluating Defendants' motion for summary judgment.[5] Turning to Defendants' legal arguments. Defendants argue that using an excessive[6] amount of OC spray against a hand-cuffed, passive, pre-trial detainee is not unconstitutional. In doing so Defendants 1) rely on arguments already rejected multiple times by this Court; 2) rely on inapposite and non-binding precedent for their legal conclusions; and 3) misunderstand the state of the law concerning use of OC spray against hand-cuffed, passive, pre-trial detainees.

This Court has already considered and rejected the exact same legal arguments advanced by Defendants here. *See* Docs. 24 (denying Defs' First Mot. to Dismiss in relevant part concerning

---

[5] Further, these assertions are directly contradicted in Plaintiffs' statement of material facts. *See* Pls.' SOF at ¶¶67-71 (Jerome Jones did not know why defendants were asking him to move,  including whether it was related to COVID-19 protocols, and he was not acting aggressively or threatening safety and security), 70-73 (Fowlkes sprayed Jerome with a  "riot can" of mace, filling the room in which Jerome was restrained).

[6] Defendants assert that it was a one-time short burst, not an excessive amount. But as identified earlier, they cite nothing in support of this conclusion and this is contradicted by Plaintiff Jerome Jones.

qualified immunity); Doc. 136 (denying Defs' Second Mot. to Dismiss); Doc. 264 (denying Defs'

Third Mot. to Dismiss). As explained above, Defendants offer no new facts in support of this same

argument. As such, the conclusion now should be the same: Defendants' motion denied. *See*

*UniGroup, Inc. v. Winokur*, 45 F.3d 1208, 1211 (8th Cir. 1995) ("when a court decides a rule of law,

that decision should govern the same issues in subsequent stages in the same case").

Even if this Court had not already rejected Defendants' legal arguments, their brief primarily

relies on irrelevant precedent that should not sway this Court. Defendants first rely on *Soto v. Dickey*,

744 F. 2d 1260 (7th Cir. 1984). In *Soto*, convicted prisoners in a maximum-security prison brought a

class action concerning the use of mace against them. *Id. Soto* is not binding on this Court. But more

importantly, *Soto* is an Eighth Amendment prison case that does not inform the analysis appropriate

for the Fourteenth Amendment claims at issue here. Even if *Soto* were on point, Jerome's claim

would succeed under its standard. In *Soto*, the Seventh Circuit clarified when an officer's use of

chemical agents is unconstitutional in the prison setting:

> …the appropriateness of the use [of chemical agents] must be
> determined by the facts and circumstances of the case. We have held,
> and now restate that it is a violation of the Eighth Amendment for
> prison officials to use mace or other chemical agents in quantities
> greater than necessary or for the sole purpose of punishment or the
> infliction of pain.

*Id.* at 1270. Following the Seventh Circuit's context specific test for use of chemical agents requires

looking at the facts and allegations in this case.

Looking at the instant case, Plaintiffs allege exactly what the Seventh Circuit deemed to be

unlawful: 1) the use of excessive chemical agents; and 2) the use of chemical agents for the sole

purpose of punishment. Defendants have set forth no facts undermining Jerome's allegations.

Defendants cite *Soto* as saying: "The use of mace, tear gas or other chemical agent of the like nature

when reasonably necessary to prevent riots or escape or to subdue recalcitrant prisoners does not

constitute cruel and inhuman punishment." *Id.* But this only serves to support Plaintiffs' argument.

There is not a single fact in the record even gesturing at the idea that Jerome was attempting to riot or escape, or needed to be subdued. In this case Jerome was a passive, handcuffed, pre-trial detainee who was excessively maced and locked in a mace filled room for twenty-five minutes. That is a far cry from what *Soto* or any relevant court has condoned.

Defendants also cite to *Burns v. Eaton*, 752 F.3d 1136 (8th Cir. 2014), another Eighth Amendment case out of a maximum-security facility, in support of their argument that, as explained above, relies on a subjective standard. As such, *Burns* is of little assistance to Defendants. This is all the truer when examining other differences between *Burns* and Jerome's allegations here. In *Burns* the plaintiff was not handcuffed and was not passive. In fact, he threw an object at the officer who was attempting to handcuff him. Jerome, on the other hand, was handcuffed, in a locked visiting booth, and had at no time taken any step towards any form of assault on an officer. In relation to Jerome, Defendants cite *Burns* as supporting their conclusion that "Lt. Fowlkes was justified in using a single short burst of pepper spray." But this is not what *Burns* stands for (particularly not in the Fourteenth Amendment context) and, as identified above, the number and amount of spray used by Lt. Fowlkes is a disputed fact and cannot be relied on in support of Defendants' arguments.

At no point do Defendants attempt to satisfy the applicable Fourteenth Amendment standard under *Kingsley v. Hendrickson*, 576 U.S. 389, which requires consideration of multiple factors in determining whether a use of force was reasonable, to wit:

> the relationship between the need for the use of force and the amount of force used; …any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue…and whether the plaintiff was actively resisting.

576 U.S. at 397. Were Defendants to conduct this analysis, it would undermine their motion.

Further, there are numerous cases that mirror Jerome's claims and cut in favor of allowing his claims to proceed to trial. This case is much more akin to a long series of on point cases from the Eighth Circuit. *See, e.g.*, *Lawrence v. Bowersox*, 297 F.3d 727, 730 (8th Cir. 2002) (reversing district

court's grant of summary judgment where plaintiffs allege that, following a prison riot, officers excessively sprayed prisoners in confined cells); *Treats v. Morgan*, 308 F.3d 868 (8th Cir. 2002) (affirming district court's denial of summary judgment and qualified immunity in a case where plaintiff alleged that he was pepper sprayed and thrown to floor by officer); *Foulk v. Charrier*, 262 F.3d 687, 702 (8th Cir. 2001) (holding a reasonable jury could find an officer engaged in a malicious and sadistic use of force when he enticed an incarcerated person to a screened window and sprayed pepper spray into the plaintiff's face). For these reasons, Defendants' motion for summary judgment on Jerome Jones's claims should be denied.

## C. Defendants' Motion for Summary Judgment on Marrell Withers' Excessive Force Claim Should Be Denied

Defendants' arguments to dismiss Marrell Withers' excessive force claims are based solely an unduly narrow, one-sided characterization of surveillance video of the incident, even ignoring the sworn testimony of Defendants Wills and Jones. Defendants entirely ignore the fact that Officer Jones testified that Marrell was not a threat to any person or property and that Captain Wills testified that Marrell did not threaten or assault anyone prior to being sprayed. Pls.' SOF at ¶¶32, 42-44. They also ignore the fact that the Officer Jones testified there was no urgent matter occurring at the time Marrell was sprayed. *Id.* at ¶¶26-27, 43. Indeed, at the time he was first sprayed, Marrell had been sitting, restrained in handcuffs, for a full minute. *Id.* at ¶¶32-37. Moreover, Defendants omit the fact that Marrell was terrified, believing he was negative for Covid-19, and was desperate to avoid exposure to the deadly virus in the isolation unit. *Id.* at ¶¶8-19.

The expression of a detainee's sincere concern for their safety should be afforded significant weight, even if that anxiety is ultimately misplaced. *See, e.g.*, *Alberts vs. Wills*, No. 3:20-CV-3008, 2020 WL 7427215 (W.D. Ark. Dec. 18, 2020) (denying motion for summary judgment where detainees were pepper-sprayed for causing a disturbance because they mistakenly "believed there was a fire in the facility and that their jailers were doing nothing to help them."). Marrell repeatedly asked CJC

staff to inquire into his COVID status. Defendants ignored these requests. Pls.' SOF at ¶¶9, 14, 16-18, 33. Marrell proceeded to request mental health support services, a sign that he recognized his own increasing anxiety. *Id.* at ¶14. But Defendants made no efforts to diffuse a tense situation before using force. *Id.* at ¶¶ 18, 33, 35, 37.

Defendants also rely on Marrell's statement: "I'll break your computer," in defense of their use of force. However, they elide the fact that Defendant Jones testified that Marrell did not present any threat to property and took no steps evincing a genuine intent to harm anything. Pls.' SOF at ¶¶42-44. Nor could he—at the time he was first sprayed, Marrell had been sitting, restrained in handcuffs, for a full minute. *Id.* at ¶¶22-23, 36. The second time Office Jones sprayed Marrell, Marrell turned away from officers in a manner that would be impossible to construe as combative. *Id.* at ¶38. Just as the first spray, Withers was restrained and presented no immediate "security problem" no did any demand the Officers attention at the time. *Id.* at ¶¶41-44.

