**SIMCO Correctional Consulting, LLC**
**1468 S. Ledgestone Avenue**
**Springfield, Mo. 65807**
**(417) 224-5215   -   joe@simco1.com**

### I. Introduction

This case encompasses a variety of documents the defendant's have provided to me in review of this case, to include depositions, use of force reports, St. Louis Jail policies, staff documentation, and other materials relating to the use of O/C in the jail. The Third Amended Complaint, Case: 4:21-cv-00600-HEA, filed 06/10/22, alleges St. Louis Jail, St. Louis, Mo., used excessive use of force with inmates housed at the jail.

### II. Documents and Materials Reviewed

Third Amended Complaint
St. Louis DOC Use of Force Policy
St. Louis Use of Chemical Agents Policy
Corporate Representative Deposition Notes and References
Duty Officer Logs
OC Spray Purchases
Plaintiff Profiles
Training Documents
Use of Force Reports for Named Plaintiffs
City Memorandum for OC Spray
Use of Force Videos – Derrick Jones, Darnell Rusan, and Merrill Withers)
Aisha Turner Deposition
Bruce Borders Deposition
Che Batman Deposition
Corporate Representative (Roth) Deposition
Dirrell Alexander Deposition
Tonya Harry Deposition
Sherry Richard Deposition
Javan Fowlkes Deposition
Doug Jones Deposition
Freddie Willis Deposition
Michelle Lewis Deposition
Darnell Rusan Deposition
Derrick Jones Deposition
Jerome Jones Deposition
Merrell Withers Deposition

1

## A. Overview of the Third Amended Complaint

In the third amended complaint, plaintiff contends that staff at the jail were using OC arbitrarily when inmates refused an order, inmates would not comply with orders and verbal commands by staff, and in situations in which force was going to have to be utilized. However, the long term jail policy allowed staff to use OC (pepper spray) in situations to refrain from having to be physically involved with inmates i.e., becoming involved in a physical altercation in which staff and inmates could be assaulted alike. Plaintiffs further contend staff arbitrarily shut the water off in units, showers, and cells to punish the inmates.

The following italicized text identifies specific claims made by the plaintiffs in this civil suit:

*Plaintiffs Derrick Jones, Jerome Jones, Darnell Rusan and Merrell Withers individually and on behalf of all similarly situated individuals,1 file this Third Amended Complaint against the City of St. Louis, Lieutenant Javan Fowlkes, Lieutenant Aisha Turner, Correctional Officer Direll Alexander, Lieutenant Sherry Richard, Correctional Officer Bruce Borders, Captain Freddie Wills, Correctional Officer Douglas Jones, and Correctional Officer John Doe ("Defendants") and allege as follows:*

*Claims for Relief COUNT I Excessive Force in Violation of Fourteenth Amendment under 42 U.S.C. § 1983 (Derrick Jones against Defendants Richard and Fowlkes) 163. Plaintiffs incorporate all preceding paragraphs as if fully set forth in this Count. 164. Defendants Richard and Fowlkes purposefully or knowingly used objectively unreasonable force on Derrick Jones when they sprayed him with an excessive number of chemical agents while he was restrained and again while he was confined within a secure room, and without providing a prior warning, as described more fully above. 165. The circumstances under which Richard and Fowlkes used chemical agents against Derrick, as described above, were not rationally related to a legitimate governmental purpose or, alternatively, were excessive in relation to any legitimate governmental purpose. 166. Alternatively, defendants Richard and Fowlkes's use of force against Derrick was objectively unreasonable. 167. Defendants Richard and Fowlkes's above-described actions were undertaken with malice and/or reckless disregard for Derrick's constitutional rights. 168. Defendants Richard and Fowlkes's actions were the direct and proximate cause of the violations of Derrick's constitutional rights and the damages suffered by Derrick, including pain, suffering, emotional distress, and injury. WHEREFORE, Plaintiff Derrick Jones prays this Court enter judgment in his favor against Defendants Richard and Fowlkes, award compensatory damages, costs and attorneys' fees, and punitive damages against Defendants Richard and Fowlkes, and for such further additional relief as this Court may deem just and appropriate.*

*COUNT II Excessive Force in Violation of Fourteenth Amendment under 42 U.S.C. § 1983 (Jerome Jones against Defendant Fowlkes) 169. Plaintiffs incorporate all preceding paragraphs as if fully set forth in this Count. 170. Defendant Fowlkes purposefully or knowingly used objectively unreasonable force on Jerome Jones when he sprayed him with an excessive number of chemical agents while he was restrained and within a secure room, as described more fully above. 171. The circumstances under which Defendant Fowlkes used chemical agents against Jerome, as described above, were not rationally related to a legitimate governmental purpose or, alternatively, were excessive in relation to any legitimate governmental purpose. 172. Alternatively, Defendant Fowlkes's use of force against Jerome was objectively unreasonable. 173. Defendant Fowlkes's above-described actions were undertaken with malice and/or reckless disregard for Jerome's constitutional rights. 174. Defendant Fowlkes's actions were the direct and proximate cause of the violations of Jerome's constitutional rights and the damages suffered by Jerome, including pain, suffering, emotional distress, and injury. WHEREFORE, Plaintiff Jerome Jones prays this Court enter judgment in his favor against Defendant Fowlkes, award compensatory damages, costs and attorneys' fees, and punitive damages against Defendant Fowlkes, and for such further additional relief as this Court may deem just and appropriate.*