Finally, in their narrative of the video, Defendants fail to mention that Withers informed Wills and Jones that he had asthma prior to each deployment of OC spray, a quintessential condition adversely effected by OC spray. *Id.* at ¶¶29-30, 39. Given this context, Jones and Wills' conduct cannot be deemed "objectively reasonable" when it is well-settled that "use of pepper spray will not be justified every time an inmate questions orders or seeks redress for an officer's actions." *Treats v. Morgan*, 308 F.3d at 873. Here, there simply was no "need for the use of force," hence **any** "amount of force" was disproportionate and excessive. For both sprays, the officers took no steps "to temper or to limit the amount of force" in any way, a factor that must be considered when evaluating whether force is excessive. *Kingsley*, 576 U.S. at 397. After the use of OC, the officers bypassed steps that could have tempered its impact, neither allowing Marrell to shower nor providing him with a fresh change of clothes. Pls.' SOF at ¶¶45-50.

Defendant Wills conceded that he and Officer Jones violated CJC's own policies, when he testified that Marrell was at worst "passively resistant." *Id.* at ¶44. While not dispositive on the constitutional question, the Eighth Circuit has explained that "[p]rison regulations governing the conduct of correctional officers are also relevant in determining whether an inmate's right was clearly established." See *Treats*, 308 F.3d at 875. CJC policy prohibits spraying a detainee who is passively resistant. Pls.' SOF ¶ 58; Defendants further flouted their own policies when they did not permit Marrell to shower or change his clothing after the incident. *Id.* at ¶59. Even Major Tonya Harry, Jones and Wills' supervisor, concluded that the utilization of OC spray was improper. *Id.* at ¶¶52-54. In view of the foregoing, this Court should deny Defendants' motion.

### D. Defendants' Motion for Summary Judgment on Darnell Rusan's Excessive Force Claims Should Be Denied

Darnell Rusan alleges three separate uses of excessive force against him, two on the same day. This Court should deny Defendants' motion on all three. At the time Darnell suffered from, and continues to suffer from, bipolar disorder, major depressive disorder and epilepsy-related seizures.

#### 1. Defendant Turner sprayed Darnell excessively, without warning or justification.

In their arguments related to Defendant Turner's use of force on Darnell, Defendants advance only the perspective of Lt. Turner—facts that are disputed by the testimony of Darnell himself and the video footage. Disputed factual issues should not be resolved at the summary judgment stage. *Wealot v. Brooks*, 865 F.3d 1119, 1128 (8th Cir. 2017). Here Plaintiffs' evidence establishes that Lt. Turner used OC spray on Darnell for what, at worst, could be perceived verbal resistance or annoyance. Correctional officers "do not have a blank check to use force whenever a prisoner is being difficult" and the "use of pepper spray will not be justified every time an inmate questions orders or seeks redress for an officer's actions." *Treats*, 308 F.3d at 875. Such was the case here.

On December 19, 2020, Darnell complied with multiple orders from Defendant Turner and Officer Lewis. Pls.' SOF at ¶¶129-138. Perhaps because Darnell was asking his sister to file a complaint

against Defendant Turner, Officer Lewis yelled he needed to "lock back down for the rest of the day." *Id.* at ¶141. The video demonstrates that Officers Lewis and Turner yelled at Darnell to "step-in" for about 20-25 seconds before Lt. Turner walked up to Darnell and sprayed him, without warning, directly in the face with a "big" or "riot sized" canister of OC spray, giving him almost no time to comply. Pls.' SOF at ¶¶142-148. At the time Lt. Turner first sprayed Darnell, he was standing facing the phone booth, with one hand by his side and one hand on the phone. *Id.* at ¶144.

Defendant Turner's needless and sudden spray of Mr. Rusan was objectively unreasonable under *Kingsley*, which requires consideration of any effort made by the officer to temper the amount of force; the severity of the security problem at issue, and whether the plaintiff was actively resisting. *Kingsley*, 576 U.S. at 397. There was no demonstrated need for the use of force given that Darnell had just complied with two different orders. Defendant Turner made no efforts to temper the amount of force as she deployed OC spray almost immediately after a directive to lock down was given. There was certainly no need for the amount of spray used—it is uncontested that Defendant Turner deployed a "riot sized canister" directly at an individual from a close distance. At most, Darnell verbally questioned orders and objected to the tone and treatment from correctional officers.

From the beginning of Defendants' depiction of the incident, Defendants present disputes as uncontroverted facts. First, Defendants allege that Lt. Turner "believed that Rusan was trying to distract her and Officer Lewis from the smoke," and that "Lt. Turner also believed Rusan to be under the influence of whatever drug had generated the smoke in the housing unit. SOF #22." Doc. 319 at 11-12. This allegation lacks credibility given that Defendant Turner's narrative in the Use of Force report, generated immediately after the incident, contains no mention of any possible drug use. It was only at her June 29, 2022 deposition that she broached that possibility. Pls.' SOF at ¶¶151, 177-178. Moreover, Darnell disputes being under the influence of illegal drugs. *Id.* at ¶¶151.

Second, Defendants argue that Darnell was threatening Lt. Turner with physical violence and that he was "going 'call his people.'" Doc. 319 at 12. But Darnell insists he was speaking with his sister and asked her to come down and file a complaint. *Id.* at ¶135. Finally, Defendants spend a great deal of time discussing Darnell's actions subsequent to Defendant Turner attack. Doc. 319 at 12-13. But those subsequent actions do not explain or justify the initial force, especially where, as here, Darnell had never been sprayed with OC before and suffered from a seizure and bipolar conditions. Under the facts seen in the light most favorable to Darnell, Defendant Turner's use of force was needless, punitive, and excessive. Defendant Turner is not entitled to summary judgment.

2.  <u>Defendants Border and Alexander assaulted Darnell, and exposed him to excessive amounts of OC Spray.</u>

Darnell Rusan also raises a claim of excessive force by Defendants Border and Alexander. After the incident with Defendant Turner, Defendants Border and Alexander handcuffed Darnell, took him into an elevator, and slammed his head against the wall. Pls.' SOF at ¶¶153-155. Defendants Border and Alexander choked Darnell, leaving bruising on his neck, put him in a visiting booth, maced him two more times, and left him there. *Id.* at ¶¶163-166. Throughout this they threatened him, telling him. "we'll kill your little ass in here." *Id.* at ¶¶158, 163. Darnell was handcuffed for large sections of this and was compliant and non-resistant in an attempt to avoid further abuse. It is beyond question that correctional officers cannot hit, choke, or pepper-spray a compliant detainee. *Thompson v. Zimmerman*, 350 F.3d 734, 735 (8th Cir.2003) (reversing summary judgment based on qualified immunity where guards beat prisoner who was not resisting or causing a disturbance); *Tatum v. Robinson*, 858 F.3d 544, 552 (8th Cir. 2017).

Defendants ostensibly acknowledge in the summary of the claims that Darnell raises claims of excessive force on **three** instances, including when "Defendants Alexander and [Borders][7] exercised

---

[7] Defendants misidentifies Defendant Borders as Defendant Fowlkes.

excessive force by allegedly slamming Rusan's head into a wall." Doc. 319 at 2. But they do not explain why Defendants Alexander or Borders are entitled to summary judgment nor provide any argument regarding that incident. Doc. 319. Defendants also do not provide any Facts which address the claims against Defendants Alexander and Border. Doc. 316. As such, Defendants have waived this argument and Mr. Rusan's claims against Defendants Alexander and Borders should be set for trial.

### 3. Defendant Fowlkes unnecessarily sprayed Darnell and left him to marinate in the chemical agents for hours.

Defendants argue that Lt. Fowlkes is entitled to "qualified immunity" because of Darnell's "refusal to cooperate" with a strip search. Here Defendants repeat the same error as with Defendant Turner in asking this Court to assume as true the contested perspective of the moving party. Of course, the standard of review requires the opposite approach be taken. *Simler*, 2018 WL 2223684 at *2.

Viewing the facts in the light most favorable to Darnell, there was no active resistance or failure to comply. Darnell complied fully with the strip search. Pls.' SOF at ¶¶184-186; Pls.' Resp. to Defs' SOF at ¶30. After Darnell balked at having to undergo a second strip search as punishment for a joke, the CO called Lt. Fowlkes, over another officer's objection. Pls.' SOF at ¶¶186-187. Darnell explained to Lt. Fowlkes that he "just did everything they told [him] to do," that the officer told him to "bend over and spread my ass again," and that he didn't want to because "I ain't with the – I ain't with the gay stuff, man." *Id.* at ¶188. Rather than listen to his explanation, Lt. Fowlkes told him, "Get with it," sprayed Darnell with an MK-9 OC spray, and shut the door, leaving him in the visiting booth. *Id.* at ¶¶189-193. CJC's own records confirm that Darnell was enclosed in the visiting booth after the MK-9 was deployed on him. *Id.* at ¶191. At no point does anyone allege that Darnell was physically or actively resisting or that he posed some kind of threat.