*COUNT III Excessive Force in Violation of Fourteenth Amendment under 42 U.S.C. § 1983 (Darnell Rusan against Defendants Turner, Alexander, Borders, and Fowlkes) 175. Plaintiffs incorporate all preceding paragraphs as if fully set forth in this Count. 176. Defendants Turner, Alexander, Borders, and Fowlkes purposefully or knowingly used objectively unreasonable force on Darnell Rusan when they sprayed him three times with an excessive number of chemical agents, including once while he was restrained and months later when he was fully nude and confined within a secure room. In each instance, he was not actively resisting or threatening staff and was sprayed without prior warning, as described more fully above. 177. Defendant Alexander also purposefully or knowingly used objectively unreasonable force on Darnell Rusan when he slammed Darnell's head into the elevator wall after macing him, and when he hit and choked Darnell, telling him, "we'll kill your little ass in here." Darnell's head still hurts from those beatings. 178. The circumstances under which Turner, Alexander, Borders, and Fowlkes used mace against Darnell, as described above, where not rationally related to a legitimate governmental purpose or, alternatively, were excessive in relation to any legitimate governmental purpose. 179. Alternatively, Defendants Turner, Alexander, Borders, and Fowlkes's use of force against Darnell was objectively unreasonable. 180. Defendants Turner, Alexander, Borders, and Fowlkes's above-described actions were undertaken with malice and/or reckless disregard for Darnell's constitutional rights. 181. Defendants Turner, Alexander, Borders, and Fowlkes's actions were the direct and proximate cause of the violations of Darnell's constitutional rights and the damages suffered by Darnell, including pain, suffering, emotional distress, and injury.*

*COUNT IV Excessive Force in Violation of Fourteenth Amendment under 42 U.S.C. § 1983 (Marrell Withers against Defendants Wills and Jones) 182. Plaintiffs incorporate all*

*preceding paragraphs as if fully set forth in this Count. 183. Defendants Freddie Wills and Douglas Jones purposefully or knowingly used objectively unreasonable force on Marrell Withers when they sprayed him with an excessive amount of chemical agents while he was restrained, as described more fully above. 184. The circumstances under which Defendants Wills and Jones used chemical agents against Marrell, as described above, were not rationally related to a legitimate governmental purpose or, alternatively, were excessive in relation to any legitimate governmental purpose. 185. Alternatively, Defendants Wills' and Jones' use of force against Marrell was objectively unreasonable. 186. Defendants Wills' and Jones' above-described actions were undertaken with malice and/or reckless disregard for Marrell's constitutional rights. 187. Defendants Wills' and Jones' actions were the direct and proximate cause of the violations of Marrell's constitutional rights and the damages suffered by Marrell, including pain, suffering, emotional distress, and injury.*

*COUNT V Class Action Claim for Prospective Relief for Excessive Use of Force in Violation of the Fourteenth Amendment under 42 U.S.C. § 1983 (Class Claim against the City of St. Louis) 188. Plaintiffs incorporate all preceding paragraphs as if fully set forth in this Count. 189. Plaintiffs and the class they represent were deprived and continue to be deprived by Defendants of their rights under the Fourteenth Amendment to the United States Constitution to due process of law and to be free from excessive force. 190. The widespread use of force at the City Justice Center, including Defendants' failure to take reasonable precautions against macing detainees with disabilities that makes them particularly susceptible to serious harm from chemical agents, and Defendants' failures to take appropriate steps to curb this brutality are objectively unreasonable and taken together or individually, constitute deliberate indifference to Plaintiffs' rights to be free from cruel and unusual punishment. 191. Defendants know of and disregard a substantial risk of serious injury that detainees housed in the City Justice Center face at the hands of staff. 192. Upon further information and belief, supervisory staff, including Superintendent Barnes and Commissioner of Corrections Clemons-Abdullah are aware of these unconstitutional practices and violations of written policy, but are deliberately indifferent to these unconstitutional practices and have not taken adequate steps to reprimand, discipline, or train staff who are responsible for the violations described herein. WHEREFORE, Plaintiffs pray this Court enter judgment in their favor against the City of St. Louis, and enter an order against the City prohibiting the unconstitutional use of chemical agents going forward, and for such further additional relief as this Court may deem just and appropriate.*

*COUNT VI Monell Claim for Excessive Force in Violation of Fourteenth Amendment under 42 U.S.C. § 1983 (Individually Named Plaintiffs against the City of St. Louis) 193. Plaintiffs incorporate all preceding paragraphs as if fully set forth in this Count. 194. Plaintiffs have experienced and witnessed countless instances of staff's indiscriminate, excessive, and unnecessary use of mace on detainees. These instances occur with shocking frequency, and have been occurring with frequency for their entire detention.*

4

*195. During the relevant time period, Superintendent Barnes and City Commissioner Clemons-Abdullah and her predecessors had or should have had notice of widespread practices by employees under which detainees were sprayed excessively with mace without proper warning and absent any security need warranting the use of chemical agents, and under which detainees were sprayed with mace for the malicious purpose of infliction of pain and punishment. 196. These widespread practices are the result of the lack of formal training and supervision on the use of chemical agents, and lack of repercussions for the excessive and inappropriate use of chemical agents. 197. These widespread practices were allowed to flourish and become so well-settled as to constitute de facto policy of the City jails because governmental policymakers with authority over the jails exhibited deliberate indifference to the problem, thereby effectively ratifying it. 198. Additionally, these practices are allowed to flourish because staff routinely obstruct and completely disregard detainee IRRs and other complaints regarding instances of force by correctional officers, so as to cover-up and insulate staff from sanctions both civil and criminal repercussions when targeting and abusing detainees. 199. Plaintiffs' injuries were caused in substantial part by these widespread policies, practices, and procedures promulgated by the City jail staff.*