Locking a detainee in a room filled with clouds of OC spray after the detainee simply questions the need for an invasive and humiliating procedure is objectively unreasonable. *See Lawrence*, 297 F.3d at 730 (reversing summary judgment where plaintiffs allege that, following a prison riot, officers

excessively sprayed prisoners in confined cells); *Treats*, 308 F.3d at 875 ("force may be justified to make an inmate comply with a lawful prison regulation or order, but only if the inmate's noncompliance also poses a threat to other persons or to prison security."). Defendant Fowlkes did not attempt any de-escalation tactics before deploying chemical agents. The relationship between the need for the force (tenuous at best) and the amount of force used (hours spent in excessive clouds of chemical agents) demonstrates the force was objectively excessive.

Defendants argue that the Constitution permits the use of summary force to compel compliance with any direct order given in a jail setting, and that such authority is necessary to maintain control of the institution. Doc. 319 at 7, 12-13. That argument was rejected by the Eighth Circuit almost 20 years ago: although officers may compel compliance with legitimate regulations, "summary force has yet to be ratified as the de jure method of discipline where security concerns are not immediately implicated." *Hickey v. Reeder*, 12 F.3d 754, 759 (8th Cir. 1993). In sum: Darnell had complied with orders, was attempting to explain himself, and was being subjected to degrading treatment from the officer. The use of OC spray to punish him was excessive and Defendant Fowlkes is not entitled to summary judgment.

### E. Defendants' Motion for Summary Judgment on Derrick Jones' Excessive Force Claims Should Be Denied

Just as is the case with Darnell Rusan, many of the facts Defendants cite in support of their Motion as to Derrick Jones' excessive force claims amount to an inaccurate interpretation of video evidence. Courts may consider video evidence at the summary judgment stage, but may only rely on it if it actually and **indisputably** shows the facts. *White v. Jackson*, 865 F.3d 1064, 1077 (8th Cir. 2017). Any interpretation of evidence, including video evidence, remains a jury's job. *Kampouris v. St. Louis Symphony Soc.*, 210 F.3d 845, 847 (8th Cir. 2000). Where a video lacks certainty or clarity, summary judgment is inappropriate. *Michael v. Trevena*, 899 F.3d 528, 533-34 (8th Cir. 2018). Ambiguity in unclear

video can create a genuine issue of material fact when the video "demonstrably contradicts material representations" by the moving party. *Mann v. Yarnell,* 497 F.3d 822, 827 (8th Cir. 2007).

The video in question does show some of the incident clearly: it indisputably shows Defendant Richards deploy OC Spray against Derrick as he stands still, with his arms crossed, with several correctional officers standing nearby; and it shows guards take Derrick to the ground. But the video does not clearly show what happens once on the ground. Pls.' SOF at ¶107. Thus the video does not prove, as Defendants attempt to argue, that Derrick pulled Lt. Richards to the ground. Nor does the video support Defendants' claim that Derrick refused multiple directives to return to his cell, or that Lt. Richards verbally warned Derrick before deploying OC Spray. No warning is audible in the video, and as discussed below, Derrick maintains that no such warning was given. *Id.*

The Eighth Circuit has upheld claims of excessive force involving the use of chemical agents when, as here, there is "no warning this force would be used, no apparent purpose other than inflicting pain, use of unnecessary 'super-soaker' quantities of the chemical, refusal to allow the victim to wash off the painful chemical for days, and/or use of additional physical force." *Burns* 752 F.3d at 1140; *Treats*, 308 F.3d at 873; *Lawrence v. Bowersox*, 297 F.3d at 732. A factfinder could determine that all of these circumstances were present here with respect to each of the **four** times that Defendants sprayed Derrick with chemical agents. For these reasons, Defendants' Motion for Summary Judgment should be denied.

1. <u>It is undisputed that Richards and Fowlkes deployed OC Spray on Derrick Jones without any verbal warning.</u>

First, although Derrick Jones was aware that Lt. Richards was holding a large can of OC Spray, Richards did not give any verbal warning that she was going to deploy the OC Spray prior to doing so.[8] To the contrary, at the time Richards sprayed Derrick—from just a foot away—they were

---

[8] Further, Derrick testified that the mace cannister still appeared to have a pin in it, which suggested to him that she was not planning to deploy the spray. Pls.' SOF at ¶99.

discussing his request for a cell change when, "she got close and she just sprayed me right in my eyes." Pls.' Resp. to Defs' SOF at ¶5; Pls.' SOF at ¶102. Lt. Fowlkes admits that he did not warn Derrick before deploying OC Spray. Pls.' SOF at ¶113. At worst, the record establishes a question of material fact as to whether Derrick was given an adequate warning before OC Spray was deployed. At best, it affirmatively demonstrates he was not.

> 2.  Questions of material fact exist as to the quantity of OC Spray used by Lt. Richards and Lt. Fowlkes against Derrick Jones and whether Derrick was fully decontaminated after

Second, a question of fact exists as to whether Defendants used "super-soaker" quantities of the chemical against Derrick. The video shows Defendant Richards spraying Derrick for approximately two seconds. Pls.' SOF at ¶102. Crucially, Richard deploys the larger MK-9 Fogger reserved for use against crowds and "riots." *Id.* at ¶¶95-98. The quantity of OC spray Fowlkes used on Derrick is also a disputed fact. The video evidence does not clearly show Fowlkes' first use of chemical agents on Derrick in the housing unit and the City has not produced any video of Fowlkes' use of OC Spray on Derrick while he was held in medical. Fowlkes' testimony is directly contradicted by Derrick's sworn testimony that at least one of Fowlkes' sprays lasted for seven seconds. Pls.' Resp. to Defs' SOF at ¶¶17-18.

Third, a material question of fact exists as to whether Defendants properly decontaminated Derrick after he was repeatedly assaulted with chemical agents. Contrary to Defendants' assertion, the video evidence does not prove he was decontaminated—it cuts out as Derrick is dragged, handcuffed, from the housing unit. Derrick acknowledges he was taken to medical after this incident (where he was sprayed two more times), but he disputes that he was decontaminated. Fowlkes rushed the nurse through her medical examination of Derrick after the incident, Defendants did not provide him with clean clothes, and he did not receive a shower for eight days. Pls.' SOF at ¶¶114-116.

These circumstances are more severe than those in cases where the Eighth Circuit found jury issues as to whether the use of OC spray was reasonable and in good faith. *See, e.g., Walker v. Bowersox,*

526 F.3d 1186, 1188 (8th Cir. 2008) (finding jury issue as to excessive force claim where plaintiff was not allowed to shower or have clean clothes or bedding for three days, and was sprayed without warning for disrupting the unit routine); *Treats*, 308 F.3d at 872 (denying qualified immunity to prison guards who sprayed the plaintiff without warning, threw him to the floor, and handcuffed him for failing to obey an order); *Lawrence v. Bowersox*, 297 F.3d at 730 (affirming judgment on excessive force claim where guards pepper sprayed prisoners without warning for questioning an order). Likewise, here, Plaintiffs are entitled to have this claim considered by a jury.

3. Defendants' use of chemical agents was accompanied by additional physical force and other conduct demonstrating malicious intent.

Another fact demonstrating that Defendants' use of force was excessive is Defendants' use of physical force against Derrick Jones after and while he was maced. After Lt. Richards sprayed Derrick from one foot away, officers took Derrick to the floor. While he was on the floor, six officers kicked him, and he was sprayed with mace again. Pls.' SOF at ¶106. While Derrick could not see who was kicking him and spraying him, he testified:

> I remember getting kicked on the back of my head, getting kicked on my body and sprayed…with the Mace…I'm on the ground and I just feel me getting kicked in my head and getting sprayed by the Mace.

Pls.' SOF at ¶106. This physical assault, combined with multiple bursts of OC Spray deployed at close range, demonstrate that Defendants' use of force was not objectively reasonable. At the very least, it raises material questions of fact.

4. Material facts exist as to whether Derrick Jones posed a security risk justifying the use of OC Spray while he was in the housing unit.