*Defendants CO Doe and FowIkes's actions were the direct and proximate cause of the violations of Derrick and Jerome's constitutional rights and the damages suffered by Derrick and Jerome, including pain, suffering, emotional distress.*

*COUNT X Monell Claim for Conditions of Confinement Amounting to Punishment in Violation of the Fourteenth Amendment under 42 U.S.C. § 1983 (Individually Named Plaintiffs against the City of St. Louis) 221. Plaintiffs incorporate all preceding paragraphs as if fully set forth in this Count. 222. Plaintiffs and countless others have been subjected to punitive and retaliatory water shut-offs at the City Justice Center. These deprivations occur sporadically but regularly, and are imposed not in response to misconduct related to plumbing, but as punishment for minor and nonthreatening misconduct, such as asking questions or "getting an attitude." These shut-offs have persisted for months, and continue to take place. 223. During the relevant time period Superintendent Barnes, Commissioner ClemonsAbdullah, and her predecessors had or should have had notice of widespread practices by employees at the CJC under which detainees were intentionally deprived of drinking water and water for their toilets, for the malicious purpose of infliction of pain and punishment.*

*These widespread practices were allowed to flourish and become so well-settled as to constitute de facto policy of the CJC because governmental policymakers with authority over the jail—namely, Superintendent Barnes and Commissioner Clemons-Abdullah,— exhibited deliberate indifference to the problem, thereby effectively ratifying it. 225. These practices also are allowed to flourish because CJC staff fail to apprise detainees of the jail's grievance process, and routinely obstruct and completely disregard detainee IRRs and other complaints so as to cover-up and insulate staff from sanctions both civil and criminal repercussions when targeting and abusing detainees. 226. Plaintiffs'*

*injuries were caused in substantial part by these widespread policies, practices, and procedures promulgated by the CJC.*

*COUNT XI Class Action Claim for Prospective Relief for Conditions of Confinement Amounting to Punishment in Violation of the Fourteenth Amendment under 42 U.S.C. § 1983 (Class Claim against the City of St. Louis) 227. Plaintiffs incorporate all preceding paragraphs as if fully set forth in this Count. 228. Plaintiffs and the class they represent were deprived and continue to be deprived by the Defendants of their rights under the Fourteenth Amendments to the United States Constitution to due process of law on account of correctional officers' regular action of shutting off water to their cells 229. During the relevant time period Superintendent Barnes, Commissioner Clemons Abdullah, and her predecessors had or should have had notice of widespread practices by employees at the CJC under which detainees were intentionally deprived of drinking water and water for their toilets, for the malicious purpose of infliction of pain and punishment. 230. The widespread practice of water-shut offs, and Defendants' failures to take appropriate steps to curb theses water shut-offs, is objectively unreasonable and constitutes deliberate indifference to Plaintiffs' rights to be free from cruel and unusual punishment. WHEREFORE, Plaintiffs pray this Court enter judgment in their favor against the City of St. Louis, and enter an order against the City prohibiting the unconstitutional practice of water shut-offs as punishment going forward, and for such further additional relief as this Court may deem just and appropriate.*

### B. Duty Officer Logs

The duty officer logs for the facility in the period relating to this complaint show that duty officers were involved in this process. For instance, if they were at the facility, they would be notified either after OC was utilized, or in some instances prior to using the OC. The duty officers noted in the logs that staff had encountered few injuries.

### C. Staff Training

The training materials I was provided reveal an extensive program to train staff in all areas of the jail, to include use of force and use of OC. This training encompasses how to utilize OC, when it is justified, the decontamination process, and follow documentation. In addition, this training included the utilization of confrontation avoidance, which in essence uses good communication tools to prevent incidents from rising to the need to use force, as well as preventing the escalation of force.

### D. Jail Policies

St Louis DPS, DOC Use of Force Policy

In accordance with the SL DOC Use of Force policy, the Shift Supervisor/Area Supervisor may approve a use of force in situations in which force is necessary and/or anticipated. Similarly, the Shift Supervisor/ Area Supervisor is authorized to order the use of security devices in a use of force situation and has the authority to activate the Special Response Team, (SRT), if necessary, to regain control and ensure order and safety. Additionally, correctional staff may use reasonable force on an inmate when it is necessary to:

a. Prevent the omission of a felony, including escape,
b. Prevent an act which could result in death or serious bodily injury to self.
or another person,
c. Defend oneself or another against a physical assault,
d. Prevents serious damage to property,
e. Prevent or control a riot or disturbance,
f. Move an inmate who has refused a proper order by an employee,
g. Apprehend an escaping inmate,
h. Conduct the search of an inmate who has refused a proper order by an employee to submit to said search,
i. Preserve the overall order and security of the institution,
j. Preserve the safety of any employee, inmate, or visitor,

It also identifies the use of chemical agents, and specifically what is considered a use of force. The use of chemical agents, firearms, and the restraint chair, or physically grasping an inmate to re-gain control are all considered to be uses of force. For physical contact between staff and inmate to qualify as use of force, the physical contact must be deliberate as opposed to accidental and, the contact is employed to control the inmate's behavior. Inmates are not subjected to personal abuse, corporal punishment, personal injury, disease, property damage or harassment.

Employees are prohibited from the following act of use of force:

a. Use or permit the use of excessive force,
b. Use or permit the use of force as punishment or discipline,
c. Strike or permit to strike an object or blunt object on inmate's head,
d. Choke or permit to choke inmate as a restraint measure,

Custody staff will not use any form of security device or restraint method in which they have not received training. Shift Supervisor may authorize use of security device if emergency situation requires same,

Chemical Agents may be used by trained staff and only when all other minimal options and procedures prescribed have been exhausted.