Defendants argue that their use of force against Derrick Jones was reasonable because of the supposed threat he posed to the safety of officers and other people detained at CJC. But this is a disputed fact and the video evidence is not dispositive of this issue. At the time Lt. Richards deployed OC Spray against Derrick, he is standing still with his arms crossed. He is not actively resisting an

order. He is not inciting or threatening violence. Pls.' SOF at ¶¶100-101. In fact, according to Mr. Jones he is simply engaging in a conversation about a request to move cells so he doesn't have to bunk with a detainee who was presumably COVID positive. Even Lt. Richards agreed that this amounts to mere "verbal resistance." *Id.* Viewed in a light most favorable to the plaintiffs, the evidence does not show an objective need for the use of OC Spray because Derrick Jones was not jeopardizing any person's safety or threatening jail security.

*Burns v. Eaton*, does not warrant a different conclusion. 752 F.3d 1136 (8th Cir. 2014.) In *Burns*, the plaintiff did not simply refuse jail authorities' orders—he also threw a shampoo bottle at staff, and spit at them. 752 F.3d at 1138, 1140. Derrick Jones did no such thing. Thus, this case is more akin to *Treats v. Morgan*, where prison staff sprayed the plaintiff in the face "with a prolonged burst of capstun pepper spray," for failure to follow an order to retrieve a form. 308 F.3d 868, 870 (8th Cir. 2002). An officer then "slammed" the plaintiff to the floor, where he was handcuffed. *Treats*, 308 F.3d at 872. In affirming the district court's order denying qualified immunity, the Eighth Circuit noted the "use of force, and use of pepper spray will not be justified every time an inmate questions orders or seeks redress for an officer's actions."308 F.3d at 872-73 (internal citations omitted).

Similarly, here, Derrick Jones was simply questioning Lt. Richards' refusal to permit him to move cells to avoid exposure to the COVID-19 virus. He was not actively resisting or threatening anyone. The video shows eight guards around Derrick at the time OC was deployed. All other detainees are in their cells, which Lt. Richards admitted minimizes any threat to security and safety. While Defendants argue that Derrick posed a threat by crossing the red line into the "officer only" area, a review of the video evidence demonstrates that this cannot reasonably be considered to justify Defendants' use of force. Derrick crosses the red line only briefly, and two minutes before he is sprayed. These facts do not justify Defendants' use of OC Spray in the first instance.

OC was deployed a second time in the housing unit, this time by Lt. Fowlkes, while guards had Derrick Jones on the floor, placing handcuffs on him. Pls.' SOF at ¶¶106-108. Fowlkes' use of force against Derrick Jones in the housing unit was not justified. As an initial matter, there is a dispute as to whether Derrick actually assaulted Lt. Richards. Derrick denies ever hitting Lt. Richards. *Id.* at ¶104. He testified that he did not raise a closed fist to hit her; instead, he put his arms up across his face, instinctually, to block the OC Spray. *Id.* Fowlkes could not recall whether he actually witnessed Derick Jones allegedly strike Lt. Richards in the face and the video does not resolve this question. Pls.' SOF at ¶¶105-107. And contrary to Defendants' assertion, it is not possible tell from the video recording whether Derrick is resisting at all given the angle and number of officers involved. Taken as a whole, whether Derrick Jones was resisting officers in a way that posted a danger to safety or security and warranted the use of force is a question that should be presented to a factfinder.

5. <u>Derrick Jones posed no risk to safety or security while he was in the medical unit, and the record demonstrates Lt. Fowlkes' malicious intent in deploying OC Spray against Derrick in medical.</u>

The record also raises a question of material fact as to Fowlkes' motive behind spraying Derrick Jones twice in the medical unit: whether Fowlkes was acting maliciously for the purpose of inflicting pain. Here is Derrick Jones' sworn account of what happened to him after he was sprayed, restrained, and taken to the medical unit:

> I'm in the Medical room in cuffs and I was like yelling out the door like, I'm burning and I can't breathe, 'cause my lungs was closing up, … Lieutenant Fowlkes… opens the door. I turn my back to him and he sprayed me again for about seven seconds. … And I'm in there, I'm like screaming like, it's not right, I'm burning….and he **[Fowlkes] was just like, aw, he's okay. Let him marinate. Like, he all right. And they was laughing. They was laughing and making a joke out of it.**

Pls.' SOF at ¶112 (emphasis added). Fowlkes testified he sprayed Derrick because he was kicking the cell door, but there is no evidence that Derrick was even at risk of destroying property. Derrick testified he was kicking the door to get attention because he was in medical distress. Rather than

respond to that need, Fowlkes deployed multiple bursts of OC Spray into the secure, closed cell. This is against CJC policy. *Id.* at ¶261.

Even setting aside CJC policy, Derrick's kicking a door does not warrant Fowlkes' deployment, twice, of chemical agents into a secured and poorly-ventilated cell. *See Lawrence*, 297 F.3d at 730. And even though Plaintiffs do not have to prove Defendants' subjective motivations, this evidence is relevant because it undermines Fowlkes' purported penological justification for the use of force. *Compare Williams v. Jackson*, 600 F.3d 1007, 1014 (8th Cir. 2010) (finding that lack of penological purposes for use of force raises "the reasonable inference that the officers acted maliciously in an effort to cause harm."). From these facts, a jury could conclude that Lt. Fowlkes sprayed Derrick Jones and left him to "marinate" in the chemical-filled cell for the purpose of inflicting pain. Such actions are clearly prohibited by the constitution. As such, Defendants are not entitled to summary judgment for their excessive use of force against Derrick Jones.

## II.  Defendants Are Not Entitled to Summary Judgment on Plaintiffs' *Monell* Claims

Municipal liability is established by proving that a plaintiff's constitutional rights were violated pursuant to "misconduct so pervasive among non-policymaking employees of the municipality 'as to constitute a "custom or usage" with the force of law. *Ware v. Jackson Cnty., Mo.*, 150 F.3d 873, 880 (8th Cir. 1998). Here Plaintiffs set forth two claims of *Monell* liability: (1) that there was an unofficial custom with respect to excessive force and, (2) that there was an unofficial custom with respect to water shut offs. Defendants have not demonstrated they are entitled to summary judgment on either claim.

A "custom or usage" may be proved with demonstrating: (1) 'the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) "deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct"; and (3)

an 'injury by acts pursuant to the governmental entity's custom'", i.e., proof that custom was moving force behind constitutional violation. *Mitchell v. Kirchmeier*, 28 F.4th 888, 899-900 (8th Cir. 2022). Here, robust evidence establishes that a custom of using excessive force and water shut offs is rampant and pervasive at the City Justice Center jail.[9]

### A. The St. Louis City Commissioner of Corrections is the *Monell* Final Policymaker

Defendants have never disputed that the Commissioner of Corrections, Jennifer Clemons-Abdullah and her predecessor Dale Glass, is the person with final policymaking authority at CJC. Nor could they. Courts look at local custom and usage when determining who has policymaker power. *See Atkinson v. City of Mt. View*, 709 F.3d 1201, 1215–16 (8th Cir. 2013). Beyond being the "appointing authority" with the "ultimate responsibility and authority over all personnel" the evidence supports a finding that the Commissioner is a final policymaker with respect to the customs of failing to discipline adequately officers engaged in excessive force and failing to investigate allegations of such misconduct. Pls.' SOF at ¶¶212-214. The Commissioner has the following authority and responsibilities: (1) to promulgate the protocols, policies and procedures which govern the correctional officers' actions in CJC. (2) "final sign off" on the policy and procedures of the Division of Corrections. (3) training jail staff, and implementing and enforcing protocols, policies, and procedures which govern COs' actions in CJC; and (4) disciplining correctional officers for their actions towards individuals who are detained at CJC. *Id.* at ¶214.

The Eighth Circuit has determined that officials with similar authority and responsibilities are the final policymakers. *See Ware v. Jackson Cnty., Mo.*, 150 F.3d 873, 875 (8th Cir. 1998) (director of jail had final policymaking authority where he had the authority to promulgate policy, implement

---

[9] Defendants cite to *Leonard v. St. Charles Cnty.*, 570 F. Supp. 3d 707, 730 (E.D. Mo. 2021), for the proposition that "each allegation of excessive force must be individually evaluated to make a determination if the degree of force was justified" in evaluating liability under *Monell*. Doc. 319 at 6. But *Leonard* says no such thing in the context of *Monell* liability.

such policy; handle discipline); *Angarita v. St. Louis County,* 981 F.2d 1537 (8th Cir.1992) (holding that police chief who was highest ranking police official in St. Louis County, responsible for the entire department, and responsible for drafting and approving many of the department's general orders had final policymaking authority in St. Louis.) Both Jennifer Clemons-Abdullah and Dale Glass, as policymakers, were deliberately indifferent to the widespread and firmly established unconstitutional practices of excessive Use of Force through OC spray and unconstitutional water shut-offs described below. These practices were allowed to flourish under their leadership and were the "moving force" behind Plaintiffs' injuries.