Firearms may be used by trained and certified staff only, and only when a clear and present threat of loss of life or serious physical injury is present.

Force and restraint devices are only used as a control measure.  Correctional staff will use the least amount of force necessary to overcome resistance, and all use of forces will stop once staff regains control.

Due to the potential consequences of the use of force, strict compliance with procedures and work rule by staff must be maintained to minimize the potential of serious injury to staff and inmates.

In situations involving spontaneous use of force, the inmate must show active resistance above and beyond mere non-compliance with verbal command.

When attempting to gain control of a situation, the Correctional Staff will not use threatening language, or take action that would escalate aggressive behavior or physical violence.

Correctional staff are prohibited from lifting up inmate by gasping and pulling the inmate on the applied restraints.

Restraint device and tactics used during an incident involving force may not be used in the following manners:

a. As a method of punishment,
b, Around the inmate's face, head, or neck,
c. In any way that restricts the blood circulation or obstructs the inmate's airways,
d. In any way that causes unnecessary or extreme physical pain,
e. To secure the inmate to a fixed object (does not apply to cuff bars made for such restraint), such as a cell door, chair, etc., and

Only approved Divisional issued security devices will be use in any instances involving the use of force, The use of personal restraint devices or weapons is strictly prohibited and/or not allowed on site.

All persons (inmate and employee) injured in a use of force incident will be given an opportunity by the Area Supervisor to receive immediate medical attention and treatment as needed.

The Shift Supervisor/Area Supervisor will have all staff involved in a use of force incident to fill out their appropriate sections of Use of Force Report packet and submit it along with all other related reports to the Shift Supervisor.

The Shift Supervisor/Area Supervisor will conduct Use of Force de-briefing after all reports have been submitted following any incident in which force was used, and no later than one business day after the incident. The investigator of use of force incident will not participate in the Use of Force de-briefing to avoid conflict of interest. A use of force de-briefing report will include information on lessons learned and may recommend policy changes as a result of lesson(s) learned. The Shill Supervisor Area Supervisor will submit the report to the Chief of Security and will ensure that the de-briefing summary report is submitted with other related reports no later than the end of tour of duty.

<u>St Louis DPS, DOC Use of Chemical Agents Policy</u>

Oleoresin Capsicum (OC) is authorized and issued to custody staff by the city of St Louis Division of Corrections. The issued OC to individuals is for spontaneous use in situations warranting the use of force,
only trained custody staff may carry the approved and individual's issued OC on them for personal safety. Employees are prohibited from bringing non-institutional issued OC or other chemical agents into the facility.

The use of the OC will only in be in accordance with the manufacturers' recommendations and in compliance with the Divisional training program plan and the institutional use of Force policy. OC spray may be used when staff safety is threatened, or when an inmate is engaging or displays active resistance behavior. OC use is a level of force escalation necessary to compel compliance and requires a use of Force Report. OC will not be used on an inmate in a closed vehicle, unless staff is attempting to secure an active resistant inmate or inmate attempting to escape from transportation vehicle. OC will not be used on an inmate that has been placed in restraint.

An inmate that does not pose eminent danger to staff safety, other inmates; is passive resistant, or is confined inside a secured cell but is 'disruptive in the cell, will not be pepper sprayed to punish the inmate for being disruptive. Any OC spray into inmate's cell when the inmate is disruptive i.e., banging on the wall, must be authorized by the Supervisor in a planned use of force and justified in writing.

Employees are strictly prohibited from using the OC as a punishment on inmates. It is a violation of this policy to spray an inmate with chemical agent when there is no justifiable security reason to do so. Staff will be subject to discipline including and up to termination for inmate abuse.

The large OC canister or MK9-cell Buster is not designated for spontaneous' use of force. The use of the cell buster must be authorized by the shift supervisor, and only in a planned use of force warranting such use and is justified in writing. The MK9-cell Buster may not be issued to any staff to carry on their person.

All uses of OC including the MK9-Cell Buster are considered a use of force, and policy required reporting requirements.  Individual OC is weighed after each use, by the Supervisor to determine the amount used, and reported. The shift supervisor inventories all the OC that has not been issued out, and related security equipment at least monthly to determine their condition and expiration dates and submits report to the Chief of Security.

All custody staff will receive four hours of training on the use of chemical agents by a certified trainer prior to being issued and allowed to carry Divisional issued OC.  Prior to issuing an OC canister to staff the Custody Supervisor weighs the item and records the weight in the OC Issue Log.  Correctional Staff will inspect their OC canister at least once a month, checking the seal and the expiration date and report all concerns to their supervisor.  Custody staff will request new canisters issued canister has expired or is empty, when the Shift Supervisor receives the empty or expired canister the Supervisor records a number on a new canister and issues it to the staff.

Custody staff uses OC under the following circumstances after concluding that a lesser degree of force will not stop the inmate, when in:

Spontaneous Use of Force –

Through the actions of the inmate, the staff concludes that bodily harm to the staff or another person is imminent, an inmate is attempting to escape from the facility or from the custody of a correctional officer.

Planned Use of Force -

The inmate is engaged in active resistance with staff, or the inmate is in the process of willfully destroying property.  A mere banging on a cell wall or door does not rise to a level of "destruction of property."  In situations of spontaneous use of force, the custody staff and/or the Master Control Officer will radio for assistance.