**B. Defendants' Pattern or Practice of Excessive, Punitive, and Unjustified Use of OC Spray**

The evidence in the record not only establishes a shockingly widespread, persistent and brutal practice of excessive use of force through OC spray at the CJC jail, but also supports a reasonable inference that the policymakers were deliberately indifferent to this ongoing misconduct, a pattern which was the "moving force" behind Plaintiffs' injuries.

1. There is a continuing, widespread, persistent pattern of unconstitutional excessive use of OC spray at the CJC jail.

The Eighth Circuit has not directly addressed the quantum of evidence Plaintiffs must show to survive summary judgment, although it has held that the "continuing, widespread, persistent pattern" descriptors are just a way to describe the essential element of a "pattern"— namely, that single or isolated incidents do not suffice and that evidence of "many" incidents establishes liability. *Parrish v. Luckie,* 963 F.2d 201, 206 (8th Cir. 1992); s*ee also Wilson v. City of N. Little Rock*, 801 F.2d 316, 322-23 (8th Cir. 1996); *Wedemeier v. City of Ballwin, Mo.*, 931 F.2d 24, 26 (8th Cir. 1991). Courts in this Circuit have found sufficient evidence demonstrating a pattern of unconstitutional conduct where Plaintiffs show evidence of repeated past similar misconduct, particularly when that misconduct occurs to different individuals over a prolonged time. *Ware v. Jackson,* 150 F.3d 873, 881-882 (8th Cir.

1998) (rejecting defendant contention that there are only a "handful" of prior complaints where jury heard evidence of five months of sexual misconduct from one officer and incidents from three years earlier from other officers); *Watson v. Boyd*, 447 F. Supp. 3d 924, 950 (E.D. Mo. 2020), *overturned on other grounds by Watson v. Boyd*, 2 F.4th 1106 (8th Cir. 2021) (ten to fifteen complaints over fourteen months of excessive force incidents constituted "sufficient evidence of a custom").[10]

The volume of repeated past misconduct here goes far beyond the number of incidents found to satisfy a *Monell* "practice." Notably, Plaintiffs need not show that each prior incident involves the exact same misconduct, but rather that the misconduct bears sufficient factual similarity to fall within the parameters of the unconstitutional custom alleged. *Tirado v. City of Minneapolis*, 521 F.Supp. 3d 833, 840-841 (D. Minn. 2021). Likewise, although Plaintiffs must show an unconstitutional custom existed at the time of the incident, "[p]ost-event evidence can shed some light on what [customs or] policies existed in the city on the date of an alleged deprivation of constitutional right." *Bordanaro v. McLeod,* 871 F.2d 1151, 1167 (1st Cir. 1989).

Evidence of the "continuing, widespread, persistent pattern" wherein corrections staff needlessly and punitively deployed OC against detainees is demonstrated by the staggering volume of damning evidence summarized in the facts above, and as further documented, in painful detail, in Plaintiffs' Statement of Additional Material Facts. Plaintiffs adduce hundreds of examples of officers punitively targeting detainees with OC spray despite the absence of any genuine penological concerns. Pls.' SOF ¶¶218-232, 234-260, 263-284, 286-294. **For instance, the City's own records reveal at**

---

[10] By contrast, where Courts have found plaintiffs have only presented evidence of isolated incidents have *significantly* fewer pieces of evidence than what Plaintiffs present here. *See, e.g., Perkins v. Hastings,* 915 F.3d 512, 521-22 (8th Cir. 2019) ("one unjustified shooting does not establish a pattern of constitutional violations"); *Brewington v. Keener,* 902 F.3d 796, 801-02 (8th Cir. 2018) ("two incidents of excessive force . . . cannot be considered a pattern of widespread…conduct"); *Plamp v. Mitchell Sch. Dist. No. 17-2,* 565 F.3d 450, 460 (8th Cir. 2009) ("[T]hree concrete complaints . . . scattered over approximately twelve years were insufficient to show a widespread pattern of conduct).

least 250 instances of using OC spray on detainees who are passively resistant; including at least 50 instances of using OC spray on detainees who are on suicide watch; and a well-established pattern, informed from scores of officer reports, of using OC spray against detainees who are restrained in handcuffs or in their own cells.[11] *Id.* It is also evident, from dozens of reports and grievances, that Officers deploy OC spray on detainees for inconvenient speech such as complaining about a jail procedure, asking for more information, or making repeated requests. Pls.' SOF at ¶¶218-232. Detainees are attacked with OC over minor misunderstandings. Such conduct is patently unconstitutional. The law does not permit the "use of force on difficult inmates not posing a real threat to other persons or raising security concerns." *Treats*, 308 F.3d at 872.

Plaintiffs have also adduced a deluge of examples of Correctional Officers using excessive amounts of OC spray on detainees. **On at least 70 occasions, Officers have used MK-9s or "riot-sized" OC spray on individual detainees despite is purpose for use on crowds."** Pls.' SOF at ¶¶296-297. **And use of force reports, detainee grievances paint a startling pattern of using Correctional Officers using four or more busts of OC spray one detainee during a single encounter.** Pls.' SOF at ¶¶298-301. All of these events are similar, sometimes even identical, in their mode, method and fact pattern. As one detainee described it to investigators, in reference to OC spray, "they kill us with is." *Id.* at ¶345.

The practices comprising this pattern are unconstitutional under Supreme Court and Circuit precedent. *Kingsley,* 576 U.S at 397; *Treats*, 308 F.3d at 872-3. The evidence in the record makes overwhelmingly clear the existence of a pattern wherein, over a number of years, municipal employees regularly violated the constitution by deploying OC in a needless, punitive fashion. At the very least

---

[11] This is damning evidence, even despite the fact that the City has not produced a complete record of all relevant Use of Force Reports and videos, which has been the subject of many discovery motions in this case.

there are genuine issues of material fact on all of the elements establishing municipal liability under *Monell*, preluding summary judgment.

> 2. <u>The City of St. Louis was deliberately indifferent to the widespread and entrenched practice of excessive use of force against detainees.</u>

Deliberate indifference in the context of § 1983 municipal liability is demonstrated where the Defendant had notice of the unconstitutional customary conduct and was nonetheless deliberately indifferent to its known consequences. *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 398 (1997); *Ware v. Jackson Cnty.*, 150 F.3d 873, 880 (8th Cir. 1998). This is an objective inquiry. *Farmer v. Brennan*, 511 U.S. 825 (1994) ("It would be hard to describe the *Canton* understanding of deliberate indifference, permitting liability to be premised on obviousness or constructive notice, as anything but objective"). Here, the evidence shows that Defendant City of St. Louis, through its final policymaker, had notice of and refused to act on a clear and well-established pattern of misconduct for years.

> i. ***Commissioners Glass and Clemons-Abdullah had notice of pervasive misconduct at CJC.***

The City's policymakers, Dale Glass and Jennifer Clemons-Abdullah, had actual and constructive notice of the widespread unconstitutional use of OC spray at the CJC jail that would eventually lead to the attack on all four Plaintiffs. *See Gatlin ex rel. Est. of Gatlin v. Green*, 362 F.3d 1089, 1094 (8th Cir. 2004). Constructive knowledge can be found when the conduct is "widespread or flagrant." *Thelma D. v. Board of Educ.*, 934 F.2d 929, 933 (8th Cir. 1991). As evidenced above, the conduct at issue here was widespread and flagrant such that notice can be imputed.

Beyond the obvious nature of the widespread excessive force through OC spray at the CJC jail, it can be inferred that the City had knowledge of the unconstitutional conduct based on policymakers' access to a large number of grievances and Use of Force reports describing that unconstitutional conduct. In *Tirado v. City of Minneapolis*, for example, the court found that the

37

plaintiff satisfied *Monell*'s notice requirement when she identified at least five similar incidents. 521 F. Supp. 3d 833, 843–44 (D. Minn. 2021); s*ee also Parrish v. Luckie,* 963 F.2d 201, 204–05 (8th Cir.1992) (finding overwhelming evidence to support jury finding of *Monell* deliberate indifference where plaintiff presented evidence of use of force reports, citizen complaints, and operating an investigation system in which complaints were discouraged"); *Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999) ("[t]his Court has held municipalities liable under *Monell* when the plaintiffs have produced evidence of prior complaints sufficient to demonstrate that the municipalities and their officials ignored police misconduct."); *Hayward v. City of New Orleans,* No. CIV.A. 02-3532, 2004 WL 258116, at *7 (E.D. La. Feb. 12, 2004) (question of fact exist on whether the city policy makers had notice where there were multiple abuse complaints made against officer).