The custody staff shakes the Pepper Spray's canister and aims the nozzle at the inmate's face while standing at 2 to 8 feet from the inmate, at which time the custody staff yells OC to warn other correctional officers of the eminent discharge of OC spray. The staff sprays steps back from the inmate for 2 to 3 seconds in a circular pattern on the face, and the point of spray.   The staff takes a defensive position and waits to see the inmate's reaction, and if the deployment has not stopped the inmate's actions, the custody staff repeats steps 3 through 6, or uses other reasonable force to gain control of the inmate.

After using the OC, the custody staff radios to responding Correctional Officers that a Pepper Spray has been used. Once the inmate is under control, Correctional Officers escort the inmate to the Medical Unit for treatment. Staff gives the inmate a clean set of clothing while wearing latex gloves, puts the soiled clothing in a plastic bag marked "OC clothing," and places the plastic bag in a dirty laundry cart.
The correctional officer ensures the area of chemical agent discharge is mopped and wiped down.

After decontamination and clearance by the Medical Unit, Correctional Officers will:
a. Move the inmate to the Disciplinary Segregation unit pending a hearing.
b. Physically check on the inmate every 30 minutes. for a minimum of 4
hours or more often if directed by Medical personnel.
c. Make a log entry for each check in the IJMS Daily Activity Log Book. The inmate does not have to be placed alone into the cell unless there is a security reason to do so.

Reporting Requirements

Staff must adhere to the reporting requirements as with use of force, in addition to the following:

1. Medical Staff completes an Injury Report and forwards a copy to the Shift Supervisor,
2. The correctional officer writes a use of force report. All other staff participants write an incident report in accordance with policy, all of which are turned in to the Shift Supervisor by the end of the shift,
3. The Shift Supervisor weighs the OC after each use to determine amount used, report findings in the Use of Force Report Form, and records the new weight in the appropriate log. The Shift Supervisor reviews the report and forwards the reports to the Chief of Security,
4. The Chief of Security reviews the reports to see that the use of OC was appropriate and within guidelines. The Chief of Security forwards it with comments to the Detention Center Superintendent,
5. The Detention Center Superintendent reviews the reports to see that the use of OC was appropriate and within guidelines. If the force was not within guidelines, the Detention Center Superintendent initiates an investigation,
6. The Detention Center Superintendent forwards a copy of the reports and results of the review to the Commissioner of Corrections,
7. The Detention Center Superintendent forwards the Use of Force Report to Records Retention Unit, where it is filed in accordance with policy on records retention,
8. If a Correctional Staff is exposed to the chemical agent and requests medical treatment, the Shift Supervisor initiates an employee Injury Report, and issues a treatment authorization.

### E. Use of Force and OC Incident Reports by Year

In a memorandum from Marilyn Earvin, Captain to Eddie Assistant Counselor, Law Department, Police Section of St. Louis, dated November 18, 2022, titled "OC Spray/Use of Force (2016-2022) Totals,' she identified the number of times OC/Use of Force was used in specific years, as follows:

2016 – 118
2017 – 139
2018 – 390
2019 – 500
2020 – 347
2021 – 3
2022 – 76 (as of the date of the memorandum)

### F. Inmate Handbook

The Inmate Handbook, dated April 2019 (revised), includes all information for inmates to review as applicable to their incarceration with the City of St. Louis Department of Public Safety, Division of Corrections, at the St. Louis City Justice Center (CJC) and the Medium Security Institution (MSI). This inmate handbook is printed as authored by the Commissioner, Deputy Commissioner, MSI Superintendent, and Mayor.

This handbook identified privileges and may have and what will happen if the privileges are denied based on their conduct. It also identifies an extensive grievance process, in which the inmate can file a formal grievance and expect a response from the grievance as well as the process of forwarding the grievance under the appropriate official. Also included in this handbook is the identification of minor and major rules violations. It also identifies what the sanctions may be for these violations. This includes but is not limited to temporary lockdown, verbal warning, denial of a job, disciplinary time on the shelf, extra chores, etc. Sanctions for major rules violations are locked down, all privileges revoked, recreation alone, movement restriction, and other sanctions. This handbook in my opinion, is there a standardized inmate handbook I have seen in the Federal Bureau of Prisons, private prisons, county jails, and state prisons.

### G. OC Units Used in the Facilities

The OC dispersion devices the county jail used in the period of the alleged complaints were the Sabre MK-4 Pepper Spray Streamer and the Sabre MK-9 OC Cell Buster Fogger. These are identified as exhibits P-4 and P-5. In a memorandum, dated May 19, 2021, from Anthony white, inventory supervisor, to Kim Maloney. Mr. White identified what they had in stock as far as OC and other less lethal and restraint equipment, which was standard and normal for jails and correctional facilities.

## H. Rule 30 (b)(6) Witness Notes of Relevance

The following information is a relevant portion of the defendants' responses relating to policies at the SL DOC, which pertains mainly to water shut-off, use of force, and use of chemical agents. Rule 30(b)(6) requires the party seeking the deposition of an agency/corporation designee to describe with reasonable particularity the matters for examination. The persons designated must testify about information known or reasonably available to the organization, as matters for Examination as identified by Plaintiffs in Notice of Rule 30(b)(6) Deposition.