Both Commissioners had access to the Use of Force reports and grievances that describe excessive use of OC spray against detainees. Indeed, Dale Glass, who was Commissioner when Plaintiffs Derrick Jones, Darnell Rusan, and Jerome Jones were subject to excessive force, testified to tracking the use of force reports when he was Commissioner. Pls.' SOF at ¶¶304-308. Current Commissioner Clemons-Abdullah assembles regular "Monday morning quarterback" meetings where she and staff review Use of Force Reports and talk them over. *Id.* at ¶309. What's more, the City of St. Louis has tracked the use of OC spray since at least 2014 on a detailed spreadsheet. *Id.* at ¶305. That spreadsheet notes factors like: (i) bursts of OC spray used; (ii) whether OC spray was deployed through a chuckhole; (iii) whether officers used MK-9 foggers; and (iv) whether officers were deploying OC onto detainees from a close distance. It also describes incidents when officers used OC on detainees for refusing to go on suicide watch, used MK-9 foggers on detainees for kicking their cell doors, and deployed OC spray on detainees already restrained in their cell for perceived displays of verbal disrespect. Staff even went so far as to bold whenever more than 1 burst of OC spray was used, presumably because it was notable. *Id.* That spreadsheet was used to draft the

Monthly Reports—reports which the Commissioner is responsible for preparing and submitting to the Commissioner of Public Safety. *Id.*at ¶306. Evidence of notice through the spreadsheet alone is overwhelming.

In Marrell Withers' case, who was added as a Plaintiff nearly a year after Plaintiffs first filed this case, the evidence is even more damning. Commissioner Clemons-Abdullah was put on notice by the filing of this very lawsuit, which was filed over seven months before Plaintiff Withers was attacked by OC spray, while handcuffed and not actively resisting or posing a threat.

### ii. Defendant City was deliberately indifferent to the unconstitutional custom of which they were on notice.

Deliberate indifference means that, "faced with…constructive knowledge that its agents will probably violate constitutional rights, the city may not adopt a policy of inaction." *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004). Here the record clearly demonstrates that the City was deliberately indifferent by its inaction to the deluge of reports of excessive force against detainees. *See Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 807 (8th Cir. 1994) ("inaction or laxness can constitute government custom if it is permanent and well settled.)" A "policy of inaction in light of notice that [the status quo] will cause constitutional violations is the functional equivalent of a decision...to violate the Constitution." *Connick v. Thompson,* 563 U.S. 51, 61-62 (2011); *see also Brown v. City of Ft. Lauderdale,* 923 F.2d 1474, 1481 (11th Cir. 1991). Beyond that, the City exhibited deliberate indifference in several specific ways: by refusing to act on use of force reports describing violent attacks on detainee, by refusing to respond to detainee grievances while simultaneously making the grievance process inaccessible, and by refusing to discipline officers known to engage in misconduct.

First, despite their shocking frequency, Defendant City almost never finds uses of force to be unjustified. In fact, of the 1,241 Use of Force reports produced in this case, only nine were found to be unjustified, including the use of force against Plaintiff Withers. Pls.' SOF at ¶315. **Put another way, the City of St. Louis approves 99.93% of all uses of force involving mace.** This failure to

act rises to the level of deliberate indifference. *See Parrish*, 963 F.2d at 2014 (department's failure to act on "use of force" reports describing attack on prisoner evidence of deliberate indifference). Defendant's argument that the City cannot be considered deliberately indifferent because Tonya Harry found the use of force against Mr. Withers to be unjustified misses the point entirely. In fact, this only buttresses the fact that the City is deliberately indifferent. Not only was Mr. Withers' case one of 0.07% of uses of force found to be unjustified, the City took no follow up action after this finding to address the abuse. Despite Harry's determination that the use of OC spray against Marrell was unjustified, no supervisor discussed the incident with COs Wills or Jones, and neither officer was disciplined. What's more, Tonya Harry was subsequently demoted. Pls.' SOF at ¶56.

Harry wasn't the only supervisor punished for speaking out about excessive force. Former Superintendent Adrian Barnes was demoted by Commissioner Clemons-Abdullah for recommending forced leave for an officer who punched a detainee. *Id.*at ¶57. He was also required to retract his recommendation of forced leave. *Id.* In short, Defendant City operates a system that discourages and even punishes any attempt at accountability. Even where a supervisor dares to speak out about the excessive use of force, Defendant chooses to do nothing other than punish that supervisor, ratifying the misconduct in the process. A custom "that…encourages or allows officers to engage in [unconstitutional conduct] without concern for punishment" constitutional *Monell* deliberate indifference. *Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999).

Second, Defendant City routinely disregarded and erased detainee grievances, the impact of which is to cover-up and insulate staff from being held accountable for their abuse of detainees. Detainees at CJC primarily use tablets to make grievances, but those grievances are ignored and ultimately erased. Indeed, former Commissioner Glass testified that even though the Commissioner was the last point of review in the grievance process, he was "pretty sure" there were not even five grievances filed in his last year as Commissioner. That testimony is flatly belied by the record of

grievances produced in this case, which exhibit that at least 41 grievances were submitted about OC spray alone from May 2020-2021, the last year that Dale Glass held his possession as Commissioner. Pls.' SOF at ¶316. Failing to investigate complaints and grievances, especially those as grievous and numerous as they are here, constitutes deliberate indifference. *Parrish,* 963 F.2d at 204-205 (finding failure to investigate citizen complaints and operating a system in which reports of abuse were ignored or covered up is indicative of deliberate indifference); *Shannon v. Koehler*, 673 F. Supp. 2d 758, 802 (N.D. Iowa 2009)( prior complaints could be evidence that the City ignored police misconduct).

In the case of Fowlkes, Defendant City has allowed him to continue his reign of abuse, without discipline, despite repeated detainee complaints against him. Pls.' SOF at ¶314. Lt. Harry attempted to discipline Defendant Fowlkes for unreasonable use of OC spray, but that attempt was "thrown out." *Id.* at ¶321. The same is the case for Defendant Direll Alexander, who was criminally indicted for assaulting a detainee in June 2023, yet complained to investigators two years earlier that they didn't get sticks or tasers like sheriffs. *Id.* at ¶¶317,354. In Alexander's case, CJC's actions are perhaps even more egregious. In a rare moment of accountability, Alexander was suspended in 2016 for use of OC spray against a detainee. Despite this, Defendant City subsequently tasked him with training other officers on "safety and training" and on the use of chemical agents. *Id.* at ¶319-319. And Superintendent George Hayes reported to investigators that he thought there was a "lack of accountability" at the CJC with respect to the use of pepper spray. *Id.* at ¶355. A defendant's failure to adequately discipline officers for misconduct and ignoring, concealing, encouraging, or ratifying a pattern of misconduct triggers *Monell* liability. *Ware,* 150 F.3d at 883. (deliberate indifference is evidenced by its failure to discipline adequately).[12]

---

[12] To date, Defendants still have not complied with their discovery obligations vis-à-vis Defendant Alexander. Specifically, they have not supplemented their discovery answers with information regarding Alexander's 2023

3. The unconstitutional custom of excessive use of force was the moving force behind Plaintiffs' injuries.

Finally, *Monell* requires a plaintiff show the municipality's customs and failures are the "moving force behind the injury of which the plaintiff complains." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. at 404-05. In order to do so, "[i]t is enough that the defendant's fault was a 'substantial factor' in producing the plaintiff's injuries, and the defendant's fault need not have been the sole proximate cause in order to allow recovery." *Trudeau v. Wyrick*, 713 F.2d 1360, 1367 (8th Cir. 1983).

The specific instances of force against the four individual plaintiffs are textbook examples of CJC's custom of needlessly and punitively deploying excessive amounts of OC spray. Indeed, even the specific details of uses of force against the four Plaintiffs are strikingly similar, reflective of the experiences of many other individuals, and clearly attributable to the customs of the institution. At the time each of the four plaintiffs were sprayed, all were not actively resisting or posing a threat. Pls.' SOF at ¶¶23, 32, 42, 44, 71, 100, 103. All four plaintiffs were denied adequate medical care or even an opportunity to clean themselves off after the spray. *Id.* at ¶¶44-46, 75-78, 114-116, 159-161, 167. Three of the four plaintiffs were locked in either a visiting booth or cell into which jail staff deployed OC spray and left them there to suffer. *Id.* at ¶¶68-74, 111-112, 162-167, 184-193. Two of the plaintiffs experienced the use of a "riot sized" canister on them as individuals. *Id.* at ¶¶95, 148, 190-191. And three of the four detainees were sprayed by a specific officer, Defendant Fowlkes, who has a track record of excessive force and a litany of other detainees who have attempted to notify the facility of his brutality to no avail. *Id.* at ¶¶67-73, 106-114, 184-193.