CJC policies, practices and procedures for determining when to shut off water to detainees' cells or housing units (referred to herein as '(water shut-offs). Sanitation. Water Supply) ("It is the policy of the St. Louis City Department of Corrections to comply with federal, state and local water supply laws and regulations to ensure that the health of all inmates, staff and visitors is not jeopardized.").
The safety and/or operational needs that, in practice, have precipitated an interruption of water service to any part of the plumbing system include the needs to (a) perform ordinary maintenance or repair on a plumbing fixture or part of the plumbing system (b) make emergency repairs and/or undertake damage
prevention and mitigation measures typically arising from detainee misuse, abuse and destruction of the plumbing system or fixtures (such as breaking sprinkler heads and clogging toilets and/or covering drains to enable/cause flooding) and/or (c) to disable a toilet in a cell to facilitate the "shakedown" seizure and prevent loss or destruction of contraband.

Interruption of detainees' access to water is de minimis, because detainees are temporarily moved to a cell or area to which water supply has not been interrupted while the maintenance, repair, prevention or mitigation measures to their regular cell is completed and access to water in their original cell is restored. Cogging and causing the overflow of the toilet in their cells, water to the toilet in the cell
may be restricted to regular scheduled periods each hour (typically water restored every hour, on the hour, for 10 minutes). Such restrictions are not often employed and have not remained in place for longer than a single 8-hour shift.

It is the policy of the St, Louis City Department of Corrections to comply with federal, state and local water supply laws and regulations to ensure that the health of all inmates, staff and visitors is not jeopardized.") safety or other operational need. The safety and/or operational needs that, in practice,
have precipitated an interruption of water service to any part of the plumbing system include the needs to (a) perform ordinary maintenance or repair on a plumbing fixture or part of the plumbing system (b) make emergency repairs and/or undertake damage prevention and mitigation measures typically arising from detainee misuse, abuse and destruction of the plumbing system or fixtures (such as breaking sprinkler heads and

13

clogging toilets and/or coveting drains to enable/cause flooding) and/or (c) to disable a toilet in a cell to facilitate the "shakedown" seizure and prevent loss or destruction of contraband.  Such interruptions are not intended to extend beyond or to last longer than the time and
area needed to meet and correct the condition that gave rise to the safety or operational need to interrupt the water supply or service.  Interruptions of detainees' access to water service, if any, are de minimis. This is because detainees are temporarily moved to a cell or area to which water service has not been interrupted until the maintenance, repair, prevention or mitigation measures to their
regular cell is completed and access to water in their original cell is restored.

Shut off valves in plumbing chase controlling plumbing fixtures in individual cells are limited to the toilet and do not affect the availability of water service to the sink/water fountain in the cell (controlled by separate lines via water "manifold").  The sprinkler system is separate from and is not connected to the domestic water service, A separate water fire suppression line supports the fire sprinkler service. A
sprinkler head discharge thus does not affect domestic water fixtures per Pod/Cell. The sprinkler system typically would have a primary building shut off and branch shut off per floor. For the fire sprinkler system, the primary service can be shut down and each Pod per floor can be shut down.

CJC policies, practices and procedures for communicating with detainees about water shut offs.  Detainees are informally advised by staff when such water shut-offs are necessary to be deployed, and in cases of extended water shut-off, detainees are notified formally, except no such advance advice occurs in the case of interruption of water service in support of a contraband shakedown.

Corrections Task Force Report, dated March 12, 2021

Water (p27-29)

Detainees interviewed were satisfied with access to water and noted that water is available to drink in cells, at each meal, and from a fountain in the clay room. Shower and sink water are also available in the day rooms. Staff and detainees confirmed that water is only shut down momentarily for maintenance needs on the 3rd and 4th floors while detainees on the 5th floor did relay that water has been shut off at times, It was confirmed by staff that other than for maintenance reasons, this is only done to stop a detainee or detainees who are actively engaged in "flooding."

Audits, assessments, or evaluations of CJC since May 1, 2016, that refer or relate to water shut-offs show advocates have long established, well understood channels of communication and public information through which complaints and grievances that

may arise concerning interruptions in and detainee access to potable water can be communicated and publicly advocated.

Work orders and repair records regarding plumbing or plumbing (including fire suppression) equipment.
Rule violations proceedings against detainees alleged to have caused flooding and/or purposely destroy or misuse plumbing fixtures.

Any efforts undertaken by the City or CJC staff in an attempt to evaluate, investigate, or address the use of chemical agents at CJC. "Whether the force used was objectively reasonable, turns on the facts and
circumstances of each particular case," id. At 397 (quoting Graham, 490 U,S. at 396). Because officers facing disturbances are often forced to make split-second judgmentsin circumstances that are tense, uncertain, and rapidly evolving," the Court has stressed the need to view the use of force 'from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight.'

CJC includes use of force and use of chemical agents as subjects of at least 4 hours of the 40 hours of annual training for correctional staff, which includes policy and procedures.

### I. Use of Force Packets for Named Plaintiffs

The following is the incident summary memorandums for each of the plaintiff's use of force packets provided to me in my review.

   (1) Derrick Jones 136255, December 14, 2020, from Lt. Sherry Richard:

On this date I was assisting Nurse Kristina Davis with taking information from inmates that were assumed to hove COVID symptoms from a week ago. Inmate Derrick Jones #136255 was in cell 3 with his cellmate whom was assumed to have COVID symptoms. Nurse Davis placed both inmates on isolation. Inmate Jones refused to lock down, I exited 4C gave Officer C. Eastling a directive to leave inmate Jones where he sat. I returned to 4C with the MK9 Fogger and gave innate Jones several directives to lockdown, inmate Jones refused to comply and stated to me if I spray him he was going to hit me. I called for all available officers, Officers D. Gorovoglio. P. Hopgood. M. Allen, R. Powell, Lt. K. Conley, Lt. J. Fowlkes arrived to 4 Charlie to assist with inmate Jones disruptive behavior. I applied a single burst of OC spray to the facial area of inmate Jones, inmate Jones took a closed fist and hit me in the left side of my facial area and I fell backwards on my hip. The assisting officers took inmate Jones to the floor and handcuffed him to escort him to medical for aftercare  assessment.  inmate Jones is now housed in 5Bravo pending adjustment hearing.