"It is logical to assume that continued official tolerance of repeated misconduct facilitates similar unlawful actions in the future." *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990). The

---

indictment for assaulting a CJC detainee, despite numerous requests from Plaintiffs' counsel. Because of this discovery misconduct, Plaintiffs ask for a discovery sanction to be imposed against Defendants in the form of an adverse inference that the City ignored, concealed, encouraged, or ratified Alexander's pattern of misconduct.

officials in charge of CJC have tolerated and even endorsed excessive force for years, without a meaningful effort to prevent this misconduct or to allow detainees a way to be heard. The named Defendants knew they could use excessive amounts of OC spray on detainees for any and no reason, and further knew that even if the detainees attempted to complain, there would be no accountability—even if their use of force were found to be unwarranted. As such, the evidence Plaintiff presents herewith is sufficient for a jury to find that St. Louis City is liable for the Defendants' unconstitutional conduct under *Monell*.

### C. Pattern and Practice of Water-Shut Offs

All four Plaintiffs were unconstitutionally deprived of a minimal life necessity – access to water – for extraordinary periods of time while detained at the CJC jail . That deprivation was due to the City's unconstitutional custom to which the policymakers were deliberately indifferent. Under the Due Process Clause of the Fourteenth Amendment, "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *Boswell v. Sherburne Cnty.*, 849 F.2d 1117, 1120 (8th Cir. 1988). "Punishment that deprives inmates of the minimal civilized measures of life's necessities is unconstitutional." *Owens v. Scott County Jail*, 328 F.3d 1026, 1027 (8th Cir. 2003) (internal quotations omitted). Access to drinking water is, of course, a minimal life necessity. *See Robinson v. Adams*, No. 5:10-CV-00013-JMM, 2010 WL 4942163, at *5 (E.D. Ark. Nov. 9, 2010) (Plaintiff "provided evidence that he was deprived of a minimal civilized measure of life's necessities when he was not given water to drink with his meals for five days."); *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992) (The Constitution requires detainees be provided with sufficient drinking water.); *see also Spires v. Paul*, 581 F. App'x 786, 792-94 (11th Cir. 2014) (housing an inmate in a cell without potable water for several days survive is a constitutional violation).

1. <u>There is a continuing, widespread, persistent pattern of City of St. Louis employees at the CJC intentionally shutting off water to detainee cells for non-legitimate penological, punitive purposes</u>

It is clear, through officer testimony and detainee grievances, that many correctional officers intentionally turn off drinking and toilet water to cells regularly. Officers testified that they can and do shut off water to cells at CJC. Pls.' SOF at ¶331. Records show that correctional officers shut off the water to cells at CJC. Detainees report being without water for days and weeks at a time as well. *Id.* at ¶¶324-342. When the water to cells is shut off for very long periods of time, CJC has no policy requiring the provision of water beyond the cups of water that are provided to detainees at mealtimes. *Id.* at ¶¶329, 339-340. Such a long-period of time without water independently is a violation of the Fourteenth Amendment. *See Stearns v. Inmate Servs. Corp.*, 957 F.3d 902, 907 (8th Cir. 2020) (If conditions of confinement for pretrial detainees are found to be arbitrary or excessive, it is permissible to infer that the purpose of the governmental action is punishment); *Robinson v. Adams*, No. 5:10-CV-00013-JMM, 2010 WL 4942163, at *5 (E.D. Ark. Nov. 9, 2010) (Plaintiff "was deprived of a minimal civilized measure of life's necessities when he was not given water to drink with his meals for five days.").

But detainees here report that officers intentionally turn off their water as punishment. Pls.' SOF at ¶¶325-327. They specifically name Lt. Fowlkes as a person who shuts off the water to cells for punishment, retaliation, and other non-legitimate penological reasons. *Id.* at ¶¶334-335. Lt. Fowlkes even admits in multiple emails and use of force reports that he intentionally deprives detainees of water. *Id.* What's worst, detainees report their water being shut off in conjunction with being exposed to mace, specifically to punish them. *See, e.g.,* Pls.' SOF at ¶¶76-78, 206. When detainees ask for water during water shutoffs, they are maced. Pls.' SOF at ¶¶224, 326, 330. This too violates the Constitution. *Stearns* 957 F.3d at 907.

2. <u>City of St. Louis policymaking officials demonstrate deliberate indifference to or tacit authorization of the water shutoffs after notice to the officials of those punitive water shutoffs</u>

Just as with the use of force, City of St. Louis' policymaking officials had notice of the unconstitutional custom of water shutoffs. Pls.' SOF at ¶¶328, 335, 337. The policymaking officials were aware of complaints from detainees regarding the deprivation of water at CJC, and ignored them. *Id.* at ¶337. Moreover, the punitive water shutoffs at CJC are persistent and continuing. *Id.* at ¶325. In addition, Darnell Rusan testified that his water was shut off as late as October 2022 and detainee TB states he was maced for asking for water in January 2023. *Id.* at ¶¶341.

Defendant City willfully does not monitor or concern itself with the systemic water shut-offs, the effect of which is to allow Officers to act with impunity. The City of St. Louis does not have any written policies specifically governing who can turn the water off to detainee cells, for what purposes, documentation requirement, the amount of time water can be shut off for, and what measures must be in place to ensure detainees have access to drinking water and adequate sanitation facilities during a water shutoff. *Id.* at ¶¶329, 338-340. There is also no evidence to show that employees at CJC are trained on water shutoffs. *Id.* at ¶340. In fact, Lt. Fowlkes' direct supervisor has no idea under what circumstances Fowlkes shuts off the water to detainees' cells.[13] *Id.* at ¶336. While a public defender notified then-Commissioner Glass of the water issues at CJC, he conducted a woefully inadequate "investigation" of the issue—not even checking to confirm the water was working. *Id.* at ¶337. Such laxness in light in the face of notice constitute deliberate indifference. Defendant City has known about the unconstitutional water shutoffs for at least five years and they

---

[13] The City's failure to keep any records together with the lack of policies regarding shut-offs means that there are no records identifying which officer shut off the water at CJC at any particular point. But Plaintiffs' *Monell* claims do not require individual officer liability before finding that the City of St. Louis can be held liable under *Monell*. *See Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010); *see also Anderson v. City of Atlanta*, 778 F.2d 678, 686 (11th Cir. 1985) (citing "sister circuits" in support of the same"). !

have done nothing—no trainings, no policymaking, no discipline of employees. *See Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 807 (8th Cir. 1994).

3. The unconstitutional custom of punitive water-offs was the moving force behind Plaintiffs' injuries

The above described custom and failure was the "moving force" behind and a substantial factor in causing Plaintiffs' injuries. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. at 404-05; *Trudeau,* 713 F.2d at 1367. As the custom of excessive force, Plaintiffs' experiences with water deprivation were part and parcel of a long-standing, well-entrenched practice. Just as other detainees have experienced, Derrick Jones testified that Lt. Fowlkes turned off his sink and toilet water at the CJC in February 2021 for eight hours, and that Fowlkes regularly shut off water to cells for punishment. Pls.' SOF at ¶¶117-119. He even begged to be "treated like a human being" in an IRR form complaining of water shutoff. *Id.* at ¶120. Jerome Jones testified that the water to his entire housing unit was shut off for a couple of weeks to punish his housing unit. *Id.* at ¶85-86. Jerome testified that he "got to my breaking point, sir, so I cried to my mom…'cause they are doing a lot of inhumane (sic) stuff …" in reference to the water shut-offs. *Id.* at ¶87. Darnell Rusan testified that Lt. Fowlkes maced him and then shut off his sink and toilet water for more than 24 hours starting on February 3, 2021. *Id.* at ¶204. And Marrell Withers testified that his water was shut off "like all the time" while he was in CJC for punishment purposes. *Id.* at ¶¶61-62. At one point, Marrell was detained in a cell for seven or eight days without water. Plaintiffs' injuries occurred because the City tolerated a system of harm associated with water shut-off and encouraged impunity by failing to monitor or regulate water shut-offs in any meaningful way. *See Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990). The evidence here is sufficient for a jury to find that St. Louis City is liable for the Defendants' unconstitutional custom of water-shut-off under *Monell.*

### III. **A Reasonable Jury Could Decide that Defendants Violated Plaintiffs' Claims Under the ADA**

Defendants argument for summary judgment on Plaintiffs' claims under the Americans with Disabilities Act (ADA) is fundamentally flawed because it rests on a misunderstanding of ADA law, unsupported factual assertions, and inapposite legal authority. In order to properly plead an ADA claim, Plaintiffs must allege that:

> (1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or denied the benefits of the jail's services, programs, or activities, or was otherwise subjected to discrimination by the jail; and (3) that such exclusion, denial of benefits, or other discrimination was by reason of his disability.