15

(2) Inmate Jerome Jones 117427, dated February 9, 2021, from Lt. Javan Fowlkes:

At approximately 1700 hours a transfer log sheet was created by Unit Manager Warren Thomas. The movement sheet had inmate Jerome Jones #17427 being moved from 5 Delta 33 to 5 Delta 36. Officer Paul Hopgood reported Jones refused to cooperate. Officer Conrad Eastling reported Jones refused to cooperate. At approximately 1730 Officer Anthony, Spencer and myself responded to 5 Delta and directed inmate Jerome Jones to move to his assigned cell. Jones replied "Fowlkes I been jailing over 6 years I'm not taking no cellmate." I gave Jones one more directive to move to his cell assignment to which he shook his head and replied "nope". 1 Burst of OC spray was deployed directly in the face of inmate Jones at 1740 hours. Jones was moved to the cell assignment he was assigned to 5 Delta cell 36. Nurse Wagner assessed inmate Jones at 1809 hours. Jones remains in 5 Delta.

(3) Inmate Darnell Rusan 97326, dated December 19, 2020, from Lt. Aisha Turner:

On the above date approximately 0856 Inmate Rusan, Darnell #97326, was on his recreation period. I, Lt. Aisha Turner was in the housing unit prior to the recreation due to another issue. Inmate Rusan came out of his cell hostile due to recreation starting late. Officer Michelle Lewis and I were having a conversation about the smell of smoke and the book she had taken from an inmate in the unit. Inmate Rusan was making us uncomfortable with his comments and intervening on our conversation, so I directed him to another phone. He complied. Inmate Rusan became extremely disrespectful stating I'm going to call my people. Officer Lewis then gave a directive for him to put his mask on properly or lockdown. He observed other inmates without their mask, but complied. As I was wailing away he stated "bitch" continuing to be disrespectful. Officer Lewis directed Inmate Rusan to look clown and he refused. I deployed 1 burst of OC spray to his facial area. He threw a chair at me, but no contact was made. I called for the response team. Officer Lewis came from behind the podium, called the response team and deployed 1 burst of OC spray to the facial area of inmate Rusan. He hit Officer Lewis with a chair. I deployed 1 burst of OC spray towards the facial area of inmate Rusan, Officer Lewis followed him as he ran on the other side of the stairwell where he hit her. She slipped on the spray but regained her balance. I directed him to stop and I deployed 1 burst of OC spray to Inmate Rusan's facial area. He ran to the other side of the dorm. Officer Lewis followed him. Inmate Rusan entered the shower where I secured him. The team entered and Officer Borders handcuffed and escorted Inmate Rusan to medical. Inmate Rusan refused treatment in medical and was placed in 5 Bravo where he received a shower and clean clothes.

(4) Inmate Merrell Withers 11932, dated January 6, 2022, from Captain Freddie Wills:

On January 6, 2022, Inmate Withers Merrell # 11932 was assigned to PAHF cell #15, He refused to take the cell due to another Inmate was in the cell. Inmate Withers was

16

given verbal commands to enter the cell, and he refused to do so. The response team was summoned, upon their arrival, inmate Withers still refused to go into the cell. Officer Jones deployed two bursts of OC spray to the facial area of Inmate Withers. He was escorted to medical by Officer Jones, Officer McKenzie and Officer Hopgood for after care treatment. Upon arriving to medical he was treated by Charge Nurse Jones. After which he was placed in a clean cell and given new clothing in the medical area.

Review:  In review of these memorandums, in addition to all other documents in each incident's packet, I found each use of force, including the use of chemical agents, justified.  Each incident was handled and managed in accordance with St. Louis DOC policy.  Additionally, each incident included all steps required in policy leading up to the use of force, the actual use of force, and subsequent decontamination and reporting guidelines.

### J. Use of Force Videos

Every use of force incident video I was reviewed, and each review supported all the facts of each use of force incident of plaintiffs, as noted in sub-section I.  Staff made more than reasonable efforts to communicate to the inmates what was being required of them, multiple verbal warnings, eventual use of force and/or use of OC, and follow-up decontamination.  I must also note staff made more than reasonable efforts to gain the inmate's compliance in the videos, rather than to have to resort to use of force, including use of chemical agents.

### III.  Summary

In review of all the materials relevant to policy and guidelines for staff, staff at the jail were allowed to use OC rather than become involved in physical confrontations with inmates. Many jails are using this process, because it prevents and refrain staff from having to intervene with inmates or an inmate and put themselves in harm's way.  This system allows inmates the least amount of harm, staff from being injured as well as the inmates, the medical attention and follow-up, and decontamination process with those is very quick. In essence, after the OC is used and staff gain compliance by the inmate, staff can take control the situation in a quick manner, decontaminate the inmate and then place the inmate either back in a cell, or in another cell, in the institution hospital, or the special housing unit or administrative detention.

The rule 30 (b)(6) Witness Notes of Relevance references provided to me revealed the jail has been scrutinized in several instances and has asked outside agencies to observe and assess its operations.