*Baribeau v. City of Minneapolis*, 596 F.3d 465, 484 (8th Cir. 2010); *see also* 42 U.S.C. § 12132.

Defendants assert that Plaintiffs did not plead that they were denied access to a program, service, or activity. Not so, and this Court has already rejected that argument. Doc 264. Essentially everything in a prison or jail is a "program, service, or activity" as defined by the ADA. *See Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (rejecting the argument that because prisons do not provide benefits as generally understood that their services fall outside the ambit of the ADA); 28 C.F.R. Pt. 35, App. A, at 663 (things as basic as a safe place to sleep are a program service or activity under the ADA).

Here, Plaintiffs have alleged that officers' use of force is a service provided by the jail that must be administered in accordance with the ADA. *See* Compl. at ¶¶ 2, 68-69, 77, 158, 206-207, 211-213. Numerous courts have held that uses of force, constitute programs, services, or activities under the ADA. *See Wilson v. City of Southlake*, 936 F.3d 326 (5th Cir. 2019) (finding ADA claim against a city responsible for training a School Resource Officer who berated and handcuffed a disabled student should survive summary judgment); *Spencer v. Dawson*, No. 04 C 5048, 2006 WL 3253574, *11 (N.D. Ill. Nov. 7, 2006) (Rehabilitation Act applied to defendant officer's on-the-street response where he was alleged to have arrested and pepper sprayed plaintiff); *see also Gorman v. Bartch*, 152

F.3d 907 (8th Cir. 1998) (arrestee transportation was "program" or "service" of police department and "benefit" plaintiff sought was "to be handled and transported in a safe and appropriate manner"). The same reasoning also applies to correctional officers using force against detainees.

Defendants next argue that because Plaintiffs pleaded that use of OC spray was "widespread" in the facility that this somehow undermines their ADA claim. This argument fundamentally misunderstands Plaintiffs' allegations and the ADA. Plaintiffs allege that they were denied necessary accommodations in violation of the ADA when those with physical conditions or mental disabilities that would subject them to increased harm from OC spray were nevertheless sprayed without any inquiry into their medical conditions, the particularly deleterious effects of OC on them, or potential alternatives. *See*, *e.g.*, Compl. at ¶207. In short, Plaintiffs do not claim that they were singled out for spraying because they were disabled, but rather that the facility, knowing of their disabilities, failed to accommodate those disabilities in the application of force.

This type of claim, a "failure to accommodate" claim, is a quintessential ADA claim. This is because "[d]iscrimination against the handicapped...[is] most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect." *Alexander v. Choate*, 469 U.S. 287, 295 (1985). The ADA's imposition of an "affirmative duty" on public entities to reasonably accommodate aims to remedy that thoughtlessness. *See Peebles v. Potter*, 354 F.3d 761, 767 (8th Cir. 2004). Defendants seem to argue that if they excessively use OC spray against everyone equally, this would shield them for liability under the ADA. But precisely the opposite is true under the ADA, where it is not being treated differently, but being treated the same that gives rise to discrimination. Plaintiffs allege that because of their disabilities, they are more injured from OC spray than their able-bodied colleagues and that they have been denied accommodations that would remedy these discriminatory effects. Nothing in Defendants' submission undermines this claim.

Next, Defendants assert that Plaintiffs' claim necessarily rests on the assertion that a disability "entitle[s] them to refuse to follow staff directives in violation of CJC policy or to engage in acts of violence that threaten the safety of staff and detainees or the security of the CJC." Doc. 319 at 18. This assertion is nothing more than hyperbole and contains no basis or legal arguments whatsoever. Further, to the extent that Defendants rest their argument on facts showing threats to safety at CJC, they do not cite or support these assertions. Nor could they, as this would, at minimum, require reading facts heavily in favor of Defendants, which is impermissible at this stage.[14]

Finally, Defendants cite "*Baribeau v. City of Minneapolis* 578 F. Supp.2d 1201(8th Cir.2008)[sic]" without explanation. In truth, *Baribeau* says nothing about the instant matter. In *Baribeau* jail officials confiscated a detainee's prosthetic leg. *Baribeau v. City of Minneapolis*, 578 F. Supp. 2d 1201, 1221 (D. Minn. 2008), *aff'd in part, rev'd in part and remanded*, 596 F.3d 465 (8th Cir. 2010). There, the District Court did not find an ADA violation because the Plaintiff was given a wheelchair as an accommodation, and there was no evidence that he could not access all parts of the facility equally in the wheelchair. *Id.* at 1222; *see also Baribeau*, 596 F.3d at 484. There is no allegation or single piece of evidence that the disabled Plaintiffs here were alternatively accommodated in the way the Plaintiff in *Baribeau* was. Because that finding was the lynchpin of denying the claim in *Baribeau*, the case has no persuasive effect here. For the foregoing reason Defendants' motion for summary judgment on Plaintiffs' ADA claims should be denied.

## IV. <u>Plaintiffs Are Entitled to Adverse Inferences Based on Defendants' Discovery Misconduct</u>

As extensively described in Plaintiffs' Motion for Sanctions and Motion to Reconsider, Defendants have engaged in serious discovery misconduct throughout this litigation. Docs. 298 and

---

[14] To the extent that Defendants seek to argue, without stating, that the accommodations requested by Plaintiffs are unreasonable, this is not the appropriate stage for such an argument. What constitutes a reasonable accommodation is "inherently fact-intensive" and typically left to the fact-finder. *Folkerts v. City of Waverly*, 707 F.3d 975, 984 (8th Cir. 2013).

322. Specifically, Defendants deleted scores of videos directly relevant to Plaintiffs' *Monell* claims prior to the Court's January 27, 2023 order to preserve, failing to preserve nearly 80% of video footage should have been produced in this litigation and prejudicing Plaintiffs' ability to prosecute their case. This failure to preserve is especially egregious in light of documents produced just last night by the Circuit Attorney's Office evidencing that the City and CJC leadership received a preservation letter from the CAO in March 2021 requiring them to preserve, among other things, video recordings of use of force and complaints about conditions at CJC. As such, in evaluating Defendants' Motion for Summary Judgment, Plaintiffs ask that this Court apply the following adverse inferences:

A) The video evidence would show, consistent with Plaintiffs' allegations, a consistent pattern of excessive use of OC Spray.

B) The video evidence would show, consistent with Plaintiffs' allegations, a consistent pattern of use of OC Spray against non-violent, non-actively-resisting, or restrained individuals.

C) The video evidence would show, consistent with Plaintiffs' allegations, a consistent pattern of use of OC Spray against people with mental health conditions.

D) The video evidence would show, consistent with Plaintiffs allegations, a consistent pattern of failing to provide individuals medical treatment or decontaminate individuals (by providing a shower, eye wash services, or clean clothes) after they were subjected to use of OC spray.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that this Court deny the Defendants' Motion for Summary Judgment.

Dated: July 27, 2023                          Respectfully submitted,

By: */s/ Shubra Ohri*
Amy E. Breihan (MBE #65499MO)
W. Patrick Mobley (MBE #63636MO)
Shubra Ohri (E.D. Mo. Bar No. 63098241L)
906 Olive Street, Suite 420
Saint Louis, Missouri 63101

RODERICK & SOLANGE MACARTHUR
JUSTICE CENTER

 /s/ Maureen Hanlon (with consent)
Blake A. Strode (MBE #68422MO)
Jacki Langum (MBE #58881MO)
Maureen Hanlon (MBE #70990MO)
Nathaniel R. Carroll (MBE #67988MO)
440 N. 4th Street, Suite 390
Saint Louis, MO 63102

ARCHCITY DEFENDERS, INC.

 /s/ Lauren Bartlett (with consent)
Brendan Roediger (E.D. Mo. Bar No. #6287213IL)
Lauren Bartlett (MBE #71698MO)
100 N. Tucker Blvd.
Saint Louis, MO 63101-1930

SAINT LOUIS UNIVERSITY SCHOOL OF LAW
LEGAL CLINICS

 /s/ Oren Nimni (with consent)
Oren Nimni *admitted pro hac vice
416 Florida Avenue, NW #26152
Washington, D.C. 20001

RIGHTS BEHIND BARS


*Attorneys for the Plaintiffs*