In these assessment/audit reports, it was indicated that interruption of detainees' access to water is de minimis, because detainees are temporarily moved to a cell or area to

which water supply has not been interrupted while the maintenance, repair, prevention or mitigation measures to their regular cell is completed and access to water in their original cell is restored. Cogging and causing the overflow of the toilet in their cells, water to the toilet in the cell may be restricted to regular scheduled periods each hour (typically water restored every hour, on the hour, for 10 minutes). Such restrictions are not often employed and have not remained in place for longer than a single 8-hour shift.

Furthermore, it is the policy of the St, Louis City Department of Corrections to comply with federal, state and local water supply laws and regulations to ensure that the health of all inmates, staff and visitors is not jeopardized.") safety or other operational need. The safety and/or operational needs that, in practice, have precipitated an interruption of water service to any part of the plumbing system include the needs to (a) perform ordinary maintenance or repair on a plumbing fixture or part of the plumbing system (b) make emergency repairs and/or undertake damage prevention and mitigation measures typically arising from detainee misuse, abuse and destruction of the plumbing system or fixtures (such as breaking sprinkler heads and clogging toilets and/or coveting drains to enable/cause flooding) and/or (c) to disable a toilet in a cell to facilitate the "shakedown" seizure and prevent loss or destruction of
contraband. Such interruptions are not intended to extend beyond or to last longer than the time and
area needed to meet and correct the condition that gave rise to the safety or operational need to interrupt the water supply or service. Interruptions of detainees' access to water service, if any, are de minimis. This is because detainees are temporarily moved to a cell or area to which water service has not been interrupted until the maintenance, repair, prevention or mitigation measures to their
regular cell is completed and access to water in their original cell is restored.

Shut off valves in plumbing chase controlling plumbing fixtures in individual cells are limited to the toilet and do not affect the availability of water service to the sink/water fountain in the cell (controlled by separate lines via water "manifold"). The sprinkler system is separate from and is not connected to the domestic water service, A separate water fire suppression line supports the fire sprinkler service. A
sprinkler head discharge thus does not affect domestic water fixtures per Pod/Cell. The sprinkler system typically would have a primary building shut off and branch shut off per floor. For the fire sprinkler system, the primary service can be shut down and each Pod per floor can be shut down.

Detainees at the CJC are informally advised by staff when such water shut-offs are necessary to be deployed, and in cases of extended water shut-off, detainees are notified formally, except no such advance advice occurs in the case of interruption of water service in support of a contraband shakedown.

18

The Corrections Task Force Report, dated March 12, 2021, Water (p27-29), cited that detainees interviewed were satisfied with access to water and noted that water is available to drink in cells, at each meal, and from a fountain in the clay room. Shower and sink water are also available in the day rooms. Staff and detainees confirmed that water is only shut down momentarily for maintenance needs on the 3rd and 4th floors while detainees on the 5th floor did relay that water has been shut off at times, it was confirmed by staff that other than for maintenance reasons, this is only done to stop a detainee or detainees who are actively engaged in "flooding."

Audits, assessments, or evaluations of CJC since May 1, 2016, that refer or relate to water shut-offs show advocates have long established, well understood channels of communication and public information through which complaints and grievances that may arise concerning interruptions in and detainee access to potable water can be communicated and publicly advocated.

Work orders and repair records regarding plumbing or plumbing (including fire suppression) equipment.
Rule violations proceedings against detainees alleged to have caused flooding and/or purposely destroy or misuse plumbing fixtures.

Any efforts undertaken by the City or CJC staff in an attempt to evaluate, investigate, or address the use of chemical agents at CJC was provided.  It was cited that "whether the force used was objectively reasonable, turns on the facts and circumstances of each particular case," id. At 397 (quoting Graham, 490 U,S. at 396).  Because officers facing disturbances are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving," the Court has stressed the need to view the use of force 'from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight.'

CJC includes use of force and use of chemical agents as subjects of at least 4 hours of the 40 hours of annual training for correctional staff, which includes policy and procedures.

In the modern era of Corrections, a significant issue is the use of force as it relates to persons coming into jails as they are being processed, and to make every effort to afford incoming inmates/detainees from physical contact with staff.  As a result, a big issue in today's technology and modern corrections, is to use less lethal devices that will prevent significant injuries to inmates and staff.  Many jails use tasers, OC, pepper ball guns, stingball grenades, etc., and in this process compliance is easily gained by staff without having to resort to physical confrontations with inmates.

In my conclusion, I have found that the policies governing use of force and use of chemical agents are inclusive, and include all relevant national and federal standards

for staff to following in such use of force incidents.  I have also found the training provided covers all required areas applicable to use of force, follow-up procedures, reporting guidelines, and confrontation avoidance techniques for staff to use to prevent further escalations of using force.

In review of use of force packets and videos for the named plaintiffs in this case, I found each use of force, including the use of chemical agents, justified.  Each incident was handled and managed in accordance with St. Louis DOC policy.  Additionally, each incident included all steps required in policy leading up to the use of force, the actual use of force, and subsequent decontamination and reporting guidelines.  In these incidents, it was evident to me staff made every effort to de-escalate the incident, and when force had to be utilized, it was done so in a manner to maximize the security of the facility, and the safety of both inmates and staff.

In conclusion, staff did not violate the rights of the plaintiffs (or others) in the uses of force, as cited in the Third Amended Complaint, nor did they show or meet any deliberate indifference standards or claims by the plaintiffs.

/// End of Report ///

Note:  I reserve the right to modify this report, and/or make any changes as new or additional information is provided to me.

_____  
Joseph E. Gunja  
President/CEO  
SIMCO Correctional Consulting LLC

4/14/23  
Date